FILED
08 AUG 19 PM 3:41

1   <u>PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY</u>

2   Name     PAIGE     JAMAINE     ✓
             (Last)           (First)              (Initial)

3   Prisoner Number     K-39043

4   Institutional Address

5                        H-D-S-P, P.O.Box 3030 Susanville CA 96127

6   ====================================================================

    UNITED STATES DISTRICT COURT
7   NORTHERN DISTRICT OF CALIFORNIA

8   JAMAINE V. PAIGE                    CV   08        3963
    (Enter the full name of plaintiff in this action.)

9                                                  Case No. _____
                        vs.                        (To be provided by the clerk of court)

10  Scott M. Kernan Etal;              PETITION FOR A WRIT
                                       OF HABEAS CORPUS
11  _____

12  _____

13  _____         E-filing

14  (Enter the full name of respondent(s) or jailor in this action)

15  ====================================================================

16                    <u>Read Comments Carefully Before Filling In</u>

17  <u>When and Where to File</u>

18        You should file in the Northern District if you were convicted and sentenced in one of these

19  counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20  San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in

21  this district if you are challenging the manner in which your sentence is being executed, such as loss of

22  good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

23        If you are challenging your conviction or sentence and you were <u>not</u> convicted and sentenced in

24  one of the above-named fifteen counties, your petition will likely be transferred to the United States

25  District Court for the district in which the state court that convicted and sentenced you is located. If

26  you are challenging the execution of your sentence and you are not in prison in one of these counties,

27  your petition will likely be transferred to the district court for the district that includes the institution

28  where you are confined. Habeas L.R. 2254-3(b).

1    Complete all applicable questions in the proper blank spaces. If you need additional space to

2    answer a question, you may attach additional blank pages. Make clear the question to which any such continued answer refers.

3    Only one sentence or conviction may be challenged in a single petition. If you challenge more

4    than one, you must do so by separate petitions.

**V.    After Petition Is Filed**

5
    You will be notified as soon as the court issues an order. It is your responsibility to keep the

6    court informed of any changes of address to ensure that you receive court orders. Failure to do so may result in dismissal of your suit.

7
**VI.    Inquiries And Copying Requests**

8
    Because of the large volume of cases filed by inmates in this court and limited court resources,

9    the court will not answer inquiries concerning the status of your case or provide copies of documents, except at a charge of fifty cents ($0.50) per page. You must therefore keep copies of all documents

10    submitted to the court for your own records.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3. Did you have any of the following?

    Arraignment:                             Yes __✓__     No _____

    Preliminary Hearing:               Yes __✓__     No _____

    Motion to Suppress:               Yes _____     No _____

4. How did you plead?

    Guilty _____    Not Guilty __✓__    Nolo Contendere _____

    Any other plea (specify) _____No_____

5. If you went to trial, what kind of trial did you have?

    Jury __✓__    Judge alone_____    Judge alone on a transcript _____

6. Did you testify at your trial?          Yes _____    No __✓__

7. Did you have an attorney at the following proceedings:

    (a)    Arraignment                Yes __✓__     No _____

    (b)    Preliminary hearing        Yes __✓__     No _____

    (c)    Time of plea               Yes __✓__     No _____

    (d)    Trial                     Yes __✓__     No _____

    (e)    Sentencing                 Yes __✓__     No _____

    (f)    Appeal                    Yes __✓__     No _____

    (g)    Other post-conviction proceeding    Yes _____     No _____

8. Did you appeal your conviction?       Yes __✓__     No _____

    (a)    If you did, to what court(s) did you appeal?

        Court of Appeal            Yes __✓__     No _____

        Year: __1998__    Result:_____Denied_____

        Supreme Court of California    Yes __✓__     No _____

        Year: __1998__    Result:_____Denied_____

        Any other court U.S. DISTRICT NORTHERN Yes __✓__     No _____
                      DISTRICT OF CALIFORNIA

        Year: __2002__    Result:_____Denied_____

    (b)    If you appealed, were the grounds the same as those that you are raising in this

petition?                                      Yes __✓__    No_____

(c)    Was there an opinion?                   Yes _____    No __✓__

(d)    Did you seek permission to file a late appeal under Rule 31(a)?

                                               Yes __✓__    No_____

If you did, give the name of the court and the result:

U.S.    9 TH CIR   COURT OF APPEALS

Denied certificate of Appealability reason Failed to file timely n.o.a.

9.  Other than appeals, have you previously filed any petitions, applications or motions with respect to
this conviction in any court, state or federal?            Yes __✓__    No_____

[Note:  If you previously filed a petition for a writ of habeas corpus in federal court that
challenged the same conviction you are challenging now and if that petition was denied or dismissed
with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit
for an order authorizing the district court to consider this petition.  You may not file a second or
subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit.  28
U.S.C. §§ 2244(b).]

(a)    If you sought relief in any proceeding other than an appeal, answer the following
       questions for each proceeding.  Attach extra paper if you need more space.

I.     Name of Court: _____ NO _____

       Type of Proceeding: _____ No _____

       Grounds raised (Be brief but specific):

       a._____ No _____

       b._____ No _____

       c._____ NO _____

       d._____ No _____

       Result: _____ No _____ Date of Result:_____

II.    Name of Court: _____ NO _____

       Type of Proceeding: _____ NO _____

       Grounds raised (Be brief but specific):

1     a._____ No _____

2     b._____ No _____

3     c._____ No _____

4     d._____ No _____

5     Result: _____ No _____ Date of Result:_____

6   III.   Name of Court: ____ No _____

7     Type of Proceeding: ___ No _____

8     Grounds raised (Be brief but specific):

9     a._____ No _____

10     b._____ No _____

11     c._____ No _____

12     d._____ No _____

13     Result: _____ No _____ Date of Result:_____

14   IV.   Name of Court: _____ No _____

15     Type of Proceeding: _____ No _____

16     Grounds raised (Be brief but specific):

17     a._____ No _____

18     b._____ No _____

19     c._____ No _____

20     d._____ No _____

21     Result: _____ No _____ Date of Result:_____

22   (b)   Is any petition, appeal or other post-conviction proceeding now pending in any court?

23                 Yes ____    No ✓

24     Name and location of court: _____ No _____

25   B.   GROUNDS FOR RELIEF

26        State briefly every reason that you believe you are being confined unlawfully. Give facts to

27   support each claim. For example, what legal right or privilege were you denied? What happened?

28   Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

1    need more space. Answer the same questions for each claim.

2        [Note: You must present ALL your claims in your first federal habeas petition. Subsequent

3    petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4    499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5    Claim One:_____ *Please See attached*

6    _____

7    Supporting Facts:_____

8    _____

9    _____

10   _____

11   Claim Two:_____ *Please See attached*

12   _____

13   Supporting Facts:_____

14   _____

15   _____

16   _____

17   Claim Three:_____ *Please see attached*

18   _____

19   Supporting Facts:_____

20   _____

21   _____

22   _____

23   If any of these grounds was not previously presented to any other court, state briefly which

24   grounds were not presented and why:

25   _____ *NO they were presented to the CALIFORNIA*

26   *SUPREME COURT.*

27   _____

1    List, by name and citation only, any cases that you think are close factually to yours so that they

2  are an example of the error you believe occurred in your case.  Do not discuss the holding or reasoning

3  of these cases:

4  _Please___See attached_____

5  _____

6  _____

7  Do you have an attorney for this petition?                Yes____    No__✓__

8  If you do, give the name and address of your attorney:

9  _____

10    WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11  this proceeding.  I verify under penalty of perjury that the foregoing is true and correct.

12

13  Executed on _**8**-1**3**-0**8**.___            _____

14                  Date                        Signature of Petitioner

15

16

17

18

19

20  (Rev. 6/02)

21

22

23

24

25

26

27

MC–275

Name **JAMAINE PAIGE, K-39043**

Address **CALIFORNIA - STATE - PRISON, SACRAMENTO**

**P.O. BOX 290066**

**Represa, CA 95671-0066**

CDC or ID Number    **K-39043**

**SUPREME COURT**
**FILED**

MAR 2 2 2007

Frederick K. Ohlrich Clerk

Deputy

**IN THE SUPREME COURT OF CAL-**
**IFORNIA, CALIFORNIA SUPREME COURT**
(Court)

| | |
|---|---|
| **JAMAINE PAIGE** | |
| Petitioner | |
| vs. | |
| **Scott M. KERNAN Etal,.** | |
| Respondent | |

**PETITION FOR WRIT OF HABEAS CORPUS**

No. **S151137**
*(To be supplied by the Clerk of the Court)*

## INSTRUCTIONS—READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under rule 8.380 of the California Rules of Court [as amended effective January 1, 2007]. Subsequent amendments to rule 8.380 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Page 1 of 6

Form Approved for Optional Use
Judicial Council of California
MC-275 [Rev. January 1, 2007]

PETITION FOR WRIT OF HABEAS CORPUS

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rule 8.380
*www.courtinfo.ca.gov*

American LegalNet, Inc.
*www.FormsWorkflow.com*

MC-275

This petition concerns:

- [x] A conviction
- [ ] Parole
- [x] A sentence
- [ ] Credits
- [ ] Jail or prison conditions
- [ ] Prison discipline
- [ ] Other *(specify)*: ______

1. Your name: Jamaine Paige
2. Where are you incarcerated? California State Prison Sacramento
3. Why are you in custody? [x] Criminal Conviction [ ] Civil Commitment

*Answer subdivisions a. through i. to the best of your ability.*

a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").
Murder, Attempted Murders & Possession of Firearm. Penal code § 664/187 § 211, 187(A) 12021(A) 12022(d) 12022.5

b. Penal or other code sections: 664/187 § 211, 187(A) 12021 (A) 12022(d) 12022.5

c. Name and location of sentencing or committing court: OAKLAND ALAMEDA COUNTY SUPERIOR COURT.

d. Case number: SUPERIOR COURT CASE 127285 A & B

e. Date convicted or committed: December 26TH 1996.

f. Date sentenced: January 27TH 1997.

g. Length of sentence: 15 Years to Life And to the term Proscribed by Law.

h. When do you expect to be released? As soon as possible

i. Were you represented by counsel in the trial court? [x] Yes. [ ] No. If yes, state the attorney's name and address:
Lincoln N. Mintz, Financial Center Building 405 14TH Street, Suite 300 Franklin at 14TH Oakland CA 94621.

4. What was the LAST plea you entered? *(check one)*
[x] Not guilty [ ] Guilty [ ] Nolo Contendere [ ] Other: ______

5. If you pleaded not guilty, what kind of trial did you have?
[x] Jury [ ] Judge without a jury [ ] Submitted on transcript [ ] Awaiting trial

MC-275

6. GROUNDS FOR RELIEF

**Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(if you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

SEE MULTIPLE GROUNDS RANGING FROM GROUND (1) THRU (16) THEY ARE TOO MANY TO SPECIFY ON THIS SMALL SPACE THEREFORE SEE GROUNDS ATTACHED ON NEXT PAGES. GROUND #(1) INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL FOR FAILURE TO RAISE FORMER JURY INSTRUCTIONAL ERROR ON CALJIC 3.00 & 3.01 ON PETITION FOR REVIEW.

a. Supporting facts:
Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at *what time* (*when*) or place (*where*). (If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)

SEE ATTACHED GROUND (1) THRU (16) (Regarding (count 1) 187 (count 2) 664/187, (count 3) 664/187 and (count 4) 12021, Former Cal Jic 3.00 and 3.01 Principals and Aiding and Abetting was given to the jury to consider, these two instructions removed from the jury's consideration the issue of whether shared in the intent to commit murder, Attempted murder. These instructions allowed the jury to convict on evidence amounting to proof beyond a reasonable doubt. Furthermore Petitioner's jury asked the trial court "does constructive Possession of a Gun apply to all charges," Clerk Transcripts At (536) & AT CT (537) "If we believe the exact shooter is unknown and that there was not a robbery plan is it still possible to find the parties at the time of the killing to be guilty of second degree murder?" (Exhibit Z-C) The jury was re-instructed on former Caljic 3.00 & 3.01. See attached.

b. Supporting cases, rules, or other authority (optional):
*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

SEE ATTACHED GROUNDS (1) THRU (16) .( People v. Beeman (1984) 35 Cal 3d 547, 199 Cal Rptr 60, 674 P.2d 1318 Former Cal Jic 3.00 and 3.01, Strickland v. Washington (1984) 466 U.S. 668, 80 L Ed 2d 674, 104 S Ct 2052; People v. Bettaway (1988).

7. Ground 2 or Ground # 2 ___ (if applicable):                    MC-275

   SEE GROUNDS ATTACHED (1) THRU (16) . GROUND # (2) INEFFECTIVE ASSISTANCE OF
APPELLATE COUNSEL FOR NOT RAISING TRIAL COUNSEL'S INEFFECTIVENESS SPECIFICALLY
FOR FAILURE TO FILE A MOTION TO DISMISS P.C. SECTION 995 (B), 1387, that the Defen-
dant has been committed Without Probable Cause 836.

a. Supporting facts:

   ON or about 8-4-1995. Petitioner was arrested by Hayward Police Dept, and
the case was dismissed. The case was presented by the Alameda County District
Attorneys office the charge was possession of a firearm, this would be the
Same firearm that Petitioner was then Re-charged for on or about March
21-25-1996. in the information with (Exhibit 2-D / 2-E). Possession
of a firearm, Murder, Attempted Murder, personal use of a firearm,
the significance of these Events & Arrests (Exhibit 2-C) Are the fact that the
firearm was released from the Custody of Hayward P.D. to Oakland P.D. and a
Ballistics test was done on the firearm and the firearm was linked or
determined to be used in a attempted murder, Murder in the instant
case in which the Petitioner is convicted and sentenced. It is Petitioner's
Contention of once in Jeopardy and that the former information and dismissal
constitute a Dismissal order bar to other Prosecution A dismissal for
want of Prosecution as a bar. Furthermore at the first arrest in 8-4-
1995. in and by Hayward P.D. there was no basis for warrentless Arrest,
or Evidence to detain Petitioner or Re-file any or new additional
charges. This ground (2) is a State and Federal claim (Exhibit 2-D)
and (Exhibit 2-C..).

b. Supporting cases, rules, or other authority:

CALIFORNIA P.C. § 1387, 995 (B) Terry V. Ohio (1968) 392 US 1, 20
L Ed 2d 889, 88 S ct 1868, U.S. V. Strickland 902 F. 2d 937 (11th
Cir 1990), Hicks V. Oklahoma (1980) 447 U.S. 343 [100 S. ct 2227;
65 L.Ed 2d 175, IN re Hoddinott (1996) 12 c 4th 992, 50 CR 2d
706, Gerstein v. Pugh (1975) 420 U.S. 103, County of Riverside V.
McLaughlin (1991) 500 US 44, 114 L Ed 2d 49, 111 S ct 1661.

MC–275

8. Did you appeal from the conviction, sentence, or commitment?  ☑ Yes.  ☐ No.  If yes, give the following information:

a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):

FIRST APPELLATE DISTRICT DIVISION 2

b. Result    DENIED    c. Date of decision: MACH 10, 1998.

d. Case number or citation of opinion, if known:    A077240

e. Issues raised: (1) THE COURT ERRED IN DEVIATING FROM THE STANDARD INSTRUCTION ON ACCOMPLICE CORROBORATION.

(2) THE ACCOMPLICE TESTIMONY WAS INADEQUATELY CORROBORATED.

(3) THE COURT FAILED TO PROVIDE COMPLETE INSTRUCTIONS ON ORAL ADMISSIONS. ( CONTINUED ON NEXT PAGE SEE ATTACHES AT P. 3122 )

f. Were you represented by counsel on appeal? ☑ Yes. ☐ No. If yes, state the attorney's name and address, if known:

Landra E. Rosenthal 1563 Solano Ave, # 305 Berkely CA 94707.

9. Did you seek review in the California Supreme Court? ☑ Yes ☐ No. If yes, give the following information:

a. Result  Denied    b. Date of decision: June 10, 1998.

c. Case number or citation of opinion, if known:    S-069474

d. Issues raised: (1) There is insufficient Evidence to corroborate the testimony of ACCOMPLICE KEVIN BANKS; ACCORDINGLY THE JUDGEMENT OF CONVICTION MUST BE REVERSED.
(2) TRIAL COURT was required given the facts of this case to instruct the Jury on Assault with a Deadly Weapon as a Lessor offense to Attempted Murder in count (3).
(3) PETITIONER WAS DENIED DUE PROCESS & WAS PREJUDICED WHEN TRIAL COURT GAVE JURY AN INADEQUATE INSTRUCTION ON REASONABLE DOUBT.

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

THE GROUNDS ARE INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL, PROSECUTOR USED FALSE AND ILLEGALLY OBTAINED EVIDENCE, INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL, Pursuant to IN RE Hoddinett (1996) 12 C 4 TH 992, 50 C R 2d 706. There is no time limitation that governs when an Action may be brought.

11. Administrative Review:

a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See In re Muszalski (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

CALIFORNIA SUPREME COURT; PETITION FOR RECONSIDERATION (NOT ACCEPTED OR CONSIDERED)

DENIED 7-20-1998. / U.S. DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA, FEDERAL WRIT C99-2870 MJJ (PrJ) See Page 3 ISSUES RAISED IN ~~DISTRICT COURT~~ CALIFORNIA SUPREME COURT PETITION FOR REVIEW WERE THE SAME RAISED IN DISTRICT COURT, DENIED ~~~~ 1-3-2002. / 1-10-2002.. / U.S. NINTH CIRCUIT COURT OF APPEALS, FOR CERTIFICATE OF APPEALABILITY (NO ISSUES WERE RAISED, FOR MY FAILURE TO FILE A C-O-A.) DENIED 6-13-2002.. / U.S. SUPREME COURT CERTIORARI, DENIED 5-27-2003.

b. Did you seek the highest level of administrative review available? ☑ Yes. ☐ No.
Attach documents that show you have exhausted your administrative remedies.

MC-275 [Rev. January 1, 2007]    PETITION FOR WRIT OF HABEAS CORPUS    Page 5 of 6

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court? ☒ Yes. If yes, continue with number 13. ☐ No. If no, skip to number 15.

MC–275

13. a. (1) Name of court: CALIFORNIA SUPREME COURT

    (2) Nature of proceeding (for example, "habeas corpus petition"): PETITION FOR RECONSIDERATION

    (3) Issues raised: (a) NOT ACCEPTED OR CONSIDERED.

      (b) _____

    (4) Result (Attach order or explain why unavailable): DENIED JULY 20-1998.

    (5) Date of decision: JULY 20 1998.

  b. (1) Name of court: U.S. DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA

    (2) Nature of proceeding: FEDERAL WRIT C 99-2870 MJJ (Pr J)

    (3) Issues raised: (a) SEE PAGE 3 ISSUES RAISED IN THE CALIFORNIA SUPREME COURT

      (b) PETITION FOR REVIEW WERE THE SAME RAISED IN DISTRICT COURT.

    (4) Result (Attach order or explain why unavailable): DENIED JAN 3, 2002. / JAN 10, 2002.

    (5) Date of decision: JAN 3, 2002 / JAN 10, 2002.

  c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result: U.S. NINTH CIRCUIT COURT OF APPEALS FOR CERTIFICATE OF APPEALABILITY, (NO ISSUES WERE RAISED, FOR MY FAILURE TO FILE A C-O-A. DENIED JUNE 13-2002.) UNITED STATES SUPREME COURT CERTIORARI DENIED MAY 27, 2003.

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)
(SEE ATTACHED HERETO AT P. 75 ) APPELLATE COUNSEL SAID SHE WOULD NOT RAISE I.A.C. ON TRIAL COUNSEL, SINCE THEN PETITIONER FILES A COMPLAINT WITH STATE BAR AND DISCOVERED THAT TRIAL COUNSEL HAD BEEN DISBARED FOR CLIENT NEGLECT, MALPRACTICE, ECT.

16. Are you presently represented by counsel? ☐ Yes. ☒ No. If yes, state the attorney's name and address, if known:

_____

_____

17. Do you have any petition, appeal, or other matter pending in any court? ☐ Yes. ☒ No. If yes, explain:

_____

_____

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:
(SEE ATTACHED HERETO AT P. 76 ) Pursuant to In re Hoddinott (1996) 12 C 4th 992, 50 CR 2d 706. There is no time limitation that governs when an Action may be brought to vacate a sentence unauthorized by Law.

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: 3-21-2007.

▶ _Jannis Rais_
(SIGNATURE OF PETITIONER)

1. Jamaine Paige K 39043
2. California State Prison
3. Sacramento
4. P.O. Box 290066
5. Represa, CA 95671-0066
6. IN Pro Se ;

RECEIVED
MAR 8 ~ 2007
CLERK SUPREME COURT

7.   CALIFORNIA SUPREME COURT

8. Jamaine Paige
9. Petitioner
10.
11. VS.
12.
13. Scott M. Kernan et al,
14. Respondents

Case Number
To Be Supplied By The Clerk of The Court

Notice And Motion Leave of Court To File Discovery Motion §1054.1 & §1054.9 To Compel The Attorney General TO Turn over Accomplice's Kevin Banks Juvenile Record for Impeachment Purposes And To Examine Truthfulness of The Qeople's witness.

16. TO: The Above Entitled Court And TO The Attorney
17. General of The State of California And To The California
18. Supreme Court Justices Please Take Notice And Motion
19. Leave of Court To File Discovery Motion §1054.1 &
20. §1054.9 To Compel The Attorney General To Turn Over
21. Accomplice's Kevin Banks Juvenile Record for
22. Impeachment Purpose And To Examine Truthfulness
23. of The People's witnesses.
24.
25.
26. This Motion will be based upon The Fact that
27. the People Previously Refused to Comply with the
28. request At Trial.

## DECLARATION

1. I, Petitioner have reason to believe, that the defined Immunized
2. Accomplice and Prosecution material witness Kevin Banks. Was in-
3. volved in and provided cooperation to Law Enforcement concerning a
4. prior murder investigation/Prosecution, In which Law enforcement
5. gave him something of Value in exchange for testimony/cooperation,
6. while Banks was a Juvinile living with his mother in Oakland CA,
7. somewhere near 62nd^{AVE} and East 14TH St.. However Petitioner
8. do not recall being made aware of such in the Juvinile re-
9. cords he recieved outlining Kevin Banks criminal/overall history.
10. this information was revealed to me days after my sentencing,
11. by a close associate of Kevin Banks.. Letter from Trial
12. Counsel concerning difficulties he's faceing 6 Months into the
13. Case, at being forwarded all Juvinile records of Kevin Banks
14. from Law enforcement, for the impeach purposes. (Exhibit _____).
15. this also gives Petitioner reason to believe that the information
16. is true and correct and that he was denied full and compl-
17. ete access to all Juvinile records. Concerning the entire
18. history of Kevin Banks (A.K.A.) Kevin Lovett, 11-06-1977.
19. Therefore I respectfully request the (Honorable) Judge(s)
20. of this Court to grant this Motion.
21.
22.
23.
24.
25.
26. I declare under the Penalty of Perjury that the Foregoing
27. Is True And correct Except Matters stated ON MY Information And
    belief, I believe them to Be true.
28. Date! 2 - 14 - 2007          Jamur Paige

1. Jamaine Paige K-39043
2. California State Prison
3. Sacramento
4. P.O. BOX 290066
5. Represa, CA 95671-0066
6. IN Pro Se
7. U.S. DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA
   CALIFORNIA ~~SUPREME~~ COURT

8. Jamaine Paige
9. Petitioner

Case Number
To Be Supplied By The Clerk of The Court

10.
11.

Notice And Motion Leave of Court
Motion For Discovery Concerning
Law Enforcement OAKLAND
POLICE DEPARTMENT

12. VS.
13.
14. Scott M. Kernan et al,
15.  Respondents
16.
17.

18. To: The Above Entitled Court And To The Supreme
19. Court of California Justices And To The Attorney
20. General of The State of California And His or Her
21. Respondents Please Take Notice And Motion Leave
22. of Court Motion For Discovery Concerning Law
23. Enforcement. The Petitioner will move that the
24. COURT order The Attorney General office And
25. The Above-Noticed Law Enforcement Agency (at All
26. times here after referred to as "The Department") to
27. make Available for examination, copying, and for the hearing on
28. this Motion the materials described below reguarding oakland Police

(department officer Sergeant Jon Madarang, Sgt Mike Clark, AND ~~STRIKE~~ ~~STRIKE~~ . Sgt. V. Chan .

1. The names, addresses, and telephone numbers of all persons who have filed complaints with the Oakland POLICE DEPARTMENT, hereafter "The Department," for acts indicating or constituting racial prejudice, dishonesty, false arrest, illegal search and seizure, the fabrication of charges and/or evidence, any act involving morally lax character, unnecessary acts of aggressive behavior, acts of violence and/or attempted violence, acts of excessive force and/or attempted excessive force by the above-named officer(s).

2. All statements, written or oral, by persons who have brought complaints as described in Items 1 above.

3. The names, addresses, and telephone numbers of all persons interviewed by The Department, its investigators and other personnel during investigation into complaints as described in Items 1 above, by the above-named officer(s).

4. All statements, written or oral, made by persons interviewed by the Department, its investigators and other personnel during investigation into complaints as described in Item 3, above.

5. All tape recordings and/or transcriptions thereof, and notes and memoranda by investigating personnel of The Department made pursuant to investigations described in Items 1 and 3, above.

6. The names and assignments of investigators and other personnel employed by The Department as described in Items 1 and 3, above.

7. The written procedures established by The Department to investigate citizen complaints against The Department or its personnel.

8. All records of The Department concerning records of statements, reputations and opinions, including, but not limited to, findings, letters, formal reports, and oral conversations made by superior officers and other officers, of the above-named police officer(s), which pertain to acts indicating or constituting racial prejudice or acts of unnecessary violence.

9. All records of discipline imposed by The Department on the above-named police officer(s) for conduct specified in Items 1 and 8, above.

Date: 3 - 05 - 2007. 2 - 14 - 2007    Respectfully submitted,

_Jannani Pay_
(Signature) Petitioner In Pro Se

( 2 )( 4 )  <u>10</u>

# MEMORANDUM OF POINTS AND AUTHORITIES

The discovery desired of the OAKLAND    POLICE DEPARTMENT, hereafter "The Department," concerning ( is listed below, with supporting authorities:

1. The names, addresses, and telephone numbers of all persons who have filed complaints with The Department for acts indicating or constituting racial prejudice, dishonesty, false arrest, illegal search and seizure, the fabrication of charges and/or evidence by the above-named officer(s). (Evidence Code section 1045(a); Pierre C. v Superior COURT (1984) 159 CA3d 1120, 206 CR 82; Pitchess v Superior COURT (1974) 11 C3d 531, 113 CR 897; Cadena v Superior COURT (1978) 79 CA3d 212, 146 CR 390; Arcelona v Municipal COURT (1980) 113 CA3d 523, 169 CR 877; Gonzales v Municipal COURT (1977) 67 CA3d 111, 136 CR 475).

2. The names addresses, and telephone numbers of all persons who have filed complaints with The Department against the above-named officers for any act involving morally lax character. (California Constitution article I, section 28(d); People v Wheeler (1992) 4 C4th 284, 14 CR2d 418; People v Mickle (1991) 54 C3d 140, 168, 284 CR 511; People v Harris (1989) 47 C3d 1047, 1080-1082, 255 CR 352; In re Ferguson (1971) 5 C3d 525, 533, 96 CR 594 ; People v Taylor (1986) 180 CA3d 622, 225 CR 733.)

3. The names, addresses, and telephone numbers of all persons who have filed complaints with The Department against the above-named officers for unnecessary acts of aggressive behavior, acts of violence and/or attempted violence, acts of excessive force and/or attempted excessive force. (California Constitution article I, section 28(d); Evidence Code section 1045(a); People v Wheeler, supra; People v Mickle, supra; City of Santa Cruz v Municipal COURT (1989) 49 C3d 74, 260 CR 520; People v Harris, supra; Pitchess v Superior COURT; In re Ferguson, supra; Cadena v Superior COURT, supra; Arcelona v Municipal COURT, supra; Gonzales v Municipal COURT, supra; People v Taylor, supra.)

4. All statements, written or oral, by persons who have brought complaints against the above-named officers as described in Items 1, 2, and 3, above. (California Constitution article I, section 28(d); Caldwell v Municipal COURT (1976) 58 CA3d 377, 129 CR 923; Hinojosa v Superior COURT (1976) 55 CA3d 692, 127 CR 664; Gonzales v Municipal COURT, supra;  People v Wheeler, supra; People v Mickle supra; People v Harris, supra; In re Ferguson, supra; People v Taylor, supra.)

5. The names, addresses, and telephone numbers of all persons interviewed by The Department, its investigators and other personnel during investigation into complaints as described in Items 1, 2, and 3, above, against the above-named officer(s). (California Constitution article I, section 28(d); Evidence Code section 1045(a); Pitchess v Superior COURT, supra; Arcelona v Municipal COURT, supra; Kelvin L. v Superior COURT (1976) 62 CA3d 823, 133 CR 325; Lemelle v Superior

(3) (5)  11

COURT (1978) 77 CA3d 148, 143 CR 450; Gonzales v Municipal COURT, supra; People v Wheeler, supra; People v Mickle, supra; People v Harris, supra; In re Ferguson, supra; People v Taylor, supra.)

6. All statements, written or oral, made by persons interviewed by the Department, its investigators and other personnel during their investigation into complaints as described in Item 5, above. (California Constitution article I, section 28(d); Evidence Code section 1045(a); Caldwell v Municipal COURT, supra; Hinojosa v Superior COURT, supra; People v Matos (1979) 92 CA3d 862, 155 CR 293; Gonzales v Municipal COURT, supra; People v Wheeler, supra; People v Mickle, supra; People v Harris, supra; In re Ferguson, supra; People v Taylor, supra.)

7. All tape recordings and/or transcriptions thereof, and notes and memoranda by investigating personnel of The Department made pursuant to investigations described in Items 1, 2, 3 and 5, above. (California Constitution article I, section 28(d); Caldwell v Municipal COURT, supra; Hinojosa v Superior COURT, supra; People v Matos (1979) 92 CA3d 862, 155 CR 293; Arcelona v Municipal COURT, supra, 113 CA3d at 530-531; People v Wheeler, supra; People v Mickle, supra; People v Harris, supra; In re Ferguson, supra; People v Taylor, supra.)

8. The names and assignments of investigators and other personnel employed by The Department as described in Items 1, 2, 3, and 5. (Caldwell v Municipal COURT, supra; People v Wheeler, supra; People v Mickle, supra; People v Harris, supra; In re Ferguson, supra; People v Taylor, supra.)

9. The written procedures established by The Department to investigate citizen complaints against The Department or its personnel. (Penal Code section 832.5(a).)

10. All records of The Department concerning records of statements and opinions, including, but not limited to, findings, letters, formal reports, and oral conversations made by superior officers and fellow officers, of the above-named police officer(s), which pertain to acts indicating or constituting racial prejudice, dishonesty, false arrest, illegal search and seizure, the fabrication of charges and/or evidence, or any act demonstrating a morally lax character. (California Constitution article I, section 28(d); Pierre C. v Superior COURT, supra; Cadena v Superior COURT, supra; Hinojosa v Superior COURT, supra; Arcelona v Municipal COURT supra; People v Wheeler, supra; People v Mickle, supra; People v Harris, supra; In re Ferguson, supra; People v Taylor, supra.)

11. All records of The Department concerning records of statements and opinions, including, but not limited to, findings, letters, formal reports, and oral conversations made by superior officers and fellow officers, of the above-named police officer(s), which pertain to unnecessary acts of aggressive behavior, acts of violence and/or attempted violence, acts of excessive force and/or attempted excessive force, and acts demonstrating racial prejudice, or any act demonstrating a morally lax character. (California Constitution article I, section 28(d); Cadena v

(4)(6)  12

1   Superior COURT, supra; Hinojosa v Superior COURT, supra; Arcelona v Municipal
    COURT, supra; People v Wheeler, supra; People v Mickle, supra; People v Harris,

2   supra; In re Ferguson, supra; People v Taylor, supra.)

3       12. All records of discipline imposed by The Department upon the above-named
    police officer(s) for conduct specified in Items 1, 2, 3, 10, and 11. (California

4   Constitution article I, section 28(d); Evidence Code section 1045(a); Arcelona v
    Municipal COURT, supra; Cadena v Superior COURT, supra; People v Wheeler, supra;

5   People v Mickle, supra; People v Harris, supra; In re Ferguson, supra; People v
    Taylor, supra.)

6   Date: 3 - 05 - 2007.        Respectfully submitted,
          2 -14 -2007.

7

8                               _Jamar Paiz_
                                (Signature) Petitioner IN ProSe
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

( 5 )( 7 )   13

## DECLARATION IN SUPPORT OF MOTION FOR PRETRIAL DISCOVERY

1. That I am the Petitioner In Pro Se of record in the above-named defendant.

2. That I am informed and believe that the OAKLAND POLICE DEPARTMENT, hereafter "The Department," makes and keeps written records of complaints received by The Department and that such records are kept in files maintained by The Department.

3. That I am informed and believe that from time to time persons give statements to The Department concerning officers of The Department, alleging that said officers committed acts indicating racial prejudice, or dishonesty; acts constituting false arrest, illegal search and/or seizure, or the fabrication of charges and/or evidence; acts of aggressive behavior, and/or violence, and/or attempted violence, and/or excessive force, and/or attempted excessive force; acts involving a "morally lax" character.

4. That I am informed and believe that The Department assigns personnel to investigate said complaints. That these personnel correspond with or interview complainants, witnesses, and other persons and make notes, memoranda, and records of conversations in connection with their investigations and prepare and file reports, findings, opinions, and conclusions concerning their investigations. That the Department keeps in its personnel record files, or other files, notes, findings, memoranda, recordings, reports, transcripts, opinions, and conclusions of the investigations made and of the disciplinary proceedings commenced as the result of such complaints. That said files contain the names, addresses, and telephone numbers of witnesses interviewed during such investigations and of persons) who initiate complaints (as are described in the preceding paragraph).

5. That I am informed and believe that the records, data, and materials described in paragraphs (1) through (9) of the Notice of Motion, Points and Authorities, and Order for Pretrial Discovery filed and served herein are in the exclusive possession and control of The Department and/or the Office of Los Angeles County District Attorney, and are readily available to each of them; that said records, data, and materials are not known to either defendant or defense counsel and will not otherwise be made available to defendant or defense counsel.

6. A substantial issue in the trial of this case may be the fabrication of charges and/or evidence, false arrest, and illegal search and seizure by the officer(s) involved due to dishonesty, racial prejudice, excessive and illegal use of force or violence, the attempted use of excessive and illegal use of force or violence on the part of the officer(s) involved.

(6)(8) 14

7. The above-listed materials are necessary for the proper preparation of this case for trial. The materials may be used as follows:

(A) To locate and investigate witnesses or other evidence of the dishonest character of the officer(s) involved to show that the officer(s) acted in conformity with that character at the time of this incident;

(B) To locate and investigate witnesses or other evidence of aggressive character of the officer(s) involved to show that the officer(s) acted in conformity with that character at the time of this incident;

(D) To refresh the recollection of witnesses to incidents of fabrication of charges and/or evidence by the officer(s) involved and/or to incidents of the use of illegal or excessive force by the officer(s) so that defense counsel may accurately ascertain the facts and circumstances of those incidents;

(E) To properly prepare for cross-examination and impeachment of witnesses to be called by the prosecution;

(F) To properly assess the credibility of the defendant and defense witnesses; and

(G) To impeach the testimony of the officers involved with acts showing a morally lax character and hence a readiness to lie.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: ___3 - 05 - 2007___
      ___2 - 14 - 2007___     _____
                              (Signature) Petitioner In Pro Se

(7)(9)  (15

1. Jamaine Paige K-39043
2. California State Prison
3. Sacramento
4. P.O. Box 290066
5. Represa, CA 95671-0066
6. In Pro Se
7. U.S. DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA
8.  COURT OF CALIFORNIA
9. Jamaine Paige
10. Petitioner
11.
12. VS.
13.
14. Scott M. Kernan etal,.
15.

Case Number _____
To Be Supplied By The Clerk of The Court

Motion For The Appointment of Counsel On State Habeas Corpus Petition.

16.
17. TO: The Above Entitled Court And To The Attorney
18. General of The State of California And His or Her
19. Respondents And To The California Supreme Court
20. Justices PLEASE Take Notice Motion For
21. Appointment of Counsel On State Habeas Corpus Petition.
22.
23. This Motion is Based upon The Petitioner is indigent
24. And without the Assistance of Counsel And May be Necessary
25. in the Discovery Process connected with this writ
26.
27. I Declare under Penalty of Perjury that the Foregoing Is
28. true And Correct    Date: 2-14-2007 _____
    3-05-2007. (Signature) Declarant In Prose

1. Jamaine Paige K-39043
2. California State Prison
3. Sacramento
4. P.O. Box 290066
5. Represa, CA 95671-0066
6. IN Pro Se
7. U.S. DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA
   CALIFORNIA ~~COURT~~ COURT
8.
9. IN Re: Jamaine Paige | Case Number
10. Petitioner | To Be Supplied By The Clerk of The Court
11. | Notice And Motion Leave of Court
12. VS. | To File State Petition Of Writ of
13. | Habeas Corpus that Doesnot Conform to
14. Scott Kernan et al., | The Standard Forms Filed or Provided
15. Respondent | The Grounds And Supporting Facts are
16. | Numerous And Supporting documents
17. | And Exhibits.
18. TO: The Above Entitled Court And Supreme Court of
19. California Justices And To The Attorney General
20. Of The State of California And His or Her Respondents
21. PLease Take Notice And Motion Leave of Court
22. To File State Petition of Writ of Habeas Corpus
23. That Doesnot conform to The standard Forms Filed
24. or Provided The Grounds And Supporting Facts Are
25. Numerous And supporting documents And Exhibits.
26.
27.
28.

(11)   17

VERIFICATION / DECLARANT

Respectfully submitted,

I DECLARE UNDER PENALTY OF PERJURY
THAT THE FOREGOING IS TRUE AND CORRECT

Date: 3 - 05 - 2007.
      2 - 14 - 2007

(Signature) Declarant IN Pro Se

1.
2.
3.
4.
5.
6.
7.
8.
9.
10.
11.
12.
13.
14.
15.
16.
17.
18.
19.
20.
21.
22.
23.
24.
25.
26.
27.
28.

(12)    18

1. Jamaine Paige K-39043
2. California State Prison
3. P.O. Box 290066
4. Represa, California 95671-0066
5. IN Pro Se

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Jamaine Paige
Petitioner

vs.

Scott M. Kernan etal.,
Respondent

Case Number_____
To Be Supplied by the clerk of the United States
Notice And Motion Leave of Court
To File Federal writ of Habeas Corpus
That doesNot Conform To The
Standard form Filed or Provided
The Grounds And Supporting Facts
And documents Are Numerous.

TO: The Above Entitled Court And To The Attorney
General And His or Her Respondents Please Take Notice
And Motion Leave of Court To File Federal writ of Habeas
Corpus That doesNot Conform To The Standard form Filed
or Provided The Grounds And Supporting Facts And
documents Are Numerous

Respectfully
Submitted.

VERIFICATION / DECLARANT

I Declare Under Penalty of Perjury That
the Foregoing Is True And Correct.
                    3 - 05 - 2007.
Date:        2 - 14 - 2007

(Signature) Declarant IN Pro Se

2(13)    19

1. Jamaine Paige K-39043
2. California State Prison
3. Sacramento
4. P.O. Box 290066
5. Represa, CA 95671-0066
6. In Pro Se
7. U.S. DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA
8. CALIFORNIA ~~STATES~~ COURT
9.
10. In Re: Jamaine Paige
11.   Petitioner
12.
13.   VS.
14.
15.
16. Scott M. Kernan Etal.,
17.

Case Number _____
To Be Supplied By The Clerk Of The Court

Notice And Motion Leave of Court
To File Memorandum Of Points
And Authorities In Support of
State Petition For Writ Of Habeas
Corpus

18.
19. TO: The Above Entitled Court And To The Attorney
20. General Of The State Of California And His Or Her
21. Respondents Please Take Notice And Motion
22. Leave Of Court To File Memorandum Of Points
23. And Authorities In Support Of State Petition
24. For Writ Of Habeas Corpus.
25.
26. MEMORANDUM OF POINTS AND AUTHORITIES
27.
28.

(1)(14)    20

1. Pursuant to In Re Hoddinott (1996) 12 C 4th 992. 50 CR 2d
2. 706. There is No time limitation that governs when an Action
3. may be brought to vacate a Sentence unauthorized by Law.
4. The Supreme Court has stated that "when one has a
5. Substantial Right to Protect or Enforce. And This may
6. Be Accomplished by Such a writ, And There is No
7. other plain Remedy and Adequate remedy in the ordinary
8. Course of Law, He is Entitled As a Matter of Right to
9. the writ or Perhaps more correctly in other words it
10. would be AN Abuse of discretion to deny it" People V
11. Medina (1972) 6 C 3d, 484, 491. 99 CR 630, quoting
12. Potomac Oil Company V. Dye (1909) 10 CA 534, 537,
13. 102 P677 (Emphasis Added) This is particularly So when
14. No Appellate Remedy will ever be available,
15. Townsend V. Sain (1963) 372 U.S. 293. when The
16. Superior court, Court of Appeal, California Supreme Court
17. do not or have not Provided The Petitioner An Evidentiary
18. Hearing On the Issues presented in Relations to
19. Evidence, Supression, then the State is given a opportunity
20. to correct them and do not do them, the State is not entitled
21. to A presumption of Correctness on the State Judgment
22. And Are Not Entitled To Any difference. Terry V. OHIO
23. ~~ ~~ (1968) 392 U S 1. 20 L. Ed 2d 889. 88 Sct 1868, IF
24. AN officer does not have Sufficient Cause to make a terry
25. Stop, he or She may Not frisk the person even if he or she
26. Suspects the Person is Armed, Pursuant to California Penal
27. Code section § 836 Peace officers grounds for a warrantless
28. Arrest (1) The officer has reasonable Cause to believe

(2)(15) 21

1. that the Person to be Arrested has committed a
2. Public offense in the officers Presence, All
3. other Subsequent Arrest(s) were not Pursuant
4. to other Lawful Arrest California Penal Code
5. Section § 840 (3), An Arrest Takes Place "When
6. A person is restricted in his libery of Movement"
7. Call v. U.S. (9th cir 1969) 417 F 2d 462.
8. Prejudice is Presumed, however, where Counsel's
9. Performance was so deficient that a breakdown in the
10. Adversarial Process occured U.S. v. Chronic (1984) 466
11. U.S. 648, 656-659 104 S. Ct 2039, 2045-47, 80 L. Ed
12. 2d 657, When a true adversarial criminal trial has
13. been conducted even if defense counsel may have made
14. demonstrable errors - the kind of testing envisioned
15. by the Sixth Amendment has occured. But if the
16. Process Loses its character as a Confrontation between
17. adversaries the Constitutional guarantee is violated.
18. In People v. Beeman (1984) 35 Cal. 3d 547, 199
19. Cal. Rptr 60, 674 P. 2d 1318. we held that a defendants
20. liability as an aider and abettor required proof that
21. he intended to Commit or facilitate the commission
22. of the offense, on Appeal Division one of this court reversed
23. defendant Pettaway's murder conviction for Beeman error
24. ( People v. Beeman Supra that the language of Caljic
25. 3.01 as it then existed "removed from the Jury's
26. Consideration the issue of Whether appellant shared in the
27. intent to Commit murder."
28.

(3)(16)    22

1. Burks v. United States (1978) 437 U.S. 1, 98 S.Ct.
2. 2141, 57 L. Ed. 2d1 which held that a defendant
3. may not be Retried if he obtains a reversal
4. of his Conviction on the ground that the evidence
5. was insufficient to convict, where the Jury is so
6. Instructed as in this case, there is Significantly less
7. reason to Assume that the State failed to prove it case.
8. ~~when~~ Accordingly, there is less reason to consider
9. a Second Attempt ~~to at~~ bite at the Apple Burks v.
10. US supra. Gerstein v. Pugh (1975) 420 U.S. 103;
11. County of Riverside v. McLaughlin (1991) 500 US
12. 44, 114 L. Ed. 2d 49 111 S.Ct. 1661 Petitioner didnot
13. Receive a Prompt Probable Cause determination by a
14. Neutral And detach magistrate Seperate from the
15. Arraigment And filing of the Information felony
16. Complaint. United States Constitutional Amendment 4
17. California Constitution Article 1 Section 13
18. unreasonable Search And Seizure, Brown v. Borg (9th cir
19. 1991) 951 F. 2d 1011 The Prosecutions Knowingly Presentation
20. of false Evidence, upon issuing an order to Show cause
21. a court must Now appoint Counsel for Any unrepresented
22. Petitioner who desires but Cannot afford counsel
23. California Rules of Court 4. 551. (c)(2), circumstances
24. that may constitute cause to excuse procedural default
25. include interference by Government officials, constitutionally
26. ineffective Assistance of counsel and Actual conflict of
27. interest by Counsel Manning v. Foster (9th cir 2000) 224
28. F. 3d 1129, 1133, Smith v. Idaho (9th cir 2004) 392 F. 3d 350.

1. A prisoner may also challenge a state court verdict on the
2. grounds that there was insufficient evidence to support the
3. conviction. In reviewing such an argument, A federal court
4. must decide whether there was sufficient evidence for
5. a rational trier of fact to find the Petitioner guilty
6. beyond a Reasonable doubt of the elements of the criminal
7. offense as defined by the state criminal Codes Jackson v.
8. Virginia (1979) 443 U.S. 307, 318-19 [90 S. ct 2781; 61
9. L. Ed. 2d 560], The burden of proof is on the state to
10. show that an error didnot substantially influence the
11. Jury's decision, and doubt should be resolved in favor of
12. the Petitioner O'Neal V. Mc Aninch (1995) 513 U.S. 432
13. [115 S. ct 992; 130 L. Ed. 2d 947.], When a Jury
14. Instruction might have allowed the Jury to convict
15. on evidence amounting to less than proof beyond a
16. reasonable doubt the conviction(s) will automatically
17. be reversed without any need to show actual prejudice
18. Sullivan v. Louisana (1993) 508 U.S. 275 [113 Sct 2078;
19. 128 L. Ed 2d 182; Constitution Of California Article 6
20. Section 13 Judgment - When Set Aside
21. No Judgment Shall be set Aside, or New trial granted,
22. in any cause on the ground of misdirection of the Jury, or
23. of the improper admission or rejection of evidence, or for
24. Any error as to any manner of pleading, for Any Error as to
25. Any matter of procedure, unless, after an examination of the
26. entire cause, including the evidence, the court shall be of
27. the opinion that the error complained of has resulted in a miscarriage
28. of Justice,

1. California Constitution Article 1 Section 15
2. Persons may not twice be put in Jeopardy for the same
3. offense or be deprived of life, liberty, or property without
4. due process of Law.
5. UNITED STATES CONSTITUTIONAL AMENDMENT 5
6. Nor shall any person be subject for the same offense
7. to be twice put in Jeopardy of life or limb.
8. People v. Castello (1998) 65 Cal. App. 4th 1242 Code of civil Procedure
   §1008 (a) which Provides that reconsideration requests must be based on
9. new or different facts, circumstance or law is directory in criminal cases
   and indicates that courts must "exercise due caution before modifing
10. Amending revoking Prior orders id at P1249.       Respectfully Submitted,
11.
12. I Declare under Penalty of Perjury that the Fore-
13. going Is True And Correct except Matters Stated in it
14. on My Information And belief I believe them To Be
15. True.
16.            3 - 05 - 2007.
17. Date: 2 - 14       - 2007
18.
19.
                    _James Paige_
20. (Signature) Declarant In Pro Se
21.
22.
23.
24.
25.
26.
27.
28.

MC-275

~aine Paige K-39043
Fornia State Prison Sacramento
2x 290066
sa. CA 95671-0066

U.S. DISTRICT COURT NORTHERN DISTRIA OF CALIFORNIA.

# IN THE ~~DISTRICT~~ COURT OF CALIFORNIA

PETITION FOR WRIT OF HABEAS CORPUS

Jamaine Paige

vs.

Scott M. Kernan Etal,.

No. _____
(To be supplied by the Clerk of the Court)

## RELATED CASE NUMBERS

Direct Appeal A 077240
Petition For Review S-069474
Alameda County Superior Court 127285 A E B
U.S.D.C. Northern District court writ C99-2870NJS
Petition for Reconsideration S-069474
United States Supreme Court Certiorari 02-9701

California Penal Code Section statutes
§ 1473, § 1487, § 995, § 118 (a), § 124, § 1096, § 1387,
§ 836

(1) (20)

This petition concerns:

☑ A conviction ☐ Parole
☑ A sentence ☐ Credits
☐ Jail or prison conditions ☐ Prison discipline

☐ Other (specify): _____

our name: Jamaine Paige

'here are you incarcerated? California State Prison Sacramento

'hy are you in custody? ☑ Criminal Conviction ☐ Civil Commitment

nswer subdivisions a. through i. to the best of your ability.

State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

murder Attempted murder Possession of firearm

Penal code § 664/187,§211, 187(A) 12021(A) 12022(d) 12022.5

Penal or other code sections: _____

Name and location of sentencing or committing court: Alameda County Superior court

Case number: Superior Court case 127285 A & B

Date convicted or committed: December 26th, 1996

Date sentenced: January 27th, 1997

ength of sentence: 15 Years to Life And to the term Proscribed by Law.

When do you expect to be released? As Soon As Possible

Were you represented by counsel in the trial court? ☑ Yes. ☐ No. If yes, state the attorney's name and address:

-incoln N. Mintz, Financial Center Building 405 14th Street, Suite 300 Franklin at 14th Oakland Ca 94621

t was the LAST plea you entered? (check one)

☑ Not guilty ☐ Guilty ☐ Nolo Contendere ☐ Other: _____

 pleaded not guilty, what kind of trial did you have?

Jury ☐ Judge without a jury ☐ Submitted on transcript ☐ Awaiting trial

Did You Appeal from the Conviction, Sentence, or Commitment? yes

a. Name of court: First Appellate District Division 2

b. Result Denied                    c. Date of decision: march 10, 1998

Case number A 077240

Issues raised (1) The court erred in deviating from the standard instruction on Accomplice Corroboration, (2) The Accomplice testimony was inadequately Corroborated.
(3) The Court failed to provide complete instructions on oral admissions.
The court erred in not instructing on the target crimes appellants allegedly aided and abetted

The Court erred in failing to instruct Su a Sponte on assault with a deadly weapon as a lesser included offense of Attempted murder.

6) The Natural and Probable Consequences theory of aiding and abetting liability is a Judicially created doctrine devoid of Statutory codification, and therefore unconstitutional.

7) The Natural and Probable Consequences doctrine violates Due Process because it removes from the Jury the need to find malice aforethought as to an aider and abettor of a Second degree Murder.

) The Jury was improperly instructed on reasonable doubt.

Were you represented by Counsel on Appeal? yes

Sandra E. Rosenthal. 1563 Solano Avenue #305 Berkeley CA 94707

Did you Seek Review in The California Supreme Court Yes

Result Denied   b. date of Decision: June 10, 1998

Case Number S-069474

Issues Raised: (1) There is insufficient Evidence To Corroborate The testimony Of Accomplice Kevin Bank; Accordingly the Judgment of Conviction must be Reversed.
) The Trial Court was Required, given the facts of this case to instruct the Jury on Assault with a deadly weapon As A lesser offense to Attempt murder in count three.
3)    Petitioner was denied Due Process And was prejudiced when The trial Court Gave The Jury AN inadequate instruction on Reasonable doubt.

. If your petition makes a claim reguarding your conviction, Sentence, or commitment that you or your Attorney did not make on Appeal, explain why the claim was Not made on Appeal?

The grounds Are Ineffective Assistance of Appellate Counsel, Prosecutor used false And illegally obtained evidence, Ineffective Assistance of Trial Counsel,

Pursuant To In Re Hoddinott (1996) 12 C 4th 992. 50 C R 2d 706. There is No time limitation that governs when aN Action may be brought.

1. Ground #1 Ineffective Assistance Of Appellate
2. Counsel For Failure To Raise Former Jury Instructional
3. Error On Caljic 3.00 and 3.01 on Petition for Review
4. Supporting Facts:
5.  Appellate Counsel didnot Raise Jury Instructional
6. Error of Former Caljic 3.00 and 3.01 on direct
7. Appeal Nor did Appellate Counsel Raise this
8. Contention on A Petition For Review to the California
9. Supreme Court, Reguarding Counts (1) California
10. Penal Code Section 187, Count (2) 664/187, Count (3)
11. 664/187, Count (4) 12021, former Caljic 3.00 and 3.01
12. Principals and Aiding and Abetting was given to the jury
13. to Consider, these two instructions removed from the
14. Jurys' Consideration the issue of whether Shared
15. in the intent to commit murder, Attempted murder
16. these Instructions allowed the jury to Convict on
17. evidence amounting to less than Proof beyond a
18. Reasonable doubt, furthermore the Petitioners Jury Asked
19. the trial Court does Constructive Possession of a gun Apply
20. to All charges, Clerks Transcripts At (536) and At clerks
21. transcripts (537) If we belive the exact Shooter is
22. unknown and that there was not a Robbery plan, is it
23. still Possible to find the parties at the time of the
24. killing to be guilty of Second degree murder? (Exhibit, Z-C)
25. the Jury was reinstructed on former Caljic 3.00 and 3.01
26. And It didnot Allow the Jury to ultimately Consider the
27. Reasonable doubt in reaching to All Counts especially
28. Counts 1, 2, 3, Petitioner was However found Not Guilty of

1. Possession of a firearm in Count 4 of the information
2. See Attachments & Exhibits.  2-C (RELEVANCE # EVIDENCE OF COUNT 4 Ect.)
3. Supporting Cases: People V. Beeman (1984) 35 Cal 3d
4. 547, 199 Cal. Rptr 60, 674 P. 2d 1318, Former Caljic 3.00
5. and 3.01, Strickland V. Washington (1984) 466 US
6. 668, 80 L Ed 2d 674, 104 S ct 2052; People V Pettaway
7. (1988) 206 Cal. App 1 Dist; former Caljic 3.00 and 3.01,
8. Pettaway V. Plummer (9th cir 1991) former Caljic 3.00 and
9. 3.01, Sullivan V. Louisiana (1993) 508 U.S. 275 [113
10. S. Ct. 2078; 128 L. Ed 2d 182; Arizona v. Fulminante
11. (1991) 499 U.S. 279, 331 [111 S. ct 1246; 113 L. Ed 2d
12. 302]; Ramirez V. Hatcher (9th cir 1988) 136 F. 3d 1209.
13. ground #1 Is a State And Federal claim.
14.
15. Petitioner contends that all the relevant Law and Evidence incomm-
16. ection with Count (4)_. Shows that without Petitioner having
17. Actrual and/or, Constructive possession of a Gun in the comm-
18. ission of crime. As the Jury so determined through verdict
19. of ACQUITTAL to Petitioner in count (4). This proves that
20. Petitioner could NOT have had shared intent in either of
21. the crimes as an actual perpetrator and/or, as an Aider and
22. Abettor. For by law inaccord to that Acquittal in Count (4)
23. Petitioner could NOT have personally used a firearm nor
24. could he have been armed with a firearm in the comm-
25. ission of these Crimes, Counts (1) (2) and (3). SEE HOW
26. ALL EVIDENCE REGARDING COUNT (4) Establish and/or does not
27. Establish Petitioner being liable for commission of crimes (Exhibit
28. 1-A THRU 1-J, And, Exhibits 2-C.). 2-D and 2-E.).

# Ground #2

~~Ground 2 or Ground~~ _____ (if applicable):

Ineffective Assistance Of Appellate Counsel for Not Raising Trial Counsels Ineffectiveness Specifically For Failure to File A Motion to Dismiss Penal code Section 995 (B), 1387, that the defendant has been Committed without Probable Cause 836

Supporting facts:

On or About August 4th, 1995 Petitioner was Arrested by Hayward Police department, Arrested And the Case was dismissed the case was presented by Alameda County District Attorneys office the charge was Possession of a firearm, this would be the Same firearm that Petitioner was then Re-charged for on or About March 25th, 1996 in the information with (Exhibit 2-D 2-E) Possession of A firearm, Murder, Attempted murder, Personal use of A firearm, the Signifigance of these Events And Arrests (Exhibit 2-C) Are the fact that the firearm was released from the custody of Hayward P.D. to Oakland P.D. and A ballistics test was done on the firearm and the firearm was linked or determined to be used in a Attempted Murder, Murder, in the instant Case in which the Petitioner is convicted And Sentence. It is Petitioners Contention of Once in Jeopardy And that the former information And dismissal constitute A Dismissal order bar to other Prosecution a dismissal for want of Prosecution as a bar. furthermore at the first Arrest in August 4th, 1995 in and by Hayward Police department there was no basis for warrantless Arrest, or Evidence to detain Petitioner or Refile Any or New Additional charges. this ground 2 is a state And Federal Claim (Exhibit 2-D)

Supporting cases, rules, or other authority:

2-C) California Penal Code §1387, 995 (B) Terry V. ohio (1968) 392 US 1, 20 L Ed 2d 889, 88 S Ct 1868, U.S. V. Strickland 902 F. 2d 937 (11th cir 1990), Hicks V. Oklahoma (1980) 447 U.S. 343 [100 S. Ct 2227; 65 L Ed 2d 175, In re Hoddinott (1996) 12 C 4th 992, 50 CR 2d 706, Gerstein V. Pugh (1975) 420 U.S. 103, county of verside V. McLaughlin (1991) 500 US 44, 114 L Ed 2d 49, 111 S Ct 1661.

( GROUND # 3 , INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL )

Violated Petitioner's 6 TH AND 14TH AMENDMENT RIGHT TO DUE PROCESS
AND CALIFORNIA CONSTITUTION (ARTICLE 1 SECTION 24). When he failed
to execute proper defense strategy and tactical decision — failing
to thouroughly investigate,      prep witness(es) for Petitioner's
Defense, (Being; Alibi witness(es) and witness(es) as to a fight between
Petitioner and Kevin Banks. Along with counsels failure to impeach
credibility of Banks by using Juvenile record exposing Banks history
of assaulting his own Mother Ms. Sharon Lopez. This could've been
the bases for establishing a proper defense, — impeaching, discred-
iting and undermining the credibility and damaging testimony of
Kevin Banks. ( Exhibit 4-A ). By way of revealing to Jury just
how violent, shrewd, dispicable, and vengful Banks is and
to what extreme measure's he'll take when afforded an opper-
tunity to get back at someone he has had a serious conflict
with. (See, Banks Juvenile record (Exhibit 4A ).
This could've all coincided with why Banks was lying on Petitioner
about Petitioners alleged involvement in this case. Due to Petitioner
and Banks engaging in a physical altercation. which stemed
from Banks threatening to shot Petitioner, and Petitioner in re-
sponse punching Banks in the face. ( see, witness(es) Declarations,
Exhibit 4-A ). As there were too other witness(es) who helped break
up that fight. And (2); Declarations by Alibi witnesses that Petit-
ioner was in Reno on 7-28-1995. And on 7-29-1995. With both
Fiancé and mother inlaw, as also the identity of those other witne-
sses could've only been revealed by the foresaid witnesses (Exhibit 4-A
) letter from Trial Counsel acknowledging that I did inform

this decision by counsle was more prejudicial than probative Petitioner notes that during closing argument the Prosecution capitalized from the absence of this evidence, Inflaming the passions and prejudice of the jury by saying there was not a shred of evidence in the record to suggest that Defendants were any where other than out committing these crimes and that no evidence of conflict or bad blood ever exsisted between Banks and either Defendant, to substantiate a means or motive for why Banks would make false accusations about his Cousins. (See Exhibit 3-D) (2-D)

Ground #4, Ineffective Assistance of Trial Counsel Violated Petitioners 6th And 14th Amendment Right To Due Process And California Constitution Article 1 section 24 Trial Counsel show ineffective Assistance when he displayed incompetence in the form of Client Neglect when in closing Arguments he Against Petitioners will Employed and improper damaging and Prejudicial defense Stragedy And Tactical decision, When in closing Argument Counsel called Petitioner a drug dealer, against Petitioner's will and best interest, All of which inflamed the passion and prejudice of the Jury and which coincided with the Prosecution's burden of proof thereon and it's case in chief. In agree-ince to the motive for the commission of crimes of murder and attempted murders and robbery and/or attempted robbery as was supported by the evid-nce. And which bolstered the credibility as to the damaging testimony of ce Prosecution's material witness Kevin Banks. And Furthermore Petitioner was rejudiced by conflict when Prosecution Capitolized on conflict in closing argument =directing Jury's attention to that conflict as a means of vouching for credibility of her witness Banks, Thus saying that even Trial counsel believed evidence introd-sed to substantiate Prosecutions burden of Proof that Petitioner is guilty and that nce that testimony is believed by Petitioner's own counsel in one regard, than witness truthful and should be ~~be~~ believed by Jury in every other aspect of his testimony against Petitioner

(SEE EXHIBIT, 2-D)

( GROUND #5,    INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL - )

Violated Petitioner's 6TH AND 14TH AMENDMENT RIGHT TO DUE PROCESS AND
CALIFORNIA CONSTITUTION ( ARTICLE 1 Section 24). When he failed to
~~~~~~ challenge through filing 995 Motion, and when he provided a
poor investigation in and for obtaining ~~~~~ recorded results of Physical
line up, that Petitioner informed counsel O.P.D, forced/ordered him
to attend as well as ordered him to elect other Inmates, from city
Jail to accompany him in that line up. But rather counsel left it as
~ ~~~ the O.P.D. packet does not contain any indication of a line-
up and a simple request by Counsel, that he be provided those
records. (Counsel's letter to Prosecution Exhibit, 2-A ). (~~~~~~~).


( GROUND # 6,   INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL - )

Violated Petitioner's 6TH AND 14TH AMENDMENT RIGHT TO DUE PROCESS AND
CALIFORNIA CONSTITUTION ( ARTICLE 1 Section 24). When he
Elicited highly inflamatory, prejudicial and damaging testimony from
State witness Kevin Banks, of Petitioner possessing other firearms,
those which were unrelated to the offenses charged and tried and hearsay
evidence of petitioner participating in other crimes of Robbery again
unrelated to the offenses charged and tried. (Exhibit 2-B ). (~~~~~~
~~~~~).

( GROUND # 7 ) _____ PROSECUTORIAL MISCONDUCT )

violated Petitioner's 14TH AMENDMENT RIGHT TO DUE PROCESS- When in closing argument she committed foul blow by vouching for and discrediting the credibility of witness(es). When she said ①: Kevin Banks is telling the truth, think about it no one has given any reason, or offered any evidence of any conflicts or fights arising between Banks and Defendant_ and therefore there's no motive as to why Banks would want to lie on his own family. (Exhibit ▓▓▓▓).

②: that Ms. Shavon Andrews was being untruthful when she claimed she could not I.d. the men who did the shooting that night, of course she's not going to I.d. Defendant(s). but she knew she was safe to pick out Kevin Banks photo as she did, because she did not have to face off with him in court (objection made)(Exhibit 3-B ). And

③: Recalling Jury attention to Ms. Myisha Singleton leaving the witness stand and going to sit among the Defendant(s) Mother(s). (Prosecutions attempt to inflame the passions and prejudice of jury by making it appear that witness had a close association / ties to Defendant's families.). (objection was made)(RT 1233-1234 Exhibit 3-C ).

(10) (29)  34 C

( GROUND # 8,    PROSECUTORIAL MISCONDUCT, )

Violated Petitioner's 14TH AMENDMENT RIGHT TO DUE PROCESS— When she made Direct and Indirect comments on Defendants failure to testisy and present evidence in their own defense. (Exhibit 3-D).

( GROUND # 9,    PROSECUTORIAL MISCONDUCT, )

Violated Petitioner's 14TH AMENDMENT RIGHT TO DUE PROCESS— When she inflamed the passions and prejudice of the jury by arguing facts not in evidence, of witness(es), being reluctant to testify against Defendant(s) because they feared for their lives, and would have trouble returning to their old lifestyle being branded as a snitch. (Exhibit 3-B ).

( GROUND # 10,    PROSECUTORIAL MISCONDUCT, )

Violated Petitioner's 14TH AMENDMENT RIGHT TO DUE PROCESS— When the Oakland-Police-Department Homicide investigators, and members of the Oakland Alameda County District Attorney's office, Bribed, offered, Promised, Gave witness Kevin Banks, Something of value in-exchange for Cooperation/testimony against Defendant(s).(Exhibit 3-E) (RT 907, 1210 ; 1093-1094.).

Ground # 11, Prosecutor Used False ILLegally Obtained Evidence At Defendants Trial And Knew or Should Have Known Of The False Nature of It's Existence In Connection with Counts 1, 2, 3, 4, And The Introduction Of Incredible And insubstantial Testimony of Accomplice KEVIN BANKS, And The Depositions Taken By Oakland Police Investigators

Supporting Facts: That The Prosecution Knew of the False Nature of the Testimony of Kevin Bank The Contradictory And inconsistencies In The Transcribed Reporter Transcripts And clerk Transcripts AS Well as the Taped Conversations Interviews by the lead Investigating Officer Sgt. JON Madarang oakland Police department, Officer Sgt Michael clark oakland Police department,

these Supporting documents Are Attached As Exhibits at (1-A Thru 1-J) the Back of the Petition. Pursuant To California Penal Code Section § 125 Unqualified statements of that Not Known to be true. An Unqualified statement of that which one doesnot Know to be true is equivalent to a Statement of that which one Knows to be false, Due Process is Violated when a state fails to follow its own established criminal Procedures and Violates its own statutes or Constitution. Hicks V. oklahoma (1980) 447 U.S. 343 [ 100 S. Ct. 2227; 65 L. Ed. 2d 175, Fundamental fairness denied either by a Single grossly prejudicial evidentiary ruling or by numerous lesser evidentiary errors Such that the totality of circumstances constituted a deprivation of substantive due Process, Brown V. Borg (9th 1991) 951 F. 2d 1011 Prosecutions Knowing Presentation of false Evidence, The burden of Proof is on the State to Show that an error didnot Substantially

1 Influened the Jury's decision and doubt should be resolved
2 in favor of the Petitioner O'Neal v. Mc Aninch (1995)
3 513 U.S. 432 [115 S. Ct. 992: L Ed 947.
4 Pursuant To California Penal Code Section §836
5 Peace officers Grounds for A warrantless Arrest
6 (1) The officer has reasonable cause to believe that
7 the Person to be arrested has committed a Public offense
8 in the officers presence, this clearly wasnot the case
9 on July 29, 1995 and All the way until March 21, 1996 the
10 oakland Police department Never had Any Probable cause
11 between the Above mentioned dates Petitioner didnot have
12 Any outstanding Arrest warrants, It wasnot until Kevin
13 Banks Made Self serving incriminating statements concerning
14 the charges in counts 1 thru 4 in which the oakland Police
15 departments And Prosecutor used these statements pursuant
16 Proposition 115 the Admissability of Heresy statements to bound
17 Petitioner over for trial, the Most important factor is that the
18 Firearm used In the commission of these crimes didnot have
19 Any fingerprints oN the weapon however Kevin Banks Admitted
20 and confessed to Investigators that the bag of cocaine found
21 by Hayward Police department where oakland Police Investigators
22 took Possession of the firearm was Right Next to the guN and
23 It was Kevin Banks himself who gave oakland Police department
24 the Story Kevin Banks version of what took place on
25 July 29, 1995 Petitioner didnot confess and Never was
26 linked in Any way with ~~Petitioner~~ Kevin Banks Sole
27 version of Events, Exhibits will show how quite clear
28 the insubstantial and incredible the testimony was and How it

(13) (32)   37 ✔

1 Affected Petitioners Jury as a whole with Kevin Banks
2 Testimony, The investigators Refusal to bring Perjury charges
3 Against him for inconsistence statements throughout the first
4 Interview And subsequent interviews were contradictory
5 statements were Actually given under oath in court and
6 to Investigators. O'Neal V. Mc Aninch (1995) 513 U.S.
7 413 [115 S.Ct 992; 130 L.Ed 947. The standard
8 of Review for Corroboration of Accomplice Testimony
9 Penal Code Section 1111 Provides: A Conviction
10 cannot be had upon the testimony of an accomplice unless
11 it be Corroborated by Such other evidence as shall tend
12 to connect the defendant with the commission of the
13 offense; and the Corroboration is not Sufficient if it
14 merely shows the offense or the Circumstances thereof.
15 AN accomplice is hereby defined as one who is liable to
16 Prosecution for the identical offense charged against the
17 defendant on trial in the Cause in which the testimony of the
18 accomplice is given (Emphasis added). Petitioner shows
19 that in this Case the evidence not Supplied by the accomplice,
20 Kevin Banks, merely shows the Commission of the offenses
21 and the Circumstances thereof, and that the evidence, aside
22 from Banks statements and testimony, fails to connect
23 Petitioner with those crimes. IN People V. Rodrigues
24 (1994) 8 Cal. 4th 1060, 1128, The California Supreme
25 Court Summarized the rules for determining whether
26 Corroboration of AN Accomplice's Testimony is
27 Sufficient.    The Court Stated
28                    (14) (33)    38 ✓

1  that the requisite,corroboration,may be established entirely by cir-

2  cumstantial evidence...Such evidence may be slight and entitled to little consider-

3  ation when standing alone...(People v. Rodrigues , supra 8 Cal.4th at 1128 quoting

4  People v. Zapien (1993) 4 Cal.4th 929, 982 and People v. Miranda (1987) 44 Cal.3d

5  57,100.) Nevertheless, Corroborating evidence must tend to implicate the defendant

6  and therefore must relate to some act or fact which is an element of the crime but it

7  is not necessary that the corroborative evidence be sufficient in itself to establish

8  every element of the offense charged. . (People v. Rodrigues, supra, 8 Cal.4th at 1128

9  quoting People v. Zapien, supra, 4 Cal.4th at 982 and People v. Sully (1991) 53Cal.3d

10  1195, 1228.) The Rodrigues Court went on to state that the prosecution must

11  produce independent evidence which, without aid or assistance from the testimony

12  of the accomplice, tends to connect the  defendant with the crime charged. Rod-

13  riques, supra, 8 Cal.4th at 1128 quoting People v. Perry (1972) 7 Cal.3d 756,

14  769.) Corroborating evidence would be found sufficient if, for example, it

15  substantiates enough of the accomplice's testimony to establish his credibility.'

16  (People v. Rodrigues, supra, 8Cal.4th at 1128 quoting People v. Bunyard(1988) 45 Cal.

17  3d 1189, 1206-1207.) On that point, Petitioner Allege's, that the verdict

18  in the instant case -- in which the jury rejected  the Felony Murder suggested by

19  Kevin Banks's Testimony-- Demonstrates that this Jury did Not find Kevin Banks's

20  testimony Credible. Of the accomplice corroboration rules, the rule most

21  pertinent to the instant case is the one requiring the posecution to produce in-

22  dependent evidence which connects the defendant with the commission of the crime

23  without interpretation from the testimony of the accomplice. This longstanding

24  rule has been repeateatedly endorsed by the California Supreme Court. (See, -

25  for example, People v. Perry, supra, 7 Cal.3d at  769; People v. Lyons (1958) 50 Cal.

26  2d 245, 257; People v. Morton (1903) 139. Cal. 719, 724.) In Morton, supra,

27  the Supreme Court, marking the way for many decisions to come, announced the prop-

28  er  technique for determining whether accomplice testimony is adequately

(15) (34)   39 ✔

1   corroborated: (E)liminate from the case the evidence of the accomplice, and then

2   examine the evidence of the other witness or witnesses with the view to ascer-

3   tain if there be inculpatory evidence -- evidence tending to connect the defen-

4   dant with the offense. If there is, the accomplice is corroborated; if there is

5   no inculpatory evidence, there is no corroboration, though the accomplice may be

6   corroborated in regard to any number of facts sworn to by him.' (Id., at

7   724 quoting Welden v. State (_) 10 Tex. App. 400; see also People v. Lohman (1970)

8   6 Cal. App. 3d 760, 765- 766.) In Lohman, the court noted that the evidence is in-

9   sufficient to corroborate an accomplice if it merely shows association with the

10  actual criminals, or that only casts grave suspicion on the defendant, or which

11  fails to connect defendant with the crime itself, or which is not corroborative

12  of an element of the crime itself. (Id., 6 Cal. App. 3d at 765; see also People v.

13  Reingold (1948) 87 Cal. App. 2d 382, 393; People v. Lyons (1958) 50 Cal. 2d 245, 257

14  (corroborative evidence must relate to some act or fact which is an element of

15  the crime).) In the instant case, Kevin Banks was an accomplice as a matter of

16  law, and the jury was so informed. (CT 511-512.) There Is Insufficient Evidence

17  to Corroborate Kevin Banks and to Connect Petitioner With the Offenses Charged

18  Petitioner Allege's that if the testimony of Kevin Banks is eliminated from

19  consideration, the remaining evidence does Not connect Petitioner with the off-

20  enses committed July 29, 1995. Without Banks's testimony, the following is estab-

21  lished: Officer Samuel found Cedric Nelson, who had been wounded, at about 1 a.m.

22  on July 29, 1995. (RT 58-59.) An ambulance arrived and Officer Samuel  proceeded

23  to 60th Avenue and MacArthur, where he found Sean Landry and Shavon ~~nell-

24  Pannell- Andrews. Landry was dead, and Shavon was wounded, but still alive.

25  (RT 60 - 62.) He found spent shell casings on the parking lot and in Landry's

26  green Buick, which he identified as .45 caliber casings. (RT 96, 98.) Shavon  -

27  Pannell-Andrews testified that she accompanied Sean Landry on July 29, 1995. When

28  he pulled into the parking lot at 60th Avenue and MacArthur, she saw three Black

men -- two on the parking lot and one across the street near a Baskin - Robbins store. (RT147-148.) Shavon could not provide any detailed description of the men on the parking lot, and she was never able to identify Petitioner or Andre Nelson as the men she saw that night. (RT 148,168, 175-176, 247, 312-313.) Contrary to the testimony of Kevin Banks -- who said there were three of them waiting for Landry -- Shavon testified there were only two men on the parking lot to meet with Sean Landry. (RT 257, 260.) Julie Jaecksch collected evidence at the crime scene, including .40 caliber and .45 caliber spent shell casings; she found no weapons. (RT 354-366, 409.) She looked for, but was unable to find any identifiable fingerprints on the shell casings. (RT 391-392.) She did not check the public phone for fingerprints; nor did she check the green Buick for any prints. (RT 344,393.) She found $55 in Sean Landry's pocket. (RT 373.) On the memory of his pager, she found that he had received a call from the public pay phone located on the parking lot at 60th and MacArthur . (RT 390.) She found baggies of crack cocaine on the hood of Sean Landry's car. (RT 375-376.) Dr. Van Meter testified that Sean Landry died from multiple gunshot wounds. (RT 113.) On August 4, 1995, four officers from Hayward's tactical narcotics team (TNT) were patrolling the area near Manon and Tennyson, an area known for drug activities, when they saw Petitioner, Andre Nelson and Kevin Banks walking on Huntwood Avenue. The Officers stopped to speak with the three men and Sgt. Martin retraced the path along which he had seen the three men walking. (RT 438-439, 459, 472, 488-489.) Martin said he had seen Petitioner and Nelson in the area at least once before August 4, 1995. (RT 475-477.) On a small fenced -in field, Sgt. Martin found a .40 caliber Glock semi-automatic handgun. (RT 449-451.) Sgt. Perry retraced the same path and right next to the spot where the gun had been found, he located a baggie of what appeared to be rock cocaine. (RT 490-491.) Sgt. Martin testified that on August 4, he did not see Petitioner or the others do anything wrong. (RT 482-483.)

(17)(36)  41 ✓

Although he saw Petitioner pass the spot where the gun was found, he did not see Petitioner throw it there. (RT 486.) The gun was found to be registered to a women in Richmond, who told Martin it had been stolen in a burglary. She was never connected to Petitioner in any way. (RT 492.) Martin asked that the gun be checked for fingerprints and was told by an evidence technician that no prints could be found on the weapon. (RT 485.) Sgt. Perry testified that he had previously seen Petitioner in the area of Manon and Tennyson ''numerous'' times. (RT 970.) However, he admitted that he had not seen Petitioner or the others throw or drop anything on the night of August 4. (RT 978.) In addition, contrary to the testimony of Kevin Banks--who said he, Andre Nelson and Petitioner had each dropped a baggie of drugs -- Sgt. Perry testified that despite a through search, he found only one bag containing drugs. He searched the detainees as well, and found no drugs on any of them. (RT 991- 992.) Sometime after August 4, 1995, the gun found in Hayward was sent to the Oakland Police Department. Evidence technician Anthony Camacho examined the gun .40 caliber Glock and found no fingerprints on the gun, the magazine or any of the shells. (RT 513-521.) Criminalist Lansing Leeexamined the gun and reached the conclusion that it was the same gun that had fired the .40 caliber shell casings found on the parking lot the night of July 29, 1995. (RT 940-943.) Miesha Singleton testified that on a night in July 1995, somtime after her birthday on July 25, she was awakened around 2:30 a.m. by her cousin, Kevin Banks, knocking on her window. (RT 999-1001.) She let him in, along with two other men, who she did not bother to identify at the time. When she awakened later, she found Banks in the house along with Petitioner and Andre Nelson. (RT 1001-1003.) She was certain that the night Banks came to her house was not a Saturday because she remembered getting up to dress for work, and she said she only worked Monday through Friday. (RT 1010.) The trial court took judicial notice that July 29, 1995, fell on a Saturday. (RT 1081.) Petitioner Allege's that,

(18)(37)  42 ✓

excluding the testimony of Kevin Banks and the testimony of Sgt. Madarang-

which essentially recounted Banks' statements to him -- this is a fair summary

of the evidence regarding the offenses committed on July 29, 1995. Naturally,

the evidence contains more details about the shooting of Shavon Pannell-

Andrews, and about the arrests in Hayward on August 4. However, absent the

testimony of Kevin Banks, Petitioner Allege's, there are no facts that directly

connect Petitioner to any of the events of July 29 ,1995. Petitioner was not

identified as one of the persons at the crime scene on July 29, 1995, by either

of the surving victims -- Cedric Nelson and Shavon Pannell-Andrews. His finger-

prints were not found on any of the shell casings found on the parking lot. Nor

were his fingerprints identified on the public phone from which Sean Landry was

paged, or in or on Landry's car, on which the drugs were found. Drugs were never

found in Petitioner's possession. His fingerprints were not found on the

baggie containing drugs picked up in Hayward on August 4. He was not seen in

possession of the Glock handgun found on August 4. The Hayward police officers

who arrested Petitioner on August 4 testified they did not see Petitioner

drop anything or make any kind of throwing gesture. (RT 482, 486, 978.) His print-

s were not found on the Glock; nor were they found on the magazine or the shells.

The rules on accomplice corroboration require that the other evidence, outside

of the accomplice testimony, corroborate, however slightly, some element

of the offense.. That means in this case the evidence must connect Petitioner

in some fashion to the shooting and/or attempted robbery of Sean Landry,

and to the attempted murders of Cedic Nelson and Shavon Pannell-

Andrews. Petitioner Allege's there is nothing in the evidence, outside of the

testimony of Kevin Banks or in the statements Banks gave to Sgt. Madarang that

meets the requirement. The evidence clearly establishes that Sean Landry was shot

was shot and killed with a .45 caliber gun, and that the same gun was used to

shoot Shavon Pannell-Andrews. The evidence establishes how and when the offenses

(19)(38)  43 C

occurred. Cedric Nelson did not testify. (Based on statements made by Kevin
Banks during his testimony, it appears that Cedric Nelson may have died prior
to this trial, apparently in a manner unrelated to this case. See, for example,
(RT 677-678, 829.) Shavon never identified Petitioner as one of the assailants.
Petitioner could not be connected to any of the drugs found at the crime
scene in Oakland, or at the scene of his arrest in Hayward on August 4. He
could not be connected to the .40 caliber Glock handgun, other than by the
testimony of Kevin Banks. Even though Hayward police officers testified they
had previously seen Petitioner in the area of Manon and Tennyson-
-an area known for a high incidence of drug activity -- the officers did
not state they had ever seen Petitioner engaged in any drug transactions. He
did not have any drugs on his person when he was arrested. Finally, although
Miesha Singleton said she saw Petitioner at her house late at night sometime in
July 1995, she could not specify the date, and she said it was definitely
not a Saturday. In addition, even assuming arguendo that the night Miesha
saw Petitioner was July 29 1995, there is nothing about that fact that connects
him to any element of any of the offenses committed. The evidence is that the
shooting occurred in Oakland sometime around midnight. Kevin Banks said
he took Petitioner and Andre Nelson to Alameda after the shooting was over.
Even though Petitioner's pesence in Alameda may have corroborated Banks's
testimony regarding what he did after the shooting, it does not corroborate
any element of the offenses with which Petitioner was charged. Miesha Singleton
did not see a gun, she did not see any drugs, she did not overhear any discuss-
ion regarding Sean Landry or a shooting or robbery. Thus, Petitioner's presence
in her home-- even if it was on July 29, 1995 -- does not corroborate the accomp-
lice testimony of Kevin Banks in a manner that will satisfy the requirements
of Penal Code section 1111. A conviction cannot rest on insufficient evidence
. The long-established standard of review for sufficiency of the evidence re-

quires that the reviewing court determine '' whether a reasonable trier of fact could have found the prosecution sustained its burden of proving the defendant guilty beyond a reasonable doubt.'...Evidence, to be' substantial' must be ' of ponderable legal significance... reasonable in nature, credible, and of solid value. '(Citations.)'' (People v. Johnson (1980) 26 Cal. 3d 557, 576.) In applying the test for sufficiency of the evidence, the court of Appeal must ''review the whole record in the light most favorable to the judgment to determine whether it contains substantial evidence... from which any a(ny) rational trier of fact could have found the defendant guilty beyond a reasonable doubt. (Citations.) In apply- ing this test, (the court) must 'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'' (People v.- Fosselman (1983) 33 Cal. 3d 572, 578; People v. Silberman (1989) 212 Cal. App. 3d 1099 , 1110; see also Jackson v. Virginia (1979) 443 U.S. 307.) A conviction that fails to meet the test for sufficiency of the evidence, as seth forth in Jackson v. Virginia, supra, 443 U.S. at 319, Violates due process. (Mikes v. Borg (9th Cir. 1991) 947 F. 2d 353, 356.) Thus, An appellate court called upon to review the sufficiency of the evidence supporting a judgment of conviction of a criminal offense must, after a review of the whole record, determine whether the evidence is such that a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. (People v. Bean (1988) 46 Cal. 3d 919, 932– 933; emphasis added; see also People v. Figueroa (1992) 2d Cal. App. 4th 1584, 1587) The standard is the same whether the People rely on direct or circumstantial evidence. Where circumstantial evidence is susceptible of two interpretations, the jury is the ultimate arbiter as between the two choices, and the reviewing court will not reverse so long as the circumstances proven reasonably justify the findings of the trier of fact. (People v. Figueroa, supra, 2 Cal. App. 4th at 1587; emphasis added.) Petitioner Allege's that correct application of the rules for determinating the sufficiency of evidence to corroborate an accomplice, which

(21) (40)    45 ✓

1. Requires that the accomplice's testimony first be eliminated
2. from consideration in this Case leave a Record which does not
3. legally corroborate the accomplices testimony and which,
4. by itself, does not support a conviction against Petitioner
5. For the Second degree Murder of Sean Landry or the
6. Attempted Murders of Cedric Nelson or Shavon Pannell
7. Andrews. A Prosecutor may grant immunity to one Jointly
8. Charged with a crime upon the condition that he or she
9. testify fully and fairly as to the facts involved People V.
10. Green (1951) 102 Cal. App. 2d 831, 838-839, 228 P. 2d 867,
11. when the grant of immunity places the witness under a strong
12. compulsion to testify in a particular fashion, however the
13. testimony is tainted by the witness's self interest and is
14. inadmissible (People V. Medina (1974) 41 Cal. App 3d 438,
15. 116 Cal. Rptr. 133, In People V. Green (1951) 102 Cal. App.
16. 2d 831, 838-839, 228 P. 2d 867. for example an accomplice
17. was induced to testify by the Promise that he would be
18. granted immunity from prosecution if his testimony at the
19. Preliminary hearing resulted in the defendants being held to
20. Answer. The Conviction that resulted from the Accomplices
21. later and inconsistent trial testimony was reversed because
22. of the use of testimony which was impure, dubious, and
23. "tainted beyond redemption" (102 Cal. App. 2d at PP. 838-
24. 839, 228 P. 2d 867. The error involved in the use of such
25. tainted testimony is a denial of the fundamental right to a
26. fair trial in violation of federal Constitutional principles
27. (41 Cal. App. 3d at P. 456, 116 Cal. Rptr 133.) According the Judgment
28. must be Reverse. See Exhibits (2-C, 1-A thru 1-J Exhibits 2-0 and 2-E.)

22 (41)   46

Relevant / criticle evidence inaccord to Prosecutions burden of Proof thereon by tieing Petitioner into case soley through the alleged use and attempted proof of Petitioner having actual and constructive possession and personally using / discharging in the commission of crime the count (4) Exhibit 9.C firearm, as was presented solely by the testimony of witness Kevin Banks. (Exhibit 2-E).

Thus the verdict of Acquittal rendered Petitioner in count (4) Substantiates Petitioner's claim that the testimony of Kevin Banks is incredible and insubstantial on it's face and ~~rate insufficient~~ amounts to insufficient evidence to support Prosecutions burden of Proof and it's case in it's entirety. ( Exhibit ~~2-C~~ 2-C- 2-E.)

(23) (42)    47

3. GROUNDS FOR RELIEF  Ground # 12,

~~Grounds~~ State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

Ineffective Assistance of Appellate Counsel For Not Raising Trial Counsels Ineffectiveness in Counts 1, 2, 3, 4, for Not Filing a Motion For Aquittal 1118.1 at the Close of the Case before the Case was Submitted to the Jury on the grounds that the Evidence is insufficient to Sustain a Conviction on Appeal counts 1, 2, 3,

a. Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what *time (when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

After the Judge Heard All the testimony and the circumstances of the Case the trial Attorney was in a unique Position to Point out the inconsistencies of Kevin Banks Testimony, and that how it affected the outcome of the Case from Arrest on August 4th, 1995 all the way until the Point of trial And the time Period from August 4th, 1995 until March 21, 1996 the was No independant credible Substantial testimony in which to connect the defendant with the charges (EXHIBIT 2-C 2-D5 2-E) in which he was Convicted And from 8/4/1995 to March 21, 1996 there was No Probable cause to Believe that Petitioner commited A Public offense, No Arrest warrant issued in instant case, and was free to go where he desired from 8/4/1995 thru 3/21/1996 is 7 months that a Substantial Amount of time where there was No Probable cause Except Kevin Banks Testimony

b. Supporting cases, rules, or other authority (optional): Appellate counsel Refused to Raise this ground

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)* (SEE EXHIBITS, 3-E, THRU 3-H AND, EXHIBITS 1-A THRU 1-J.)

§1118.1 California Penal Code §836, Kimmelman V. Morrison (1986) 477 US 365, §118 (a) penal code, §125, Burks V. United States (1978) 437 U.S. 1, 57 L.Ed 2d 1. Strickland V. Washington (1984) 466 US 668, 80 L Ed 2d 674, 104 Sct 2052

MC-275 [Rev. July 1, 2005]                    PETITION FOR WRIT OF HABEAS CORPUS

(Page 5)

Ground # 13,
~~¿¿¿¿¿¿¿¿¿¿¿¿~~ _____ *(if applicable):*

neffective Assistance of Appellate Counsel for failure to Raise The Trial
ourt Erred in failing to Instruct The Jury on uncharged Target offenses
that Might Have Been The Basis For Holding Appellant Responsible As An
ider And Abettor under The Natural And Probable Consequences Doctrine.
on Petition for Review

Argument//

Appellant submits that under *People v. Prettyman* (1996) 14 Cal.4th

248, the trial court erred in failing to identify and define the target offenses

that appellant might have aided and abetted, and further failed to require that

the jury determine beyond a reasonable doubt whether the offenses actually

committed were in fact natural and probable consequences of the target

offenses.

### The Trial Court's Instructions on Aiding and Abetting

First, the trial court instructed the jury pursuant to Penal Code section

31 and CALJIC No. 3.00 that all principals in the commission of a crime are

equally culpable. (CT 510.) The court stated that persons who aid and abet

are included in the definition of principals. Next, the court stated:

"In other words, you can be liable, as fully responsible as a
person who commits the act even though you're not even at the scene
of the crime so long as you're an aider and abettor if you advise the
commission or attempted commission of the offense.

"In plain words, one who aids and abets, one who assists or
helps in a crime with criminal intent is equally guilty as the person
committing the crime.

"And one who aids and abets is not only guilty of the particular
crime that to his knowledge his confederates are contemplating
committing, but **he is also liable for the natural and probable or
reasonable consequences of any act that he knowingly aided or
encouraged.**

"Now, how do you define aiding and abetting?



"A person aids and abets the commission of a crime if with knowledge of the unlawful purpose of the perpetrator of the crime and with criminal intent, by act or advice, aids, promotes, encourages, or instigates the commission of a crime;

"Mere presence at the scene of a crime which does not itself assist the commission of the crime does not amount to aiding and abetting.

"Mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting.

"In other words, one who helps another commit a crime with criminal intent is liable as an aider and abettor.

"And criminal intent for the purpose of this instruction is the intent to commit, to encourage, to aid or facilitate the commission of the offense.

"That's the definition of aiding and abetting."

(CT 510-511; emphasis added.)

The instructions given, which paraphrased but did not duplicate the instructions in CALJIC, omitted the part of CALJIC No. 3.02 that explains the natural and probable consequences doctrine, with the exception of the language noted above.[7] Utilizing the charges in the instant case to fill in the blanks, appellant submits the trial court should have given the following instruction:

"One who aids and abets another in the commission of a crime is not only guilty of that crime, but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crime originally aided and abetted.

"In order to find the defendant guilty of the crime of **murder**,

---

[7] The record contains a list of instructions requested by appellant, which shows that he did not request that the court give CALJIC No. 3.02. (See CT 466.) The record does not contain a list of requested instructions from the prosecutor.

as charged in Count 1, and **attempted murder** as charged in count 3, you must be satisfied beyond a reasonable doubt that:

> "(1) The crimes of **murder and attempted murder** were committed,

> "(2)  The defendant aided and abetted such crimes,

> "(3)  A co-principal in such crime committed the crimes of **murder and attempted murder**, and

> "(4) The crimes of **murder and attempted murder** were a natural and probable consequence of the commission of the crimes of **robbery, assault with a deadly weapon and purchase for sale of a controlled substance**."[8]

In keeping with the prosecutor's theory of first-degree felony murder, the jury was in fact instructed on the elements of robbery, although it was not connected to the giving of CALJIC No. 3.02, and the jury was **not** informed it was required to find robbery beyond a reasonable doubt **in connection with aiding and abetting** as would have been required by CALJIC No. 3.02. (CT 516-517; RT 1262.) In any event, the jury rejected the felony murder theory, as shown by the verdict of guilty of second-degree murder.[9] This leaves open the question of exactly what target offenses might appellant have aided and abetted.  Whatever the answer, appellant submits the trial court, having decided to use CALJIC No. 3.02, was obligated to identify and define uncharged target offenses in connection with the natural and probable

---

[8] The purchase for sale of a controlled substance is a violation of Health and Safety Code section 11351.

[9] Appellant notes that in *People v. Prettyman*, discussed at length below, the Supreme Court declined to decide "whether a defendant may be convicted under the 'natural and probable consequences' doctrine when the target criminal act was not committed." (*People v. Prettyman*, *supra*, 14 Cal.4th at 262, n.4.)

consequences doctrine.

## Under *People v. Prettyman,* the Jury Should Have Been Instructed on Robbery, Assault with a Deadly Weapon and Purchase for Sale of a Controlled Substance as Uncharged Target Offenses, the Commission of Which May Have Led to Murder and/or Attempted Murder

In *Prettyman*, the Supreme Court stated that where an aider and abettor assists a confederate in the commission of a target offense, the aider and abettor can also be responsible for any other "nontarget" crime committed by the confederate that is a natural and probable consequence of the original target offense. (*Prettyman, supra*, 14 Cal.4th at 254.) The court explained that the jury would be required to find that the confederate committed an offense other than the original target offense "and that the nontarget offense perpetrated by the confederate was a 'natural and probable consequence' of the target crime that the defendant assisted or encouraged." (*Prettyman, supra*, 14 Cal.4th at 254.)

In *Prettyman*, the jury was asked to determine if Prettyman's co-defendant, Bray, aided and abetted the murder, or if the murder was a natural and probable consequence of any uncharged offenses that she may have aided and abetted. The trial court failed to identify or describe any such offenses. The Supreme Court identified the issue as whether "absent a request by counsel, the court should have so instructed the jury." (*Id.*, 14 Cal.4th at 254.) The court then stated "We conclude that when the prosecutor relies on the 'natural and probable consequences' doctrine, the trial court must identify and describe the target crimes that the defendant *might* have assisted or encouraged." (*Id*; emphasis added.)

The Supreme Court recognized the issue before it as "whether, when a trial court instructs a jury on the 'natural and probable consequences' doctrine, the identification and description of potential target offenses are

'general principles of law that are commonly or closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case,' thus triggering the trial court's duty to so instruct the jury on the court's own initiative." (*Id.*, 14 Cal.4th at 264 citing *People v. Montoya* (1994) 7 Cal.4th 1027, 1047; *People v. Estrada* (1995) 11 Cal.4th 568, 574; *People v. Perez* (1992) 2 Cal.4th 1117, 1129.) The Supreme Court agreed with Prettyman's co-defendant, Bray, that "in addition to CALJIC No. 3.02, the court should have given an instruction describing or defining the elements of the target crimes." (*People v. Prettyman, supra*, 14 Cal.4th at 266.) The court went on to state "the central issue here is whether the trial court must identify and describe uncharged target offenses for the jury. As in *Failla*, we conclude that such an instruction is necessary and should be given whenever uncharged target offenses form a part of the prosecution's theory of criminal liability and substantial evidence supports the theory." (*Id.*, 14 Cal.4th at 266-267, and 269 citing *People v. Failla* (1966) 64 Cal.2d 560, 564.) –

In *Prettyman*, the court said that if co-defendant Bray encouraged Prettyman to commit an assault but had no reason to believe Prettyman would use a deadly weapon to do so, it would not be reasonable to find that Bray aided and abetted a murder that was based on the assault. (*People v. Prettyman, supra*, 14 Cal.4th at 267.)

In the instant case, there was evidence that appellant expected to assist Andre Nelson in a drug robbery of Sean Landry. The testimony of Kevin Banks would also support a theory that appellant anticipated the possibility of assaulting Sean Landry, and also recognized the possibility of purchasing crack cocaine from Landry. Banks gave two taped statements (Exhs. 22 and 23), both of which were played for the jury. (CT 533; RT 1046, 1050.) In one statement he said the plan was to purchase drugs from Landry, while in the

second statement, Banks said there was a plan to rob Landry. In both statements he said there was no plan to kill Landry. The jury requested the tapes during deliberations. (CT 489.)

In any event, neither appellant nor Andre Nelson were charged with robbery or attempted robbery, and the jury apparently found no basis for convicting them on a felony murder theory. Thus, the jury disbelieved the evidence that there was a plan to commit robbery. That leaves the question of what target offense(s) were the basis for the verdict. In addition the defendants were not charged with assault or with the purchase or attempted purchase of a controlled substance. (See, *People v. Prettyman, supra,* 14 Cal.4th at 263 [noting the jury could reasonably conclude assault was a natural and probable consequence of aiding and abetting a robbery] citing *People v. Rogers* (1985) 172 Cal.App.3d 502; *People v. Fagalilo* (1981) 123 Cal.App.3d 524; *People v. Bradford* (1972) 28 Cal.App.3d 695; *People v. George* (1968) 259 Cal.App.2d 424, 429.) There is, as noted above, no evidence of any overt pre-existing plan to kill Landry or those present with him on the parking lot.

Absent some evidence that appellant had reason to believe Andre would kill Landry and would try to kill Shavon Pannell-Andrews, and in view of the fact that appellant was not present when Shavon was wounded, it would be possible to find appellant did not aid and abet, with respect to the attempted murder charged in count 3, which he had no reason to expect would happen in the first place. The People offered no evidence to the contrary -- i.e., evidence to show either that appellant knew Andre would try to harm Shavon, or that appellant was present at the time -- and they are therefore bound by their own evidence which shows appellant lacked knowledge and was not present. (*People v. Collins* (1961) 189 Cal.App.2d 575, 590.)

Recognizing that "[to] apply the 'natural and probable consequences'



30(49)

doctrine to aiders and abettors is not an easy task" the Supreme court stated:

> "The jury must decide whether the defendant (1) with knowledge of the confederate's unlawful purpose, and (2) the intent of committing, encouraging, or facilitating the commission of any target crime(s), (3) aided, promoted, encouraged, or instigated the commission of the target crime(s); whether (4) the defendant's confederate committed an offense other than the target crime(s); and whether (5) the offense committed by the confederate was a natural and probable consequence of the target crime(s) that the defendant encouraged or facilitated. Instructions describing each step in this process ensure proper application by the jury of the "natural and probable consequences" doctrine."

(*People v. Prettyman, supra,* 14 Cal.4th at 267.) The Supreme Court limited the trial court's obligation to a situation where "(1) the record contains substantial evidence that the defendant intended to encourage or assist a confederate in committing a target offense, and (2) the jury could reasonably find that the crime actually committed by the defendant's confederate was a 'natural and probable consequence' of the specifically contemplated target offense." (*Id.,* 14 Cal.4th at 269.) Here, applying the test set forth in *Prettyman,* there is substantial evidence that appellant intended to assist in one of the several offenses noted above. Moreover, it would be possible for the jury to find that the crimes committed by Andre Nelson -- i.e., the murder of Sean Landry and the attempted murder of Shavon Pannell-Andrews -- were a natural and probable consequence of robbery. (But see *People v. Fauber* (1992) 2 Cal.4th 792, 834 [aiding a robbery or burglary did not give rise to accomplice liability for murder because there was no suggestion that the accomplice 'had any prior knowledge' that a murder was intended. Hence, the court apparently assumed that murder is not **necessarily** a natural and probable consequence of robbery or burglary].) Thus, the jury here would be expected to decide if, beyond a reasonable doubt, Nelson's actions were a natural and probable consequence of the target offense of robbery, or of any nontarget

offenses, and under *Prettyman*, the trial court was obligated, without request, to identify and define the possible target and nontarget offenses which might naturally and probably lead to murder or attempted murder. In the instant case, with the exception of robbery -- which as noted above, was defined in the context of the felony murder instructions -- the trial court failed to identify and define **any** specific target or uncharged nontarget offenses.

The *Prettyman* court limited the trial court's responsibility to those cases where the prosecution elects to proceed in reliance on the natural and probable consequences doctrine, and where the court has determined it is proper to do so. (*Prettyman, supra*, 14 Cal.4th at 269.) Moreover, the trial court "need not identify all potential target offenses supported by the evidence, but only those that the prosecution wishes the jury to consider." However, the Supreme Court noted that "If the the prosecutor requests that the jury be instructed on the 'natural and probable consequences' doctrine, but fails to identify potential target crimes, the trial court should inquire about the particular target offenses on which instruction is desired." (*Id.*, 14 Cal.4th at 269, n.9 and at 270.) The court did not explain what must be done where, as here, the trial court has decided, apparently on its own motion, to give CALJIC No. 3.02 and to permit the jury to use the natural and probable consequences doctrine. Appellant submits that if the jury is given that leeway, the doctrine must at least be explained and the possible target offenses identified.

Unlike in *Prettyman*, the trial court's omission in this case was prejudicial to appellant. In *Prettyman*, the Supreme Court found that because the jury had been given instruction on first and second degree murder as to co-defendant Bray, and had rejected the latter, convicting her of first degree murder, there was no basis to find she was prejudiced by the trial court's

failure to instruct on involuntary manslaughter as a lesser included offense. (*People v. Prettyman, supra*, 14 Cal.4th at 276.) In addition, the Supreme Court noted that the prosecutor in *Prettyman* did not rely on the natural and probable consequences doctrine and did not argue it in closing argument. (*Id.*, 14 Cal.4th at 272-273.)

Here, in view of the very inadequate instructions on aiding and abetting, the jury was given an inadequate basis for evaluating whether or not appellant, as an aider and abettor, should be held responsible for the actions of Andre Nelson, both with respect to the murder of Sean Landry and with respect to the attempted murder of Shavon Pannell-Andrews. It is clear that the jury rejected the target offense of robbery as the basis for holding appellant responsible as an aider and abettor. However, there were several potential nontarget offenses which, under the evidence presented, could have been the basis for appellant's aiding and abetting liability. The jury should have been required to determine if beyond a reasonable doubt, the offenses committed by Andre Nelson were natural and probable consequences of those uncharged, nontarget, predicate offenses. Based on the trial court's failure to provide the jury with any alternatives for its consideration, and in view of the evidence regarding the level of appellant's conduct in counts 1 and 3, it cannot be said that the issue was decided adversely to appellant under other correct instructions. (See *People v. Sedeno* (1974) 10 Cal.3d 703, 721.)

### Conclusion

The trial court's failure to adequately and fully instruct the jury upon factors that must be considered when the People proceed on a theory of aiding and abetting liability was prejudicial to appellant. Although the *Prettyman* court suggests otherwise, appellant submits that matters relating to proof of any element of the charge and/or the prosecution's burden of proof thereon



violates the defendant's state and federal constitutional rights to trial by jury and due process (Cal.Const., Art. I, §§ 15 and 16; U.S. Const., Amends. 6 and 14). Thus, appellant submits the error was prejudicial under federal standards. (*Chapman v. California* (1967) 386 U.S. 18, 24.) In any event, under the principles set forth in *People v. Prettyman*, the judgment of conviction must be reversed. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

(SEE EXHIBITS  Z - C.  ) (  2 - D   2 - E ).

round 14, Ineffective Assistance of Appellate Counsel For Failure To Raise Argument
Appellant's Right To Due Process was Violated Because The Use of The Natural And
Probable Consequences Doctrine To Impose Liability Improperly Permitted
Appellant To Be Convicted of Second Degree Murder without Proof of
Malice Aforethought As A Necessary Element of The Offense.
On Petition for Review

Arguments:

Appellant submits that the use of the common law natural and probable consequence doctrine, when applied, as it was in this case, to permit a jury to find a defendant guilty of murder without also finding that he **personally** acted with malice aforethought, violates his due process right to be convicted of crime only upon proof beyond a reasonable doubt of every element of the offense, and his Sixth Amendment right to have the necessary findings made by the jury. (U.S.Const., Amends. V, VI, & XIV.)

When an offense is prosecuted under the felony murder doctrine, the prosecutor is excused from having to prove malice aforethought.  In *People v. Dillon* (1983) 34 Cal.3d 441, the California Supreme Court upheld the first-degree felony murder rule against a constitutional challenge premised on the fact that the rule allows conviction of murder without proof of malice. Central to the court's decision were two related conclusions, based on an exhaustive review of the history of the felony-murder rule in California:  First, that the Legislature had enacted the felony-murder rule into law; and second, that in so doing it had created a crime of felony-murder in which malice was not an element.  (*Id.,* 34 Cal.3d at 463, 465, 475-477.)

The natural and probable consequence doctrine differs from the first-degree felony murder rule in both of these crucial aspects:  there is nothing in its history that suggests that the natural and probable consequence doctrine was ever adopted into law, either explicitly or implicitly by the Legislature. Furthermore, aiding and abetting itself (without regard to the natural and

probable consequence doctrine) has never been considered as establishing an independent crime; rather, it has consistently been held to be nothing more than a theory of liability. (See, for example, *People v. Brigham* (1989) 216 Cal.App.3d 1039, 1049, n.8.) Thus, a conviction of murder based on the natural and probable consequence theory, rather than on proof of malice, unconstitutionally permits the state to avoid its obligation to prove malice, as required in Penal Code section 187.

### The Judicially-Created Doctrine of Natural and Probable Consequences Infringes Upon the Legislature's Exclusive Authority to Determine the Elements of Crime

There are no common law crimes in California. The legislature and the legislature alone, has the authority to determine what constitutes criminal conduct. (Pen.Code, § 6; *Keeler v. Superior Court* (1970) 2 Cal.3d 619, 631-632 ["subject to the constitutional prohibition against cruel and unusual punishment, the power **to define crimes** and fix penalties is **vested exclusively in the legislative branch**."]; emphasis added.)

The rules governing an aider and abettor's liability for crime are contained in Penal Code section 31, which was adopted in 1872, and never amended. Section 31 provides:

> "All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission, and all persons counseling, advising, or encouraging children under the age of fourteen years, lunatics or idiots, to commit any crime, or who, by fraud, contrivance, or force, occasion the drunkenness of another for the purpose of causing him to commit any crime, or who, by threats, menaces, command, or coercion, compel another to commit any crime, are principals in any crime so committed."

Penal Code section 31 makes no reference to the natural and probable

consequences doctrine, nor does it contain any language that can readily be interpreted as incorporating it.

In contrast, some jurisdictions have clearly and explicitly decided to codify the common law doctrine of natural and probable consequences by using language in their penal statutes that specifically indicates its adoption. (See, e.g., Kans.Stat.Ann. § 21-3205(2) (1981); Me.Rev.Stat. Ann. Tit. 17-A, § 57 (e) (A) (1983) ['a person is an accomplice...to any crime the commission of which was a reasonably foreseeable consequence of his conduct."].)

Because Penal Code section 31 has never been amended, the Legislature's intent at the time of its enactment is controlling. (*Keeler, supra,* 2 Cal.3d at 624.) Moreover, the legislative history of section 31 provides no indication that its adoption had anything to do with the natural and probable consequence doctrine. Throughout its history, section 31 has been construed, not as a provision designed to incorporate the common law, but as one designed to ameliorate certain of its complexities. (See, for example, *People v. Coffey* (1911) 161 Cal. 433, 439, ["It [section 31] obliterated the common-law distinctions between principals in their different degrees and accessories before the fact...to simplify criminal procedure and to do away with the technicalities of the common law..."]; *People v. Rozelle* (1899) 78 Cal. 84, 87-89 [information need not, under §§ 31 and 971, specify whether defendant "advised and encouraged" or "aided and abetted" charged crime]; *People v. Gusti* (1896) 113 Cal. 177, 179 [whether defendant committed criminal act or caused it to be done is one and the same under § 31]; *People v. Nolan* (1904) 144 Cal. 75, 76 [defendant need not be present when crime is committed to "advise and encourage"]; *People v. Dole* (1898) 122 Cal. 486, 492.)

None of the early cases citing section 31 discussed the provision in relation to the natural and probable consequence doctrine. Although the courts



continued to follow the common-law doctrine of natural and probable consequences after its adoption, they did so without reference to or reliance on section 31.[10]

In *People v. Kauffman* (1907) 152 Cal. 331, 334, the court propounded the rule "abundantly supported by authority" that each member of a conspiracy "is responsible for everything done by his confederates, which follows incidentally in the execution of the common design as one of its probable and natural consequences, even though it was not intended as a part of the original design or common plan." The court did **not** rely on section 31 for this rule. In fact section 31 is not even cited in the decision. (See also *People v. Creeks* (1915) 170 Cal. 328, 334 [court relies on *Kauffman*, not on section 31, in its discussion of natural and probable consequences].)

Appellant's has found no decision prior to 1992 which found in section 31 any Legislative intent to enact the common law natural and probable consequence doctrine. Then, in *People v. Woods* (1992) 8 Cal.App.4th 1570, discussed above in Argument II, the Court of Appeal, calling the doctrine a "common law rule of aider and abetter liability" noted that the decisions that have relied on it "did not refer to the language of section 31." (*Id.*, 8 Cal.App.4th at 1583.)

Apparently wanting to anchor the rule more firmly in the bedrock of legislative intent, the court continued,

"Nevertheless, we must conclude the court [in *People v. Croy, supra*...] impliedly determined that, in specifying an aider and abettor is liable

---

[10] Nevertheless, in *People v. Keefer* (1884) 65 Cal. 232, 233, the Supreme Court, without citation of authority, plainly evoked a version of the natural and probable consequence doctrine when it ruled that it was error for the trial court to refuse an instruction that would have informed the jury that the defendant could not be convicted of murder if the killing was "neither necessarily nor probably involved in [the offense defendant aided and abetted] nor incidental to it, but was an independent and malicious act with which defendant had no connection. . . ."

> for 'any crime so committed' by the perpetrator, the Legislature intended -- consistent with common law -- that the aider and abettor is guilty not only of the criminal act originally contemplated and abetted but also of any other crime by the perpetrator which is a reasonably foreseeable consequence of the offense originally contemplated by the aider and abettor."

(*People v. Woods, supra*, 8 Cal.App.4th at 1583-1584 citing *People v. Croy* (1985) 41 Cal.3d 1, 12, fn. 5.)

Appellant respectfully submits there is no basis for any such implied determination in the statutory language. Stripped to its bare essentials, section 31 may be paraphrased as providing:

> "All persons concerned in the commission of **a crime**, whether it be felony or misdemeanor, and whether they directly commit the act constituting **the offense**, or aid and abet its commission . . . are principals in **any crime so committed**."

(Emphasis added.) When the statute is thus simplified, it can plainly be seen that the phrase "any crime so committed" has two antecedents, the words "a crime" and the words "the offense." The meaning of the provision is unmistakable: Anyone who either directly commits a crime or aids and abets in its commission is considered a principal in the crime he perpetrated or aided and abetted. This reading of the statute makes perfect grammatical sense. It also comports with the expressed intent, at the time of the enactment of section 31, to do away with the complicated jargon and procedural rules differentiating different classes of accessories.

"[T]he objective of statutory interpretation is to ascertain and effectuate legislative intent. [Citations.] In determining intent, we look first to the words themselves. [Citations.] When the language is clear and unambiguous, there is no need for construction." (*People v. Woodhead* (1987) 43 Cal.3d 1002, 1007-1008.) There is nothing in the language of Penal Code section 31 --



nothing in its legislative history, and nothing in the courts' treatment of the provision during a period spanning more than a century -- that suggests the provision ever had or ever was meant to have any bearing on the common law doctrine of natural and probable consequences. Moreover, appellant has found no other statutory provision which could conceivably demonstrate that the Legislature had **enacted** the natural and probable consequence doctrine. This rule was and is entirely a product of the common law -- it is judge-made law, and was never enacted by the Legislature. (See, *People v. Luparello* (1986) 187 Cal.App.3d 410, 455 (Wiener, J., concurring).)

### The Common Law Natural and Probable Consequence Doctrine Cannot Be Used To Impose Liability for Murder Because It Eliminates an Essential Element of the Crime, as Determined by the Legislature

Judicial application of the common law natural and probable consequences rule may not properly be used to permit a defendant's conviction of murder, in the absence of evidence that he **personally** entertained the requisite mental state (malice aforethought) because it encroaches on the Legislature's exclusive right to determine the elements of crime.

In Penal Code sections 187 and 188, the Legislature has defined murder as an unlawful homicide committed with either express or implied malice aforethought. As the Supreme Court pointed out in *People v. Dillon, supra*, 34 Cal.3d at 475: "In every case of murder other than felony murder the prosecution undoubtedly has the burden of proving malice as an element of the crime." Felony murder remains the only theory for murder in which proof of malice is not required. Moreover, as has been discussed above, the jury in this case clearly and unambiguously rejected felony murder as the basis for appellant's conviction.

When used as the basis for a charge of murder, the natural and probable



consequence doctrine allows the prosecution to avoid its burden of proving that the defendant acted with malice by permitting the jury to attribute the mental state of another to the defendant. The essential facts the prosecutor must prove, when this theory is used, are: (1) that someone committed a murder (either an unlawful homicide with malice or a homicide which occurred during the course of a felony); (2) that the defendant aided and abetted that person in the commission of **some crime**; and (3) that the murder was a **natural and probable consequence of the crime the defendant aided and abetted.** These facts -- the elements of murder under the natural and probable consequence doctrine -- differ substantially from the elements of murder as defined by the Legislature, and in effect operate to create a **common law crime of murder.** Because there are no common law crimes permitted under Penal Code section 6, no such crime can exist in California. (Pen. Code, § 6; *People v. Keeler, supra,* 2 Cal.3d at 631-632.)

Accordingly, when the courts of this state permit a defendant to be convicted of murder on the theory that a murder he did not commit, intend, seek to bring about, or anticipate, was the natural and probable consequence of a less serious crime that he aided and abetted, they do something that the judiciary is not authorized to do under our tripartite system of government.

**The Application of the Natural and Probable Consequence Doctrine to this Case Violated Appellant's Due Process and Jury Trial Rights by Permitting the Prosecution to Obtain a Murder Conviction Without Proof of Malice**

The jury here was instructed pursuant to CALJIC No. 3.02 that an aider and abettor is liable for any crime committed by a principal which is a natural and probable consequence of the crime aided and abetted. (CT 511.) Thus, the jury was in effect excused from having to find malice on the part of appellant, if they found it on the part of Andre Nelson, regardless of whether

or not they found the offense to be a felony murder.

Appellant submits that the use of CALJIC No. 3.02 in this case, which permitted the jury to find appellant guilty on the basis of the natural and probable consequence doctrine, deprived appellant of his due process right to proof beyond a reasonable doubt of every element of the offense charged, and of his Sixth Amendment right to have the determination of guilt, as to each element of the offense, made by the jury. (U.S.Const., Amends. V, VI, & XIV.)

Due process "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." (*In re Winship* (1970) 397 U.S. 358, 364.) Here, however, the use of CALJIC No. 3.02 permitted the jury to find appellant guilty of a second degree murder, that the prosecutor essentially agreed he did not **personally** commit, without any proof of malice: a necessary element of murder under sections 187 and 188. (See, for example, RT 1091 [prosecutor argues that Nelson made his partners murderers], 1093, 1109.) In California, as noted above, proof of malice is only excused when the offense is prosecuted as a felony murder. However, because the jury rejected felony murder, proof of malice was not excused. The jury might impute Nelson's formation of malice to appellant if it found appellant aided and abetted a murder. However, the natural and probable consequences doctrine would permit the jury to convict appellant on a finding that he aided and abetted some other, lesser offense, as to which malice need not be found.

California's natural and probable consequences instruction is similar to the instruction that the United States Supreme Court, in *Sandstrom v. Montana* (1978) 442 U.S. 510, 520, condemned as violative of due process. The instruction disapproved in *Sandstrom* stated "'the law presumes that a person

intends the ordinary consequences of his voluntary acts...'" (*Id.* 442 U.S. at 512.)

The United States Supreme Court condemned the instruction in *Sandstrom* because it contained an unconstitutional presumption. CALJIC No. 3.02 does not mention the word presumption. However, the jury in this case was told:

> "And one who aids and abets is not only guilty of the particular crime that to his knowledge his confederates are contemplating committing, but he is also liable for the natural and probable or reasonable consequences of any act that he knowingly aided or encouraged."

In effect -- and in combination with CALJIC No. 3.01, which was also given, in paraphrase (see CT 511) -- what the instruction conveyed to the jury was that one who aids and abets is liable for the natural and probable consequences of any criminal act that he knowingly and intentionally helps to commit, even if his own intent and knowledge is different from that of the actual perpetrator. Thus, unlike the *Sandstrom* instruction, this instruction does **not** tell the jury that the law **presumes** a person intends the foreseeable consequences of his voluntary acts. In effect, CALJIC No. 3.02 is worse than the *Sandstrom* instruction because it tells the jury that under the law a person **is liable** for the natural and probable (i.e., foreseeable) consequences of his voluntary acts, **whether he intended those consequences or not**. If any meaningful distinction could be drawn between the instruction held to violate due process in *Sandstrom* and the natural and probable consequences instruction given in this case, it would **not** favor the constitutionality of this instruction.

In other words, CALJIC No. 3.02 does not establish a presumption that a person intends the natural and probable consequences of his acts, but rather a rule of law that a defendant is criminally liable for the natural and probable

consequences of his acts, whether he intended them or not. When applied to murder, the rule relieves the prosecution of the burden of proving the requisite mental state of express or implied malice, **on the part of the defendant**, as required by Penal Code sections 187 and 188.

A comparison between the natural and probable consequence doctrine and the felony murder rule demonstrates that, when applied to murder, the natural and probable consequence rule unconstitutionally permits a defendant to be convicted of murder without proof beyond a reasonable doubt of all the elements of the offense -- a result that, in California, is **only** permissible in the context of felony murder. As noted above, in *People v. Dillon* the Supreme Court upheld the first-degree felony murder rule against a due process challenge premised on the fact that the felony murder rule allows the prosecution to prove murder without establishing malice. (*Dillon, supra*, 34 Cal.3d 441.)

In rejecting the constitutional challenge, the court concluded that, although it originated in the common law, the felony murder rule in California had become "a creature of statute" (*id.* at p. 463), and that in **enacting the** felony murder rule in Penal Code section 189, the Legislature had effectively **created a substantive crime** that does not require proof of malice, something the Legislature unquestionably has the power to do. (*Id.*, 34 Cal.3d at 465, 475-477.)

The natural and probable consequence doctrine, unlike the felony murder rule, was **and is** a creature of the courts -- it started off as a common law rule **and remains just that**. Furthermore, it has been consistently held to be a "theory of liability" and **not** a distinct crime with its own elements. (*People v. Torres* (1990) 224 Cal.App.3d 763, 768; *People v. Ott* (1978) 84 Cal. App.3d 118, 131.) The logic of *Dillon*, thus, strongly suggests that the



44(63)

use of such a common law theory of liability to permit the prosecutor to dispense with an element of murder violates due process. (See *People v. Luparello, supra*, 187 Cal.App.3d at 455 (Wiener, J., concurring).)

Appellant is aware that in *Luparello, supra*, 187 Cal.App.3d at 439, the Court of Appeal rejected a *Sandstrom* challenge to the natural and probable consequences instruction, stating:

> "Luparello errs when he concludes the perpetrator and accomplice must 'share' an identical intent to be found criminally liable for the same crime. Technically, only the perpetrator can (and must) manifest the mens rea of the crime committed. Accomplice liability is premised on a different or, more appropriately, an equivalent mens rea. [Citation omitted.] This equivalence is found in intentionally encouraging or assisting or influencing the nefarious act."

The *Luparello* court is unquestionably correct in stating that under the natural and probable consequence doctrine, the accomplice need not share the intent of the perpetrator. Under the doctrine, the intent to encourage, assist or influence the nefarious act originally contemplated is as a matter of law deemed to be the equivalent of the mens rea required for the crime which was actually committed.[11] The problem is that *Luparello* neither considers nor explains how this can be so, and still be consistent with the Constitutional requirement of proof beyond a reasonable doubt of every element of the crime.

The *Luparello* court apparently assumed that there can be, and are, different elements of the crime charged, depending on whether the defendant was the perpetrator or the accomplice. Yet there is only one statutory

---

[11] This equivalence is demonstrably a legal fiction. Where the intent of the perpetrator and the intent of the accomplice are in fact equivalent, there is no need to use the natural and probable consequence doctrine to punish the accomplice for the greater crime. Where the accomplice does not have the mental state required for conviction of the greater crime, the natural and probable consequence doctrine imposes punishment on him that is in excess of his moral culpability.



45 (64)

definition of murder applicable to this case. There is no separate crime called "aiding and abetting murder". Indeed, as noted above, it is well recognized that "aiding and abetting" merely creates a **theory of liability** rather than a substantive crime with distinct elements. (*People v. Brigham, supra,* 216 Cal.App.3d at 1049, n.8; *People v. Torres, supra,* 224 Cal.App.3d at 768.)

The effect of permitting application of this theory of liability is to permit a presumption of some mental state, other than malice aforethought, as a basis for conviction of the crime of murder. This is precisely what the instruction in *Sandstrom* did, and precisely what the United States Supreme Court found to be a violation of due process.

In *Clark v. Jago* (6th Cir. 1982) 676 F.2d 1099, 1104, cert. denied (1983) 466 U.S. 977, the defendant was convicted of "aggravated murder," which under Ohio law required proof of a "purpose to kill." The jury was instructed that it could find the defendant guilty of murder if it found that his **accomplice** (the actual perpetrator) had killed intentionally. In declaring this instruction unconstitutional, the Circuit Court reasoned:

> "In contrast to *Sandstrom,* this case does not directly involve the use of a presumption as such. That is, the jury was never instructed that it must or might infer that the defendant had a purpose to kill based upon other facts in evidence. Instead, the jury in this case was instructed that the essential element of purpose to kill could be found in the mind of the defendant 'and/or' his accomplice. Nevertheless, the principles articulated in *Sandstrom* are equally applicable here. Under *Sandstrom* principles we have no doubt that **this...charge relieved the state of its burden to prove that [the defendant] had a purpose to kill the victim.**"

(*Id.,* 676 F.2d at 1104; emphasis added.) The court held that "where purpose to kill is an essential element of the crime of aggravated murder, a jury instruction permitting that element of culpability **to be found in either the defendant or his accomplice** is violative of the principles of Due Process



46(65)

under the Fourteenth Amendment." (*Id.*, 676 F.2d at 1106; emphasis added.)

CALJIC No. 3.02 is more complex than the instruction found constitutionally infirm in *Clark*. It does not explicitly tell the jury that the defendant can be convicted of murder on the basis of his accomplice's malice. Instead, it provides a formula for accomplishing the same result, and permits a jury using the natural and probable consequence doctrine to find that someone other than the defendant killed with malice, in order to hold the defendant guilty of murder. Appellant submits that an instruction permitting the jury to do so violates the defendant's right to due process of law in California no less than it does in Ohio.

The natural and probable consequence doctrine is a common law rule that has never been enacted by the Legislature and was never intended to define a substantive crime. Such a theory of liability cannot alter the elements of crimes as enacted by the Legislature. Because, as used in this case, the doctrine allowed the jury to find appellant guilty of murder without necessarily finding he acted with malice aforethought, it violated his right to a jury verdict of guilt beyond a reasonable doubt as to each element of the offense, as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

## The Use of the Natural and Probable Consequence Rule in this Case Requires Reversal

The jury's verdict in this case must have rested on the natural and probable consequence instruction. It was, after all, the position of the prosecutor that appellant did **not** kill Sean Landry. His responsibility for Landry's death, in the view of the People, was based essentially on a theory that his death was a natural and probable consequence of a plan to commit a robbery, entered into by appellant, Banks and Andre Nelson, the actual

perpetrator. Because the case was prosecuted as a felony murder, the jury was instructed that the perpetrator of the offense had to have acted with malice. However, the jury was given instructions on the necessity of finding malice on the part of appellant in the event the jury failed to find a felony murder.

An instruction that allows the jury to presume an element of the offense is subject to harmless error analysis under the "harmless beyond a reasonable doubt" standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 36.) In *Carella v. California* (1989) 491 U.S. 263 and *Yates v. Evatt* (1991) 500 U.S. 391, the United States Supreme Court explained the form this analysis must take when applied to an instruction that permitted the jury to presume an element of the offense. The relevant inquiry is not whether the evidence establishes guilt beyond a reasonable doubt but whether "it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'." (*Yates, supra*, 500 U.S. at 406.)

The problem with CALJIC No. 3.02 is not that it allows the jury to presume malice. The problem is that it allows the jury **to dispense with it entirely** if it finds that the murder was the natural and probable consequence of a crime the defendant aided and abetted. Nevertheless, it operates in exactly the same way as a conclusive presumption, by allowing the jury to find the defendant guilty on the basis of certain predicate facts deemed by operation of law to be the equivalent of the ultimate fact at issue. Like a presumption, it cuts off the jury's consideration of an element of the offense.

The pertinent question in reviewing such an error is whether "the predicate facts relied upon in the instruction, or other facts necessarily found by the jury are so closely related to the ultimate fact to be presumed that no rational jury could find those facts without also finding that ultimate fact, so that making those findings is functionally equivalent to finding the element



48 (67)

required to be presumed." (*Carella, supra*, 491 U.S. at 271; *People v. Reyes* (1992) 2 Cal.App.4th 1598, 1603.)   Appellant submits that under the circumstances shown in this case, it **cannot** be said that the finding of the predicate facts is the functional equivalent of finding appellant acted with malice in the death of Sean Landry.

Given the jury's rejection of robbery, the predicate facts necessarily found by the jury in this case are that appellant aided and abetted either an assault or an attempt to purchase for sale a controlled substance.   Neither offense necessarily implies that appellant harbored malice aforethought.

The jury was not instructed that anyone other than the direct perpetrator had to have acted with malice.   Thus, it is doubtful that the jury even questioned whether or not appellant did so.   Yet, as explained above, the doctrine of natural and probable consequences as a basis for circumventing the element of malice has not been enacted by the Legislature.   Until the Legislature does so, felony murder remains the **only** basis on which a defendant accused of murder may be found guilty without the prosecution being required to prove beyond a reasonable doubt that the accused acted with malice aforethought.

Moreover, in this case, the relationship between malice and the predicate facts necessarily found by the jury is not so close that the jury's findings can by any stretch of the imagination be considered the "functional equivalent" of a finding of malice.   The murder conviction must be reversed because the error was not harmless beyond a reasonable doubt. In addition, appellant submits that the same reasoning applicable to count 1, also applies to the conviction of attempted murder of Shavon Pannell-Andrews, in count 3, and that that conviction must likewise be reversed. (SEE EXHIBIT 2-C, 2-D) (2-E).

1. Ground #15, Ineffective Assistance of Appellate
2. Counsel And Ineffective Assistance of Trial Counsel
3. For Failure To File A Motion To Set Aside
4. Verdicts of Guilty in Counts 1, 2, 3,
5. Supporting Facts: Petitioner was found Not
6. Guilty of Possession of a firearm, ~~____~~ (count 4) AND
7. under The Provisions of California Penal Code
8. Section§654 offenses punishable in different ways
9. by different provisions; double Jeopardy. (SEE, EXHIBIT 2-C).
10. Petitioner contents that the Acquittal of The Firearm
11. is An Acquittal or conviction and sentence under
12. Any one bars a prosecution for the Same act or
13. Omission under Any one. The Stay of the Sentence
14. imposed by the court doesnot Satify the requirement
15. because An Acquittal bars prosecution for the
16. Same Act. under The Provisions of California
17. Penal Code Section §1022 Former acquittal on
18. The Merits; Acquittal of Same offense, Petitioner
19. further contends he is Acquitted of the Same offense,
20. or A Necessarily Included offense, Since ultimately
21. The firearm was connected with Counts 1, 2, 3, and
22. Cannot also be liable for punishment such as
23. personal use of a firearm, The Acquittal of The
24. Firearm means That I cannot be punished for
25. ~~____~~ personal use of a firearm, or punished with
26. Armed with firearm in Addition to the Actual
27. connected necessarily Included offense, Attempted murder,
28. murder, where the Gun was determined to be a necessarily included

1. Due Process is Violated when a state fails to follow its
2. own established criminal Procedures and Violates
3. its own Statutes Constitution. Hicks V. Oklahoma
4. (1980) 447 U.S. 343 [100 S. ct. 2227; 65 L. Ed.
5. 2d 175.] U.S.C.A 14th Amendment.
6. California Penal Code Sections § 654§, 1022,§ 12021(a)
7. §1385,§1387,§1118.1.

8. (SEE EXHIBITS, 2-C, 2-D, 2-E).
9.
10.
11.
12.
13.
14.
15.
16.
17.
18.
19.
20.
21.
22.
23.
24.
25.
26.
27.
28.

Ground#16, Prosecutor Used False Illegally obtained
Evidence At Petitioners Trial AND Knew or should have KNOWN
of The False Nature of It's existence IN connection with
Counts 1 thru 4 The Introduction of Oakland Police Departments
( ) Probable Cause Declarations AND consolidated Police Reports
   And Subsequent Supplemental Police Reports .


O.P.D, Detectives [1] Sgt. V Chan, (2) Sgt. Jon Madarang, (3) Sgt. Mike
Clark, (4) (supervisor) Sgt. Neely, and Arresting officers, (5) Parkinson, 7753 P.
and (6) D. Downer, 7604 T. violated Petitioner's 14TH AMENDMENT RIGHT TO DUE
PROCESS when they made a Warrentless ~~Arrest~~ Petitioner without Probable
cause,. The Declaration insupport of ~~the~~ Arrest was issued 24 HRS.
after the actual 3-21-1996. Arrest (D-I-O-A,) issued on 3-22-1996.
(see Exhibit 3-F). It was alleged and founded upon the newly dev-
eloped statement of Cedric Nelson, according to Sgt. Clark, (PROP 115)
(CT _____ )(Exhibit 3-G). The information was filed and submitted as
evidence by Sgt. Madarang, as a means for establishing Probable Cause
~~(                  )~~ ~~and~~ inaccord to providing Corroboration for statements
made by Kevin Banks, in and for, the purpose of obtaining a Declaration
insupport of that arrest. (Exhibit 3-F & 3-H). It was'nt until 3-19-1996.
when Sgt. Madarang, was advised by Sgt. V. Chan, that Petitioner was
arrestable for an attempt (211) at a Bank. However still No outstand-
ing warrent was issued For Petitioner's arrest, nor was the conditions
of Petitioner's Probation violated. (Exhibit 3- ). It was not until 3-21-
1996. when the Arrest was made and charges by Sgt. V. Chan,
and charges by Sgt. Madarang, and Sgt. Clark, were consolidated on
the arrest report as well as on the Probable Cause Determination sheet
(D-I-O-A,) ~~issued~~ was not issued until 3-22-1996. (Exhibit 3-F & 3-H).

California Penal Code Section § 840(3). However Petitioner ask this Court to take Judicial notice of trial counsels letter requesting Prose-cuting Attorney to foward a copy of O.P.D, record/results of Physical line up which Petitioner was ordered to attend and moreover ordered to elect other Inmates to accompany him in the line up. And though Petitioner did inquire   authorities gave no explanation as for the basis of said line up. (Exhibit 2-A), Therefore it's inconclusive evidence to supp-ort Probable Cause for consolidated arrest report and (the D.I.O.A.) Declaration - Insupport - Of - Arrest. Petitioner also notes that over a corse of (8 months) into this murder, and attempt murder(s) investigation, the victim/witness Cedric Nelson, had never gave any indication of Petition-r nor of any like unto Petitioner, as being ___ connected to offenses harged. (Exhibit 3-H). there is also inconsistent/Insufficient evidence to Legalize the (D-I-O-A.) When considering the ~~~~~~~~ inconsistent testimony of Sgt. Clark, (PROP 115) When Clark testified on direct Exam-nation that he was infact present during the new development of Cedric Nelson's 3-22-1996. Statement. (CT 12-13-14-15, 34.) And yet during cross exam-nation he testified that he was not present at the time his partner Sgt. Madarang, first developed that new information from Cedric Nelson, (T 24-25-26-27) (Exhibit 3-G). This gives Petitioner reason to believe as it is lso reasonably likely that those officers fabricated evidence and filed false report, inrefrence to the alleged 3-22-1996. statement of Cedric elson, gwen after 8 long months into the investigation, suddenly or the first time, said victim/witness C-Nelson can possitively identify titioner, as being not (1) of the (2) suspects, as was originally narrated y both victims in all their previous statements. But rather Petitioner was ... (1) of (2) suspects involved in the commission of the crime(s), on July

statement was taken just one day "AFTER" Petitioners Arrest". And (2) that his alleged statement was identical to that of Kevin Banks, that inwhich Banks ___ provided inconsistent statements both prior to and after Petitioner's arrest (Exhibit 3 - E, 1-A, thru 1-J.) Banks also testified that prior to his giving a statement(s) against Petitioner, during his Jan 5-1996. interview he was Threatened and Intimidated P.C § ___ , made Promises P.C § ___ , and coerced - P.C § ___ , by Sgt. Jon Madarang. Inwhich Sgt. Madarang. told Kevin Banks that ( Banks would not be charged if Banks told him the truth just like Sgt. Madarang. had already explained, ~~the truth to be~~, and knew the truth to be that Petitioner/ Jamaine Paige, and Andre Nelson were the shooters and that ~~he~~ Banks was there also but that he did not believe that Banks had a gun. Also he needed Banks to cooperate with him and that if so he would see to it that Banks not go to Jail for murder. (Exhibit 3 - E).

(See also, Exhibit 2 - D).

er than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, nmitment, or issue in any court? ☑ Yes. If yes, continue with number 13.    ☐ No. If no, skip to number 15.

(1) Name of court: California Supreme Court

(2) Nature of proceeding (for example, "habeas corpus petition"): Petition for Reconsideration

(3) Issues raised: (a) Not Accepted or Considered.

(b) _____

(4) Result (Attach order or explain why unavailable): denied July 20th, 1998

(5) Date of decision: _____

(1) Name of court: U.S. District Court Northern District of California

(2) Nature of proceeding: Federal writ    C 99-2870 MJJ (PJ)

(3) Issues raised: (a) See page 3 Issued Raised in the California Supreme

(b) Court Petition for Review were the Same Raised in district court.

(4) Result (Attach order or explain why unavailable): denied January 3, 2002 / January 10, 2002

(5) Date of decision: _____

(1) Name of court: U.S. Ninth Circuit Court of Appeals

(2) Nature of proceeding: for Certificate of Appealability

(3) Issues raised: (a) NO ISSUES WERE RAISED, FOR MY FAILURE TO FILE A C.O.A.

(b) _____

(4) Result (Attach order or explain why unavailable): denied June 13th, 2002

(5) Date of decision: _____

For additional prior petitions, applications, or motions, provide the same information on a separate page.

my of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

United States Supreme Court certiorari denied May 27, 2003

Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.)

Appellate Counsel Landra E. Rosenthal Informed Petitioner by computer generated letters that She wasnot going to bring Any Ineffective Assistance of ~~Appell~~ counsel Claims And was going to Review the state court Records clerks & Reporters Transcripts letter dated May 19, 1997 And find out why Trial Counsel didnot file A §995 Motion, She Also stated If there was a basis for filing a writ She would do it, She couldnot make that decision until Reading the record.

Since May 19, 1997 Past ON April 26, 1999, Petitioner filed A Complaint with the State Bar ON trial Attorney And discovered the trial Attorney was Suspended And disbarred letter dated September 8th, 1998, September 16, 1998, January 24, 2003 Marsden Motion on Trial Attorney Mintz dated July 11, 1996, future developments Since Petitioners Convictions Include A letter from the U.S. Department of Justice Federal Bureau of Investigation, dated March 13, 2001 Indicating that four oakland Police officers have been charged by the Alameda county district Attorney office with Various criminal violation iN Relations to my Peace officers misconduct Complaint Against oakland Police officers. oakland Police department Internal Affairs Intervie Conducted on January 17, 2008

Are you presently represented by counsel? ☐ Yes. ☑ No. If yes, state the attorney's name and address, if known:

Do you have any petition, appeal, or other matter pending in any court? ☐ Yes. ☑ No. If yes, explain:

If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

Pursuant To In re Hoddinott (1996) 12 C 4th 992, 50 CR 2d 706. There is No time limitation that governs when an Action may be

brought to vacate a Sentence unauthorized by Law. The Supreme Court has stated that "when one has a Substantial Right to Protect or Enforce, And this may be accomplished by such a writ He is entitled As A Matter of Right to the writ, or Perhaps more correctly in other words it would be an Abuse of discretion to deny it. People V. Medina (1972) 6 C 3d, 484, 491, 99 CR 630. Quoting Potomac oil Company V. Dye (1909) 10 CA 534, 537, 102 P677 (Emphasis Added) This is Particulary so when No Appellate Remedy will ever be Available.

Frey V. SCHUETZIE (8th Cir 1996) 78 F3d 359 Pro Se Habeas Corpus litigants must be given liberal Construction, And Petitioner is not required to specify specific Legal theories or offer Case citations in order for Relief.

This Court has Jurisdiction to hear this writ of Habeas Corpus Pursuant to California constitution Article 6 Section 10 Jurisdiction original Article 1 Section 28 (d) Right to truth in Evidence, Article 6 Section 13 Judgment-when Set Aside UNITED STATES CONSTitutional Amendments Article 6 Section 2 Supreme Law of the Land, Article 6 Section 3 oath of office Townsend V. Sain (1963) 372 U.S. 293 when the Superior Court, Court of Appeal, California Supreme Court donot or hadnot Provided the petitioner An Evidentiary on the issues presented in Relations to Evidence, Suppression, then the state is given an Opportunity to correct and donot do them the State is given a opportunity the state is not entitled to A presumption of Correctness on the State Judgment And Arenot Entitled to Any difference. The presumption of Correctness may also be rebutted with Arguments that the state court didnot properly determine the facts because the petitioner was prevented from Presenting evidence or had insufficient opportunity to be heard on the merits of the factual li

# DECLARANT VERIFICATION

## ACTION REQUESTED:

#1 Order AN Evidentiary Hearing.

#2 Appoint Petitioner Defense Counsel.

#3 Set Aside State Superior Court Judgment in Case Numbers 127285 A&B A077240.

#4 Discharge Petitioner from Custody Forthwith unconditionally Pursuant To California Penal Code §1487 discharge by virtue of Process That the defendant has committed without probable cause.

#5 Issue An Order To Show Cause.

#6 Order A discovery Concerning Kevin Banks Juvenile Record.

#7 Order discovery of Oakland Police department Police Personnel Records.

#8 Take Judicial Notice of Clerk, Reporter Transcripts Police Reports, Declarations, Exhibits, Motions.

#9 Any other Appropriate And Just Remedy of Law the Court deems fit.


I, The Undersigned Say: That I Am The Petitioner In This Action, I declare under penalty of Perjury Under the Laws of the State of California That The Foregoing Allegations And Statements Are True And Correct, Except As To matters That Are Stated on My Information And Belief, And To Those Matters, I believe them to be True.

Respectfully submitted,

3 - 05 - 2007.

DATE: 2 - 14 - 2007

Jannie Paige

(Signature) Declarant IN Pro Se

# PROOF OF SERVICE

(C.C.P. §2015.5; 28 U.S.C. §1745)

I, _Jamaine Paige_, am over the age of eighteen (18) years, and I (am) (am not) a party to the within cause of action. My address is:

_Jamaine Paige K-39043_
_H-D-S-P / B-3-145_
_P.O. Box 3030_
_Susanville, CA 96127_

On, _8-8-_, _08._, I served the following documents:

_Petition for Writ of Habeas Corpus Petition_ ~~for declaration~~/ ~~Declaration~~. _____ on the below named individuals by depositing true and correct copies thereof in the United State mail in ~~Represa~~, California, with postage fully prepaid thereon, addressed as follows:

~~1. Office of the clerk,~~
~~California Supreme Court~~
~~350 McAllister Street,~~
~~San Francisco, CA 94102~~

2. _NORTHERN DISTRICT COURT OF CALIFORNIA_
_U.S. COURTHOUSE_
_450 GOLDEN GATE AVE,_
_San Francisco, CA 94102-3483_

I have read the above statements and declare under the penalty of perjury of the laws of the State of California that the foregoing is true and correct.

Executed this _8_ day of _8_, _08._, at California State Prison at ~~Susanville, Represa~~, California.

(Signature) _Jamaine Paige_
Declarant

# EXHIBIT

# A

(176) S

314

1    pending.

2            THE COURT:  Sustained.

3            MR. CIRAOLO:

4    Q.   Did you make a call to Andre's mother at any time

5    after you were released from juvenile hall to find out if

6    Andre had been arrested yet?

7            MS. MCINTOSH:  Objection, irrelevant.

8            THE COURT:  Overruled.

9            THE WITNESS:  No, I didn't call and see if he was

10   arrested.

11           MR. CIRAOLO:

12   Q.   Did you call his girlfriend to see if he was

13   arrested?

14   A.   No.

15   Q.   When you first talked to Sergeant Madarang about

16   this, did you tell him that you were present at the scene

17   of the murder?

18   A.   Yes.  Later on that night.

19   Q.   How long did you stay in that interview room

20   before sergeant -- strike that.  Before you told Sergeant

21   Madarang you were at the scene of the murder?

22   A.   Um, I got there at about 3, like start talking to

23   him about 8.

24   Q.   Eight at night?

25   A.   Yes.  I stayed there until about 10.

26   Q.   When you started talking to him, did he tell you

27   what would happen to you if you didn't talk to him?

28   A.   Um, yes.

1    Q.   What did he tell you would happen to him if you

2    did not talk to him?

3              MS. MCINTOSH:   Objection, hearsay.

4              THE COURT:   Overruled.

5              THE WITNESS:   He told me that I would be convicted

6    for murder and I had a little baby on the way and he said I

7    wouldn't see my baby, I would see my baby but my baby would

8    have to see me locked up and things of that nature.

9    Q.   He told you you were a suspect in the murder,

10   didn't he?

11   A.   Yes.

12   Q.   He told you he could make you for the murder,

13   didn't he?

14   A.   I don't remember.

15   Q.   Well he told you you were there?

16   A.   Yes, he did say that.

17   Q.   And he said he had somebody pick you out of

18   photographs to show you were there?

19   A.   No.

20   Q.   But he said he knew you were there?

21   A.   Yes.

22   Q.   And he told you he could prove that you were

23   there?

24   A.   Yes.

25   Q.   And when he told you he could prove that you were

26   there, he also told you you're going to be put away for

27   along time?

28   A.   Yes.

1    Q.  And he told you if you didn't cooperate with him,

2  he'd make sure that would happen?

3    A.  No.

4    Q.  What did he tell you?

5    A.  He just told me that um, told me the options.

6    Q.  What options did he tell you?

7    A.  He told me that I could be put away for 25 years,

8  50 years, whatever.  My baby would see me in jail for the

9  rest of my life.

10    Q.  So he told you you would be an old man and your

11  baby would be a grown man?

12    A.  Yes, something like that.

13    Q.  And he told you if you didn't cooperate, that's

14  what would happen?

15    MS. MCINTOSH:  Objection, misstates the testimony.

16    THE COURT:  He may answer.

17    THE WITNESS:  I don't recall.

18    MR. CIRAOLO:

19    Q.  Well he gave you some options according to you?

20    A.  Yes.

21    Q.  What were the options?

22    A.  That my baby would have to see me grow up in jail

23  and I would be locked up for 25 to life.

24    Q.  What were the other options?

25    A.  Or I could cooperate.

26    Q.  And did he tell you what he meant by cooperating?

27    A.  Yes.

28    Q.  What did he tell you he meant by cooperating?

1    A.    Telling the truth.

2    Q.    And what did you understand the truth to be?

3    A.    Um what you mean what did I understand it to be?

4    Q.    Well, did he tell you what he was looking for?

5    A.    Yes.

6    Q.    What did he tell you he was looking for?

7    A.    Um, he said that he knew it was three people

8    there.  He knew that I was there.  And he knew that Dre and

9    Jamaine was the shooters.

10   Q.    Did he tell you how he knew Jamaine and Andre were

11   the shooters?

12   A.    No.

13         MS. MCINTOSH:  Objection, irrelevant.

14         THE COURT:  Overruled.  The answer may stand.  Go

15   ahead.

16         MR. CIRAOLO:

17   Q.    Did you ask him if he knew all this why he needed

18   you?

19   A.    Um, yes.

20   Q.    And what did he say in response to that?

21   A.    I don't know word for word but um he just said he

22   needed me.

23   Q.    Did you ask him again, if what he said to you is

24   true, why he needed you?

25   A.    Um did he tell me why he needed me?

26   Q.    Yes?

27   A.    To tell the truth.

28   Q.    But he told you that he knew you were there and he

319    106

THE COURT:  Ask it again.

MR. CIRAOLO:

Q.    I'll rephrase it.   Did he tell you that if you talked to him, he would not charge you?

A.    In a way.

Q.    What did he tell you that led you to believe that?

A.    I really don't know word for word but in a way he said that if I told him the truth, that like he, he said he already knew the truth and if he told him my part in it then um he would, I would not be under arrest, in some words.

Q.    He told you that he would not lock you up if you talked to him; is that correct?

A.    Um, yes.

Q.    And he told you that if you talked to him and gave him a statement, you would go home that night?

A.    Yes.

Q.    And he told you that even though he knew you were there and he knew that Andre was the shooter and Jamaine was the shooter, he still needed and wanted you to cooperate with him?

          MS. MCINTOSH:  Objection, asked and answered.

          THE COURT:  Overruled.

          THE WITNESS:  Yes.

          MR. CIRAOLO:

Q.    And he told you that if he, if you cooperated with him, you would go home?

          MS. MCINTOSH:  Objection, asked and answered.

(616)

320    107

```
1              THE COURT:  Sustained.

2              MR. CIRAOLO:

3         Q.   You talked to that sergeant that night, did you

4    not?

5         A.   Yes.

6         Q.   And you went home that night?

7         A.   Yes.

8         Q.   And you lied to him?

9         A.   No.

10        Q.   You didn't tell him everything?

11        A.   No.  I didn't tell him everything but I told him

12   and I left certain details out.

13        Q.   Well you left certain details out; right?

14        A.   Yes.

15        Q.   That means you did not tell him everything, did

16   you?

17        A.   Right.

18        Q.   And you first told him a story that you were there

19   and you were a block away and you saw this go down?

20        A.   No.

21        Q.   You told him you were right, standing up next

22   against Sean?

23        A.   No.

24        Q.   You tell him that you were buying dope from Sean?

25        A.   No, I didn't tell him I was buying dope from Sean.

26        Q.   You told him that you saw Andre do the shooting

27   after he told you that he knew Andre was the shooter?

28              MS. MCINTOSH:  Objection, vague and compound.
```

108

321

1        THE COURT:  Sustained.

2        MR. CIRAOLO:

3    Q.    Did the sergeant tell you he knew Andre was the

4   shooter?

5    A.    Did he tell me he knew Andre was the shooter?

6    Q.    Yes?

7    A.    Yes.

8    Q.    Did he tell you that before you said you saw Andre

9   shoot?

10   A.    Yes.

11   Q.    And did he tell you that Jamaine was a shooter

12  before you told him that you saw Jamaine shoot?

13   A.    Yes.

14   Q.    When you talked to Sergeant Madarang you talked

15  with him alone or was there another officer there?

16   A.    The first time alone.

17   Q.    And when you first talked to Sergeant Madarang

18  when he said you're going to be an old man and your baby

19  won't see you except in jail, was he alone?

20   A.    Yes.

21   Q.    When he told you that, did he have a tape recorder

22  going?

23   A.    No.

24   Q.    Later on, did he turn the tape recorder on?

25   A.    Um, not -- No.

26   Q.    Pardon me?

27   A.    No.

28   Q.    Did he take a tape recording of you at all that

322                                    109

1   night?

2      A.   No.

3      Q.   When he said you would go home if you cooperated,

4   was he alone with you in that room?

5      A.   Excuse me?

6      Q.   When Sergeant Madarang told you that if you

7   cooperated, you would go home, was he alone with you?

8      A.   Yes.

9      Q.   After you talked with him you went home; is that

10  correct?

11     A.   Yes.

12     Q.   Did Sergeant Madarang drive you home?

13     A.   No.

14     Q.   How did you get home?

15     A.   A cab.

16     Q.   Did you have money for the cab?

17     A.   Yes.

18     Q.   Did he tell you that he was going to see that you

19  were not charged with this offense?

20     A.   No.

21     Q.   Did he tell you that he would talk to the district

22  attorney to make sure you were not charged with this

23  offense?

24     A.   No.

25     Q.   Did he tell you that he was going to talk to the

26  district attorney in juvenile court to make sure you were

27  not violated?

28     A.   No.

1    Q.   Did he make you any other promises other then he

2    said you won't go to jail and you'd go home?

3    A.   No.

4    Q.   That was the only promise?

5    A.   Yes.

6    Q.   And you kept some information back that first

7    time; is that correct?

8    A.   Yes.

9    Q.   Now, when you talked to Sergeant Madarang, were

10    you aware if Andre was in jail or out of jail?

11    A.   Yes.

12    Q.   He was in jail?

13    A.   Yes.

14    Q.   And it was in juvenile court?

15    A.   Yes.

16    Q.   Now using when you talked to Sergeant Madarang as

17    a reference point, had you gone to juvenile court to visit

18    Andre before that date?

19    A.   Yes.

20    Q.   And how many times did you go to juvenile court to

21    visit Andre?

22    A.   Once.

23    Q.   And when you went to juvenile court, were you

24    sitting with Andre's girlfriend?

25    A.   Yes.

26    Q.   And when you were sitting with Andre's girlfriend

27    in juvenile court, did she have a copy of the police

28    report?



# EXHIBIT

# 2 — A

(NO 995 MOTION / NO LINE UP).

Mintz, Giller and Mintz, A Law Corp. ♦ Lincoln Nathan Mintz, Attorney at Law
17 Apr 96

In re:       *PAIGE   Jamaine V. v Peo [1996 -- OMC # 408621 -- 187 & various]*
Letter to:   *District Attorney for the County of Alameda, Oakland branch office*
Subject:     *Discovery request*

toxicology and the like, I would appreciate it if you could order them up and furnish copies when they arrive.

Fourth, I'm betting Lansing Lee has photos and notes pertaining to his firearms identification reports and opnions. (He makes the notes in a separate typewriter, which he "opens" on opening his examination of the forensic evidence; and, he always photographs positive findings.) As his evidence will be very important if he testifies, and likely exculpatory if he doesn't, I would appreciate it if you could order these up and furnish copies of the notes (and any further reports) and allow us to come and see the photos.

Fifth, I'm informed that there were corporeal lineups in this case; I think there's likely a chance that my client was in such a lineup. The "packet" contains **no** mention whatever of this. I would appreciate it if you would ask OPD (probably Sgt. Madarang, or maybe Sgt. Mike Clark) whether they have such reports and, if they do, then forward copies at once. **This is real important.** I need information as to who the participants in those lineups were, and I think I'm entitled to know who the observers/witnesses were, as well as any reports/lineup cards that may have memorialized the lineups.

Sixth, the information provided did not have the photo lineups, and I really think there are probably more reports of photo lineups than just the scanty notes I've been given. I think we should have these, please. (I know there to be a photo lineup including my client that was apparently shown to Cedric Nelson, from which he allegedly made a photographic ID.)

Seventh, would you please provide the entirety of the "rap-sheet" as you may have access to it of André Nelson?

Eighth, would you please provide the entirety of the "rap-sheet" as you may have access to it of my client, Jamaine Vernon Paige? Also, Mr. Paige was apparently arrested in March, 1996, on this case; but only after Sgt. Chan had reported to Sgt. Madarang that Mr. Paige was "arrestable" for an attempt 211 at a bank. May I please have copies of the reports on that alleged attempt 211 at the bank?

And, finally, there's mention in a couple of places of some guy named Lawrence McLeod as apparently a witness to these charged offenses. But there's insufficient information for us to make out where he comes from as a witness, what he might have seen, or who in heck he is. Apparently, he was taken to OPD homicide by patrol officers to talk with Sgt. Madarang, at Sgt. Madarang's request; but we have no information as to what he might have said there, or what information there is that he might be a witness. Could you illuminate? Maybe after a conversaation with Sgt. Madarang?

Thanks for your kind assistance. Incidentally, the time constraints are such that we have no way of complying with the 15-day informal discovery request requirement; therefore, I would think that you should be prepared to comply with whatever you're going to comply with by Monday 22 April 1996, or that I should be prepared to file my formal motion on 48-

FINANCIAL CENTER BUILDING
405 - 14TH STREET, SUITE NUMBER 300, OAKLAND, CALIFORNIA  94612
Telephone 510/451-6686  ♦  FAX 510/451-4820
(114)

3



# EXHIBIT

( 1 — A ᵀᴴᴿᵁ 1-J. X ~~AND EXHIBIT 2-C~~ )

INSUFFICIENT, INCREDIBLE
INSUBSTANTIAL TESTIMONY OF
KEVIN BANKS.

(1) The initial O.P.D. report at p; 14 in Madarang + Kevin banks puts the .40 CAL Glock handgun / attempted murder weapon, in A. Nelson's hand on both July 29th-1995. and August 4th-1995. (INCONSISTENCY) At, O.P.D, April 24-th-1996. statement taken by Sgt. Jon Madarang, and Sgt. Mike clark, Banks put the same .40 CAL Glock in Paige hand. (See EXHIBIT 1-A) At p; 14. and see Exhibit 1-A) (RT 594-595-596, 784.).

(2) O.P.D., 4-24-1996. statement, Banks swear there was no discussion or plan to committ robbery. (Exhibit 1-A) p; 16. (INCONSISTENCY) At, O.P.D., 4-26-1996. statement taken by Sgt. Madarang, and Sgt. Mike clark, Banks swear there was a lengthy discussion and plan to committ robbery. (Exhibit 1-B) p; 1-2-3-4..

(3) Banks testified and admitt to having lied to investigators, about both Defendant(s) exiting an apt whereby they returned to his car now possessing two firearms for the commission of the robbery. (Exhibit 1-C) (RT 893).

(4) Banks testified that we use to trade of the .40 CAL Glock Gun used in the shooting. (Exhibit 1-D) (RT 808-809.). (INCONSISTENCY). Banks later testified that we never traded off the Gun. (Exhibit 1-D) (RT 810.).

(5) Banks testified that he first started coming to South Hayward, to sell dope with the Defendant(s) a week or two after July 4-1995. Sometime prior to the shooting incident of July 28-29-1995. (Exhibit 1-E) (RT 532) (INCONSISTENCY) Banks just started coming out there with Defendant(s), After the shooting (Exhibit 1-E) (RT 591).

(6) Banks testified and always informed investigators, that he first begain coming to South Hayward to sell dope with both Defendant(s) prior to the shooting incident. He also swore that within that time he always knew, Paige to possess and hid his .40 CAL Glock in some apt(s) on the turf. (Exhibit 1-E) (RT 532). (INCONSISTENCY) Never seen Paige on the turf prior to the night Sean Landry was Killed (Exhibit 1-E (RT 814).

(7) Banks testified to having lied while under oath at the Preliminary Examination

(48)

1   ( Exhibit 1-F ) ( RT 621 ).

2   (8) Banks testified to having outright lied to Sgt. Madarang. ( Exhibit 1-G )( RT

3   620-621, 768-769-770, 893, 896, 901.).

4   (9) Sgt. Madarang, testified that Banks lied on him when Banks testified that

5   Sgt. Madarang, made him promises, threatened, intimidated and coerced him during

6   his intial interview. ( Exhibit 1-H ) ( RT 1031-1032, 1044, 1050-1051-1052-1053-1054

7   1055-1056-1057-1058-1059-1060-1061-1062-1063-1064.). Banks also testified at

8   Preliminary Examination, that he was given a supeana and was told by Sgt. Mad-

9   arang, that he was to appear in court. Which shows that a deal and/or a promise

10  was made and Kept to the witness / informant / Accomplice. granting him

11  liency from prosecution something of value inexchange cooperation / testimony,

12  in this case. ( Exhibit 1-H   ). ( CT 124.)

13  (10) Shavon Andrews testified that there were only two men present on

14  the parkinglot at the time of the shooting, who did the shooting not three

15  men as Kevin Banks, always alleged,. ( Exhibit 1-I ) ( CT 85-86-87-88-89.)

16  Shavon also picked out I.d. Kevin Banks photo as being closet to one

17  of the two men that did the shooting. ( Exhibit 1-I ) ( RT 118-119-120-121-

18  122-123-124.).

19  (11) Also to g Further Substantiate this claim of Accomplice Kevin Banks state-

20  ments and testimony being insufficient, incredible or insubstantial on it's

21  face Petitioner ask this court to take Judicial Notice of the Jury's criticle

22  questions concerning both law and evidence inconnection to count (4) an essential

23  element of offenses charged and tried. And Jury's verdict of Acquittal to

24  Petitioner in count (4). Which proves that the jury did not believe the test-

25  imony of Kevin Banks when Banks said that Petitioner Paige possessed and

26  personally discharged the Exhibit 9C. count (4) firearm at and upon cedric

27  Nelson as charged in count (2) resulting to the crime(s) of Attempted murder in cou

28  (2) and aiding and abetting to murder in count (1) and attempted murder in count (3).

    ( EXHIBIT 1-J ).

                                        (49)

A

# EXHIBIT



**Description:** FALSE STATEMENT    ACCOMPOLICE OF(KEVIN BANK"'S)

TESTIMONY OF CO-CONSPIRATOR

**Pages:** ~~RE 399 line - 5, thru 11~~

(50)

| NANT E | DEFENDANT | RD NO. |
|--------|-----------|--------|
| drlj Sean | | 95-7085/ |

his narcotics. Banks claimed that he was not armed and although he didn't like the idea felt that he couldn't back out at this point. The three of them went to a parking lot at 60th Ave. and MacArthur Blvd. where they paged the comp again. This time he returned their call and agreed to come to their location and sell them "Fifties." Within 30 minutes the comp arrived driving his car and in the car were two others (male & female = C. Nelson & S. Pannell.) Banks said that the comp backed his car against the east boundary of the parking lot and exited the car. The other male (C. Nelson) also exited the car and began to walk around the parking lot in front of the comp's car. The female remained seated in the front seat and both front doors were left in an open position. Banks said that the comp stood next to the L/F fender and placed several packets of cocaine on the hood of the car for the susps to examine. A. Nelson (no relation to C. Nelson.) stood in front of the front bumper of the car, nearest to the comp and to his left, and began to negotiate a price for the cocaine. A. Nelson kept telling the comp that the rocks looked small whereupon the comp offered to throw in a few extra rocks. Banks was standing to A. Nelson's left and Paige was standing to Bank's left, all directly in front of the comp's car bumper. At this point A. Nelson pulled a gun from his rear pants pocket with his left hand and began to fire at the comp. The comp fell immediately to the ground and C. Nelson started to run S/B through the parking lot with Paige chasing him, firing his gun at C. Nelson. Banks said that he backed up and watched as A. Nelson walked around to the open drivers door and shot the female who was begging A. Nelson not to kill her. Banks heard A. Nelson say just before shooting the female, "Shut up bitch." Moments later Paige returned to the car and A. Nelson yelled at him to finish killing the comp on the ground. Paige yelled back at A. Nelson that he couldn't because he was out of bullets. With that A. Nelson yelled at Banks to grab the cocaine off the hood of the car but Banks refused. Banks said that he ran to his aunts car to flee and he was joined by A. Nelson and Paige. Banks said they drove off and went to A. Nelson's grandmother's home in Oakland where Nelson hid a 45 caliber semi-auto handgun. They then drove to Bank's aunt's home in the ▓▓▓▓▓▓▓ where they spent the night. The next morning they parted company. Banks told me that A. Nelson held onto his Glock 40 caliber semi-auto handgun because he liked the gun and didn't want to get rid of it. Banks also told me that Nelson was the one that dropped the same Glock in Hayward when HPD stopped them.

Banks was released until further consultation with the D.A.'s office.

| INVESTIGATOR | SERIAL NO. | 2ND INVESTIGATOR | SERIAL NO. | SUPERVISOR | SERIAL NO. |
|--------------|-----------|------------------|-----------|------------|-----------|
| T. V. Malali | 7137C | | | Lt. Cace 6805C | |

F262 (6/85)       (5 D)

**STATEMENT OF KEVIN BANKS**

| | |
|---|---|
| Taken At: | Oakland Police Department<br>Interview Room 202 |
| Taken By: | Sgt. Jon Madarang<br>Oakland Police Department |
| Date of Statement: | April 24, 1996 |
| Time: | 1450 Hours |
| Present: | Sgt. Jon Madarang<br>Oakland Police Department |
| | Sgt. Michael Clark<br>Oakland Police Department |
| | Kevin Banks |
| Transcribed By: | Sandra Stiving<br>Office of the District Attorney |
| Date of Transcription: | August 22, 1996 |

\* \* \* \* \* \* \* \* \* \*

**SGT. MADARANG:** Today is the 24th of April 1996. I'm Sgt. Madarang at the Oakland Police Department and with me is my partner Sgt. Clark. And with us is Kevin Banks and we're in room 202 and the time right now is 1450 hours. Now Kevin, you can see we're recording this, correct?

**KEVIN BANKS:** Yes.

Q. Ok. So now for the purpose of the tape will you tell us your full name and date of birth?

A. Kevin DeDominique Banks. My birthday is 11-6-77.

Q. Ok. Now, the reason you're here is because Sgt. Clark, you called me and I asked you to come in and talk to me, and this is the second time we've talked. What we're talking about is the shooting that happened at 60th and MacArthur when you were with two other fellows, is that correct?

A. Yes.

Q. Ok. Now, whereabouts are you living nowadays? With your girlfriend?

A. Yes.

Q. Ok. And that's in East Oakland, correct?

A. Yes.

Q. Ok. Now, you know Jamaine Paige and you know Andre Nelson, correct?

A. Yes.

Q. And are they related to you?

A. Um, his, Andre Nelson mother had a baby by my Uncle, June.

(52)

1    Q.    Sean did?

         A.    -- yeah, Sean called somebody on his mobile phone to tell them that um, Dre (unintelligible)
2         in the car with him right now, he can do him right now. And I guess whoever he was on
          the phone with, told him that it wasn't the right time.
3

4    Q.    Told Sean that?

         A.    Yeah. And um, Dre was ear hustling, the music was up kind of loud and they were smoking
5         some weed, and I guess he thought Dre wasn't paying attention to him. And um --

6    Q.    So Dre overheard this conversation?

         A.    -- yeah, Dre overheard, but it wasn't meant for him to hear the conversation. And um, Sean
7         told Dre, let's ride to Pinole, you know, let's ride to Pinole, ride to Pinole. And Dre said no,
          take me back to the spot, take me back to the spot. Sean said, I got hella weed, we could
8         just smoke hella weed and just ride while I go take care of this business. Dre overheard the
          conversation so he decided not to go. And Sean took him back to the spot. Then um, when
9         I started coming around, um, he told me what happened. And then at this point I had just
          started going to Hayward like the week before the incident occurred. And then um, I didn't
10        meet Sean until that night.

11   Q.    Ok. Now, at some point you and Jamaine and Dre were in Hayward?

         A.    Yes.
12
         Q.    And you were stopped by the Hayward Police, correct?

13   A.    Yes.

14   Q.    Ok. That night that you guys were stopped, the police took you in, right?

         A.    Yes.
15
         Q.    Ok. And the police found the gun, is that correct?

16   A.    Yes.

17   Q.    Now is that gun the same Glock that we're talking about was used in this murder?

         A.    Yes.
18
         Q.    Ok. And who had the Glock that night when the Hayward Police found it?

19   A.    Jamaine had it that night.

20   Q.    Now what happened? Walk me through what happened? You guys were walking along and
          what happens?
21   A.    Um, we used to trade, we used to trade off the gun like, when we used to be on our way
          to the spot (unintelligible) 'cause I didn't have no car at the time so we used to catch the
22        BART and stuff so we used to trade off the gun. And um, that night Jamaine had the gun.

         Q.    Ok.
23   A.    And uh, we was walking. And we saw Taylor and them in a little brown, looked like he was
          in a Cutlass.

24

25

26

27

28

1    Q.    And how do you, why do you think he has it?
       A.    Because that's who, I guess he gave it to the night, we went by his grandmother's house.

2

     Q.    And did he try to go back and get the gun or what?
3    A.    Yes.

4    Q.    And what happened?
       A.    And his uncle kept putting him off, putting him off, putting him off.  And um, Dre got tired
5         of it and he just, like, forgot it.

6    Q.    Ok.  Sgt. Clark?

7    SGT. CLARK:    Just a couple questions.  When you guys are going to meet them after he was paged,
                after Sean was paged, was there any talk by Andre or Jamaine regarding setting 'em
8               up?  Like taking care of business?
       A.    Not at that, no.
9
     Q.    When was it that, was it discussed anytime before the shooting was it discussed?
10   A.    Um, it had to be, you know, but you know what I'm saying?  I figured it had to be discussed
         when I was getting my food and Ced and Sean were getting back in the car.  Or it was
11         discussed, it had to be discussed, it just had to be discussed.

12   Q.    And they didn't, did they tell you anything about what they planned on doing?
      A.    No, they didn't tell me nothing about no murder.
13

14   Q.    Ok.  Did you see them take any money off of any of them or did they talk about taking any
          money?
15   A.    Um, it wasn't no, it wasn't no, you know what I'm saying?  It wasn't no robbery or nothing.
         It looked like it was just, just a killing.  It looked like it was just a (unintelligible) killing.

16   Q.    They wanted you to take the dope --
      A.    Take the dope.
17

     Q.    -- that Sean left out?
18   A.    Yeah, he wanted me to take the dope that Sean left out.

19   Q.    Ok.  That's all I have.

20   SGT. MADARANG:    Ok, did you tell anybody else about what happened that night?
      A.    No, I didn't um, like, talk to my girlfriend and told her like little pieces, but she, I ain't never
21         just told her the big picture, but it was like little pieces.

22   Q.    Did you talk to anyone else besides your girlfriend?
      A.    No.
23

     Q.    Ok.  Have you talked to Jamaine or Dre since they got arrested?
24   A.    Yes, like, I ain't talked to Jamaine, but I talked to Dre like twice.  That was before the first
         time that you um, talked to me.
25

     Q.    Ok.  What did they tell you basically?
26   A.    They told me that you all was coming, and to have a, Dre told me that you all was coming
         and to have a lawyer. And his lawyer called me too, and told me that uh, she know a lady
27         lawyer and I can only pay like two hundred dollars to come in and say that um, that I don't
         know nothing and I don't want to say nothing.  And then from what they got to tell me that
28         you all didn't have nothing to arrest me on, and um, my lawyer, which I'd be able to walk
         out with my lawyer.



1    Q.    All right. Sgt. Clark, anything else?

2    SGT. CLARK:  Nothing else.

3    SGT. MADARANG:    Ok, is this the complete truth here you're telling us?
     A.    Yes, this is the complete, the honest, the truth, the complete truth.

4

5    Q.    Now you know the first time you and I spoke together, you were really scared, I could tell.
           Um, is that the reason why you hesitated about going on tape the first time?
     A.    Yes.

6

7    Q.    Ok. All right. With that we're gonna end this tape and the time right now is 15:19.

8                                   -END OF STATEMENT-

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



1  A.      Probably about 17 rocks.

2  Q.      17?

3  A.      Yes.

4  Q.      Were they dime rocks?

5  A.      Yes.

6  Q.      All individually wrapped?

7  A.      Yes.

8  Q.      When you sold them out there, do you always

9  individually wrap up your rocks?

10  A.      Yes.

11  Q.      Why is that?

12  A.      Put them in your mouth.  If you got stopped by the

13  police, you can actually swallow them.

14  Q.      If they were wrapped up?

15  A.      Yes.

16  Q.      Okay.  You saw them make a U-turn?

17  A.      Yes.

18  Q.      Is that at the point where you tossed the bag of

19  dope?

20  A.      Yes.

21  Q.      Did anybody else throw anything?

22  A.      Yes.

23  Q.      Who threw something?

24  A.      Jamaine.

25  Q.      What did Jamaine Paige drop?

26  A.      His gun and his dope.

27  Q.      He had a bag of dope?

28  A.      Yes.

(56)

1    Q.        Okay.  Do you know how much dope Jamaine Paige was

2    carrying that night?

3    A.        No.

4    Q.        You say he threw a gun?

5    A.        Yes.

6    Q.        What kind of gun did he throw?

7    A.        The .40 caliber.

8    Q.        Okay.  Do you know what kind of .40 caliber this was?

9    A.        No.  It was a Glock.  I don't know what -- it was

10    a --

11        THE REPORTER:  What was that?

12        THE WITNESS:  I know it was a Glock.  I didn't know

13    what kind it was.

14        MS. DANZIG:  Q.  What does Glock mean to you?

15    A.        A plastic pistol.

16    Q.        Okay.  Was that the same pistol that you had seen

17    which Jamaine used to shoot Cedric the night of the

18    shootings?

19    A.        Yes.

20    Q.        Now, you had mentioned that Andre Nelson had gotten

21    rid of the .45.  He had dropped it off at grandmother's

22    house?

23    A.        Yes.

24    Q.        Did Jamaine Paige talk about getting rid of his

25    pistol, the one he used?

26    A.        No.

27    Q.        Was there any conversation about it?

28    A.        No.

1    Q.    Okay. Let me show you an item that has been marked
2    9C for identification and ask you to take a look at that and
3    tell me whether you recognize it?

4    A.    Yes.

5    Q.    What do you recognize this to be?

6    A.    The .40 caliber.

7    Q.    Is this the same .40 caliber that Jamaine Paige had
8    during the night of the shooting?

9    A.    Yes.

10    Q.    How do you recognize it?

11          How do you recognize it?

12    A.    Bring it back over here and I can show you exactly
13    how I recognize it.

14    Q.    (Complying.)

15    A.    It has little white part back there. I remember
16    the --

17          THE COURT:  Talk slower and into the mike.

18          THE WITNESS:  I remember that part back there, and I
19    remember exactly how the gun looked, appeared.

20          MS. DANZIG:  Q.  Are you referring to the rear
21    sight, there's a white mark on the rear?

22    A.    Yes.

23    Q.    And you recognize that?

24    A.    Yes.

25    Q.    Have you ever handled this weapon before?

26    A.    Yes.

27    Q.    About how many times do you think that you had an
28    opportunity to handle this weapon?

(58)

JAMES LEE, CSR NO. 4820

1  of a gun, don't you?

2  A.        Yes.

3  Q.        And that the 23 refers to how the gun is designed;

4  right?

5  A.        Yes.

6  Q.        And you know there's a difference between the nine

7  millimeter and a .40 caliber?

8  A.        Yes.

9  Q.        And you know that the gun that was used in the

10  shooting of Sean Landry and the shooting of Cedric was a

11  Glock 23 .40 caliber; right?

12  A.        Yes, I thought it was a -- no, I thought it was a

13  Glock 23.  I thought the Glock 23 shoot nine millimeter

14  bullets.

15  Q.        Okay.  Now, let me ask you this:  When was the first

16  time you identified the gun here in the courtroom that was

17  shown to you by the prosecuting attorney?

18            You've identified that gun as being the particular

19  Glock that was dropped out there in Hayward that night when

20  you were arrested; right?

21  A.        Yes.

22  Q.        And that's the same gun that was used in the shooting

23  of Sean Landry and Cedric; right?

24  A.        Yes.

25  Q.        Now, when was the first time ever that you saw that

26  gun?

27  A.        Like I said, before Sean had died when I went over to

28  Jamaine (sic) house prior to that.

(59)

$\mathcal{B}$

# EXHIBIT



**Description:**   PERJURY      KEVIN BANK'S

Perjury of Kevin Bank's    Lie on the Stand.

**Pages:** ~~RT 779,Lines 20~~ ~~RT 769,Lines 1-20,RT 770 Lines 3~~.
~~RT 000,Lines~~ ~~RT 004 Lines~~9.

## STATEMENT OF KEVIN BANKS

| | |
|---|---|
| Taken At: | District Attorney's Office<br>Conference Room |
| Taken By: | Inspector Tim Painter |
| Date of Statement: | April 26, 1996 |
| Time: | 11:20 a.m. |
| Present: | Inspector Painter<br>Sgt. Madarang |
| | **Kevin Banks** |
| Transcribed By: | Christine L. Soo<br>Office of the District Attorney |
| Date of Transcription: | November 5, 1996 |

* * * * * * * * * * * *

Testing. Testing 1-2-3. Testing. Testing. My name is Inspector Painter from the District Attorney's Office with Sgt. Madarang from the Oakland Police Department and we are at the Alameda County District Attorney's Office Conference Room. Its 11:20 on the 26th of April and we've been talking to Kevin Banks. Kevin the reason we're here you had spoken to — you've come into our office yesterday, is that correct?

A:    Yes.

Q:    Ok. And you had talked to Donna McIntosh for a while?
A:    Yes.

Q:    Ok. And from what I understand anyway some new different information came out and the only reason we're here is because we want to just document what that information is.
A:    Yes, I understand.

Q:    Ok. You understand that you are not under arrest. You're not in custody, you understand that?
A:    Yes.

Q:    You understand you're free to leave any time you want.
A:    Yes.

Q:    And you understand that I'm going to take, how did you get here today for the tape?
A:    Um, you drove me down here.

Q:    Ok. And, so, anyway, why don't you just tell me, let's start from, can you tell me what in your mind is different from what you had told her yesterday, what _____.
A:    What's in my mind just right now is that I really don't want to testify, period. I don't want to testify, period, you know. I really don't want to testify.

ffice of the
ISTRICT ATTORNEY
lameda County

1    Q:    Ok. I understand that and that's not what we're here about. Ok. What – can you tell me about what your conversation was with Donna yesterday?

2    A:    Yes.

3    Q:    What, what, tell me about the robbery portion of this thing?

     A:    The robbery portion of this thing is, like I said, we saw Sean and Ced at the, um...at Manon, coming

4          off of Manon...

5    Q:    Ok.

     A:    And we went to Caesar Burger (unintelligible) so we walked over here, its like a block away. We

6          went there. We was talking about getting some dope. And, I asked for (unintelligible) I was eating my food and then we came back. I already discussed my conversation about the dope and Dre

7          discussed they conversation about the dope. And, they had left. And then we got in the car and we left. Then on the way, on the freeway, on the way back to Andre's house, there was a discussion

8          in the car about a robbery. The discussion was: him and Jamaine draw down, and for me to get the dope and the money. When I say "draw down" it means like, a robbery like "everybody hold

9          up, everybody freeze," that type, that type of thing. And, um, we went to 60th, went to little Dre's house and that's what I told him.

10

11   Q:    Ok. And when you went to 60th, what did you do at 60th?

     A:    First we got out of the car and we went across the street to the telephone and, uh, we called Sean.

12         And I guess Sean called back but it was a phone that just had – one of 'em phones that like buzzzzzzzzz where you can't hear the person, so he hung up the phone and then he went to his

13         house. We didn't go up in his house. (unintelligible) Me and Jamaine stayed outside or him and Jamaine went inside the house, I'm really not too clear on that. And he came back out of the house.

14         I was sitting in front, Jamaine was sitting in back. Dre was sitting in the front, too. We drove to a telephone booth near to 60th and MacArthur and I parked it by Baskin-Robbins at first. He didn't

15         want to park there. So then I turned around; I showed you where I parked at.

16   Q:    Right...

     A:    I parked there. And we walked a block, like, it was a block away from there. We walked over to the

17         telephone booth. He called Sean from the telephone booth. The telephone booth called back. He talked to Sean... and, I guess from what I hear from what Little Dre sayin', I can't really hear what

18         Sean's saying, but, I guess the conversation was something like, um: are y'all gonna be there for a minute? And, Dre say, "Yeah." And, we was there for a minute, and we was waiting like 15

19         minutes. And I don't recall if Dre called him back again or not, but I know he didn't return the second phone call if I say, if he did call him back had to be, like, three or four

20         minutes before he pulled up. I'm not too sure if he did call him back, but he pulled up and he went in. He went all the way in and he, like, saw us at the phone booth but he wasn't too for sure if it

21         was us. So he went back out and then when he recognized that it was us, he was like: "Oh, OK. I didn't recognize y'all at first." It was like, he had assessed. He pulls back in. He backs up into the

22         parking stall.

23   Q:    Can you tell me what the act before you guys got there, what was the actual plan for how the robbery was going to go down?

24   A:    Um, the plan was, um, Dre and Jamaine draw down, and I take the dope and the money.

25   Q:    OK. But where were you... how was this actually going to happen? I mean, was it going to happen out in the parking lot? Or was it...

26   A:    It wasn't really discussed where it was going to happen at 'cause it wasn't really no place to have it at first. You know what I'm saying? It was like one of them pick-n-pull things where, if, um,

27         wherever it's at, you know, it's like, wherever it's at, one of them type of things.

28   Q:    Did you guys discuss at all about doing it inside a car, as opposed to doing it outside...?

     A:    Yeah, we...we discussed it, you know, we discussed it, like a whole bunch of ways... and we discussed it in the car. We discussed it, how would it be outside the car. We discussed it a whole bunch of different ways. So, I took it like (unintelligible) everything.

1 Q: OK. How was it gonna to happen if it went down outside the car? What did you guys talk about it in advance? Of how you guys wanted to do it if it was outside?

2 A: We all thought that it was just going to be Sean and Ced. And we thought if Sean, Sean got out the car then, um, Ced might get out the car, you know... And Ced wasn't nobody with no money. I mean, yeah, Ced wasn't nobody with no money so we weren't really worried about robbing him.

3 He wasn't, like, the person we really wanted to rob, you know. It was really Sean, the person that had all the money and Ced was just like a runner with him, just the person that always be with him

4 in a way. And, um, our main principle was to get Sean, get the money, get the dope and leave.

5 That was my prospective of the whole idea... and, um, it didn't happen that way.

6 Q: OK. What else did you guys discuss if it happened in the car?

7 A: Um... Yeah, the plan was, in the car if it happens in the car, dope deals usually goes down... and, um, you get in the car. A lot of them go down. My dope deals usually go down when you get in the car, you buy the dope, you get out your car, you go back to your car and drive off. And, um,

8 that's how we wanted it to be done. We wanted me and Little Dre to get in the car and, um, I believe Jamaine would stay out. I don't know, but, it was going to be like, Little Dre was gonna sit

9 behind Sean because it was known for Sean always having a gun in the car -- from what I gathered Sean always carried a gun inside his car. And, Little Dre was going to grab Sean and draw down

10 on Sean. BOOM! Then um, I guess I was going to strip Sean. And it was going to happen was going to happen... And he kept his dope up under the... under the... front...

11

12 Q: Was it the dash?

  A: Yeah, I believe he kept it in the dash, from what I saw, I gathered he kept it in the dash. And it was just going to be a robbery... and it didn't happen that way. He was out of the car... and it happened

13 a totally different way... and I didn't expect it to happen like that. That's how come I didn't do my job on getting the dope and the money.

14

15 Q: Um... When you said that... when you, you guys confronted each other in the parking lot, there was some conversation. Did you have a conversation with Sean when you first met in the parking lot?

  A: Yes, we all had conversation.

16

17 Q: OK. What was yours with Sean?

  A: The dope.

18 Q: OK. Did you make any kind of transaction, or do anything?

  A: Yes, me and him made a transaction.

19

20 Q: And did you give him money?

  A: Yeah, I gave him $45.00.

21 Q: OK. And did he give you something?

  A: Yeah, he gave me some dope.

22

23 Q: OK.

  A: But I wasn't really worried about my $45.00 'cause I had, I knew that I was going to get it back.

24 Q: OK.

  A: But it was... like, we didn't talk about giving him no money at first. It was like one of those things

25 where your mind kind of like tells you, you know, it's to make him feel more comfortable, and go ahead and buy the dope something like that.

26

27 Q: OK. And then when, um... what kind of conversation does Dre have with Sean?

  A: Um... He don't like the dope. He's not happy with it, like. Know what I'm saying? He's not happy

28 with... not how good the dope feels or nothing like that, but not happy with how much it is, like, it's not enough to make...

| | | |
|---|---|---|
| 1 | Q: | The size of the rock? |
| 2 | A: | Yeah. It's not enough to make what he, he supposed to make off of it. One of them type of things and he didn't like none of the fifty rocks, he didn't like none of 'em. So, then Sean went to his car to get some more, to get some more dope to please Dre. And we all walked back there. First Sean walked with his back turned towards us, he walked. And then Little Dre was like, right behind, not right behind him, but kind of like behind him. And me and Jamaine was behind him. We was only like a foot or two away from Dre. It was like, it was kind of like all walking together, but he was like just a foot ahead of us. Like that. And then, um... I was on this side, Jamaine was on this side, Little Dre was in the center. And, um, his foot was on the thing on the front bumper of the car on the driver's side, and um, Sean was sitting in the car, and he wasn't like sitting, he didn't like sit in the car, he was like laying in the car, I guess to get the dope from up under the dash and his feet was out of the car. I guess he was trying to get the dope from up under the dash or something. And then he got out of the car, and that's when he had left his car door open. And, um, he came back to the front to the front of the car, the front end on the driver's side. He was picking out rocks. He was just picking out rocks, picking out rocks, picking out rocks. And then, um, Dre looked at me. And he like looked at me, and he didn't really like give me no mean look, it was like, kind of like, a little look... and then he looked at Jamaine. And Jamaine was like... And, um... Sean got down to the last, like the little last rocks. And Dre shot him. |
| 10 | | |
| 11 | Q: | What d-d-did, what did Sean do or say anything? (unintelligible) |
| | A: | He kind of like took a step back like he was ready to get robbed. Know what I'm saying? Like a normal person do, like you take a step back and get ready to get robbed... |
| 12 | | |
| 13 | Q: | You put your hands up? |
| | A: | Yeah, he like, you like surprised but, now, you like, you know what's going on, so you like, Boom! you can have everything! Like, you can just have it. You can take it. You know? Like, something like that. |
| 14 | | |
| 15 | Q: | Did you, you're still... saying you didn't have a gun? |
| | A: | No, I didn't. |
| 16 | | |
| 17 | Q: | OK. And the second gun: did, at one point did you say you got it at Jamaine's house? |
| | A: | No, I said he picked up the .45 from Little Dre house. |
| 18 | Q: | OK. So you got the first -- Dre had the first gun. You went back to Dre's house and got the second gun? |
| 19 | A: | No, Jamaine had the first gun. |
| 20 | Q: | Jamaine had the first gun. |
| | A: | And then we went to Little Dre's house to get his gun. |
| 21 | | |
| | Q: | OK. |
| 22 | A: | Jamaine kept his gun, you know. He kept his gun all the time, and it was like, he left it on the... When he come to Manon, he left it there, and then when he goes home, he takes it with him. You know, it's like, something like that. It was like everybody's, like, everybody's gun out there, but it's like his gun that is his, but he tried to have it where it's like everybody's gun out there, something like that. |
| 23 | | |
| 24 | | |
| 25 | Q: | Was there any conversation about, when you were planning this robbery, about shooting him? I mean... |
| 26 | A: | No, it ain't no conversation about shooting. It's supposed to be a robbery, you know. It's supposed to be a robbery. It's supposed to be a robbery. |
| 27 | | |
| 28 | | |

ffice of the
ISTRICT ATTORNEY
lameda County

1   **Q:**   OK. How did – when you heard the shots going off, what did you think? Or how did you feel?

    **A:**   How I respond? Well, I can't really say I was, like, shocked, but you know what I'm saying, I was

2   like surprised in a way, you know, 'cause I ain't never seen a dead man body before, and I was kind of like surprised in a way, 'cause I ain't never seen no dead man's body. And I ain't fit to dig in no

3   dead man's pocket, and take no money out, you know. That's not me. I'm not going to dig in nobody's that dead to take no money out. And the dope, I just totally like forgot about the dope

4   in the car. I like totally forgot, you know.

5   **Q:**   OK. Did you see the girl's face?

    **A:**   You mean...

6

    **Q:**   In the back?

7   **A:**   In the back, what you mean?

8   **Q:**   The girl that was sitting in the front?

    **A:**   Yes.

9

    **Q:**   OK. Did you see her face?

10  **A:**   Plainly, I saw her face.

11  **Q:**   Did she, did she look at you?

    **A:**   I can't even say she, like, looked at me, but now I saw her face when we all first walked to the car

12  I saw her.

13  **Q:**   And do you think she saw you full faced?

    **A:**   Yes, yeah she probably saw me full faced.

14

    **Q:**   Do you think that she saw Jamaine?

15  **A:**   Yes.

16  **Q:**   And do you think that she saw Dre?

    **A:**   Yes.

17

    **Q:**   OK. All right. This is all we needed to do. And anything else Sgt. Madarang?

18  **SGT. MADARANG:**   No, nothing.

19  **INSPECTOR PAINTER:** OK. Anything you need to add? I'm going to give you a ride home and, like I said,

    we just needed to come down here and just document this, this little extra bit here.

20  It's now 11:31 and we'll be turning off the tape.

21                **\*\*\*END OF RECORDED STATEMENT\*\*\***

22

23

24

25

26

27

28

C

# EXHIBIT

1 - C

Description: ~~Preliminary Examination "Forgery" to Sgt. Mandaring~~

~~during the Preliminary Hearing.~~

Pages: ~~RI-020, three~~ 

1   didn't know what the something was?

2   A.      No.

3   Q.      You're sure about that?

4   A.      No.

5   Q.      And didn't you tell him that the first time you ever

6   knew there was any guns around is when after both of them

7   came out of this apartment and then you understood that there

8   was guns?

9   A.      Yes, I might have said that.

10  Q.      That was a lie, wasn't it?

11  A.      Yes.

12  Q.      Okay.  And he let you go after that, didn't he?

13  A.      Yes.

14  Q.      And, in fact, you did not see or hear from anybody

15  from that date until April 24th?

16  A.      Yes.  I thought I had a warrant.

17  Q.      But nobody that you know was looking for you up until

18  then except --

19          Wait a minute.

20          What was the warrant about?

21  A.      Sergeant Madarang told --

22          MS. DANZIG:  Objection; relevance, what was the

23  warrant about.

24          MR. COLE:  Q.  When was the warrant for?

25          MS. DANZIG:  Objection; relevance.

26          THE COURT:  Sustained.

27          MR. COLE:  Q.  Okay.  So you didn't talk to anybody

28  from January 5th to April 24th?

# EXHIBIT



**Description:** Kevin Bank's Perjury of Co-defendant~~(s), of trading~~

~~back and forth a gun, listed under exhibit B-6(c).~~

**Pages:** ~~NT 805,lines 9,10,NT 806,lines 1,2,NT 808,line 1-28;~~

~~NT 809,lines 1-28,NT 810,lines 1-6,exhibit B-6(c).~~

(68)

1   A.      The answer is I'm not sure because that -- when we

2   had went to Jamaine that night, we had caught the BART from

3   regular Hayward, and he was trying to pass it to me to hold.

4   I don't believe I had got it.

5   Q.      He was trying to pass it to you to hold?

6   A.      Yes.

7   Q.      And you don't believe you got it?

8   A.      No.

9   Q.      Was there ever another time that Jamaine was trying

10  to pass you the gun to hold?

11  A.      I'm not sure.

12  Q.      Let me ask you whether the following questions were

13  asked and whether you gave the following answers, going back

14  to the last question/answer:

15          Question:  Okay.  And who had the

16  Glock that night when the Hayward police

17  found it?

18          Answer:  Jamaine had it that night.

19          Question:  Now, what happened?  Walk

20  me through --

21          Question:  Now, what happened?  Walk

22  me through what happened.  You guys were

23  walking along, and what happens?

24          Answer:  We used to trade, we used to

25  trade off the gun like when we used to be on

26  our way to the spot, 'cause I didn't have no

27  car at the time, so we used to catch the BART

28  and stuff, so we used to trade off the gun.

(69)

1    And that night Jamaine had the gun

2    Was that question asked of you, did you give that

3  answer?

4  A.    Yes.

5  Q.    Now, tell me something. Did you ever use to trade

6  off that gun?

7  A.    No, not around them times, no.

8  Q.    Not around the time?

9  A.    No.

10  Q.    Okay. Then tell me, ever, at any time, tell me ever,

11  at any time when you used to trade off that gun?

12  A.    Whenever he would leave it in the bushes and it was

13  always able -- it was always there for anybody to get. So,

14  therefore, anybody could grab it.

15  Q.    Let me go this question and this answer with you

16  again:

17         Question: Now, what happened?  Walk

18         me through what happened. You guys were

19         walking along, and what happens?

20         Answer:  We used to trade, we used to

21         trade off the gun, like when we used to be on

22         our way to the spot 'cause I didn't have no

23         car at the time, so we used to catch the BART

24         and stuff, so we used to trade off the gun.

25         And that night Jamaine had the gun.

26         Now, you said that the question was asked of you and

27  that you're the one who gave the answer. You're the one who

28  said we used to trade off the gun.

(70)

1    MS. DANZIG:  Objection.  Is there a question coming?

2    MR. MINTZ:  Yes there is.  And I appreciate your

3    patience.

4    Q.    Those are your words about trading off the gun.

5          Did you or did you not ever trade off the gun?

6    A.    No.

7    Q.    Then why did you tell Sergeant Madarang such a thing?

8    A.    That was the first statement, right, the first time.

9    Then he had me there six, seven hours then, and then I was

10   just answering the questions, and I wasn't thinking, just

11   answering fast.

12   Q.    So you told Sergeant Madarang that you used to trade

13   off the gun 'cause you weren't thinking?

14   A.    No, that night I was tired.  I was in there for a

15   long time, so Sergeant Madarang was asking me questions, and

16   I wasn't -- I was just answering yes or no.  I wasn't giving

17   too many --

18         What you call that when you talk?

19   Q.    Details?

20   A.    Yeah, I don't give him too many details.

21   Q.    You were just answering yes or no?

22   A.    Yes, pretty much.

23   Q.              Question:  Now, wh

24         me through what happened.  You guys were

25         walking along, and what happens?

26              Answer:  We used to trade, we used to

27         trade off the gun, like when we used to be on

28         our way to the spot, 'cause I didn't have no



# EXHIBIT



**Description:** Accompolice Kevin Bank's lied ~~Testimony to having~~

~~Knowledge of petitioner False in possession of gun,~~

~~to Count (2)Attempted Murder.~~

**Pages:** ~~RT 597,lines 2-15,RT 611,lines 16-20,RT 612,lines 1-23~~;

~~RT 613,lines~~ 1-23,see Contradiction/Perjury ~~RT 614,lines~~

~~18-19.~~

(72)

```
 1        MS. DANZIG:  Q.  Mr. Banks, how soon after July 4th,

 2   the time you got stabbed, did you start going out to Hayward

 3   to sell dope?

 4   A.       A couple weeks later, like a week or two later.

 5   Q.       And at that time were you -- were you living up in

 6   Oakland?

 7   A.       Yes.

 8   Q.       Now, when you went down to South Hayward to sell

 9   dope, would you go by yourself or with somebody else?

10   A.       I'd go with someone else.

11   Q.       Who would you go with?

12   A.       Andre Nelson.

13   Q.       And would you be with anybody other than Andre

14   Nelson?

15   A.       Yes, and Jamaine.

16   Q.       Would it always be the three of you together, or

17   would it sometimes just be you and Andre or you and Jamaine

18   Paige?

19   A.       Normally would be the three of us together.

20   Q.       Was there some method in the way that you would sell

21   together?

22   A.       Yes, the majority of the time we would take -- take

23   turns.  Sometimes we won't.

24   Q.       When you say take turns, take turns doing what?

25   A.       Take turns giving the -- serving.  Take turns giving

26   dope to someone.  It would be my turn.  Then it would be his

27   turn.  Then it would be the next person (sic) turn.

28   Q.       And you would call that serving --
```

```
1   Q.      Who were you with?

2   A.      Andre and Jamaine.

3   Q.      Andre and Jamaine?

4   A.      Yes.

5   Q.      How long had you been in Hayward before you were

6   arrested that night?

7   A.      We had just started going out there. (I had just

8   start going out there with them after -- after the incident

9   with the shooting.)

10  Q.      After the shooting?

11  A.      Yes.

12  Q.      Now, when you were arrested, had you been out on

13  the -- in South Hayward for several hours, you just get

14  there?

15          How long had you been there before you got arrested?

16  A.      That day, just got out there.

17  Q.      How did you get there?

18  A.      Take BART.

19  Q.      All three together take BART?

20  A.      Yes.

21  Q.      You didn't have a car?

22  A.      No.

23  Q.      Andre Nelson didn't have a car?

24  A.      No.

25  Q.      How about Jamaine Paige?

26  A.      No.

27  Q.      So you guys were walking from the BART station?

28  A.      Yes.
```

(74)

JAMES LEE, CSR NO. 4820

1   Q.      When you picked Jamaine up at his house with Andre,

2   did you see Jamaine with a gun?

3   A.      I'm not too sure if I saw him with a gun at that

4   time.

5   Q.      You told Sergeant Madarang that you didn't see a gun,

6   correct?

7   A.      Yes, because I wasn't too sure and I don't want to

8   be like yes, I saw it, or no, I didn't see it.  So, you know

9   what I'm saying.  I'm not too sure because I'm not too sure.

10  Q.      But you told Sergeant Madarang that you knew the gun

11  was there because Jamaine always carried a gun on the turf,

12  right?

13  A.      Yes.

14  Q.      Mr. Banks, did you ever see Jamaine Paige on the turf

15  at any time ever from the beginning of time, did you ever at

16  any time see Jamaine Paige on the turf before the day that

17  Sean Landry was killed?

18  A.      No.

19          MR. MINTZ:  Thank you.

20          I have no further questions.

21          THE COURT:  All right.  I think, Ladies and

22  Gentlemen, we'll take our recess until tomorrow at 10:00

23  o'clock.

24          You'll remember the admonition.

25          Be in recess until tomorrow morning at 10:00 o'clock.

26          (Proceedings adjourned.)

27                       ---oOo---

28



# EXHIBIT



Description: ~~agentda ang (Leading Homicide Detective under and that~~

~~Kevin Doak objecting to the Interview by this Detective~~
~~in light Miranda, also Coercive Interrogation to Confession.~~

Pages: ~~RT 1053, lines 25-28, RT 1064, lines 1-24.~~



```
1   A.      Yes, I did.

2   Q.      So you told Madarang there was no robbery?

3   A.      Yes, so I did lie.

4   Q.      Well, when I asked you about that at the preliminary

5   examination, you told me that you hadn't lied to Madarang,

6   didn't you?

7   A.      Yes.

8   Q.      And at the preliminary examination, you were under

9   oath, weren't you?

10  A.      Yes.

11  Q.      And so when you were under oath at the preliminary

12  examination and I asked you whether you lied to Madarang and

13  you said no, that was a lie?

14  A.      Yes.

15  Q.      So you're admitting now to having lied under oath at

16  the preliminary examination?

17  A.      Yes.

18  Q.      Why did you lie under oath at the preliminary

19  examination?

20  A.      Because I did not remember if he had asked me a

21  question or not until you just brought it up.

22  Q.      Until I just brought it up?

23  A.      Yes, because at the preliminary you did not bring

24  that question up.

25  Q.      Okay.  But everything you said here is the truth?

26  A.      Yes.

27  Q.      And, for example, the reason you told Donna about the

28  robbery, what you've testified just to, is because you felt
```

JAMES LEE, CSR NO. 4820

# EXHIBIT



**Description:** False Testimony from Kevin Bank's ~~~~~~

**Pages:** ~~~~~~

1   A.      Yes.

2   Q.      And you met with her just a few days before you

3   testified at the preliminary examination; is that right?

4   A.      Yes.

5   Q.      Now, you had already spoken with Madarang and Clark,

6   the two homicide sergeants, hadn't you?

7   A.      Yes.

8   Q.      And you hadn't told them anything at all about any

9   robbery; right?

10  A.      No.

11  Q.      Now, you hadn't lied to them about whether or not

12  there was going to be a robbery, had you?

13  A.      Excuse me?

14  Q.      Did you lie to Madarang at any time?

15  A.      No.  What was said was I told him what happened, but

16  I had left the part of the robbery out.

17  Q.      Was that a lie?

18  A.      I just didn't put it in.  You can take it as a lie,

19  but --

20  Q.      Do you take it as a lie?

21  A.      No, I take it as I had left it out.

22  Q.      You left out some details?

23  A.      Yes.

24  Q.      Everything you told Madarang was the truth, but you

25  left out some details?

26  A.      Yes.

27  Q.      So you never denied to Madarang that there was a

28  robbery; right?

JAMES LEE, CSR NO. 4820

1  robbery.

2  Q.      Now, about the second time around, you knew that

3  Jamaine and Andre were already in jail, didn't you?

4  A.      Yes.  Not in trouble with them but in the trouble

5  with the law.

6  Q.      By the second time around, you already knew that

7  Jamaine and Andre were in custody; right?

8  A.      Yes.

9  Q.      And by the second time around, they told you they

10  needed you, that is, the cops told you they needed you as a

11  witness more than they needed you as a defendant; right?

12  A.      No.

13  Q.      No?

14  A.      No.

15  Q.      Okay.  But on this second occasion you still wanted

16  to stick to the robbery?

17  A.      Excuse me?

18  Q.      On that --

19          Withdraw that question.

20          On that second occasion when you spoke to Madarang,

21  you still wanted to stick to..not telling them about any

22  robbery?

23  A.      Yes.

24  Q.      So you gave them a story about the killing that

25  didn't involve the robbery; right?

26  A.      No, I gave him part of the truth but not the whole

27  truth.

28  Q.      You told them a story, you told them what you say is

1   the truth about the killing, but the truth doesn't include

2   the story of the robbery; right?

3   A.      No, I gave them part of the truth, not the whole

4   truth.

5   Q.      So you lied to them, didn't you?

6   A.      No, it wasn't no lies involved.

7   Q.      Okay.  I want to call your attention to the

8   tape-recorded statement, the first tape-recorded statement

9   that you gave to Sergeant Madarang.  That would be the second

10  time that you spoke with him.

11          MR. MINTZ:  Counsel, page 17, lines 3 through 5 --

12  strike that.  Lines 3 and 4.

13  Q.      At the very end of your tape-recorded statement to

14  Sergeant Madarang, I want to know whether the following

15  question was asked of you and whether you gave the following

16  answer:

17              Question:  Okay.  Is this the

18          complete truth here you're telling us?

19              Answer:  Yes, this is the complete,

20          the honest -- the truth, the complete truth.

21          Was that question asked of you, and did you give that

22  answer?

23  A.      I probably did answer it, but I don't remember the

24  question.

25  Q.      Pardon me?

26  A.      I don't remember the question, but I probably did

27  give that answer.

28  Q.      Was that answer the truth?

| | | |
|---|---|---|
| 1 | A. | <u>No.</u> |
| 2 | Q. | So what you did was you <u>lied</u> to Sergeant Madarang? |
| 3 | A. | <u>Yes.</u> |

4   Q.    On the day that you first went out to Hayward when
5 maybe you sold a few rocks but you weren't yet grinding, how
6 much crack cocaine did you have with you?

7   A.    I don't remember.

8   Q.    Well, did you have more than or less than a zip?

9   A.    No.

10   Q.    No?

11   A.    I had less than a zip.

12   Q.    All right.  Did you have more or less than a half an
13 ounce?

14   A.    Yes.

15   Q.    You had more or less?

16   A.    I had less.

17   Q.    Did you have ten rocks?

18   A.    Probably about ten rocks.

19   Q.    About ten rocks?

20   A.    Probably, yes, at the most.

21   Q.    Was that what you had left from the crack cocaine
22 that you had at the time you were stabbed?

23   A.    No.

24   Q.    So you had bought some more?

25   A.    Yes.

26   Q.    Who did you bought (sic) that crack cocaine from?

27   A.    It's -- It's from several people.  I don't know who
28 exactly I got that one from.

1  from that day on you'd never get out of jail?

2  A.      No.

3  Q.      Did you think you'd be released in 72 hours if they

4  charged you with murder?

5  A.      No.

6  Q.      And they told you right before --

7          Did they tell you right before they turned on the

8  tape recorder to defend yourself on tape?

9  A.      Did they tell me to defend myself?

10 Q.      Yeah.

11         Did they tell you that?

12 A.      No, they told me I should give a taped statement

13 because they got everybody else on tape and to look out for

14 my best interests by giving my statement on tape also.

15 Q.      So they told you to defend yourself on tape in those

16 words, didn't he?

17 A.      I don't know what exact words he used, but yes, he

18 told me to look out for my best interests.

19 Q.      And so then did you tell them the truth then?

20 A.      No.

21 Q.      Because right then and there you told them that there

22 had never been any discussion about the robbery; right?

23 A.      Yes.

24 Q.      You told them that these two guys just did an

25 outright killing, had nothing to do with a robbery.

26         Isn't that what you told them when you were asked to

27 defend yourself on tape?

28 A.      That's what I said in some many words when I was

1    he didn't tell you hey, don't give me that?  You were there.

2    This is a robbery.

3          He didn't -- He didn't say you're lying to us, this

4    is a robbery?

5          He didn't say anything like that, did he?

6    A.    No, he didn't say you're lying to us, this is a

7    robbery.  He said was it a robbery.

8    Q.    And you said?

9    A.    And I lied, and I said no.

10   Q.    And he had always told you that he didn't think that

11   you were one of the shooters; right?

12   A.    Yes.

13   Q.    Did you think he was just telling you that so that

14   you could have an opportunity to make a deal with him?

15         MS. DANZIG:  Objection.  That calls for speculation

16   as to what Sergeant Madarang --

17         THE COURT:  Sustained.

18         MR. COLE:  His state of mind.

19   Q.    What did you think he was trying to get you to do?

20   A.    Give a statement about what happened.

21   Q.    Did you think he wanted you to tell the truth?

22   A.    Yes.

23   Q.    Okay.  Now, then you met up with Donna, right, the

24   next day; is that true?

25   A.    We talking about the second time that I met Sergeant

26   Madarang?

27   Q.    After you gave the statement on tape about this was

28   just a killing, it wasn't a robbery, then you met Donna?

1                (Whereupon, COPY OF

2                TRANSCRIPTION OF PEOPLE'S

3                EXHIBIT NO. 23 was marked as

4                People's Exhibit No. 23A for

5                identification.)

6     MS. DANZIG:  Your Honor, may I play the tape?

7     THE COURT:  Go ahead.

8     (Remainder of People's Exhibit No. 23, the tape, is

9 played.)

10     MS. DANZIG:  Q.  Sergeant Madarang, after hearing

11 that second tape, is that the complete unedited tape

12 recording of the conver -- the second conversation that was

13 taped with Kevin Banks on -- in this case?

14 A.     Yes, it is.

15 Q.     And at the time that second tape was made, he had not

16 yet been immunized?

17 A.     Correct.

18 Q.     Are you aware of any promise or deal that was made

19 with Kevin Banks before that tape was obtained from him?

20 A.     No, not at all.

21     MS. DANZIG:  Your Honor, at this time I don't have

22 any further questions of the witness.

23     THE COURT:  Mr. Mintz.

24     MR. MINTZ:  Thank you, Your Honor.

25              **CROSS-EXAMINATION**

26     MR. MINTZ:  Q.  Sergeant Madarang, the first

27 occasion when you talked to Kevin Banks, did you tell him

28 what would happen to him if he -- if he didn't talk to you?

(86)

JAMES LEE. CSR NO. 4820

1   Jamaine were the shooters?

2   A.      No.

3   Q.      Let me ask you about a comment that you made in

4   response to the prosecuting attorney's question about whether

5   you saw a change in the demeanor of Kevin Banks at the time

6   that you spoke with him.

7           And I believe your response was you could actually

8   see the change in demeanor, even his posture changed, his

9   body language, and then your comment was he was almost

10  resigned?

11  A.      Yes.

12  Q.      What do you mean by the phrase "he was almost

13  resigned"?

14  A.      As if he knew that I knew.

15  Q.      As if he knew that you knew?

16  A.      Yes.

17  Q.      So he had no alternative but to talk to you?

18  A.      Not that he did not have an alternative but that he

19  decided to tell me.

20  Q.      He decided to tell.

21          And that was after you had taken I believe a

22  17-minute break and then come back into the room?

23  A.      Yes.

24  Q.      And he told you at that time when his demeanor

25  changed, his body language changed, he told you that he

26  wanted to tell you exactly what happened?

27  A.      Yes.

28  Q.      And then he told that there was no plan for a

1 robbery?

2 A.  Correct.

3 Q.  And then he told you that after he and Jamaine and

4 Andre left Hayward they went to Andre's grandmother's house

5 or an apartment in Oakland where both Jamaine and Andre went

6 into the apartment and both of them got guns in the

7 apartment; is that right?

8 A.  Yes.

9 Q.  That was after he looked to you like he was almost

10 resigned?

11 A.  Yes.

12 Q.  And he told you, in fact, when he gave you that first

13 statement before you let him leave that night, he told you,

14 in fact, that he had told you the complete and honest truth?

15 A.  Yes.

16 Q.  And he never told you anything about any robbery?

17 A.  He did mention it when they came down with the guns,

18 he mentioned that he realized it was going to be a robbery.

19 Q.  And he said it was too late for him to do anything

20 about it?

21 A.  He said he felt that it was too late into it all to

22 back out.

23 Q.  Let me ask you this:  Did he ever tell you ever at

24 any time --

25    And you had a total of three conversations with him?

26 A.  Yes.

27 Q.  Did he ever tell you at any time that he had on two

28 occasions before that date, the date when Sean Landry had

1  A.      I take it -- I could take it two ways.

2  Q.      Oh, okay.

3          What's the other way that you can take it when he

4  says this is the first time I come out there?

5          You can take it as meaning that's not the first time

6  he came out there?

7  A.      No.  I could take it as this was the first time he

8  came out that night.

9  Q.      The first time he came out that night?

10 A.      Correct.

11 Q.      So I don't know how it is, so I'm not thinking

12 nothing of it.

13         So you could take it that way?

14 A.      I could take it both ways, yes.

15 Q.      And you've been a homicide investigator with the

16 Oakland Police Department for how long?

17 A.      Five years.

18 Q.      Okay.  Now, you were with Inspector Painter when you

19 took a statement, tape recorded, from Kevin Banks in the

20 library of the district attorney's office in the municipal

21 court in Oakland?

22 A.      Correct.

23 Q.      And at that point it had been but two days since you

24 had last spoken with the young man?

25 A.      Yes, it was.

26 Q.      And when you had last spoken with the young man, he

27 again had told you that he had told you the whole truth?

28 A.      Correct.

1  Q.       And he didn't tell you that he had participated in a

2  plan for any robbery when he spoke with you on the 24th?

3  A.       Correct.

4  Q.       And, as a matter of fact, on the 26th before you

5  talked to him, you were told by Donna McIntosh of the DA's

6  office he gave up the robbery?

7  A.       Yes; that's correct.

8  Q.       So you talked to him twice, and on two occasions he

9  had told you now I've told you the whole truth?

10 A.       Yes, he did.

11 Q.       As a matter of fact, early on in your conversation

12 with him the first time you spoke with him when he told you

13 he didn't know anything about it he told you that was the

14 truth, too?

15 A.       Yes, he did.

16 Q.       When you were talking to him on the very first

17 occasion and he said that those two guys came out of that

18 house or apartment with a gun, each with a gun, he didn't say

19 that they said anything about a robbery.  He just said that

20 because they had guns he knew there was going to be a

21 robbery?

22 A.       That's correct.

23 Q.       So in that first statement that he gave to you when

24 he wouldn't allow himself to be tape recorded, he told you

25 that he never heard a plan for a robbery?

26 A.       That's correct.

27 Q.       And, as a matter of fact, he even told you at the

28 second tape-recorded statement that there must have been a

1   plan for a robbery, but this plan must have been formulated

2   when he was out of the car getting his hamburger?

3   A.      Yes, that's what he said.

4   Q.      Now, I want to go to after April 26th, 1996.  I want

5   to know if you were ever contacted by any other law

6   enforcement officers about Kevin Banks?

7   A.      Not that I remember.

8         MS. DANZIG:  Objection; relevance.

9         THE COURT:  The answer may stand, no, not that I

10  remember.

11        MR. MINTZ:  Q.  Did any law enforcement officer

12  after April 26, 1996, ever ask you whether Kevin Banks was a

13  witness of yours in a homicide case?

14  A.      Not that I remember, no.

15  Q.      Stop and think, Sergeant, because I want you to

16  answer the question with your best memory.

17  A.      I don't remember anybody else asking me about.

18  Q.      Officer Midyett --

19        THE COURT:  Who?

20        MR. MINTZ:  Q.  Officer Midyett ever ask you

21  anything about that?

22  A.      I don't remember him asking me.

23  Q.      Officer Sena, did you ever talk to Officer Sena about

24  Kevin Banks?

25  A.      No, not that I remember, no.  I'm not sure who

26  Officer Sena is.

27  Q.      You're not sure who Officer Sena is?

28  A.      No.

O12

1   company from V1, which is Sean Landry?

2   A.      Correct.

3   Q.      And drove around Oakland and Hayward, and then the

4   next note you make, later in the evening he gets his aunt's

5   car to drive again?

6   A.      Yes.

7   Q.      Do you know what you heard that made you wrote (sic)

8   the notes like that?

9           Can you remember?

10  A.      No, I can't.

11  Q.      And, of course, he's -- he states that he had no idea

12  that there were guns in his presence until they just appeared

13  with Mr. Nelson and Mr. Paige; right?

14  A.      Correct.

15  Q.      And referring you to page 5, don't you have a diagram

16  there that shows Cedric Nelson walking around behind

17  Mr. Banks, Mr. Paige, and Mr. Nelson as they stood at the

18  car?

19  A.      That's correct.

20  Q.      And all three of them are standing right there at the

21  front of the car; is that correct?

22  A.      Yes, it is.

23  Q.      And that's what he told you?

24  A.      Yes.

25  Q.      Now, I want to ask you again.  You've already

26  answered the questions about what you said or did not say to

27  Kevin Banks before your first conversation.

28          I want to ask you about what you may have said to him

1  before the April 4th (sic) tape, the one where he said it's

2  not a robbery, it's just a killing.

3        You remember that occasion?

4  A.    Yes.

5  Q.    He has stated to this court that what you told him:

6  Things aren't looking too good for you.  People are starting

7  to point the finger at you.  I want you to, quote, defend

8  yourself, quote (sic), on the tape.

9        Did you ever tell him to defend himself on tape?

10  A.    No, I did not.

11  Q.    You never promised him that he could go home on

12  January 5th if only he would cooperate with you?

13  A.    No, I did not.

14  Q.    And you never threatened him with the possibility of

15  him going to prison for the rest of his life, anything like

16  that?

17  A.    No, I did not.

18  Q.    Are the things that he said about you mis -- I mean

19  if you had done those things, is that wrong?

20  A.    Yes.

21        THE COURT:  Sustained.

22        MR. COLE:  Q.  What you're telling us is Kevin Banks

23  has made several statements about you that are lies?

24  A.    About what I said, correct.

25  Q.    You're quite sure he's lying about you?

26        MS. DANZIG:  Objection; asked and answered.

27        THE COURT:  Sustained.

28        MR. COLE:  No further questions.

337    124

1    Q.    And what happened after you gave the statement?

2    A.    Um, they kept me in there for a while then um they

3    went, he left and came back and I had a subpoena.

4    Q.    They say you could go home but you have to come

5    back to court?

6    A.    Yes.

7    Q.    What time were you released?

8    A.    I don't know.  It was still daytime.

9    Q.    Did you take a cab home or they drive you?

10    A.    They dropped me off back at Lucky's.

11    Q.    So they left you off where they picked you up?

12    A.    Yes.

13    Q.    And the next day the district attorney and

14    Sergeant Madarang came out and picked you up?

15    A.    Yes.

16    Q.    They call ahead?

17    A.    Yes.

18    Q.    And when they came out, they brought you down here

19    and you were interviewed by them?

20    A.    Yes.

21    Q.    Did they play the taped statement?

22    A.    No.

23    Q.    Did you tell them the same thing you told them

24    before?

25    A.    Yes.

26    Q.    Did they take another taped statement from you?

27    A.    Yes.

28    Q.    You talked about the robbery at that time?



685

```
 1  A.      No, I just said.

 2  Q.      -- that causes you to exclude him; is that correct?

 3  A.      What you mean?

 4  Q.      What do you mean?

 5  A.      What do you mean nothing about him that would cause

 6  me to exclude him?

 7  Q.      Well, as to number one --

 8  A.      I said he's too old.

 9  Q.      You exclude him because he's too old; right?

10  A.      Uh-huh.

11  Q.      As to number two, you exclude him because he's too

12  old; right?

13  A.      Umm-hmm.

14  Q.      Is there anything about number three that causes you

15  to exclude him?

16  A.      Yeah.

17  Q.      Why do you exclude him?

18  A.      'Cause I didn't see exactly what he looked like.

19  Q.      Okay.  As to photo number four, he's too old?

20  A.      Yes.

21  Q.      As to photo number five, you picked him out when you

22  looked at the photo spread, didn't you?

23  A.      Excuse me?

24  Q.      As to photo number five, you picked him out when you

25  looked at the photo spreads, didn't you?

26  A.      Yes.

27  Q.      And what you were saying is that of the photo spread

28  and the eight pictures, number three and number five looked
```

```
 1   the closest?

 2   A.      Umm-hmm.

 3   Q.      Number five does not look too old, does he?

 4   A.      No.

 5   Q.      Okay.  As to number six, he looks too old?

 6   A.      Yes.

 7   Q.      As to number seven, he looks too old?

 8   A.      Yes.

 9   Q.      As to number eight, he looks too old?

10   A.      Yes.

11   Q.      Okay.   Now, after you looked at that photo spread,

12   someone, either Painter or Terrell?

13   A.      I got to fart.  I got to go to the bathroom.

14           THE COURT:  All right.  Let's take five minutes.

15                       (Brief recess taken.)

16           THE COURT:  All right.  Continue, Mr. Mintz.

17           MR. MINTZ:  Thank you.

18   Q.      After you looked at the eight photographs, either

19   Detective Painter or Inspector Terrell wrote something down

20   on the piece of paper; is that true?

21   A.      I don't know.

22   Q.      Pardon me?

23   A.      I don't know.  Did they write something on a piece

24   of paper?

25   Q.      You signed the piece of paper, didn't you?

26   A.      Oh, you're saying what -- piece of paper.  Yeah,

27   they wrote that.

28   Q.      Exhibit B, you signed that, didn't you?
```

```
 1    A.      Yeah.

 2    Q.      Before you signed Exhibit B, either Painter or

 3    Terrell wrote two lines on Exhibit B; isn't that true?

 4    A.      Umm-hmm.

 5    Q.      Is that yes?

 6    A.      Yes.

 7    Q.      And you read that before you signed it; isn't that

 8    right?

 9    A.      No.

10    Q.      Were you instructed to read it before you signed it?

11    A.      I don't know.

12    Q.      Did Painter or Terrell tell you to read it and then

13    sign it if it's correct?

14    A.      I don't remember.  I guess, if I signed it.

15    Q.      You guess what if you signed it?

16    A.      I said I guess I did if I signed it.

17    Q.      But you didn't read what had been written there by

18    one of them; is that right?

19    A.      I don't know, I don't know, I don't know, I don't

20    know.

21    Q.      By the way, you signed the back of photos three and

22    five, didn't you?

23    A.      Umm-hmm.

24    Q.      Is that yes?

25    A.      Yes.

26    Q.      I'm going to show you photograph number three.

27    A.      Umm-hmm.

28    Q.      Yes?
```

1  A.      Yes.

2  Q.      Can you see it?

3  A.      Yes.

4  Q.      Showing you the back of photograph number three.  Do

5  you see anything there that you recognize?

6  A.      Yeah, that's where I seen it.  That's where I seen

7  his name.

8  Q.      Showing you the back of photograph number three.  Do

9  you see anything there that you recognize?

10  A.      Yeah.

11  Q.      What?

12  A.      Cedric's name.

13  Q.      Cedric's name?

14  A.      And my name.  I'm saying that's where I seen it at.

15  Q.      Did you sign your name?

16  A.      Yes.

17  Q.      And is that written by you?

18  A.      Yeah.

19  Q.      Did you put the date?

20  A.      Yes.

21  Q.      And is that written by you?

22  A.      Yes.

23  Q.      And were you told what date to put down?

24  A.      Yes.

25  Q.      Were you told to write 4/29/96?

26  A.      I don't know.  I just asked him what today's day

27  was.

28  Q.      What's written there is 4/29/96; is that correct?

89

1   A.      Well, that must have been the day it was, yes.

2   Q.      That's why you wrote that down there?

3   A.      Yeah.

4   Q.      And you've signed that?

5   A.      Yes.

6   Q.      Why did you sign it?

7   A.      'Cause they told me to sign it.

8   Q.      What did your signature mean when you put it there

9   in your mind?

10  A.      What?

11  Q.      In your mind?

12  A.      Yes?

13  Q.      What did your signature mean on the back of that

14  photograph?

15  A.      It means that -- that -- I don't know.

16  Q.      You mean you put your signature and you didn't even

17  know what it meant?

18  A.      I put my signature there 'cause it meant that --

19  that I said three and five.  So I had to sign on three and

20  five.

21  Q.      You said three and five what?

22  A.      Man, I hate you.

23  Q.      You hate me?

24  A.      Yes, I do.  You irritate the fuck out of me, I swear

25  to God.

26  Q.      Will you marry me?  Never mind.  Usually that's the

27  first step to a marriage.

28  A.      I hate you.  I'm not talking to you no more.

1  Defense Exhibit A 2.                                    120

2

3           (Whereupon, a photo was marked
            Defendant Paige Exhibit A 2 for
4           identification.)

5  .

6       MR. MINTZ: Q.  Defense Exhibit A 1 and Defense

7  Exhibit A 2, each have your signature on the back; isn't

8  that right?

9  A.     Yes.

10 Q.     And you wrote that signature on the back of each of

11 those?

12 A.     Yes.

13 Q.     And you did not write your signature on the back of

14 s one, two, four, six, seven or eight; correct?

15 A.     Yeah.

16 Q.     What did it mean to you when you put your signature

17 on the back of photos number three and five?

18 A.     It meant that that's the one who looked the closest.

19 Q.     That's the one who looked the closest to what?

20 A.     To the people that was there.

21 Q.     To what people that were where?

22 A.     To the two people that was on the phone.

23 Q.     To the two people that were on the phone?

24 A.     Yes.

25 Q.     And were the two people who were on the phone the

26 people who did the shooting?

27 A.     Yes.

28 Q.     Now, I want to show you --

121

1    MR. MINTZ:  First of all, if your Honor please.

2  I'll ask to have Exhibit 2, removing picture number five,

3  and ask to have that marked Defense Exhibit C 1.

4                              (Whereupon, a group of
                              photographs was marked
5                              Defendant Paige Exhibit C for
                              identification.)

6

7

8                              (Whereupon, a document was
                              marked Defendant Paige Exhibit
9                              D for identification.)

10

11

12

13                             (Whereupon, a photo was marked
                              Defendant Paige Exhibit C 1 for
14                             identification.)

15    MR. MINTZ: Q.  Showing you Defense Exhibit C.  That

16  is the other photo spread at which you looked; is that

17  correct?

18  A.    Yeah.

19  Q.    Showing you Defense Exhibit D.  That's another one

20  of those documents that describes the process of looking at

21  the photo spreads; is that true?

22  A.    Yes.

23  Q.    Is your signature on Defense Exhibit D?

24  A.    Yes.

25  Q.    And does Defense Exhibit D go with Defense

26  Exhibit C?

27  A.    No.

28  Q.    Okay.  From Defense Exhibit --

122

```
 1  A.      Oh, yeah, it does.
 2  Q.      From Defense Exhibit C, did you pick out one of the
 3  photos as being, in your mind, somehow different from the
 4  other seven photos?
 5  A.      Yes.
 6  Q.      And what number photo did you pick out as being, in
 7  your mind, somehow different from the other seven photos?
 8  A.      Five.
 9  Q.      Okay.  And what did Exhibit 5 -- or strike that.
10  Photo five in Defense Exhibit C, what did that mean to you?
11  A.      Say it again.
12  Q.      Yes.  Photo number five?
13  A.      Yeah.
14  Q.      In Defense Exhibit C, what did it mean when you
15  picked out that photograph?
16  A.      It meant that that was somebody that looked the
17  closest.
18  Q.      So from among the eight photographs, photo five
19  looked the closest of the eight to the persons who were
20  there the night you were shot?
21  A.      Yes.
22  Q.      Okay.
23  A.      Can I ask you a question?
24  Q.      Of course you can.
25  A.      How come on the other pictures you got yellow paper
26  over them except for that one?  (Witness indicates.)
27  Q.      I haven't put any paper over anything.
28  A.      Oh.
```

1    Q.    Is there some piece of paper -- some picture that in

2    some way, shape or form you find some sort of paper to be

3    different?                                               123

4    A.    Yeah.  The other ones you gave to them, they all got

5    yellow paper over the bottom except that one.  That's the

6    only one.

7    Q.    Showing you Defense Exhibit A for identification.

8    It has yellow paper over the bottom of them?

9    A.    Yes.

10   Q.    What --

11   A.    On this one, that -- see?  That one got yellow paper

12   and that one got yellow paper.

13   Q.    Three and five both have yellow paper?

14   A.    Yeah.

15   Q.    You think I put them there?

16   A.    I don't know if you put them there.  That's why I'm

17   asking, why is they there if you didn't put there?  You

18   didn't?

19   Q.    Does photo six have yellow paper?

20   A.    I don't --

21   Q.    Does photo seven have yellow paper?

22   A.    I didn't take that one out either, so I don't know.

23   Q.    Does photo eight have yellow paper?

24   A.    I don't know.

25   Q.    You know photos three and five have yellow paper?

26   A.    Right.

27   Q.    Does yellow paper mean anything to you?

28   A.    I don't know.  That's why I'm asking you.

1    Q.    Did you see the yellow paper the day you were asked

2    to look at the photo spreads by Inspector Terrell and    124

3    Detective Painter?

4    A.    No.

5    Q.    Do any of the photographs one through eight on

6    Defense Exhibit C for identification, do any of those

7    photographs have yellow paper on them?

8    A.    I don't know.

9    Q.    So what you really want to know, why does --

10    A.    Five and three have them, but that one don't?

11    Q.    But five doesn't; is that right?

12    A.    Right.

13    Q.    I don't know.  I didn't put the yellow paper there.

14    A.    Oh.

15    Q.    Okay?  Now, again Exhibit 5 -- strike that.

16    Photograph five on Exhibit C for identification.

17    Photograph five meant what to you?

18    A.    That that's the one who looks the closest.

19    Q.    So he looks the closest of the eight photographs,

20    closest to the two men who were there the night you were

21    shot; is that right?

22    A.    No.  I was saying out of those pictures, I picked

23    that one 'cause that's the one who most looked like him.

24    Q.    Most looked like who?

25    A.    The -- the two people that was there that night.

26    Q.    Okay.  Let me ask you this:  The two people that

27    were there that night, did they look like each other?

28    A.    What do you mean?

125

1  Q.    Well, did the two of them look similar?

2  A.    I don't know.

3  Q.    Well, which of the two did photo five look like?

4  A.    I don't know which one they looked like 'cause I

5  didn't know what they looked like.

6  Q.    Okay.  So which of the two did photo five look

7  closest to?

8  A.    I don't know.

9  Q.    All right.  Now, you signed Exhibit D; is that

10 right?

11 A.    Yes.

12 Q.    Did you read the statement that was handwritten

13 above your signature before you signed it?

14 A.    Yes.

15 Q.    And so did you read.  Number five, out of these

16 pictures, that's the closest.  He looks like one of the

17 guys?

18 A.    I say he looks closest to one of them.

19 Q.    Okay.  So it says on there the statement that you

20 signed says quote, "He looks like one of the guys."  End

21 quote.

22       It says that, doesn't it?

23 A.    Yeah.

24 Q.    And you read that before you signed it; correct?

25 A.    Yes.

26 Q.    But that isn't what you said?

27 A.    Right.

28 Q.    So somebody wrote it down wrong?

1   A.      I'm saying that's what they said, but that's not

2   what I meant.  What I said is -- I'm saying that's as close

3   as I'm gonna come to saying that.                    126

4   Q.      See this man sitting right here?

5   A.      Yeah.

6           MR. MINTZ:  Indicating for the record, your Honor,

7   the defendant Jamaine Paige.

8           THE COURT:  Yes.

9           MR. MINTZ: Q.  Have you ever seen him before today?

10  A.      No.

11  Q.      Have you ever seen anyone who looks like him the way

12  a brother would look like a brother, a real brother looks

13  like a real brother?  Have you ever seen anyone who looks

14  like that man before?

15  A.      No.

16  Q.      Did you ever go to Hayward with Sean Landry?

17  A.      Yes.

18  Q.      Did Sean Landry use to hang out selling dope near

19  Manon Avenue in Hayward?

20  A.      I'm not familiar with Hayward.

21  Q.      Okay.  What did you go to Hayward for with Sean

22  Landry?

23  A.      That was it.  That was the only reason I went with

24  him.

25  Q.      What was the reason?

26  A.      When he went to go sell dope.

27  Q.      When he went to go sell dope, yes?

28  A.      Yes.



# EXHIBIT



Description: _____

_____

Pages: _____

536

# Superior Court Of The State Of California In And For The County Of Alameda

pt. No.   9

Action No.                    127285 A&B

E PEOPLE OF THE STATE OF CALIFORNIA                vs.        JAMAINE PAIGE and ANDRE M. NELSON

Plaintiff

Defendants

## REQUEST BY THE JURY

the jury in the above entitled cause, request the following:

Does the concept of constructive possession (of a gun

apply to all charges?

12/26/96

Foreperson 

(109)

## Superior Court Of The State Of California In And For The County Of Alameda

Dept. No.           9                        Action No.              127285-A

THE PEOPLE OF THE STATE OF CALIFORNIA           VS.        JAMAINE PAIGE
                    Plaintiff                                                      Defendant

# VERDICT OF JURY

We, the jury in the above entitled cause, find the defendant, JAMAINE PAIGE, NOT GUILTY of

a felony, to wit:   a violation of Section 12021 of the Penal Code of California as charged in the

Fourth Count of the Information.

Dated:   12/26/96 _____          Foreperson: ████████████

VERDICT OF JURY

(110)

17⁹

# EXHIBIT

# 2 - B



1    Q.        Jamaine ran over there where he was?

2    A.        Yes.

3    Q.        And drew down on dude?

4    A.        Yes.

5    Q.        Was that while you were talking to the knock?

6    A.        Yes, I was B.S.'ing.  Then when I saw it, I ran up

7    over there, too.

8    Q.        So you were B.S.'ing with the knock?

9    A.        Yes.

10   Q.        And then when you saw Jamaine draw down on dude, you

11   ran over to where Jamaine had drawn down on dude?

12   A.        Yes.

13   Q.        What happened then?

14   A.        I started picking up the money.

15   Q.        Started picking up the money from where?

16   A.        The ground.

17   Q.        Now, tell me where was that plan formulated?

18   A.        First we had formulated that we was going to wait

19   until he came out the apartment by the stalls.  But he didn't

20   come out around that time.  So I got tired of waiting.  We

21   went back out to go grind.

22   Q.        By the way, were there any firearms involved in this?

23   A.        Yes.

24   Q.        Did you hold a firearm?

25   A.        No, not that time.

26   Q.        Did you Jamaine hold a firearm?

27   A.        Yes.

28   Q.        What firearm was that?

1  A.      A gauge.

2  Q.      A gauge?

3  A.      Yes.

4  Q.      Would a gauge be like a 12-gauge shotgun?

5  A.      It's one -- a one-barrel gauge.

6  Q.      A one-barrel gauge?

7  A.      Yes.

8  Q.      So that's a one-barrel shotgun?

9  A.      Yes.

10 Q.      Where had you ever seen that one-barrel shotgun

11 before?

12 A.      At his house.

13 Q.      At whose house?

14 A.      Jamaine.

15 Q.      When had you had seen this one-barrel shotgun at

16 Jamaine's house?

17 A.      When I first started going over, he been having it.

18 Q.      When you first started going over there, he been

19 having it?

20 A.      Yes.

21 Q.      Who did Jamaine live at that house with; do you know?

22 A.      His girlfriend.

23 Q.      What was her name?

24 A.      I forgot her name.

25 Q.      Okay.  And you had seen that one-barrel shotgun when

26 you first started going over to Jamaine's house?

27 A.      Yes.

28 Q.      Let me ask you this:  The first time that you went to

JAMES LEE, CSR NO. 4820

1  before the day that Sean Landry was killed, were you ever at

2  Jamaine Paige's house?

3  A.      Yes, I believe so.

4  Q.      All right.  How long before Sean Landry was killed

5  were you at Jamaine Paige's house?

6  A.      Probably prior, probably like a week before that or

7  two.

8  Q.      I'm sorry?

9  A.      Probably like a week or two before that.  I don't

10  know.

11  Q.      When you went to Jamaine Paige's house about a week

12  or two before the day Sean Landry was killed, was this the

13  only time that you'd ever been in Jamaine Paige's house?

14          MS. DANZIG:  Objection; relevance.

15          THE COURT:  You can answer.

16          Overruled.

17          Was that the only time?

18          THE WITNESS:  Yes, I believe so.

19          MR. MINTZ:  Q.  Okay.  On that occasion when you

20  went to Jamaine Paige's house about a week or two before Sean

21  Landry was killed, did you see any firearms?

22  A.      Yes, I done saw his pistol before like I said.  I'm

23  not too sure if I was over his house before.  I can't say how

24  many times I been over there, but I have been over there.

25  Q.      So when you were over at Jamaine Paige's house a week

26  or two before Sean Landry was killed, that may not have been

27  the only time you were there?

28          MS. DANZIG:  Objection; relevance.

1    A.    True.

2    Q.    And you're not too good with left and right?

3    A.    Right.

4    Q.    But you're pretty good with a MAC 11?

5    MS. DANZIG:  Objection; argumentative.

6    THE COURT:  Sustained.

7    MR. MINTZ:  Q.  So after you got arrested in

8    Hayward, you spent 30 days in the bucket?

9    A.    Yes.

10   Q.    And then you got out; right?

11   A.    Yes.

12   Q.    Did you get out sometime in September?

13   A.    I don't remember when I got out of jail.

14   Q.    Where did you go to live when you got out of jail?

15   A.    I don't remember.  I think I was staying with my

16   mother or my auntie.

17   Q.    You were staying with your mother or your auntie?

18   A.    Yes.

19   Q.    And did you get back into selling dope?

20   A.    Yes.

21   Q.    And who were you selling dope with?

22   A.    Andre and Jamaine Paige.

23   Q.    And where were you selling dope?

24   A.    Hayward.

25   Q.    And tell me when did the robbery take place?

26   A.    You talking with Andre and Jamaine?

27   Q.    I want to talk about the only robbery you ever

28   committed after the death of Sean Landry.  I want to talk to

1    you about the only robbery you ever committed after the death

2    of Sean Landry.

3          You got that?

4    A.    Yes.

5    Q.    Did you commit that robbery with Andre and Jamaine?

6    A.    No, I committed it with Jamaine.

7    Q.    With Jamaine?

8    A.    Yes.

9    Q.    When did it take place?

10   A.    After I got out of jail.

11   Q.    Well, how long after you got out of jail did that

12   robbery take place?

13   A.    I really don't remember.  It was probably about a

14   month or two or something around there.

15   Q.    About a month or two?

16   A.    Yes.

17   Q.    So was it sometime around October or November of

18   1995?

19   A.    I believe it was after November because I didn't do

20   it before my birthday.

21   Q.    What's your birthday?

22   A.    November 6th.

23   Q.    November 6th.

24         You said you didn't do it before your birthday?

25   A.    No, I said it was after.

26   Q.    After your birthday?

27   A.    Yes.

28   Q.    So sometime after November 6 of 1995, you did a

(120)

1  robbery with Jamaine?

2  A.    Yes.

3  Q.    Now, when was the first time ever, when was the first

4  time ever at any time that you told any person at all that

5  you committed a robbery with Jamaine Paige sometime after

6  Sean Landry was killed?

7  A.    When was the first time I ever told anyone, was

8  yesterday.

9  Q.    And who did you tell?

10 A.    Donna -- the -- the district attorney right here.

11 Q.    Ms. Danzig?

12 A.    Yes.

13 Q.    And you know she's not Donna?

14 A.    I have their names mixed up.

15 Q.    You have the names mixed up.

16       When was the last time you talked to Donna?

17 A.    A long time ago, but I have her name stuck in my head

18 because it's an easy name.

19 Q.    Because what?

20 A.    It's a easy name.  It's a simple name.

21 Q.    Okay.  So yesterday you had a conversation with the

22 district attorney, Ms. Danzig; right?

23 A.    Yes.

24 Q.    And that was after court; right?

25 A.    Yes.

26 Q.    And Ms. Danzig told you that, in fact, you and she

27 had never talked about you having committed any other

28 robberies last Friday; right?

(121)

JAMES LEE, CSR NO. 4820

1  Q.     Okay.  So yesterday when you talked to Ms. Danzig,

2  that was the first time you told her you were involved in

3  another robbery with Jamaine Paige; correct?

4  A.     Yes.

5  Q.     And that robbery took place sometime after your

6  birthday, November 6, in 1995?

7  A.     Yes.

8  Q.     And tell me where did that robbery take place?

9  A.     On Manon.

10 Q.     On Manon?

11 A.     Yes.

12 Q.     And where on Manon did it take place?

13 A.     On the second Manon.

14 Q.     The second Manon?

15 A.     Yes.

16 Q.     And did it take place on the street corner?

17 A.     Yes, it took place on the street.

18 Q.     Took place on the street?

19 A.     Yes.

20 Q.     And was it planned in advance?

21 A.     Yes.

22 Q.     Okay.  Where was that robbery first mentioned by

23 either you or Jamaine Paige?

24 A.     It wasn't mentioned by either one of us.

25 Q.     Ah, so it was planned in advance, but it was never

26 mentioned by either one of you?

27 A.     No.

28 Q.     Well, when was the idea of committing that robbery

(122)

1    first brought up by either you or Jamaine Paige?

2    A.    After we heard about it.

3    Q.    After you heard about it?

4    A.    Yes.

5    Q.    Tell me what you personally heard about.

6    A.    That it was brought to my attention by associate that

7    it was somebody in the house getting ready to come outside to

8    buy him some more dope.

9    Q.    An associate told you there's somebody in that house,

10   he's getting ready to come outside to buy himself some more

11   dope?

12   A.    Yes.

13   Q.    Now, this was where you regularly did business in

14   South Hayward?

15   A.    Yes.

16   Q.    And when your associate mentioned that to you, were

17   you armed?

18   A.    No.

19   Q.    When your associate mentioned that to you, was anyone

20   else in your presence?

21   A.    No.

22   Q.    When your associates mentioned that to you, you were

23   standing alone?

24   A.    Yes.

25   Q.    There was nobody else around?

26   A.    No.

27   Q.    Correct?

28   A.    Correct.

1  Q.      Okay.  Who was the associate of yours who mentioned

2  that to you?

3  A.      Goldie (phonetic).

4  Q.      Can you spell that?

5  A.      No.

6  Q.      Can you come close?

7  A.      No.

8  Q.      What does it start with?

9  A.      A "G".  Gold, like a pot of gold.

10 Q.      Like gold?

11 A.      Yes.

12 Q.      Oh.  A pot of gold?

13 A.      Yes.

14 Q.      So Gold mentioned to you about this guy who was

15 fixing to come out of the house?

16 A.      Yes.

17 Q.      Didn't mention it to anyone else where you were

18 standing?

19 A.      No, because I was standing alone.

20 Q.      You were standing alone dealing your dope?

21 A.      Yes.

22 Q.      You weren't armed?

23 A.      No.

24 Q.      What did you do then?

25 A.      I brought it to Jamaine (sic) attention.

26 Q.      How did you go about bringing it to Jamaine's

27 attention?

28 A.      Walked over and told him.

(124)

1  Q.    Where was Jamaine at the time your associate Gold

2  mentioned to you about this guy who was fixing to come out of

3  the house?

4  A.    Behind -- it's like a brick wall over there.  He was

5  behind a wall.

6  Q.    He was behind a wall?

7  A.    Yes.

8  Q.    What was he doing behind that wall?

9  A.    Selling dope.

10  Q.    Selling dope.

11      Where was Andre Nelson; do you know?

12  A.    He wasn't nowhere around.

13  Q.    Nowhere around at all?

14  A.    No.

15  Q.    Now, you told us that when you used to deal dope in

16  South Hayward, you used to deal dope with Andre and Jamaine?

17  A.    Yes.

18  Q.    But Andre was nowhere around?

19  A.    No.

20  Q.    So how often did you use to deal out there when Andre

21  wasn't around?

22  A.    Majority of times we all go together.  Sometimes

23  maybe two of us go, but the majority of the time it was all

24  of us.

25  Q.    But you never went alone?

26  A.    No.

27  Q.    Sometimes you'd go with just Andre and Jamaine

28  wouldn't be there?

(125)

JAMES LEE, CSR NO. 4820

1  A.      Yes.

2  Q.      Sometimes you'd go with just Andre -- just Jamaine

3  and Andre wouldn't be there?

4  A.      Yes, but sometimes I would call one of them, and they

5  had told me they would be out there at a certain time.  Then

6  I drive out there at that time.

7  Q.      So on this particular day sometime after your

8  birthday in 1995, what was it that you said to Jamaine?

9  A.      I told him about -- about the lick.

10 Q.      Told him about what?

11 A.      The robbery.

12 Q.      Told him about what?

13 A.      The lick, the robbery.

14 Q.      Is the word lick?

15 A.      Yes.

16 Q.      The word you first used was lick?

17 A.      Yes.

18 Q.      What does lick mean?

19 A.      Robbery.

20 Q.      The term lick means robbery?

21 A.      Yes.

22 Q.      And so you told Jamaine about the lick?

23          Yes?

24 A.      Yes.

25 Q.      What did you tell him?

26 A.      Told him somebody was going to be coming out the

27 apartment to go deal some dope and I knew what time he was

28 coming out and it was an easy lick.

JAMES LEE, CSR NO. 4820

| | | |
|---|---|---|
| 1 | Q. | He was an easy lick? |
| 2 | A. | Yes. |
| 3 | Q. | Now, is an easy lick like a mark? |
| 4 | A. | No, not necessarily. |
| 5 | Q. | Would someone who would be an easy lick be a mark? |
| 6 | A. | No. |
| 7 | Q. | Well, what's a mark? |
| 8 | A. | Somebody who lets people talk to them any way. |
| 9 | | Somebody who lets people just run over him. |
| 10 | | MR. COLE: I couldn't hear. |
| 11 | | THE WITNESS: Somebody who lets people run over them |
| 12 | | and talk to them any way. |
| 13 | | MR. MINTZ: Q. Somebody who lets people talk to |
| 14 | | them any way, lets people run over them? |
| 15 | A. | Yes. |
| 16 | Q. | Would a mark be a coward? |
| 17 | A. | Yes. |
| 18 | Q. | Would a coward, a mark, have a gun? |
| 19 | A. | Yes. |
| 20 | | MS. DANZIG: Objection; calls for -- |
| 21 | | What's the relevance of this? |
| 22 | | It calls for opinion and conclusion. |
| 23 | | THE COURT: The answer may stand. |
| 24 | | Just an informational point of view. |
| 25 | | Go ahead. |
| 26 | | MR. MINTZ: Q. Well, you told us that the robbery |
| 27 | | of Sean Landry was committed on Sean Landry because he was a |
| 28 | | mark -- |

1    A.      Yes.

2    Q.      -- and that Sean never had a gun, not that you knew

3    of?

4           MS. DANZIG:  That misstates the testimony.

5    Objection.

6           THE COURT:  Overruled.

7           MR. MINTZ:  Q.  You said you never knew of Sean

8    Landry having a gun; right?

9    A.      Yes.

10          MS. DANZIG:  Objection.  That misstates the

11   testimony.

12          THE COURT:  Overruled.

13          When is your answer?

14          THE WITNESS:  Yes.

15          MR. MINTZ:  Q.  As a matter of fact, the word on the

16   street was and the word that you got -- whatever the word on

17   the street was, the word that you got was that Sean only

18   would have a gun around because Cedric carried a gun?

19   A.      Yes.

20   Q.      I want to go to this robbery after your birthday,

21   1995.  So Jamaine Paige is out there that day selling his

22   dope, and someone comes up to you and says there's a guy

23   fixing to come out of that house fixing to buy some more

24   dope.

25          Yes?

26   A.      Yes.

27   Q.      So after that person, your associate Gold, said this

28   to you, you went over and told Jamaine about the robbery?

(128)

JAMES LEE, CSR NO. 4820

1   A.      Yes.

2   Q.      And there had been no robbery mentioned between you

3   and Jamaine before that?

4   A.      No.

5   Q.      So the idea to do a robbery of the guy fixing to come

6   out of the house to buy some more dope was Kevin Banks' idea;

7   correct?

8   A.      Yes, it was told to me.

9   Q.      It was told to you.

10          Well, I heard you say that Gold came out and said to

11  you there's a guy in the house over there, he's fixing to

12  come out to buy some more dope.

13          That's what he said to you; right?

14  A.      Yes.

15  Q.      And when he said that to you, you went over to

16  Jamaine?

17  A.      Yes.

18  Q.      Did he say something else to you, Gold?  Did Gold say

19  something else to you?

20  A.      No, it was pretty much about the person.

21  Q.      Pretty much about the person?

22  A.      Yes.

23  Q.      Well, what did Gold say about the person other than

24  the fact that the person was fixing to come out of the house

25  fixing to buy more dope?

26  A.      Just told me that he had made a call to go buy some

27  more dope and meet somebody on the corner to get the dope and

28  he was coming out the same apartments Gold was in.

(129)

1  Q.      Now, that's all of what Gold told you?

2  A.      Yes.  I don't remember the conversation word for

3  word, but that was pretty much it.

4  Q.      But that was pretty much it?

5  A.      Yes.

6  Q.      So you went over to Jamaine and said to Jamaine

7  there's a guy fixing to come out of the apartment to buy some

8  more dope on the street and he'd be an easy lick?

9  A.      No, I didn't say he'd be an easy lick.  I thought

10 that to myself that he'd be an easy lick.

11 Q.      Okay.  I need to be a hundred percent sure.

12         Didn't you testify in this courtroom within the last

13 ten minutes that you went over to Jamaine where he was behind

14 the brick wall where he was selling his dope and you said to

15 him there's a guy coming out of his house fixing to buy more

16 dope and he'd be an easy lick?  Didn't you say that right

17 here in this courtroom?

18 A.      Yes.

19 Q.      And now it's your testimony that you didn't say to

20 Jamaine he'd be an easy lick?

21 A.      I'm talking too fast.  That's all.

22 Q.      You're talking what?

23 A.      Too fast.

24 Q.      I'm sorry?

25 A.      I'm talking too fast.

26 Q.      Oh, you're talking too fast?

27 A.      Yes.

28 Q.      Well, you can say it more slowly then.

(130)

1          You walked over to Jamaine and said to Jamaine

2    there's a guy coming out of this house to buy some more dope

3    and he'd be an easy lick?

4    A.    Yes, that's what I had said.

5    Q.    That's what you said to Jamaine?

6    A.    That's what I had said on my testimony.

7    Q.    That's what you said on your testimony.  I agree.

8          But is it now your testimony that you didn't say that

9    to Jamaine?

10   A.    Well, I'm not saying I did or I didn't.  Now, I did

11   tell him about the lick.  I'm not too sure about what exact

12   words did I use, but I used some words describing the lick.

13   I don't remember if I put the part in that he was an easy

14   lick, and I don't remember if I didn't.

15   Q.    Okay.  Gold didn't tell you anything about the guy

16   coming out of the house other than the fact that he was

17   coming out of the house to buy himself some more dope; true?

18   A.    Yes.

19   Q.    You went over and talked to Jamaine; true?

20   A.    Yes.

21   Q.    At the time you went over to talk to Jamaine, Jamaine

22   was grinding?

23   A.    Yes.

24   Q.    And grinding is standing out on the street corner or

25   the street for six or seven or eight hours at a time selling

26   rocks; true?

27   A.    Yes.  It ain't necessarily standing in one spot

28   but --

1  Q.    You might move around?

2  A.    Yes.

3  Q.    Well, what it is, it's working all day selling your

4  dope?

5  A.    Yes.

6  Q.    Tough grind, grinding out small amounts of cash;

7  right?

8  A.    Yes.

9  Q.    And what Jamaine was doing that day was he was

10  grinding?

11  A.    Yes.

12  Q.    And you were grinding?

13  A.    Yes.

14  Q.    And Gold comes up to you, and he tells you about the

15  mark; right?

16  A.    Not necessarily, he didn't say the mark, but --

17  Q.    He also didn't say anything about a lick?

18  A.    Yes.

19  Q.    Correct?

20  A.    Yes, he said something about a lick, but he didn't

21  say no mark or no punk or nothing of -- of that nature.

22  Q.    No mark or no what?

23  A.    Or no punk or nothing in that nature.

24  Q.    Tell me what that word is.

25  A.    A coward.  It's all the same thing.

26  Q.    No mark or no coward?

27  A.    Yes, it's all the same thing.

28  Q.    Okay.  But he did say something about a lick?

1  A.     Yes.

2  Q.     Well, you and I just talked, and I asked you several

3  different which ways exactly what Gold had said to you, and I

4  didn't hear anything about any lick.  I didn't hear anything

5  describing this guy at all other than the fact that he was

6  going to come out of his house to buy some more dope.

7       Now, did he say something about a lick or didn't he?

8  A.     That was the lick.  He told me that he was coming out

9  to buy the dope, told me what time he was coming out.  He

10  just called the dude for the dope to meet him on the corner.

11  That was describing the lick to me.  Didn't have to

12  necessarily say this is a lick.

13  Q.     Oh, okay.

14       So when Gold came out and said to you there's a guy

15  coming out to buy dope, that's describing a lick to you?

16  A.     Yes.

17  Q.     Why wouldn't it just be describing a potential

18  customer to sell dope to?

19  A.     It wasn't nobody who smoked dope.  It's somebody who

20  sold dope.

21  Q.     Did he say it was somebody who sold dope?

22  A.     No.

23  Q.     If he didn't say that it was somebody who sold dope,

24  how did you know that he was describing somebody who sold

25  dope?

26  A.     Because we had already seen him out there like a week

27  before that.

28  Q.     Who had already seen him out there like a week before

1   that?

2   A.      We all seen him before that, me, Gold and Jamaine,

3   Dre.  Everybody who be out there seen him before that.

4   Q.      Everybody had seen him?

5   A.      Yes.

6   Q.      Some guy?

7   A.      Yes.

8   Q.      Selling dope?

9   A.      Yes.

10  Q.      Just like Sean?

11  A.      No.

12  Q.      Well, that's what Sean did.  Sean was out there

13  selling dope; right?

14  A.      Yes, he was.

15  Q.      And he was selling dope in larger than dime rock

16  quantities?

17  A.      Yes.

18  Q.      And so when you saw this guy, when we (sic) all had

19  seen him, you and Jamaine and Andre and Gold and all them,

20  when you saw there guy, you knew that he was out there

21  selling dope but in some way other than just grinding?

22  A.      No, he was selling rock for rock just like everybody

23  else.

24  Q.      So he was selling rock for rock just like anybody

25  else?

26  A.      Yes.

27  Q.      Okay.  So on the day that Gold came to you and said

28  to you there's this guy and he's fixing on coming out of the

1  house to buy some dope, what made you think it was doing

2  anything other than coming out to grind?

3  A.       Goldie?

4  Q.       No, the guy.

5  A.       How he going to come out and grind?  He was going to

6  go buy some dope.  You got to have the dope in order to

7  grind.

8  Q.       So what you concluded from what Gold told you was

9  this guy's coming out of the house, he's going to be holding

10 some real money?

11 A.       Yes, that was the whole point of it.

12 Q.       The whole point of it was that what Gold told you

13 about the guy coming out to buy, that meant that the guy --

14 that meant that the guy would have some money; right?

15 A.       Yes.

16 Q.       So that's what made him a lick?

17 A.       Yes.

18 Q.       Okay.  So you went over to Jamaine, and you said to

19 Jamaine there's a guy coming out of the house fixing to buy

20 some dope?

21 A.       Yes.

22 Q.       And you don't recall now whether or not you said to

23 Jamaine or not he'd be an easy lick?

24 A.       I don't remember word for word.

25 Q.       Did you think to yourself he'd be an easy lick?

26 A.       Did I think to myself, yes.

27 Q.       Did you think to yourself he'd be an easy lick?

28 A.       Yes.

1   Q.      Why?

2   A.      Because I asked -- I saw him out there selling dope

3   already, and I -- I just had a feeling he would be an easy

4   lick.

5   Q.      You saw him out there selling dope.

6           You mean you had seen him out there when he was

7   grinding?

8   A.      Yes.

9   Q.      Well, what was it that you saw that made you believe

10  he would be an easy lick?

11  A.      Because I'd come out there, and he'd be out there,

12  and I would leave, and I would come back.  He would still be

13  out there.  He'd be out there all night, all day.

14  Q.      He'd be grinding for long hours?

15  A.      Yes.

16  Q.      So anybody who'd be grinding for long hours would be

17  an easy lick?

18  A.      No.

19  Q.      Well, okay.

20          Well, then, what was it that you saw in that man that

21  led you to believe he'd be an easy lick?

22  A.      I just felt he was an easy lick by the way he carried

23  himself.

24  Q.      By the way he carried himself?

25          Yes?

26  A.      Yes.

27  Q.      He carried himself like a mark, didn't he?

28  A.      No, he was too loose.  He was fretting.  What I mean



EXHIBIT

2 - C

FILED                    Dept No,  6

96 MAR 25 PH 1:24

**MUNICIPAL COURT FOR THE OAKLAND-PIEDMONT-EMERYVILLE JUDICIAL DISTRICT
COUNTY OF ALAMEDA, STATE OF CALIFORNIA**

JUDICIAL DISTRICT
THERESA S. FRANK, CLK.

PEOPLE OF THE STATE OF CALIFORNIA  DEPUTY, ANN PERKINS        408621

)
)
vs.                                            )        **COMPLAINT**
)
PAIGE, JAMAINE VERNON                           )      PFN:  AWJ285     CEN:  6135319
)
_____Defendant(s)____)

The Undersigned, being sworn, says, on information and belief, that said
defendant(s) did, in the Oakland-Piedmont-Emeryville Judicial District,
County of Alameda, State of California, on or about July 29, 1995, commit a
FELONY, to wit: **MURDER**, a violation of Section **187(a)** of the Penal Code of
California, in that said defendant did then and there murder **SEAN LANDRY** a
human being.

It is further alleged that in the commission and attempted commission of the
foregoing offense, the defendant, JAMAINE VERNON PAIGE, was within the
meaning of Sections 667 and 1192.7(c) of the Penal Code.

### USE OF FIREARM CLAUSE
(Penal Code Section 12022.5/1203.06a)

The Undersigned further deposes and says on information and belief, that in
and during the commission and attempted commission of the above offense, the
said defendant JAMAINE VERNON PAIGE, personally used a firearm, to wit:  a
**HANDGUN.**

### GREAT BODILY INJURY CLAUSE
(Penal Code Section 1203.075(a))

The Undersigned further deposes and says on information and belief, that in
and during the commission and attempted commission of the above offense, the
said defendant, JAMAINE VERNON PAIGE, with the intent to inflict such injury,
personally inflicted great bodily injury on **SEAN LANDRY.**

### SECOND COUNT

The Undersigned further deposes and says on information and belief, that said
defendant did in the Oakland-Piedmont-Emeryville Judicial District, County of
Alameda, State of California, on or about July 29, 1995 commit a FELONY, to
wit: **ATTEMPTED MURDER**, a violation of Section **664/187(a)** of the Penal Code
of California, in that said defendant did then and there attempt to murder
**CEDRIC NELSON** a human being.

(146)

It is further alleged that in the commission and attempted commission of the foregoing offense, the defendant, JAMAINE VERNON PAIGE, was within the meaning of Sections 667 and 1192.7(c) of the Penal Code.

## PREMEDITATED ATTEMPTED MURDER CLAUSE
### (Penal Code Section 664)

The undersigned further deposes and says on information and belief, that the attempted murder alleged above was wilful, deliberate and premeditated.

## USE OF FIREARM CLAUSE
### (Penal Code Section 12022.5/1203.06a)

The Undersigned further deposes and says on information and belief, that in and during the commission and attempted commission of the above offense, the said defendant JAMAINE VERNON PAIGE, personally used a firearm, to wit: a HANDGUN.

## GREAT BODILY INJURY CLAUSE
### (Penal Code Section 1203.075(a)/12022.7)

The Undersigned further deposes and says on information and belief, that in and during the commission and attempted commission of the above offense, the said defendant, JAMAINE VERNON PAIGE, with the intent to inflict such injury, personally inflicted great bodily injury on CEDRIC NELSON.

## THIRD COUNT

The Undersigned further deposes and says on information and belief, that said defendant did in the Oakland-Piedmont-Emeryville Judicial District, County of Alameda, State of California, on or about July 29, 1996 commit a FELONY, to wit:    ATTEMPTED MURDER, a violation of Section 664/187(a) of the Penal Code of California, in that said defendant did then and there attempt to murder SHARON PARNELL-ANDREWS a human being.

It is further alleged that in the commission and attempted commission of the foregoing offense, the defendant, JAMAINE VERNON PAIGE, was within the meaning of Sections 667 and 1192.7(c) of the Penal Code.

## PREMEDITATED ATTEMPTED MURDER CLAUSE
### (Penal Code Section 664)

The undersigned further deposes and says on information and belief, that the attempted murder alleged above was wilful, deliberate and premeditated.

## USE OF FIREARM CLAUSE
### (Penal Code Section 12022.5/1203.06a)

The Undersigned further deposes and says on information and belief, that in and during the commission and attempted commission of the above offense, the said defendant JAMAINE VERNON PAIGE, personally used a firearm, to wit: a HANDGUN.

OAK 014 (1/78)

## GREAT BODILY INJURY CLAUSE
### [Penal Code Section 12022.7(a)/1203.075a]

The undersigned further deposes and says that the District Attorney of the County of Alameda further charges that in and during the commission and attempted commission of the above offense, the said defendant JAMAINE VERNON PAIGE personally inflicted great bodily injury on SHARON PARNELL-ANDREWS.

## FOURTH COUNT

The Undersigned further deposes and says on information and belief, that said defendant did in the Oakland-Piedmont-Emeryville Judicial District, County of Alameda, State of California, on or about July 29, 1995 commit a FELONY, to wit: a violation of Section 12021(a) of the Penal Code of California, in that said defendant, having been convicted of a felony, in that on or about the 13th day of October, 1993 in the Superior Court in the State of California in and for the County of Alameda said defendant was convicted of a felony, to wit: DISCHARGING A FIREARM AT DWELLING/MOTOR VEHICLE/AIRCRAFT did then and there have in his possession and under his custody and control a firearm, to wit: a HANDGUN.

## PRIOR CONVICTION

The Undersigned further deposes that before the commission and attempted commission of the offense(s) charged in this complaint and on or about the 13th day of October, 1993, the said defendant, was convicted in the Superior Court of the State of California, in and for the County of Alameda, docket #117614, of a felony, to wit: DISCHARGING A FIREARM AT DWELLING/MOTOR VEHICLE/AIRCRAFT, and that pursuant to said conviction the said defendant received probation.

Pursuant to Penal Code Section 1054.5(b), the People are hereby informally requesting that defendant's counsel provide discovery to the People as required by Penal Code Section 1054.3.

Complainant therefore prays that a warrant issue and that said defendant(s) be dealt with according to law.

Subscribed and sworn to before me,

_Sgt J. Madarang_

this 25th day of March, 96    Address    OPD/MADARANG/95-70851
41017RP/ap

_Rold M Plew_

Deputy District Attorney,
Alameda County, California.

Phone

(148)

1          IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

2                         IN AND FOR THE

3                    FIRST APPELLATE DISTRICT

4                         ---oOo---

5

6

7   THE PEOPLE OF THE STATE OF          )
    CALIFORNIA,                         )
8                                       )
                PLAINTIFF AND           )
9               RESPONDENT,             )    NO.
                                        )
10      VS.                             )    ALAMEDA NO. 127285A
                                        )
11  JERMAINE PAIGE,                     )
                                        )
12              DEFENDANT AND           )
                APPELLANT.              )
13  _____)

14

15

16

17              REPORTER'S TRANSCRIPT ON APPEAL
            FROM THE JUDGMENT OF THE SUPERIOR COURT
18                 OF THE STATE OF CALIFORNIA
               IN AND FOR THE COUNTY OF ALAMEDA
19        BEFORE THE HONORABLE LARRY J. GOODMAN, JUDGE

20

                         MARSDEN MOTION
21        TRANSCRIPT SEALED PURSUANT TO COURT ORDER

22

                          APPEARANCES
23

24
    FOR THE RESPONDENT:          DANIEL LUNGREN
25                               ATTORNEY GENERAL OF CALIFORNIA
                                 6000 STATE BUILDING
26                               SAN FRANCISCO, CA  94102

27
    FOR THE APPELLANT:              IN PROPRIA PERSONA
28

1    IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2         IN AND FOR THE COUNTY OF ALAMEDA

3    BEFORE THE HONORABLE LARRY J. GOODMAN, JUDGE

4              DEPARTMENT NO. 7

5                 ---oOo---

6

7

8   THE PEOPLE OF THE STATE          )
    OF CALIFORNIA,                   )
9                                    )
                                     )
10            PLAINTIFF,             )
                                     )        NO. 127285A
11       -VS-                        )
                                     )
12   JERMAINE PAIGE,                 )
                                     )
13                                   )
                                     )
14            DEFENDANT.             )
                                     )

15

16

17            THURSDAY, JULY 11, 1996

18      REPORTER'S TRANSCRIPT OF PROCEEDINGS

19              MARSDEN MOTION

20   TRANSCRIPT SEALED PURSUANT TO COURT ORDER

21

22         A P P E A R A N C E S

23

24   FOR THE DEFENDANT:        LINCOLN MINTZ
                               ATTORNEY AT LAW
25

26

27

28

1  THIS CASE.  THEY WERE ARRESTED IN THE CITY OF HAYWARD, IN

2  SOUTH HAYWARD WHERE THERE WAS A SURVEILLANCE OF STREET

3  DOPE ACTIVITY.  AND SOMEONE AMONG THE THREE, MR. BANKS,

4  MR. PAIGE OR MR. NELSON, DROPPED A GUN AS THE POLICE WERE

5  ROLLING UP TO MAKE A WALKING STOP OF THE THREE OF THEM.

6       THAT GUN WAS TAKEN BY THE HAYWARD POLICE

7  DEPARTMENT.  AND WHEN THE OAKLAND POLICE DEPARTMENT WAS

8  DOING SOME FOLLOW-UP ON THIS CASE, THEY HOOKED UP TO THAT

9  GUN.  AND THAT GUN, WHICH KEVIN BANKS SAYS IS JERMAINE

10  PAIGE'S GUN, MATCHES UP WITH FIREARMS IDENTIFICATION

11  EVIDENCE WITH SOME OF THE BULLETS FOUND IN THE VICTIMS OF

12  THE TWO ATTEMPTED MURDERS AND THE MURDER.

13       KEVIN BANKS' TESTIMONY IS VERY CRITICAL.

14  MR. PAIGE HAS PROVIDED ME WITH INFORMATION AS TO HIS

15  DEFENSE ON THE PRIMARY OFFENSE.  AND I HAVE REQUESTED OF

16  MR. PAIGE'S GIRLFRIEND THAT SHE COME TO ME TO BE

17  INTERVIEWED BECAUSE SHE IS CRITICAL TO THE DEFENSE.  SHE

18  HAS NOT RESPONDED TO MY REQUEST, HAS NOT CONTACTED ME,

19  HAS NOT COME INTO MY OFFICE.  AND I CAN ONLY SPECULATE

20  THAT IT IS BECAUSE THERE IS A FEELING THAT I AM NOT PART

21  OF THE DEFENSE TEAM.

22       IN ANY EVENT, I WOULD LIKE TO PREPARE THAT CASE.

23  I TOLD MR. PAIGE IN MY LETTER TO HIM OF JUNE 12TH WHAT

24  THE OFFER OF PLEA BARGAIN WAS AND THAT IT WOULD INVOLVE

25  HIM DOING 20 YEARS IN PRISON AS WELL AS TESTIFYING

26  AGAINST ANDRE NELSON.

27       I ALSO EXPLAINED TO HIM THE CONSEQUENCES OF GOING

28  TO TRIAL IF HE IS CONVICTED, AND THE FACT IF HE ISN'T

1  A.      Probably about 17 rocks.

2  Q.      17?

3  A.      Yes.

4  Q.      Were they dime rocks?

5  A.      Yes.

6  Q.      All individually wrapped?

7  A.      Yes.

8  Q.      When you sold them out there, do you always

9  individually wrap up your rocks?

10  A.      Yes.

11  Q.      Why is that?

12  A.      Put them in your mouth.  If you got stopped by the

13  police, you can actually swallow them.

14  Q.      If they were wrapped up?

15  A.      Yes.

16  Q.      Okay.  You saw them make a U-turn?

17  A.      Yes.

18  Q.      Is that at the point where you tossed the bag of

19  dope?

20  A.      Yes.

21  Q.      Did anybody else throw anything?

22  A.      Yes.

23  Q.      Who threw something?

24  A.      Jamaine.

25  Q.      What did Jamaine Paige drop?

26  A.      His gun and his dope.

27  Q.      He had a bag of dope?

28  A.      Yes.

1  Q.       Okay.  Do you know how much dope Jamaine Paige was

2  carrying that night?

3  A.       No.

4  Q.       You say he threw a gun?

5  A.       Yes.

6  Q.       What kind of gun did he throw?

7  A.       The .40 caliber.

8  Q.       Okay.  Do you know what kind of .40 caliber this was?

9  A.       No.  It was a Glock.  I don't know what -- it was

10  a --

11       THE REPORTER:  What was that?

12       THE WITNESS:  I know it was a Glock.  I didn't know

13  what kind it was.

14       MS. DANZIG:  Q.  What does Glock mean to you?

15  A.       A plastic pistol.

16  Q.       Okay.  Was that the same pistol that you had seen

17  which Jamaine used to shoot Cedric the night of the

18  shootings?

19  A.       Yes.

20  Q.       Now, you had mentioned that Andre Nelson had gotten

21  rid of the .45.  He had dropped it off at grandmother's

22  house?

23  A.       Yes.

24  Q.       Did Jamaine Paige talk about getting rid of his

25  pistol, the one he used?

26  A.       No.

27  Q.       Was there any conversation about it?

28  A.       No.

(196)

1   Q.      Okay.  Let me show you an item that has been marked

2   9C for identification and ask you to take a look at that and

3   tell me whether you recognize it?

4   A.      Yes.

5   Q.      What do you recognize this to be?

6   A.      The .40 caliber.

7   Q.      Is this the same .40 caliber that Jamaine Paige had

8   during the night of the shooting?

9   A.      Yes.

10  Q.      How do you recognize it?

11          How do you recognize it?

12  A.      Bring it back over here and I can show you exactly

13  how I recognize it.

14  Q.      (Complying.)

15  A.      It has little white part back there.  I remember

16  the --

17          THE COURT:  Talk slower and into the mike.

18          THE WITNESS:  I remember that part back there, and I

19  remember exactly how the gun looked, appeared.

20          MS. DANZIG:  Q.  Are you referring to the rear

21  sight, there's a white mark on the rear?

22  A.      Yes.

23  Q.      And you recognize that?

24  A.      Yes.

25  Q.      Have you ever handled this weapon before?

26  A.      Yes.

27  Q.      About how many times do you think that you had an

28  opportunity to handle this weapon?

JAMES LEE, CSR NO. 4820

1  of a gun, don't you?

2  A.     Yes.

3  Q.     And that the 23 refers to how the gun is designed;

4  right?

5  A.     Yes.

6  Q.     And you know there's a difference between the nine

7  millimeter and a .40 caliber?

8  A.     Yes.

9  Q.     And you know that the gun that was used in the

10  shooting of Sean Landry and the shooting of Cedric was a

11  Glock 23 .40 caliber; right?

12  A.     Yes, I thought it was a -- no, I thought it was a

13  Glock 23.  I thought the Glock 23 shoot nine millimeter

14  bullets.

15  Q.     Okay.  Now, let me ask you this:  When was the first

16  time you identified the gun here in the courtroom that was

17  shown to you by the prosecuting attorney?

18         You've identified that gun as being the particular

19  Glock that was dropped out there in Hayward that night when

20  you were arrested; right?

21  A.     Yes.

22  Q.     And that's the same gun that was used in the shooting

23  of Sean Landry and Cedric; right?

24  A.     Yes.

25  Q.     Now, when was the first time ever that you saw that

26  gun?

27  A.     Like I said, before Sean had died when I went over to

28  Jamaine (sic) house prior to that.

1  disregard the circumstances that brought all these people

2  together that night and how they got together and why and

3  what they were doing, and if you focus solely on that little

4  split second where the trigger is pulled, and if you view

5  that moment very narrowly as through tunnel vision, then you

6  might conclude that it was only a second-degree murder, and

7  that would be, I think, a fairly artificial and limited view

8  of the evidence in this case, but that's how you get there.

9        Now, what about Jamaine Paige?

10       Once again, Jamaine Paige is fully responsible to the

11 same extent that Andre Nelson is responsible.  If you find

12 that Nelson is guilty of murder, then you ought to find Paige

13 guilty as well because under the law he's an aider and

14 battery.

15       Remember what the law tells us about crime partners.

16 Partners in crime are each responsible for the criminal acts

17 that they perform together, that is, each equally responsible

18 for the results of their handiwork.

19       So the major inquiry is this:  Did Paige know of the

20 unlawful purpose of the perpetrator, and, two, did he aid,

21 promote, encourage, or instigate the crime with the intent to

22 encourage or facilitate the act?

23       Again, that's the language of the code.  That's what

24 the jury instructions say.

25       What it means is very simple.  Did Paige know what

26 Nelson intended to do, and, if so, did he help?  That's what

27 that means.

28       Well, we know he was out selling dope with Andre

(199)

1  noticed it.

2      Remember the evidence is absolutely clear and

3  uncontradicted that this shooting does not arise out of any

4  kind of conflict, didn't arise out of any kind of a fight.

5  There was no argument.  There was no pushing.  There was no

6  shoving.  There was no fisticuffs, no yelling, nothing.

7      When the shooting started, when Andre Nelson pulled

8  out his gun and shot Sean Landry, Cedric ran across that

9  parking lot for his life and was followed by the defendant,

10  Mr. Paige.

11      And we know what Paige was doing.  Paige was shooting

12  at him.  He chased Cedric across the lot, and he hit Cedric

13  Nelson several times.  You can see the bullet wounds in the

14  pictures.

15      But Cedric was lucky that night.  He fell by that

16  van, the white van with the bullet hole in the back.  You see

17  it in the pictures on exhibit one, the diagram.  Kevin saw

18  him fall by that van.

19      But he was in fear of his life.  He managed to get

20  back up on his feet, and he continued running.  He ran for

21  his life.  And he made it over to Murdock Court, that little

22  cul-de-sac just down the way where he was very soon

23  afterwards found by the police.

24      Now, Paige really shot the place up.  He emptied his

25  gun of bullets.  The casings were all over the lot, trailing

26  off toward Murdock Court.  And Paige was shooting as Cedric

27  ran up 60th Avenue, and we know that he shot at him as he ran

28  up 60th Avenue after Cedric because you'll remember that a

(200)

JAMES LEE, CSR NO. 4820

1  slug recovered by the crime scene technicians was found in

2  the passenger side door of that little brown Porsche that was

3  parked up in front of the house on 60th Avenue.

4       Nelson was yelling at Paige: Hurry up, hurry up,

5  kill him. Nelson said to Paige: Kill that motherfucker.

6       Excuse my language. But the evidence in murder cases

7  is often not very polite.

8       That's what he was saying. Get it over with.

9       And what did Paige say?

10      No, I cannot. It would be wrong. That is, it would

11 be wrong to kill that man?

12      Paige says I can't because I'm out of bullets. He

13 emptied his gun at Cedric, and he managed to hit him several

14 times. He tried to kill Cedric Nelson, but he failed, and

15 that, Ladies and Gentlemen, is attempted murder.

16      Now, one thing that you'll notice when you get these

17 instructions from the Judge with respect to attempted murder

18 is that you are not going to be asked to designate the degree

19 because attempted murder isn't divided into first- or

20 second-degree attempted murder.

21      But the evidence is plain and clear and compelling

22 that this was attempted murder.

23      Did Paige attempt to kill Cedric Nelson?

24      Silly to think, silly to look at the crime scene and

25 to hear the testimony in this case and to look at what they

26 did that night and to conclude that they were trying to do

27 anything else.

28      Once again, Andre Nelson is jointly charged with

JAMES LEE, CSR NO. 4820

1    The law is essentially the same as it is for

2  first-degree, willful, deliberate, and premeditated murder.

3  The only difference between Counts Two and Three and Count

4  One is that these are botched, failed attempts to kill. They

5  tried to kill. Thank heavens, they failed.

6       The last charge in the Information that you're going

7  to receive, Count Four, charges the defendant Paige alone by

8  himself. Andre Nelson is not charged in Count Four.

9  Defendant Paige alone is charged with being illegally in

10  possession of a handgun on the night of the murder. Nelson

11  is not charged in that count, and that is the only count in

12  which the two are separately charged.

13       Those are the counts in the Information. And what

14  I've just given you is an overview of the rules of murder and

15  attempted murder that apply in this case.

16       Sean Landry is dead. These defendants along with

17  their cousin, Kevin Banks, they're all equally to blame.

18  They killed him. The defendants and Kevin Banks are all

19  responsible for the attempts on the lives of Shavon and

20  Cedric Nelson. That's their handiwork.

21       What they did that night to these victims, what they

22  did that night was terrible, and it was brutal, and the cold,

23  harsh reality is that all of the killing and all of the

24  shooting and maiming was over -- over a bit of nothing, over

25  a few rocks of cocaine and over the right to stand on a dingy

26  street corner to sell dime rocks to drug addicts.

27       Every witness involved in this case, Shavon, Miesha

28  Singleton, Kevin Banks, each and every one of them have more

1    like reasonable doubt, and you're not going to hear me

2    calling upon the Constitution of the United States or the

3    Tory veterans of the Revolutionary War to stand as advocates

4    for the guilt or innocence of the Jamaine Paige.  If it isn't

5    established clearly on the evidence produced in this

6    courtroom that he's guilty, then he's entitled to an

7    acquittal.  He has a right, any human being would have that

8    right, to be found not guilty in all cases where it is not

9    clearly established -- the word's a reasonable doubt, that he

10   is, in fact, guilty, that anyone is, in fact, guilty.  He's

11   entitled to be found not guilty.

12        Now, how the heck do you do it in this case?

13        I'm not going to elaborate on this.  But if you don't

14   believe Kevin Banks, you can't find this kid guilty.  If you

15   don't believe Kevin Banks, you can't put that Glock .40 in

16   Jamaine Paige's hands on July 29th or August 4th or at any

17   other time.  If you don't believe Kevin Banks, you can't put

18   Jamaine Paige anywhere near 60th and MacArthur on July 29th

19   or July 28th or any other time.

20        Now, we know, according to the police, that there are

21   dozens of youngsters, dozens of adults, dozens of people who

22   sell dope in South Hayward.  Jamaine Paige happens to be one

23   of them.  But that doesn't make him guilty of the murder of

24   Sean Landry or the attempted murders of Cedric Nelson or

25   Shavon Pannell.

26        I mean we got some evidence other than Kevin Banks'

27   testimony.  The problem is the evidence other than Kevin

28   Banks' testimony doesn't tie Jamaine Paige into the case.

1  against Jamaine Paige.

2       Second, I can't put Kevin Banks on trial.  The cops

3  and the DA have prevented me or anyone else from doing that

4  ever.

5       And so the words that I say about Kevin Banks relate

6  only to how you evaluate the testimony against Jamaine Paige.

7       Even the gun on August 4th, you got to decide whether

8  Kevin Banks' testimony is convincing beyond a reasonable

9  doubt, because if it isn't, nobody puts that gun in Jamaine

10 Paige's hands or pocket.

11      Now, what do we know about Kevin Banks?

12      He's a dope dealer.  He's a carjacker.  He's a dope

13 robber.  He's an admitted liar to the police.  He at one

14 point in the course of his examination in this trial said,

15 quote:  I'm always gonna look out for myself, end quote.

16 He's protected for a price.

17      He says things like I respect everyone until they

18 disrespect me, and he goes out and robs them at gunpoint.  He

19 lies.  He cheats.  He steals.  And he's wily as hell.

20      Remember what he said about Sergeant Madarang?  He

21 could only lock me up for 72 hours 'cause he didn't have any

22 evidence on me.  I explained that to him.

23      You know, the truth is this:  I have been told that

24 lawyers are ill suited, indeed, to accuse others of being

25 arrogant.  Perhaps even my closest friends, let alone those

26 somewhat more distance, have told me that I among lawyers and

27 maybe among people am even more singularly unsuited to

28 criticize someone else for being arrogant.

Mintz, Giller and Mintz, A Law Corp. ♦ Lincoln Nathan Mintz, Attorney at Law

4 Jun 96

In re:         *PAIGE Jamaine V. v Peo [1996 -- Ala/Co. # 127285 -- 187 & various]*
Letter to:     (Mr.) Jamaine Paige   **PFN AMU285**
Subject:       *Confirming today's conference*

✔  You wanted to talk about the "relevance" of the gun. I can only assume you mean the gun which Kevin Banks says you possessed when you and he and your co-defendant were taken into custody by the Hayward Police department a few days after the killing. You've always told me Banks is lying about this, that it was his gun -- so it will have to be dealt with in the same fashion as the rest of his testimony. On the other hand, the relevance of the possession of the gun, if it is believed that you possessed it, is a matter well-established in law. Possession (not singularly remote in time or circumstances) of the instrumentality or means of the commission of a crime -- thus, a gun capable of having been used during the commission of a crime such as a homicide -- is clearly probative on a material issue. The relevance of **this** particular firearm -- the one seized by Hayward Police officers -- is even more clearly established; there has been a **firearms identification** match or link established between it and the crime. So, the gun is **not** going to be excluded from evidence; we're dependent on a failure of proof that it is yours, or that you possessed it, to undermine its damaging consequences in the eyes of the jury.

✔  You inquired about the availability to you of the preliminary examination transcripts. A copy is on the way to you. (Incidentally, I took this opportunity to find out what significance the transcripts have to you. You essentially told me you're just curious. This is a very serious case, and our time is better spent in things involving more than simply curiosity.)

✔  You asked about your 1538.5 rights, and you told me that you had read that you have a **constitutional right** to have a 1538.5 in both the municipal and the superior courts. You wanted to know why I told you different. I told you different because you have neither a constitutional nor a statutory right to litigate a 1538.5 motion in both the municipal and the superior courts. Whatever you read to the contrary is simply incorrect, or else you misunderstood what was said. You have a constitutional right to exclude from your trial evidence which was seized from your person or effects as a result of an unreasonable violation of your right to privacy. California statutory procedure lets you litigate the exclusion only once, as a general rule -- in either the municipal or superior court. But none of that is very important in your case, because **THERE IS NO COGNIZABLE MOTION TO SUPPRESS IN YOUR CASE.** You were arrested many months after the alleged offense, there was no evidence seized from you nor your surroundings, the case against you is not based on the existence of **any** physical evidence **EXCEPT** that gun. And, there's no 1538.5 as to the gun because it is property which was **ABANDONED** by someone on the street in Hayward before there had been so much as an attempted detention by police officers.

✔  You indicated your understanding of a 1538.5 motion is "...they have to come with all of their evidence." They don't have to "...come with" all of their evidence until

FINANCIAL CENTER BUILDING
405 - 14TH STREET, SUITE NUMBER 300, OAKLAND, CALIFORNIA 94612
Telephone 510/451-6686 ♦ FAX 510/451-4820
(204)

2

## Superior Court Of The State Of California In And For The County Of Alameda

Dept. No.                    9                                    Action No.                127285-A

THE PEOPLE OF THE STATE OF CALIFORNIA            VS.        JAMAINE PAIGE

                    Plaintiff                                                                    Defendant

# VERDICT OF JURY

We, the jury in the above entitled cause, find the defendant, JAMAINE PAIGE, NOT GUILTY of

a felony, to wit:   a violation of Section 12021 of the Penal Code of California as charged in the

Fourth Count of the Information.

Dated:  12/26/96                          Foreperson: 

VERDICT OF JURY
(141)

179

1  talking about concerns the arrest in Hayward, and we're

2  talking about dealing in narcotics, possession of a firearm.

3        Such evidence, if believed, was not received and may

4  not be considered by you to prove the defendant is a person

5  of bad character or that the defendant has a disposition to

6  commit crimes.

7        This evidence was received and may be considered by

8  you only for the limited purpose of determining whether or

9  not it tends to show a motive for the commission of the crime

10  or that the defendant had knowledge or possessed the means

11  that might have been useful or necessary for the commission

12  of the crime.

13        For the limited purpose for which you may consider

14  such evidence, you must weigh it in the same manner as you

15  weigh all other evidence in the case.

16        You're not permitted to consider such evidence for

17  any other purpose.

18        You should give the testimony of a single witness

19  whatever weight you think it deserves.  However, testimony by

20  one witness which you believe concerning any fact may be

21  sufficient for the proof of that fact.  However, it makes

22  good sense to carefully review all the evidence upon which

23  the proof of such fact depends.

24        Again, you are the sole and exclusive judges of the

25  force and effect of the evidence.

26        Now, evidence that on some former occasion a witness

27  made a statement or statements that are inconsistent with his

28  testimony here at the trial may be considered by you not only

(149)

# EXHIBIT

# 2-D

1  to do, and to tell you the truth, pretty tough for me to do,

2  too.  But if you know the dope trade, if you think about the

3  dope trade, two people with a gal in the car don't go to 60th

4  and MacArthur and meet up with three people, including

5  supposedly Andre Nelson, with whom there's been an ongoing

6  struggle, without protecting themself (sic).  And the only

7  way they're going to be caught unaware is if it is Kevin

8  Banks and some henchman of his unknown to Sean Landry.

9       Look at the location of the crime.  Jamaine Paige

10  lives in Hayward.  Jamaine Paige, from the testimony that we

11  have, has always lived in Hayward.  Jamaine Paige is a

12  Hayward guy and deals dope in South Hayward.

13       What is --

14  DEFENDANT PAIGE:  Excuse me, Mr. Mintz.

15  MR. MINTZ:  Pardon me one minute.

16  (Off-the-record discussion between Mr. Mintz and

17  defendant Jamaine Paige.)

18       MR. MINTZ:  Mr. Paige wants to me to advise you that

19  he doesn't deal dope.

20       Jamaine Paige deals dope in South Hayward.  No

21  getting around it.

22       But the fact remains he's a Hayward guy.  The fact

23  remains there's no reason for Jamaine Paige to go to the

24  corner of 60th and MacArthur.  There's no reason for Jamaine

25  Paige to be part of any such nefarious scheme.

26       Let's talk about the real motivation for the crime.

27  Let's talk about what really happened with Kevin Banks 'cause

28  it really is interesting.

# THE BAR ASSOCIATION OF SAN FRANCISCO

September 8, 1998

Lindbergh Porter, Jr.
President

Therese M. Stewart
President-Elect

Fred W. Alvarez
Treasurer

Douglas R. Young
Secretary

Drucilla Stender Ramey
Executive Director and
General Counsel

Joan Firestone
Deputy Executive Director

Barbara Fanning
Continuing Legal Education

Camilla Kieliger
Publications

Connie Moore-Dunning
Alternative Dispute
Resolution Services

Tanya Neiman
Associate General Counsel
Director, Volunteer Legal
Services Program

Carol Woods
Lawyer Referral Service

Ann Coulson
Membership
Barristers Club

BOARD OF DIRECTORS

Teveia Barnes
Jeff Bleich
Ruth Borenstein
Frederick A. Brown
Elizabeth Cabraser
Paul D. Gutierrez
Andrew McCullough
Susan L. Paulus
Donn P. Pickett
Maro E. Rosales
Robert Rosenfeld
Mark S. Rudy
Stephen E. Taylor
Rebecca Westerfield
Andrea A. Wirum

EX-OFFICIO MEMBERS
BARRISTERS CLUB

Kathi Pugh
President

Steven S. Kaufhold
President-Elect

Christopher Hunter
Treasurer

Joanne LaFreniere
Secretary

Complaint Audit and Review
State Bar of California
1149 South Hill St.
Los Angeles, CA 90015-2299

RE:   Attorney Lincoln Mintz

Dear Complaint Division,

I understand that you are currently not operating the complaint department at this time but I am forwarding to you a complaint form filed in our office on August 13, 1998.

Please process once you begin researching complaints again.

If you have any questions, please feel free to call me at 415/982-1600.

Sincerely,

Sherri Elman, Coordinator
ADR Services

cc: Jamaine Paige

Case 5:08-cv-00003-RMW    Document 1-3    Filed 05/05/08    Page 12 of 71

# Retired attorney Mintz disbarred in client neglect

## Court cites lawyer's failure to respond

**By Sharon Lerman**
STAFF WRITER

Two years after Lincoln Mintz retired and two months after his 35-year-old son died, the respected Alameda County defense attorney's high-profile career was marred by his disbarment.

The State Bar Court in August ordered the 58-year-old attorney barred from practicing law in California, citing a client's 1998 complaint, Mintz's failure to respond to its investigation and his prior record of discipline. The decision was recently published in the California Bar Journal.

Since 1966 Mintz had defended hundreds of homicide cases in Alameda County, earning a solid reputation among judges and fellow attorneys.

"He's one of the few defense attorneys around who, if he told you something, you could bet the book on it because he was a straight shooter," said Assistant District Attorney James Anderson, who opposed Mintz in at least six homicide cases over the years.

Mintz retired in September 1998, but two months later client Benjamin Dix filed a complaint alleging he paid Mintz about $10,000 in fees, then was essentially abandoned by the attorney.

Dix said Mintz stopped returning his phone messages and became angry when Dix inquired about decisions the attorney made without first consulting him.

He also alleged Mintz did not respond to repeated requests that he return a file Dix needed for an employment termination proceeding before the Oakland School Board. Mintz's failure to return the file compromised Dix's case, the State Bar Court

able of relatively minor offenses: failure to return a file, and failure to communicate, the court wrote. "Normally, the penalty for violation [of] such rules is a reproval or suspension."

But the court wrote it recommended disbarment because of Mintz's prior record and his failure to respond to Dix's complaint.

"He has clearly lost all interest in his professional obligations, and any respect for the disciplinary system whatsoever," the court wrote.

Mintz said in a Thursday interview he was trying to put his career as an attorney behind him.

"I spent over three decades fighting for all of my clients," Mintz said. "When I left the practice of law, quite frankly, I didn't have any fight left in me anymore, so all these allegations that were made, I let them go by default."

Mintz's record of disciplinary action began with a private reproval in 1995. In 1997 he received two years' probation for misconduct, including mishandling client matters and failing to respond to the bar's investigation. He was again suspended for similar allegations of misconduct in 1999 and 2000.

Attorney James Giller, who worked as Mintz's partner for more than 30 years, said he took on most of Mintz's clients after he retired.

"He's one of the most able lawyers that ever practiced in this county," Giller said. "He had some loose ends that he just didn't wind up, basically, with the state bar before he retired."

Mintz has represented many high-profile defendants, including William and Emily Harris, who were accused of kidnapping Patty Hearst, and former Oakland Police Officer Tim Smith, who kidnapped and assaulted several women while on duty in the early 1980s.

**THE STATE BAR OF CALIFORNIA**

OFFICE OF THE CHIEF TRIAL COUNSEL
INTAKE

1149 SOUTH HILL STREET, LOS ANGELES, CALIFORNIA 90015-2299

(213) 765-1000 FAX: (213) 765-1168
TDD #: (213) 765-1566

SEP 1 6 1998

Thank you for your complaint regarding a California attorney. Although we are continuing to receive written complaints, we are unable to investigate your complaint at this time because of a lack of funding.

As you may know, the source of funding for the State Bar's attorney discipline and public protection services are license fees paid by lawyers – not taxpayer dollars. The State legislature and Governor approve the amount of fees that the State Bar can collect each year. Last year, however, the 1998 fee bill was vetoed and, as a result, we are unable to collect the full amount of fees to operate all of our attorney discipline programs. We have made every effort keep operating as long as possible, but we have run out of money.

We will hold your complaint but we are unable to respond to your questions as 90% of the discipline staff is scheduled for layoff on June 26, 1998. If funding for attorney discipline is restored, we will contact you.

While only the State Bar of California has the ability to discipline attorneys for ethical misconduct, you may be able to receive other assistance from your local or county bar association.

Your local bar association may have various programs available to assist you. For example, there may be a lawyer referral service to assist you in hiring an attorney at reduced rates. A client relations committee may be available to assist you in resolving a probelm with your attorney.

If you have a fee dispute, you may submit the matter to Fee Arbitration if the local bar association has an arbitration program.

Please contact the bar association in your area to find what limited programs are available to assist you. It can be found in the white pages of your telephone directory.

If your complaint involves criminal conduct, please contact your local law enforcement agencies.

Thank you for your understanding.

OFFICE OF THE CHIEF TRIAL COUNSEL
Intake Unit

Inquiry No.: 98-23949

THE BAR ASSOCIATION OF SAN FRANCISCO

January 24, 2003

Mr. Jamaine Paige, K39043
California Correctional Institution
4B-8B-205L
P.O. Box 1906
Tehachapi, CA 93581

Dear Mr. Paige:

I am writing in response to the letter in which you requested documentation regarding your previous attorney Lincoln Mintz. The organization that handles that type of request is actually the California State Bar Association. (We are the San Francisco County Bar Association, Lawyer Referral Service).

I checked the State Bar website and found a listing of Lincoln Mintz, stating that he has been disbarred. I am enclosing a copy of that report.

I have also forwarded a copy of your request to the State Bar Association. I am enclosing the original documents that you sent us, as we will not need them.

Thank you for contacting the San Francisco Bar Association's Lawyer Referral Service and good luck to you in pursuing your appeal.

Sincerely,
The Staff, Lawyer Referral Service of the Bar Association of San Francisco

Discipline Imposed

## Member Records Online

**Member# 37610**

**Lincoln N Mintz is <u>DISBARRED</u>**

| Discipline Imposed | Date Imposed | Date Ended | Case # |
|---|---|---|---|
| Disbarment | 9/23/2000 | | 99-O-10789 |
| Discipline w/actual suspension | 5/11/2000 | 9/23/2000 | 95-O-13052 |
| Discipline w/actual suspension | 12/31/1999 | 9/23/2000 | 95-O-18231 |
| Discipline, probation; no actual susp. | 7/31/1997 | | 96-H-02976 |

<u>Glossary</u>

If you want to know why a member was disciplined, you may <u>purchase a copy of the member's public record of discipline</u> or view that record at the offices of the State Bar. Recorded instructions are available at (213) 765-1418. **Contents of a public record of discipline are not available over the telephone.**

You may purchase a <u>Certificate of Standing</u> with a record of this members's complete Status History with the State Bar of California by sending a written request and a check for $25 payable to the State Bar of California.

**Main Menu**       *Member Search*

(193)



People of the State of California vs Jamaine Paige, et al
Alameda County superior court case # 127285
Notice of Appeal, Page 3
31 January 1997

1

2

3

4    challenges, resulting in a jury violative of the defendant's **Wheeler** (and progeny) rights;

5

6    II. The trial jury engaged in misconduct, undermining the integrity of the verdict, in that the verdict was the product of jury compromise and not based upon an open consideration of the evidence presented at the trial of the cause in accordance with the instructions of the trial court;

7

8    III. Trial counsel was incompetent and did not provide effective representation, among other things and particularly in light of the following: In the course of jury argument, trial counsel conceded in this homicide prosecution that the evidence was convincing and substantial that the defendant was in fact a trafficker in narcotics, and defendant interrupted trial counsel's argument to remonstrate that he was not a dope dealer, which point trial counsel did not then argue to the jury but instead continued upon the previously chosen course of argument.

9

10

11

12    Dated:        31 January 1997

13    Mintz, Giller and Mintz, A Law Corporation
      By: Lincoln N. Mintz, Attorney at Law

14

15    /s/ LINCOLN N. MINTZ

16    Attorneys for defendant Jamaine Paige

17    **Copy for Mr. Paige**

18

19

20

21

22

23

24

*APPLNOTC/01/31/97/003*

(207)

1  because he needed the money and he needed the dope.  He

2  wanted the dope.

3        And all of them were drug dealers, which their

4  defense attorneys concede, as they must concede.  All of them

5  needed the money.  They all needed the dope.  That's basic.

6  And all of those drug dealers, especially the ratty little

7  scroungers at the bottom of the heap, all of them need dope,

8  and free dope is a good thing.  It's a bonanza for every

9  single one of them, and they had to get it somewhere.

10        Now, we have heard in this case from the defense

11  lawyers that Kevin Banks was telling the truth when he said

12  in court that Jamaine Paige and Andre Nelson are drug dealers

13  just like he is.  Though apparently few caught it yesterday,

14  Mr. Mintz and his client disagree somewhat as to whether or

15  not it's wise to publicly admit this, but the lawyers concede

16  that Banks was telling the truth when he said these guys were

17  drug-dealing pals of his.

18        And you'll note that the only witness, the only

19  source of this information in this trial, the only witness

20  who called them drug dealers was Kevin Banks, and it's the

21  truth.

22        Kevin Banks is no Boy Scout.  Who in their right mind

23  would expect him to be?

24        Why would they hang out with him if he was a Boy

25  Scout?

26        He's not a nice guy, and his life is scary to think

27  about.  But consider his testimony, and listen to how clearly

28  and unambiguously, how candidly and consistently he talked,



EXHIBIT

2 = F

1  Now, Mr. Paige is further accused in Count Four of

2  having violated Section 12021 of the Penal Code.

3  And what that means is as follows:  Every person who

4  owns or has in his custody or control any pistol, revolver,

5  or other firearm capable of being concealed upon the person

6  is guilty of this crime.

7  Now, you need certain elements:

8  One, that the defendant has in his possession or

9  under his control a firearm;

10  Two, that the defendant exercised control or had the

11  right to exercise control;

12  Three, the defendant had knowledge of the presence of

13  such firearm;

14  And, again, that the firearm was capable of being

15  concealed upon the person.

16  Now, there's two types of possession.  One is actual

17  possession.  I have it in my hand.  The other is constructive

18  possession.  Constructive possession means the person has a

19  direct or physical control over the thing.  I have physical

20  control over the glasses.  Constructive possession does not

21  require actual possession but does require that a person

22  knowingly have the right of control over a thing, either

23  directly or through another person or persons.

24  One person may have possession alone or two or more

25  persons together may share actual or constructive possession.

26  That, Ladies and Gentlemen, defines murder, murder of

27  the first degree by either through felony murder of the

28  robbery or attempted robbery or through a willful,

536

# Superior Court Of The State Of California In And For The County Of Alameda

t. No.  9

Action No.                 127285 A&B

PEOPLE OF THE STATE OF CALIFORNIA          vs.          JAMAINE PAIGE and ANDRE M. NELSON

Plaintiff                                                                    Defendants

## REQUEST BY THE JURY

the jury in the above entitled cause, request the following:

Describe the concept of constructive possession (of a gun

apply to all charges?



12/26/96

Foreperson

(142)

537

## Superior Court Of The State Of California In And For The County Of Alameda

Dept. No.   9

Action No.

127285 A&B

THE PEOPLE OF THE STATE OF CALIFORNIA

vs.

JAMAINE PAIGE and ANDRE M. NELSON

Plaintiff

Defendants

### REQUEST BY THE JURY

We, the jury in the above entitled cause, request the following:

If we believe the exact shooter is unknown and that there was not a robbery plan, is it still possible to find the parties present at the time of the killing to be guilty of second degree murder?

12/26/96

Foreperson

(143)

THURSDAY, DECEMBER 26, 1996 -- P.M. SESSION

PROCEEDINGS

---oOo---

THE COURT:  Okay.  How are your new quarters?  All right?

JUROR NUMBER SEVEN:  Very nice.

THE COURT:  I have your note.  Let me just read it for the record.

"If we believe the exact shooter is unknown and if there was not a robbery planned, is it still possible to find the parties present at the time of the killing to be guilty of second-degree murder?"

I'll answer that directly.  But let me answer it just generally.

Mere presence, as you know, at the scene of the crime which does not itself involve assisting the crime is not sufficient.

Okay?

However, if one aids and abets the commission of a crime -- in other words, who assists or helps in a crime with criminal intent -- is equally as guilty as the person committing the act.

Okay?

So you have to have more than mere presence.  You have to aid and abet.  In other words, advises, instigates, encourages in the commission of the crime.

Okay?

And if you find that they all aided and abetted a

(144)

JESSICA BARRY LEE, CSR NO. 5428

1287

1 murder of the second degree --

2       And a murder of the second degree again is as

3 follows:

4       It's the unlawful killing of a human being with

5 malice aforethought where there is an intent to kill but the

6 evidence is insufficient to prove premeditation and

7 deliberation.

8       So, in other words, you take murder of the first

9 degree out because there is not enough evidence of

10 premeditation and deliberation. And what you're left with is

11 the unlawful killing of a human being as a direct result of

12 an intentional act involving a high degree of probability

13 that the act will result in death, the natural consequences

14 of the act are dangerous to life, the act was deliberately

15 performed by a person who knows his conduct endangers the

16 life of another, and who acts with conscious disregard for

17 human life. So that, in other words, if the people aid and

18 abet, advise, encourage, or instigate a crime, the crime of

19 the unlawful killing of a human being, it doesn't make a

20 difference who fired the gun. It can be guilty of

21 second-degree murder. However, the fact that they are there

22 is not sufficient. You need that aided and abetted,

23 encouraged or helped or assisted in the commission of the

24 act.

25       Okay?  Does that answer it?

26       Okay.  Go back up for your deliberations.

27       Thank you.

28       (Jury deliberates.)

JESSICA BARRY LEE, CSR NO. 5428

7

## Superior Court Of The State Of California In And For The County Of Alameda

Dept. No.                    9                              Action No.                    127285-A

THE PEOPLE OF THE STATE OF CALIFORNIA            VS.            JAMAINE PAIGE

Plaintiff                                                                                    Defendant

## VERDICT OF JURY

We, the jury in the above entitled cause, find the defendant, JAMAINE PAIGE, NOT GUILTY of

a felony, to wit:   a violation of Section 12021 of the Penal Code of California as charged in the

Fourth Count of the Information.

Dated:    12/26/96                                    Foreperson:

VERDICT OF JURY

(151)

17⁹

# EXHIBIT

# 2-H

LANDRA E. ROSENTHAL

ATTORNEY AT LAW

510/524-5060    1563 SOLANO AVENUE #305   BERKELEY, CALIFORNIA  94707    STATE BAR NO. 85561

June 26, 1997

JAMAINE PAIGE, K-39043
C.S.P. - Sacramento A7-221
P.O.Box 290066
Represa, CA 95671-0066

RE:    *People v. Jamaine Paige*
       Court of Appeal No. A077240

Dear Mr. Paige:

I am writing in response to your letter dated June 24.

I have written several fairly long letters to you, explaining the limitations of the appeals process. I have also explained to you why certain issues cannot be raised. After receiving your last letter, I wonder if you actually bothered to read the letters that I sent to you.

I explained in my last letter that, based on your request that I do so, I gave careful consideration to the issue of ineffective assistance of trial counsel. I read the record very carefully, paying particularly close attention to the comments of trial counsel in closing argument. I am very familiar with the legal standards that apply to the issue of ineffective assistance of counsel.

Based upon my knowledge of the law and my reading of the record, I found no evidence of ineffective assistance of counsel. I spoke at length with Mr. Mintz about his handling of the case, and I specifically questioned him about the closing argument. He had a specific, tactical reason for making his argument. It was based upon the nature of the evidence that the prosecutor had been able to put on.

It was Mr. Mintz's decision to focus the attention of the jury upon the lack of evidence with regard to the murder and attemtped murder charges. He tried to do so by reminding them that even if the evidence showed you were a drug dealer, they could ignore that evidence because it had nothing to do with the murder charges.

That is a perfectly legitimate way to handle the evidence. I cannot say he was incompetent for making that argument. In addition, as I have already explained to you previously, I found his handling of the rest of the case to be perfectly proper.

I was particularly impressed with the extremely thorough cross-examination of Kevin Banks. He did quite a good job of representing you. The fact that he did not "win" does not make him incompetent. And in fact, he was able to convince the jury to come back with second degree murder rather than first degree. Based upon the evidence, it was entirely possible for the jury to have returned a first degree verdict. But through the efforts of your trial attorney, the jury returned a lesser verdict of second degree. I am sorry, Mr. Paige, but in my opinion there is simply no basis for alleging that Mr. Mintz was ineffective.

I know you really wanted me to raise the ineffective assistance argument. However, if it cannot be supported by the record, I am simply not permitted to do so. I cannot raise an issue just because my client thinks I should do so. As an attorney, I am responsible for knowing and determining what issues are presented by the record. In your case, there is no basis for raising ineffective assistance of counsel.

Let me know if you have any other questions. And please remember to write me if you are moved to any other location.

Yours very truly,

LANDRA E. ROSENTHAL

LANDRA E. ROSENTHAL

ATTORNEY AT LAW

510/524-5060    1563 SOLANO AVENUE #305   BERKELEY, CALIFORNIA  94707    STATE BAR NO. 85561

April 26, 1999

JAMAINE PAIGE, K-39043
C.S.P. - Sacramento C-5-222U
P.O.Box 290066
Represa, CA 95671-0066

Dear Mr. Paige:

I am writing in response to your letter dated April 20.

As I have explained to you before, **I do not do any federal work** and I would not undertake to advise you how to proceed in drafting a federal writ. However, I can tell you that the federal court will not consider anything that was not raised at trial or in your state court briefs. Therefore, there is no need for you to be looking for new evidence, or to proclaim your innocence. All you need to do in a pro.per petition for writ of habeas corpus is to state very simply, in a sentence or two, what issues you are raising. There is room on the federal pro.per form for you to do this. The federal court prefers that you do it this way.

Simply tell the court what issues you are raising – including (1) insufficient evidence to corroborate the testimony of an accomplice; (2) inadequate jury instructions on lesser included offenses; (3) inadequate instructions pertaining to aider and abettor liability; and (4) the natural and probable consequences doctrine is a violation of due process because it eliminates malice as an element of murder.

You can tell the court that the state failed to comply with its own standards for sufficiency of evidence, as well as its own standards regarding proper jury instruction in an aiding and abetting case, and that this violated your right to due process under the 5th amendment. In addition, the state's reliance on the natural and probable consequences doctrine removed a critical element of the offense from jury consideration in violation of your right to fair trial under the 5th and 6th amendments.

After you advise the court of the general nature of your claims, you can tell them that you are not an attorney, are not trained in the law, and you can ask them to appoint counsel for you. They may or may not agree to do so. In addition, the court may find that the issues in question were not raised as federal errors at the trial level. If so, they will not permit you to continue. You do not automatically have a right to federal review.

1  (212)

I know you think you received ineffective assistance of trial counsel. I did not agree with you, and did not raise it in your state appeal. Therefore, if you want to be able to raise that at the federal court, **you must first go back to the trial court** and file a **state habeas corpus petition** in the Alameda County Superior Court, alleging ineffective assistance of trial counsel, in violation of the 6th amendment. You can ask for the appointment of counsel, but I would not count on it. Your case was before Judge Gold. However, he passed away last year. Therefore you should file the state habeas petition in the department of the presiding judge for the criminal courts. You cannot raise ineffective assistance of trial counsel in your federal writ until it has already been filed and rejected in the state courts.

The "Sample" that you sent me in which you simply stated a claim and cited a case or two is a very good way to handle your writ. You should try to keep it simple like that, and if you state any facts at all, do not go into great detail. If the court believes there is any basis for a hearing, they will obtain all the facts at that time. What you really want to do in your pro.per petition is to get the attention of the court. If you go on and on with mountains of factual detail, your claims will get lost.

That is really about all I can tell you. Federal rules on habeas corpus are very complicated, and therefore I will not advise my clients about them. I urged your family to have an attorney with federal experience prepare your pro.per writ for you and send it to you to sign and file on your own. That need only have involved the attorney filling out the pro.per form correctly, based on the issues raised in your state court briefs. I still think that this would be the best way for you to determine if federal review is even advisable in your case. All I can say at this point is that I wish you well.

Yours very truly,

LANDRA E. ROSENTHAL

2 (213)

LANDRA E. ROSENTHAL

ATTORNEY AT LAW

510/524-5060    1563 SOLANO AVENUE #305    BERKELEY, CALIFORNIA  94707    STATE BAR NO. 85561

May 19, 1997

JAMAINE PAIGE, K-39043
C.S.P. - Sacramento C8-B111
P.O.Box 290066
Represa, CA 95671-0066

RE:    *People v. Jamaine Paige*
       Court of Appeal No. A077240

Dear Mr. Paige:

I am writing in response to your letter dated May 15, 1997.

As I have indicated to you in my last letter, I will consider the issues that you bring to my attention.  However, I cannot guarantee that they will be included in the Appellant's Opening Brief.  It is my responsibility -- not yours -- to decide what issues to raise.  While I will give every fair consideration to your ideas about possible issues, I will make the final decision.

A good deal of the information that you wrote about in your last letter has to do with the circumstances of your arrest.  There was no Penal Code section 995 motion in your case, and that means that none of the issues you wrote about have been preserved for appeal.  This means that they cannot be raised.  It is my intention to discuss your case with your trial attorney after I have read the entire record in your case.  However, at this time, I have not completed it.  In any event, when I speak with your trial attorney I will ask about the circumstances of your arrest and find out why he did not file a section 995 motion.

There was no *Wheeler* motion made at your trial and so that cannot and will not be an issue on appeal.

I always look carefully at the jury instructions.  If it appears the trial court failed to give adequate instructions on lesser included offenses, I will    definitely raise it.

You complain about the credibility of a witness.  However, credibility cannot be raised on appeal.  It is a matter that is entirely up to the jury -- they get to judge credibility and get to decide which witnesses to believe.  There is no way to

1 (214)

challenge that decision on appeal.

If you demanded an attorney at the time of your arrest and your request was ignored, that could be the basis for an appellate issue (only if your statement was later used in the trial.) If you made no statement, or if you made one and it was not used, there is no basis for challenging the conduct of the police.) The same is true with the lineup. If no lineup was used in your trial, then it does not make any difference that you were told to stand in a lineup.) It had no impact on the decision of the jury and cannot be raised on appeal.

I realize you are spending time in the law library trying to find issues for the appeal. However, like many of my clients, you look through the cases looking only) for language that you think will help your case.) Unfortunately, you ignore all the cases that go against you -- and believe me, there are many of them -- and you do not understand the limitations of the appeals process.(I hate to sound so negative, but I would be less than realistic if I encouraged you to do your own research for the appeal.) It really is not helpful to me or to your case to have you demanding that I raise this issue or that issue, when there is no basis for it. I promise you, I will look for every issue that is actually raised by the record. In addition, if after talking to your trial attorney, I find there is a basis for filing a writ, I will also do that. However, it is too soon for me to make that decision. I cannot make any decision until I have completed the reading of the record. At that point, I will be able to make an assessment about the issues in your case.

Yours very truly,

LANDRA E. ROSENTHAL

LANDRA E. ROSENTHAL

ATTORNEY AT LAW

510/524-5060    1563 SOLANO AVENUE #305    BERKELEY, CALIFORNIA  94707    STATE BAR No. 85561

December 20, 1999

JAMAINE PAIGE, K-39043
H.D.S.P. - B-1 228L
P.O.Box 3030
Susanville, CA 96127

RE:    *Paige v. Terhune*
       Case No. C99-2870-MJJ

Dear Mr. Paige:

I am writing in response to your letter dated December 13.

As you know I raised the CALJIC No. 3.02 issue in your appeal.  However, I did not repeat the claim in your petition for review because, in my opinion, it did not raise any federal issue.  The trial court did in fact give some instructions based on CALJIC No. 3.02.  The instructions were not complete, and that was the basis for my raising it on your appeal.  However, you should re-read the opinion of the court of appeal.  They explained in great detail why there was no prejudice from the trial court's failure to give more detailed instructions on the natural and probable consequences theory.

Ordinarily, jury instructions do not raise federal issues.  In the case of the somewhat abbreviated instruction on the natural and probable consequences theory that were used in your case, I did not believe any due process issue could be demonstrated in federal court, and therefore did not raise it in your petition for review.  Instead, I raised the issues that, in my opinion, raised the most serious and potentially prejudicial federal due process issues.

As for your other request, I have explained over and over that I cannot and will not provide you with any assistance in your federal appeal.  You simply must find another attorney to do so.  I would not be doing you any favor to undertake assisting you in federal court, only to find out that I have made a mistake.  I would not want that to happen.  You have done pretty well so far.  I encourage you to continue, and to continue keeping your pleadings short and to the point.  As always, I wish you the very best.  Please give my regards to your family as well.

Yours very truly,

LANDRA E. ROSENTHAL

1 (216)

# EXHIBIT

# 2 - J

## COURT ORDERS
## &
## COURT DECISIONS/OPINIONS

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

**FILED**

MAR 1 0 1998

DON D. BARROW
By _____
DEPUTY

THE PEOPLE,

    Plaintiff and Respondent,

v.

JAMAINE VERNON PAIGE et al.,

    Defendants and Appellants.

A077240

(Alameda County
Super. Ct. Nos. 127285A&B)

I.

INTRODUCTION

    Appellants Jamaine Vernon Paige and Andre M. Nelson were each convicted in a joint jury trial of second degree murder (Pen. Code, § 187)[1] and two counts of attempted second degree murder (§ 664/187). The jury also found true the arming enhancement allegations made as to the murder count and each of the two counts of attempted murder. We review numerous contentions on appeal, most of them challenging the instructions given the jury. Reversal of appellants' convictions is urged on the following grounds: 1) the accomplice testimony was inadequately corroborated; 2) the court erred in deviating from the standard instruction on accomplice corroboration; 3) the court failed to provide complete instructions on oral admissions; 4) the court erred in not instructing on the target crimes appellants allegedly aided and abetted; 5) the court erred in failing to instruct sua sponte on assault with a deadly weapon as a lesser included offense of attempted murder; 6) the natural and probable consequences theory of aiding and abetting

---

[1]    All undesignated statutory references are to the Penal Code.

1

liability is a judicially created doctrine, devoid of statutory codification, and therefore unconstitutional; 7) the natural and probable consequences doctrine violates due process because it removes from the jury the need to find malice aforethought as to an aider and abettor of a second degree murder; and 8) the jury was improperly instructed on reasonable doubt.[2] We affirm the judgments.

## II.

### BACKGROUND FACTS

This case involves the shooting death of Sean Landry and the wounding of Cedric Nelson[3] and Shavon P.[4] in a parking lot in Oakland in the early morning hours of July 29, 1995. The prosecution's theory was that the shootings were motivated by discord between two groups of individuals engaged in the drug trade in South Hayward. In accordance with the usual rules of appellate review (*People* v. *Barnes* (1986) 42 Cal.3d 284, 303-304; *People* v. *Johnson* (1980) 26 Cal.3d 557, 578), the evidence established the following:

Appellants were engaged in the sale of rock cocaine in South Hayward. The murder victim, Sean Landry, also sold rock cocaine in South Hayward. According to 19-year-old Kevin Banks, a coparticipant and eyewitness to the shootings who received immunity in exchange for his testimony, Landry was starting to bring other people into

---

2    Each appellant has invoked rule 13 of the California Rules of Court to adopt by reference pertinent arguments presented on behalf of his coappellant.

3    Cedric Nelson is no relation to appellant Andre Nelson. Solely to avoid confusion, we refer to Cedric Nelson as "Cedric." In doing so, no disrespect is intended.

4    The full name of this victim is well-known to all parties to this appeal. Because she was a minor at the time of this crime, we choose to refer to her in this opinion as Shavon P.

2

South Hayward to sell drugs, which angered Nelson. Nelson was particularly angered because he had originally brought Landry to Hayward to sell dope.

On July 28, 1995, Kevin Banks and appellants drove to South Hayward for the purpose of selling rock cocaine. According to Banks, Nelson possessed no weapon but Paige was carrying a .40-caliber Glock firearm. They encountered Landry and made arrangements to meet him later, ostensibly to purchase drugs. After their encounter with Landry, they went to Nelson's house to pick up his firearm, a .45-caliber handgun. Banks testified Nelson wanted his handgun because the meeting with Landry was not going to be a drug deal as discussed with Landry, but rather a robbery. The plan was for Paige to draw his weapon on Landry, and for Banks to take Landry's money and drugs. Banks testified that after Nelson laid out the plan, Paige said "that he was with it" which Banks interpreted as meaning, "you'll do whatever." After the stop at Nelson's house, they drove to a parking lot at 60th and MacArthur Streets in Oakland and Nelson used a pay phone to call Landry.

After calling Landry's pager number, Landry returned the call and arrived at the parking lot. Landry was accompanied by Cedric, who had been described as Landry's "bodyguard," and Landry's 15-year-old girlfriend, Shavon P. Landry laid out drugs on the hood of his car and the parties began to negotiate a price. Without warning, Nelson pulled out his firearm and shot Landry several times. Landry died instantly from multiple gunshot wounds to his torso.

Cedric ran from the scene while being pursued by Paige, who shot him several times in the upper arm and shoulders. According to Banks, Nelson shouted at Paige to "kill the motherfucker!" Paige responded that he was out of bullets. Cedric was able to escape, and eventually recovered from his wounds.

Nelson then walked up to Shavon P. who was still seated in Landry's car. According to Bank's testimony, she began pleading for her life, to which Nelson responded, "shut up, bitch." He then shot her nine times. Shavon P. suffered wounds to

3

her arms, chest, and jaw. She survived the shooting, but suffered serious injuries requiring surgery. At trial, Shavon P. could not give a description of the person who shot her. She testified, "I didn't see what they really looked like, or if I did, I don't remember."

Although it had been Banks' role to take the money and drugs, he failed to take either. Banks testified that he was later chastised by Nelson "that even though it turned out a killing I should have still did what I was supposed to do about taking the money and the dope."

Appellants and Banks were arrested on the street in Hayward six days after the shooting. When they saw the police approaching them they discarded a quantity of cocaine and a .40-caliber semiautomatic handgun which were found in some nearby bushes. The .40-caliber handgun was later determined to be one of the weapons used in the assault on July 29, 1995.

Neither appellant testified at trial. Banks testified to much of what is recounted above under a grant of immunity. During closing arguments, counsel for each appellant sought acquittal, arguing that Banks, an admitted drug dealer and robber who had given different versions of the events in question to the police, was unworthy of belief. Paige's counsel theorized that Banks was actually responsible for Sean Landry's murder. Counsel argued: "The testimony of Kevin Banks is particularly dangerous because it's cloaked with an apparent plausibility. He knows so much about the crime. . . . [¶] [H]e's singularly equipped by reason of his inside and detailed knowledge of the crimes that he's committed to lay them off, he hopes successfully, on someone else."

After appellants were convicted, the trial court sentenced Paige to 15 years to life on the second degree murder conviction (§ 187), and stayed the sentence on the attendant arming enhancement (§ 12022, subd. (d)). The court additionally sentenced Paige to 11 years on each of the attempted murder convictions (7 years for the substantive offenses,

plus 4 years on the arming enhancements), but stayed the execution of sentence for these offenses. (§ 654.)

Nelson was sentenced to an indeterminate term of 19 years to life in state prison, imposed as follows: The court ordered him to serve 15 years to life on the second degree murder conviction (§ 187) plus a consecutive term of 4 years for his personal use of a firearm (§ 12022.5). The court also sentenced Nelson to a life term on each of the attempted murder convictions, but stayed the execution of sentence on these convictions. (§ 654.)

## III.

### DISCUSSION

#### A. *Corroboration of Accomplice Testimony*

Each appellant questions whether the testimony of accomplice Kevin Banks was sufficiently corroborated as required by section 1111. Section 1111 provides in pertinent part: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; . . ."

Although corroborative evidence must, in some way, tend to connect the defendant directly with the commission of the crime and may not merely raise a suspicion of guilt, it is nonetheless well established that a broad spectrum of evidence, both direct and circumstantial, will qualify as corroborative. Corroborating evidence may be entirely circumstantial. (*People* v. *Rodrigues* (1994) 8 Cal.4th 1060, 1128; *People* v. *Zapien* (1993) 4 Cal.4th 929, 982.) Such evidence may be slight and entitled to little consideration when standing alone. (*People* v. *Rodrigues, supra*, 8 Cal.4th at p. 1128; *People* v. *Fauber* (1992) 2 Cal.4th 792, 835.) "Corroborating evidence 'must tend to implicate the defendant and therefore must relate to some act or fact which is an element of the crime but it is not necessary that the corroborative evidence be sufficient in itself to

establish every element of the offense charged.' " (*People* v. *Sully* (1991) 53 Cal.3d 1195, 1228.) It is sufficient if it "tends to connect the defendant with the [crime] in such a way as may satisfy a jury that the accomplice is telling the truth; . . ." (*People* v. *Bunyard* (1988) 45 Cal.3d 1189, 1206.)

We find the following evidence more than sufficient to corroborate accomplice Banks' testimony that appellants murdered Sean Landry and attempted to murder Cedric and Shavon P.: (1) The evidence at the crime scene confirmed Banks' testimony that the shooting occurred during an ostensible drug transaction—37 rocks of crack cocaine were recovered from the scene and Landry's pager and cellular phone were found near his body. (2) the evidence corroborated Banks' testimony that he and appellants had called Landry from a pay phone at the crime scene to let him know they were in Oakland. When Landry's pager was recovered, the numbers stored in the pager's memory reflected that at 12:41 a.m. a call was received from a phone number registered to a pay phone at the crime scene. (3) Miesha Singleton, Kevin Banks' 17-year-old cousin, corroborated Banks' testimony that after the shooting, he and appellants spent the night at Singleton's house. She testified that on a night in July 1995, she was awakened around 2:30 a.m. by a knock on her window. She opened the door and saw that it was Banks accompanied by Nelson, whom she knew, and Paige, whom she identified at trial. When Ms. Singleton got up at 4 a.m. to make her sister a bottle, she heard someone using the electric hair clippers in the bathroom. She surmised someone was "cutting their hair, . . ." An effort to change one's appearance shortly after a crime supports an inference of consciousness of guilt and constitutes an implied admission which may properly be considered as corroborative of an accomplice's testimony. (See *People* v. *Garrison* (1989) 47 Cal.3d 746, 773.) (4) Forensic evidence confirmed Banks' testimony that there were two guns used to commit the crime, that Landry was killed and Shavon P. was wounded by a .45-caliber weapon, and that Cedric was shot by a .40-caliber weapon. (5) When arrested several days after the incident, appellants were found in possession of a .40-caliber

weapon which the evidence shows was the gun used to fire the .40-caliber ammunition casings found at the crime scene. (6) Shavon P.'s description of the assailants included her recollection that both were wearing dark clothing, and appellants were wearing dark sweatshirts and jackets when arrested.

"Unless a reviewing court determines that the corroborating evidence should not have been admitted or that it could not reasonably *tend* to connect a defendant with the commission of a crime, the finding of the trier of fact on the issue of corroboration may not be disturbed on appeal. [Citation.]" (*People* v. *Perry* (1972) 7 Cal.3d 756, 774, original italics, disapproved on other grounds in *People* v. *Green* (1980) 27 Cal.3d 1, 28.) The evidence summarized immediately above easily exceeds this rather minimal standard of review. Thus, we reject appellants' contentions that there was insufficient evidence of corroboration.

## B. *Modification of CALJIC No. 3.12*

Nelson contends the trial court impermissibly deviated from the standard "corroboration" instruction—CALJIC No. 3.12—and that the resulting instruction created jury confusion requiring reversal.[5]

Over Nelson's objection, the court added the following two paragraphs to CALJIC No. 3.11, the standard instruction on accomplice corroboration: "Such corroboration may be sufficient if it connects the defendant with the crime. The corroborating evidence may be circumstantial and may be sufficient although slight. [¶] You may take into consideration the entire conduct of the parties, their relationship, acts. and conduct during and after the crime in determining whether or not the accomplice's testimony has been corroborated." Nelson claims this instruction was confusing because it "inject[ed] a quantum measure of evidentiary support that is nowhere to be found in the CALJIC instruction. The CALJIC instruction informs the jury

---

5    Appellant Paige, who commended Judge Golde's modification at trial as "really well done," does not join in appellant Nelson's argument.

that they must determine whether there is 'any' independent evidence connecting the defendant to the crime. Here, the trial court instructed the jury they need only find slight circumstantial evidence."

"The trial court is required to instruct the jury on the points of law applicable to the case. [Citation.] No particular form is required so long as the instructions are complete and correctly state the law. [Citation.] Jury instructions must be read together and understood in context as presented to the jury. Whether a jury has been correctly instructed depends upon the entire charge of the court. [Citations.] An erroneous instruction requires reversal only when it appears that the error was likely to have misled the jury. [Citations.]" (*People v. Tatman* (1993) 20 Cal.App.4th 1, 10; *People v. Tapia* (1994) 25 Cal.App.4th 984, 1027.)

We note the challenged instruction did not mislead the jury and in fact was a correct statement of the law. The instruction merely utilized language that has appeared in numerous Supreme Court decisions to express the standard for assessing the sufficiency of corroborative evidence. (See *People v. Rodrigues, supra,* 8 Cal.4th at p. 1128; *People v. Zapien, supra,* 4 Cal.4th at p. 982; *People v. Fauber, supra,* 2 Cal.4th at p. 835.) The jury was given other instructions covering essentially the same ground, and viewing the instructions as a whole, was adequately instructed on the relevant legal principles for crediting Kevin Banks' testimony. However, we emphasize that deviation from the standard jury instructions risks error. (*People v. Guilmette* (1991) 1 Cal.App.4th 1534, 1542.) That risk could have been avoided entirely in this case where no reason appears justifying a departure from the standard instructions.

## C. *Failure to Give Complete "View With Caution" Instructions*

Nelson contends the instruction given to the jury indicating they were to view evidence of appellants' admissions with caution "was not comprehensive enough to encompass all of the admissions at issue."

The trial court instructed the jury in this case with CALJIC No. 2.71.7, which requires *pre-offense* oral statements of intent, plan, motive, or design to be viewed with caution. The instruction was read as follows: "Now, evidence has been received from which you may find that an oral statement of intent, plan, or design was made by the defendants *before the offense with which they are charged was committed.* [¶] It is for you, the jury, to determine whether such statement was made by the defendants. [¶] And evidence of an oral statement should be viewed with caution." (Italics added.)

A trial court must instruct a jury to view with caution evidence of an oral admission. (*People* v. *Stankewitz* (1990) 51 Cal.3d 72, 94.) The reason for this "view with caution" instruction was explained in *People* v. *Bemis* (1949) 33 Cal.2d 395: " 'It is a familiar rule that verbal admissions should be received with caution and subjected to careful scrutiny, as no class of evidence is more subject to error or abuse. Witnesses having the best motives are generally unable to state the exact language of an admission, and are liable, by the omission or the changing of words, to convey a false impression of the language used. No other class of testimony affords such temptations or opportunities for unscrupulous witnesses to torture the facts or commit open perjury, as it is often impossible to contradict their testimony at all or at least by any other witnesses than the party himself.' [Citation.]" (*Id.* at p. 399.) Our high court has held that the trial court should give a cautionary instruction regarding evidence of a defendant's statements "whether made before, during, or after the crime." (*People* v. *Carpenter* (1997) 15 Cal.4th 312, 393.)

Nelson argues that while this instruction was correct as far as it goes, it was incomplete. He states that Banks testified to admissions made by appellants before the charged offenses which were not related to intent, plan, or design, as well as evidence of admissions made by them after the offenses. Therefore, the court should have also instructed the jury sua sponte with CALJIC No. 2.71 which reads as follows: "An admission is a statement made by [a] [the] defendant which does not by itself

acknowledge [his] [her] guilt of the crime[s] for which the defendant is on trial, but which statement tends to prove [his] [her] guilt when considered with the rest of the evidence. [¶] You are the exclusive judges as to whether the defendant made an admission, and if so, whether that statement is true in whole or in part.  [¶] [Evidence of an oral admission of [a] [the] defendant not made in court should be viewed with caution.]"

We conclude, in accordance with numerous courts considering similar claims of error, that a more favorable result was not reasonably probable here absent the error. (*People v. Padilla* (1995) 11 Cal.4th 891, 921-923; *People v. Livaditis* (1992) 2 Cal.4th 759, 784; *People v. Gomez* (1992) 2 Cal.App.4th 819, 827; *People v. Carpenter*, *supra*, 15 Cal.4th at p. 393.)  Appellants' *post-shooting* statements were relatively insignificant when viewed against the totality of the record.  Generally, it was appellants' *pre-shooting* statements, which were adequately covered by CALJIC No. 2.71.7, that inculpated them. Banks testified in great detail about the animosity between Landry and appellants generated by competition for the drug trade in South Hayward.  As only one example of an important incriminating pre-shooting admission, Banks testified that before the shooting, appellant Nelson had warned Landry that if he ever saw anyone dealing drugs on his turf, he would kill them.

Furthermore, our view that the court's failure to give this cautionary instruction could not have affected the verdict is reinforced by the fact that the witness who related the alleged admissions was accomplice Banks, and the jurors were properly instructed that "the testimony of an accomplice ought to be viewed with distrust." (*People v. Williams* (1988) 45 Cal.3d 1268, 1315; *People v. Stankewitz*, *supra*, 51 Cal.3d at p. 94; *People v. Franco* (1994) 24 Cal.App.4th 1528, 1542.)  Thus, the addition of CALJIC No. 2.71 would have added little if anything to the instructions given, and its omission did not prejudice appellants.

Nelson additionally argues that the vice in not giving CALJIC No. 2.71 was to eliminate any assistance to the jury in determining if the statements attributed to

appellants were in fact made, let alone whether they were truthful in whole or in part. However, the jury was fully instructed on judging the credibility and believability of a witness, providing they could accept or reject any of his or her testimony. Accordingly, there is no reasonable possibility that the failure to give the cautionary instruction affected the jury's verdict. (*People* v. *Livaditis, supra*, 2 Cal.4th at p. 784.)

## D. *Jury Instructions on the Natural and Probable Consequences Doctrine*

Paige contends the trial court's instructions on aider and abettor liability were fatally defective because the trial court failed to identify and define the crimes encompassed by the evidence which appellant could have aided and abetted. He argues this omission relieved the jury of the task of determining if the murder and attempted murder were the natural and probable consequences of such target offenses.

It has long been established that a "defendant may be held criminally responsible as an accomplice not only for the crime he or she intended to aid and abet . . . but also for any other crime that is the 'natural and probable consequence' of the target crime." (*People* v. *Prettyman* (1996) 14 Cal.4th 248, 261; see *People* v. *Bunyard* (1988) 45 Cal.3d 1189, 1231; *People* v. *Beeman* (1984) 35 Cal.3d 547, 560; *People* v. *Croy* (1985) 41 Cal.3d 1, 12, fn. 5; *People* v. *Durham* (1969) 70 Cal.2d 171, 181.) "It follows that a defendant whose liability is predicated on his status as an aider and abettor need not have intended to encourage or facilitate the particular offense ultimately committed by the perpetrator. His knowledge that an act which is criminal was intended, and his action taken with the intent that the act be encouraged or facilitated, are sufficient to impose liability on him for any reasonably foreseeable offense committed as a consequence by the perpetrator." (*People* v. *Croy, supra*, 41 Cal.3d at p. 12, fn. 5.) On the other hand, if the ultimate, charged crime is not a natural, probable, reasonably foreseeable consequence of the target crime, then the aider and abettor is not guilty of the charged crime. Thus, "one is not liable who has counseled a particular criminal act, and the perpetrator has

11

committed a different one not falling within the probable consequences of that advised, ..." (*People* v. *King* (1938) 30 Cal.App.2d 185, 203.)

In *People* v. *Prettyman*, *supra*, 14 Cal.4th 248, the Supreme Court concluded that when a defendant aids and abets an uncharged offense, the jury must be instructed in its duty to determine whether the charged offense was in fact a natural and probable consequence of the planned criminal act which the defendant aided and abetted. The court held, "when the prosecution relies on the 'natural and probable consequences' doctrine to hold a defendant liable as an aider and abettor, the trial court must, *on its own initiative*, identify and describe for the jury any target offense allegedly aided and abetted by the defendant." (*Id.* at p. 268, original italics.)

The court explained the rationale of its holding as follows: "[A]t trial each juror must be convinced, beyond a reasonable doubt, that the defendant aided and abetted the commission of a *criminal act*, and that the offense actually committed was a natural and probable consequence of that act. . . . [A] conviction may not be based on the jury's generalized belief that the defendant intended to assist and/or encourage unspecified 'nefarious' conduct. To ensure that the jury will not rely on such generalized beliefs as a basis for conviction, the trial court should identify and describe the target or predicate crime that the defendant may have aided and abetted." (14 Cal.4th at p. 268, original italics and fn. omitted.) "An instruction *identifying* target crimes will assist the jury in determining whether the crime charged was a natural and probable consequence of some other criminal act. And an instruction *describing* the target crimes will eliminate the risk that the jury will engage in uninformed speculation with regard to what types of conduct are criminal." (14 Cal.4th at p. 254, original italics.)

However, the sua sponte duty to instruct imposed by *Prettyman* is limited. It normally arises only when the prosecution has elected to rely on the natural and probable consequences doctrine and the evidence will support instructions on that theory. In such instances the court need not identify *all* potential target offenses supported by the

evidence—only those which the prosecutor wishes the jury to consider. (14 Cal.4th at p. 269.)

In *Prettyman* it was argued that because the prosecution chose not to rely on the natural and probable consequences doctrine but instead argued that the defendant aided and abetted the charged crime of murder, there was no sua sponte duty to describe or identify other potential uncharged target crimes since any such crimes were irrelevant. Nevertheless, the court in *Prettyman* instructed the jury on the natural and probable consequences doctrine of aider and abettor liability without request. Having done so, the Supreme Court concluded that while the court may not have been under a sua sponte obligation to give the natural and probable consequences instruction because the prosecution did not rely on the theory at trial, once it did on its own volition, the trial court was bound to instruct the jury correctly, which included a duty to describe and identify all potential target crimes. (14 Cal.4th at p. 270.)

Like the trial court in *Prettyman*, the court below added the following language from CALJIC No. 3.02, apparently on its own initiative: "And one who aids and abets is not only guilty of the particular crime that to his knowledge his confederates are contemplating committing, but he is also liable for *the natural and probable or reasonable consequences of any act that he knowingly aided or encouraged.*" (Italics added.)

In essence, the jury was told it could find the accused guilty of the charged offense if it determined that 1) he aided and abetted the charged offense or 2) that the charged offense was a "natural and probable consequence[]" of any target crime that the appellant aided and abetted. Appellant argues that the trial court erred in not giving, sua sponte, an instruction clarifying the foregoing italicized language. identifying and describing each potential target offense pertinent to the natural and probable consequences doctrine. Therefore, the jury in this case was given an instruction which suffered the identical

defect as the instruction held erroneous in *Prettyman*. Respondent concedes error. We turn, then, to the issue of whether such error prejudiced appellants' defenses.

The prejudice of the instructional error in *Prettyman* was tested against the standard of whether there was a reasonable likelihood that the jury applied the challenged instruction in a way that violated the United States Constitution. (*People* v. *Prettyman*, *supra*, 14 Cal.4th at p. 272.) The failure to identify potential target crimes was deemed to be harmless because the court determined there was no reasonable likelihood the jury misapplied the trial court's instructions on the natural and probable consequences doctrine, and thus no federal constitutional error occurred. (*Ibid.*) In so concluding, the court noted that because neither party relied on the "natural and probable consequences" theory of aider and abetter liability during closing arguments, it was "highly unlikely" the jury relied on the theory in convicting the defendant. (*Id.* at p. 273.)

The testimony in *Prettyman* showed that the defendant Bray had encouraged the direct perpetrator Prettyman to "get" the murder victim, Van Camp, just before Prettyman fatally bludgeoned him. The court reasoned, "There was no evidence of any other possible 'target' apart from Prettyman's assault on Van Camp, an act that was indisputably criminal. There was no evidence that Bray aided and abetted any noncriminal behavior which led, as a 'natural and probable consequence,' to Prettyman's murder of Van Camp, and neither the prosecution nor the defense mentioned any such behavior in their closing arguments to the jury. Under these circumstances, it is unlikely that the trial court's failure to specify assault with a deadly weapon as a target crime led the jury to misapply the 'natural and probable consequences' doctrine by convicting Bray of murder on the theory that she assisted or encouraged some noncriminal target act." (14 Cal.4th at p. 73.) The court also concluded that there was no prejudice under the state standard (*People* v. *Watson* (1956) 46 Cal.2d 818, 836) because it was not reasonably probable the trial outcome would have been different in the absence of the instructional error. (14 Cal.4th at p. 274.)

14

The present case is not meaningfully distinguishable from *Prettyman*. Here, as in *Prettyman*, the prosecutor did not mention the natural and probable consequences theory of liability in closing argument making it "highly unlikely" the jury relied on the theory when it convicted appellants. (14 Cal.4th at p. 273.) The prosecutor's primary theory was that Paige aided and abetted Nelson in murdering Sean Landry and in attempting to murder Shavon P. In turn, the prosecutor argued Nelson aided and abetted Paige in attempting to murder Cedric. These were the crimes charged in the information. The prosecutor's position was that the target crimes which were aided and abetted were the same as the charged crimes.

In actuality, the jury's assignments of criminal responsibility were consistent with the prosecutor's theory that each appellant aided and abetted the other's charged crime—the jury found that Nelson was the shooter in Sean Landry's murder and the attempt to murder Shavon P. and Paige was the shooter in the attempt to murder Cedric Nelson. With respect to Landry's murder and the attempt to murder Shavon P., the jury found Nelson personally used a weapon and Paige was armed. With regard to the attempted murder of Cedric, the jury found Paige personally used a weapon and that Nelson was armed. These findings were consistent with both being found guilty of aiding and abetting each other's charged crime, and was not based on the "natural and probable consequences" doctrine of aiding and abetting.

Nevertheless, Paige argues that, unlike *Prettyman* where there were no potential target crimes suggested by the evidence which could form a basis for jury confusion, the evidence supported several possible crimes—attempted robbery or robbery, assault with a deadly weapon, and purchase for sale of a controlled substance—which could have served as target crimes for those charged. Paige argues the jury may have convicted him because the murder Nelson committed and the one he attempted comprised natural and probable consequences of the assaults with a firearm and/or a drug deal that Paige knowingly and intentionally aided and abetted. Likewise, the jury may have held Nelson

liable because the attempted murder Paige perpetrated was a natural and probable consequence of the assaults with a firearm and/or drug deal that Nelson knowingly and intentionally aided and abetted.

Even under these presumed circumstances, Paige does not genuinely dispute that if the target crime was either an assault with a deadly weapon or a robbery, a natural and probable consequence of either would undisputably be that someone would get shot or killed.[6] (See *People* v. *Prettyman, supra,* 14 Cal.4th at pp. 262-263 [compilation of cases where defendants convicted of murder or attempted murder as natural and probable consequence of assault with a deadly weapon or robbery which they aided and abetted].) Thus, as to those potential target crimes, Paige essentially concedes a lack of demonstrable prejudice. Instead, Paige emphasizes evidence from which the jury might have concluded the target crime he aided and abetted was a simple illegal drug sale. He refers to the taped statement Banks originally gave to the police, which differed in material respects with his testimony at trial. A tape recording of Banks' original statements to the investigating officers was played during trial. In this statement, Banks indicated that appellants had met with Landry simply to consummate a drug purchase, but before the transaction was completed Nelson suddenly decided to shoot and kill Landry, with Paige then shooting a fleeing Cedric while Nelson shot Shavon P. The day after Banks gave this statement, he recanted it and stated, in accordance with his trial testimony, that what was planned was not a drug transaction but a drug robbery. Paige argues, "Given the jury's rejection of robbery, it is proper to presume the events of July 29 proceeded from a drug transaction gone awry."

Paige concludes that in light of this evidence there exists the likelihood the trial court's failure to identify and describe the potential target crime of purchase/sale of a

---

6    The jury's apparent rejection of the alternative felony-murder theory of first degree murder is indicative that the jury did not view robbery as a target crime on which appellants' aiding and abetting convictions were predicated.

controlled substance caused the jury to misapply the natural and probable consequences doctrine. We disagree. Assuming the jury found appellants knowingly and intentionally aided and abetted a planned drug transaction, the charged crimes were undeniably natural and probable consequences of the assumed target offense which appellants aided and abetted. "[T]he issue does not turn on the defendant's subjective state of mind, but depends upon whether, under all of the circumstances presented, a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted by the defendant." (*People* v. *Nguyen* (1993) 21 Cal.App.4th 518, 531; *People* v. *Woods* (1992) 8 Cal.App.4th 1570, 1587; see *People* v. *Price* (1991) 1 Cal.4th 324, 443.) It is unnecessary that the aider and abettor foresee the precise manner or method of the execution of the charged crime. It has been said in the context of foreseeability that "[t]he precise consequence need not have been foreseen; it is enough that the defendant should have foreseen the possibility of some harm of the kind which might result from his act. [Citations.]" (1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Elements of Crime, § 132, p. 150.)

Consequently, the pivotal question is "whether or not the act committed was the ordinary and probable effect of the common design or whether it was a fresh and independent product of the mind of one of the conspirators, outside of, or foreign to, the common design, . . ." (*People* v. *Durham*, *supra*, 70 Cal.2d at pp. 182-183.) The determination of whether a charged crime is a natural and probable consequence of a target crime is not resolved by engaging in a comparison of the elements of the planned offense and the elements of the offense actually committed in the abstract. The law relating to the target crime and its elements is "irrelevant to the determination of whether the ultimate crime was a natural and probable consequence of the predicate. Whether there is a nexus of foreseeability between the predicate and the perpetrated offenses depends not on crime definitions but on the specific *facts* of each offense." (*People* v.

*Solis* (1993) 20 Cal.App.4th 264, 273-274, original italics, disapproved on other grounds in *People* v. *Prettyman*, *supra*, 14 Cal.4th at p. 268, fn. 7; see also *People* v. *Lucas* (1997) 55 Cal.App.4th 721, 732.)

The events leading up to the shootings do not support Paige's argument that the jury was confused or misunderstood the basis upon which it assigned criminal responsibility. Banks detailed the long-simmering animosity between Nelson and Landry. Banks testified that Nelson had recounted an incident where he and Paige confronted Landry at gunpoint about his encroachment on Nelson's drug turf. With Landry pleading for his life and Paige retorting "let's just kill this motherfucker right now," Nelson decided to give Landry another chance.

On the day of the shooting, Banks testified they went to Nelson's house to get his gun immediately after they made plans to meet Landry later that evening. Paige was already armed. Thus, appellants obviously contemplated use of force or the threat of force in their planned meeting with Landry. That a homicide resulted from a planned drug deal undertaken by armed men confronting a rival drug dealer is unquestionably the natural and probable consequence of that plan.

By all accounts, Sean Landry was unarmed when he arrived at 60th and MacArthur Streets. Shavon P., the only witness to the shooting besides Banks, testified that before the shooting she witnessed neither quarreling nor fighting—negating any theory of a sudden quarrel or heat of passion. Given the nature of the armed attack on Landry, it was foreseeable that innocent bystanders such as Cedric and Shavon P., who could identify the perpetrators, might also have to be shot. Although Paige attempts to characterize his role as passive and unknowing, the evidence shows he was an active participant in this night of bloodshed—he pursued Cedric, shooting at him numerous times, as Cedric ran for his life. Only the intercession of an empty ammunition clip spared his life.

18

While Paige attempts to compare his situation with that of the defendant in *People v. Hickles* (1997) 56 Cal.App.4th 1183, such a comparison is unavailing. In *Hickles*, this appellate court division found that the trial court's failure to instruct on target crimes was reversible error where the record indicated the jury's verdict was based on the natural and probable consequences doctrine and the evidence showed the defendant's conviction for murder could have been improperly based on defendant's encouragement of a noncriminal act, such as arguing. (*Id.* at p. 1197.) Significantly, in *Hickles*, the evidence was equivocal as to what role the defendant played in the murder—there was evidence he was standing outside the apartment when the murder took place, a witness testified he "appeared to be in shock" after the murder, and he told a friend that "he was surprised" the murder victim was shot and "he did not want this to happen." (*Id.* at p. 1189.) Conversely, in the instant case, the evidence adduced at appellants' trial did not lend itself to a reasonable interpretation which could have resulted in the jury misapplying the natural and probable consequences doctrine to noncriminal conduct. Here, *all* of the acts prefacing the charged crimes were criminal in nature, and in fact, of such a degree that no matter how characterized, the charged crimes were foreseeable consequences of each of the hypothesized target crimes.

The instant case is more easily compared with our Supreme Court's recent decision in *People* v. *Williams* (1997) 16 Cal.4th 635, where appellants went to a house to " 'shoot it up' " just to scare people. In finding no reversible error in failing to instruct on potential target crimes, the court indicated, " 'no reasonable jury would have concluded that the homicides were not a natural and probable consequence of such violence.' " (*Id.* at pp. 674-675.) We have already pointed out the underlying purpose for the rule in *Prettyman* was to eliminate any meaningful chance that absent such an instruction, a defendant could be convicted as an aider and abetter of a charged crime predicated on noncriminal conduct. We are abundantly satisfied that appellants faced no such exposure in their trial.

19

## E. *Failure to Instruct on Lesser Included Offense*

Paige contends the trial court should have instructed on assault with a deadly weapon as to Paige's "aider and abettor" liability for the attempted murder of Shavon P. Paige did not request such an instruction. He asserts, however, that the court was required to have given the instruction sua sponte.

Paige's contention rests on the proposition advanced in *People* v. *Woods, supra,* 8 Cal.App.4th 1570, that an aider and abettor can be found guilty of a crime less than the charged offense committed by the perpetrator if the lesser crime was a reasonable and probable consequence of the target crime but the greater charged crime was not. (*Id.* at p. 1590.) Relying on *Woods,* Paige urges that a jury could have found he intended to aid in the assault of Shavon P. without foreseeing that an attempted murder might result. He notes that the evidence showed he was chasing after Cedric when Nelson reached into the car and shot Shavon P. He argues, "Given the fact that the evidence suggests appellant was not actually present when Nelson shot Shavon, the jury could have found that appellant aided and abetted an assault with a deadly weapon, and appellant submits the trial court should have instructed the jury on this possibility."

*Woods* established the rule that the court "has a duty to instruct sua sponte on necessarily included offenses for the aider and abettor if the evidence raises a question whether the greater offense is a reasonably foreseeable consequence of the criminal act originally contemplated and abetted, but would support a finding that a lesser included offense committed by the perpetrator was such a consequence." (8 Cal.App.4th at p. 1578.) The facts justifying the result reached in *Woods* may be summarized as follows: Woods, his codefendant Windham, and others went in search of a rival gang member. They entered the apartment of several people acquainted with the rival gang member. While defendant Windham waited outside as a lookout, his codefendant assaulted the occupants. As they were leaving, they saw two men a short distance away preparing to leave in their car. Woods fired a weapon into the car, killing one occupant and injuring

the other. (*Id.* at p. 1577.) There is nothing in the *Woods* opinion to indicate the murder victim was involved in the gang dispute. The *Woods* court describes his murder as the "cold-blooded killing of an innocent bystander, . . ." (*Id.* at p. 1590.)

At trial, the prosecution's theory was that defendant Windham was criminally responsible for the murder committed by defendant Woods, contending that the murder was a natural and probable consequence of the assaults committed in the apartment which the defendant had aided and abetted. (8 Cal.App.4th at p. 1579.) During deliberations, the jury asked, "Can a defendant be found guilty of aiding and abetting a murder in the second degree if the actual perpetrator of the same murder is determined to be guilty of murder in the first degree?" The trial court answered: "No." (*Ibid.*)

On appeal, defendant Windham contended the court's response misinstructed the jury. He argued that "the trier of fact may determine the ultimate offense committed by the perpetrator was not a reasonably foreseeable consequence of the criminal act aided and abetted but that an offense subsumed within the ultimate crime was such a consequence. Thus, the trier of fact could find the perpetrator guilty of the ultimate crime and convict the aider and abettor of a lessor offense." (8 Cal.App.4th at p. 1580.) After reviewing the legislative and judicial history of aider and abettor liability in California, the reviewing court agreed with defendant Windham's argument indicating "the aider and abettor and the perpetrator may have differing degrees of guilt based on the same conduct depending on which of the perpetrator's criminal acts were reasonably foreseeable under the circumstances and which were not." (*Id.* at p. 1587, italics omitted.)

The court found it was error to give the jury "an unwarranted all-or-nothing choice" with respect to defendant Windham's aider and abettor liability for the murder perpetrated by his codefendant. (8 Cal.App.4th at p. 1590.) The court concluded that "the jury should have been told it could find a defendant guilty of second degree murder as an aider and abettor even if it determined the perpetrator was guilty of first degree murder." (*Id.* at p. 1590.) However, the *Woods* court emphasized the narrowness of its

holding: "However, the trial court need not instruct on a particular necessarily included offense if the evidence is such that the aider and abettor, if guilty at all, is guilty of something beyond that lesser offense, i.e., *if the evidence establishes that a greater offense was a reasonably foreseeable consequence of the criminal act originally contemplated, and no evidence suggests otherwise.* [Citations.]" (*Ibid.*, italics added.) In other words, if the evidence suggests that the charged crimes are not natural and probable consequences of the target crimes, but there are lesser crimes which are natural and probable consequences of the target crimes, the court is required to instruct on the lesser crimes.

Applying this principle to the instant case, if the jury could have reasonably concluded that the attempted murder of Shavon P. was not a natural and probable consequence of the assault with a deadly weapon Paige encouraged or assisted, under the rule established in *Woods* the jury had to be instructed sua sponte on assault with a deadly weapon. The evidence established beyond question that the attempted murder of Shavon P. was a reasonably foreseeable consequence of the armed assault which was visited on Sean Landry. In addition, we have discussed at length that the prosecution did not rely on the natural and probable consequences doctrine of aiding and abetting in seeking Paige's conviction for attempting to murder Shavon P., and there is no indication the jury believed Paige to be guilty of a lesser offense than Nelson; therefore, *Woods* is inapplicable. Moreover, at no time during his summation to the jury did defense counsel argue the absence of Paige's intent to aid and abet Nelson in attempting to murder Shavon P. Consistent with appellant's complete denial of culpability, his counsel attacked Banks' credibility and argued that he was a liar who falsely accused Paige of being one of the assailants. Under these circumstances, we conclude that an instruction on assault with a deadly weapon as a lesser related offense was not justified or required in this case.

## F. *Constitutionality of Natural and Probable Consequences Doctrine*

Paige's constitutional attack on the natural and probable consequences rule is two-fold: 1) that the rule is an uncodified common law rule which infringes upon the Legislature's exclusive authority to determine the elements of a crime; and 2) that, if on the contrary, it is embodied in a statute, the statute is unconstitutional because it utilizes the conclusive presumption of a necessary element in violation of *Sandstrom* v. *Montana* (1979) 442 U.S. 510 (*Sandstrom*). Adopting the reasoning of other appellate decisions who have considered these issues, we find the natural and probable consequences doctrine of aiding and abetting does not suffer the constitutional infirmities of which appellant complains.

Paige first argues that the natural and probable consequence genre of aiding and abetting is purely a creature of judicial interpretation amounting to the creation of a nonstatutory crime. He claims the doctrine arises not from any statute enacted by the Legislature but rather simply from judicially created common law. The starting point, of course, is the axiom that it is the distinct role of the Legislature to define crimes and prescribe the punishment therefor. (*People* v. *Dillon* (1983) 34 Cal.3d 441, 477; *In re Lynch* (1972) 8 Cal.3d 410, 414; *People* v. *Wingo* (1975) 14 Cal.3d 169, 174.) "[I]t is clear the courts cannot go so far as to create an offense by enlarging a statute, by inserting or deleting words, or by giving the terms used false or unusual meanings. [Citation.]" (*Keeler* v. *Superior Court* (1970) 2 Cal.3d 619, 632.)

Prior decisions recognize that the natural and probable consequences doctrine does not create a nonstatutory crime. In *Woods, supra,* 8 Cal.App.4th 1570, the court conducted an exhaustive and scholarly analysis of California's aiding and abetting statute, section 31, which was enacted in 1872, and concluded that it codified the common law rule of natural and probable consequence. Section 31 provides: "All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not

23

being present, have advised and encouraged its commission, and all persons counseling, advising, or encouraging children under the age of fourteen years, lunatics or idiots, to commit any crime, or who, by fraud, contrivance, or force, occasion the drunkenness of another for the purpose of causing him to commit any crime, or who, by threats, menaces, command, or coercion, compel another to commit any crime, are principals in any crime so committed."

As pointed out by *Woods*, the natural and probable consequences doctrine was based upon long-standing common law principles which have existed in this state well before any statute addressed the subject. (8 Cal.App.4th at pp. 1582-1583.) As a result, the court concluded that "in specifying an aider and abettor is liable for 'any crime so committed' by the perpetrator, the Legislature intended—consistent with common law— that the aider and abettor is guilty not only of the criminal act originally contemplated and abetted but also of any other crime by the perpetrator which is a reasonably foreseeable consequence of the offense originally contemplated by the aider and abettor." (*Id.* at p. 1584.) The *Woods* court unequivocally held "the apparent intent of section 31 is to make the aider and abettor a principal in any crime committed by the perpetrator which is a reasonably foreseeable consequence of the criminal act originally contemplated." (*Id.* at p. 1588, italics omitted.)

We agree with the analysis in *Woods*. Having enacted section 31, the Legislature exercised its prerogative by determining naturally and probably occurring consequential acts constitute criminal conduct. This court may not substitute its judgment for that of the Legislature, in the absence of a constitutional violation. (*Keeler* v. *Superior Court, supra,* 2 Cal.3d at pp. 631-632; *People* v. *Dillon, supra,* 34 Cal.3d at p. 463.)

The remaining question for our determination is whether appellant Paige is entitled to a per se reversal of his conviction under the principles announced by the United States Supreme Court in *Sandstrom* v. *Montana, supra,* 442 U.S. 510 and *In re Winship* (1970) 397 U.S. 358. In *Winship* the United States Supreme Court held that due process requires

the prosecution to prove each and every element of an offense beyond a reasonable doubt. (397 U.S. at p. 364.) In *Sandstrom* the court determined an instruction directing the jury that, " 'the law presumes that a person intends the ordinary consequences of his voluntary acts,' " violates *Winship*'s requirements. (442 U.S. at p. 512.) The *Sandstrom* court concluded this jury instruction created a presumption that relieved or lightened the prosecution's constitutional duty to prove every element of a criminal offense beyond a reasonable doubt, and thus, violated due process. (442 U.S. at pp. 520-521.) The court reasoned that the challenged instruction was constitutionally infirm because the jury, so instructed, " . . . could reasonably have concluded that they were directed to find against the defendant on the element of intent." (*Id.* at p. 523.) Therefore, the state was not forced to prove every fact necessary to constitute the crime beyond a reasonable doubt. (*Ibid.*)

Paige cites *Sandstrom* and *Winship* in arguing that the portion of CALJIC No. 3.02 which provides that an aider and abettor " 'is also liable for the natural and probable or reasonable consequences of any act that he knowingly aided or encouraged' " is constitutionally infirm because it allowed the jury to find appellant guilty of murder and attempted murder without finding all of the elements necessary for a conviction. While Paige concedes the error which flows from the giving of CALJIC No. 3.02 is not identical to a conclusive presumption or one which places the burden of persuasion on the defendant (cf. *Connecticut* v. *Johnson* (1983) 460 U.S. 73, 78-79), he argues it is just as effective—if not more effective—in removing the issue of the aider and abettor's intent from the jury's consideration. Paige claims that by not requiring the jury to find an aider and abettor shared the same criminal intent as the perpetrator, including malice aforethought, an essential element of aiding and abetting was removed from their consideration in assigning liability for second degree murder and attempted murder, thereby violating his due process rights.

Paige's contention that CALJIC No. 3.02 violates the principles of *Sandstrom* is unfounded in light of *People v. Luparello* (1986) 187 Cal.App.3d 410. In *Luparello* the court resolved the question of whether *Sandstrom* requires reversal of a criminal conviction based on an aiding and abetting theory of liability because the theory works to "presume conclusively the accomplice shares the perpetrator's intent . . . ." (*Id.* at p. 438.) The court rejected this argument, reasoning that the aiding and abetting instruction did not present the equivalent of the flawed presumption in *Sandstrom*. The court explained: "Luparello errs when he concludes the perpetrator and accomplice must 'share' an identical intent to be found criminally responsible for the same crime. Technically, only the perpetrator can (and must) manifest the mens rea of the crime committed." (*Id.* at p. 439.) The court then reviewed the law of aiding and abetting and emphasized the criminal intent required to convict a criminal accused as an aider and abettor is the intent "to commit the offense or to encourage or facilitate its commission . . . . Liability is extended to reach the actual, rather than the planned or 'intended' crime, committed on the policy conspirators and aiders and abettors should be responsible for the criminal harms they have naturally, probably and foreseeably put in motion." (*Ibid.*)

In essence, the *Luparello* court found that California's aiding and abetting doctrine contained no mandatory presumption which might possibly run afoul of *Sandstrom*. We agree with this reasoning. Mandatory presumptions require the factfinder to infer presumed facts if the state proves certain predicate facts, and thus relieves the prosecutor of its constitutional burden of proof on an element of the offense. (See *Francis v. Franklin* (1985) 471 U.S. 307, 314.) California's aiding and abetting doctrine does not create a mandatory presumption because it does not have the effect of relieving the prosecution of the burden of proof on the critical question of the state of mind required to convict the defendant of aiding and abetting.

26

Despite Paige's argument to the contrary, it is not necessary that an aider and abettor harbor the identical state of mind as the perpetrator in order to be convicted of second degree murder or attempted murder. While the intent of an aider and abettor of a specific intent crime has been sometimes characterized as "sharing" the specific intent of the perpetrator, our Supreme Court has made it clear there are important distinctions. "When the definition of the offense includes the intent to do some act or achieve some consequence beyond the *actus reus* of the crime [citation], the aider and abettor must share the specific intent of the perpetrator. By 'share' we mean neither that the aider and abettor must be prepared to commit the offense by his or her own act should the perpetrator fail to do so, nor that the aider and abettor must seek to share the fruits of the crime. [Citation.] Rather, an aider and abettor will 'share' the perpetrator's specific intent when he or she knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime. [Citations.]" (*People* v. *Beeman, supra,* 35 Cal.3d at p. 560.)

The Supreme Court has carefully distinguished the intent element of a particular specific intent crime from the intent component of an aiding and abetting theory of criminal liability under *Beeman.* (*People* v. *Beeman, supra,* 35 Cal.3d at p. 560.) Thus, for example, in *People* v. *Croy* (1985) 41 Cal.3d 1, the Supreme Court explained that where a defendant is charged as an aider and abettor "*[i]t is the intent to encourage and bring about conduct that is criminal, not the specific intent that is an element of the target offense, which Beeman holds must be found by the jury.* [Citation.]" (*Id.* at p. 12, fn. 5, italics added.)

Therefore, proof of malice aforethought was necessary to the conviction of Nelson as the shooter in Landry's murder and the attempt to murder Shavon P. But the specific intent required for the commission of these target crimes by the perpetrator need not have been formed by Paige in order for him to be convicted as an aider and abettor. Instead, CALJIC No. 3.01, which must be given sua sponte in every case in which the defendant

27

is prosecuted as an aider and abettor, properly told the jury that in order to find Paige guilty as an aider and abettor the jury must find he acted "[w]ith knowledge of the unlawful purpose of the perpetrator" with "the intent or purpose of committing or encouraging or facilitating the commission of the crime." Nowhere in the instruction is the jury told it may "presume" the prosecution has proved an aider and abettor has harbored the requisite intent without actual proof of that element. Thus, unlike the abbreviated charge on intent in *Sandstrom*, the instruction here did not either create a presumption of fact or remove the issue of intent from the jury's consideration. Therefore, we agree with *Luparello*'s conclusion that California's aiding and abetting theory comports with the requirements of the due process clause.

## G.  *Reasonable Doubt Instruction*

Each appellant claims the court erred in instructing the jury on reasonable doubt when it instructed the jury in the language of the new version of CALJIC No. 2.90, which omits the words "and depending on moral evidence" and "to a moral certainty" from the instruction on reasonable doubt.

The United States Supreme Court upheld California's reasonable doubt instruction, CALJIC No. 2.90, in *Victor* v. *Nebraska* (1994) 511 U.S. 1). However, *Victor* criticized the use of the phrase "moral certainty" in the instruction. (*Id.* at p. 16.) Subsequently, the California Supreme Court said in *People* v. *Freeman* (1994) 8 Cal.4th 450, that "trial courts might, in the future, safely delete the following phrases in the standard instruction: 'and depending on moral evidence,' and 'to a moral certainty.' Making these changes, and no others, would both avoid the perils that have caused appellate courts to caution trial courts against modifying the standard instruction, and satisfy the concerns the high court has expressed regarding that instruction." (*Id.* at p. 504, fn. omitted.) CALJIC No. 2.90, the standard reasonable doubt instruction, has since been revised as suggested in *Freeman* (6th ed. 1996), as has the definition of reasonable doubt in Penal Code section 1096. (See *People* v. *Ray* (1996) 13 Cal.4th 313, 347, fn. 17.)

In the present case, the court instructed the jury precisely as *Freeman* proposed. Appellants claim this was unconstitutional because the revised instruction, permitting a jury verdict based on "an abiding conviction of the truth of the charge" is insufficient to convey the degree of certainty required for proof beyond a reasonable doubt. They characterize the *Freeman* pronouncements on revision of CALJIC No. 2.90 as dicta.

However, it is well settled that "dicta of our Supreme Court are highly persuasive." (*Evans* v. *City of Bakersfield* (1994) 22 Cal.App.4th 321, 328.) In *Freeman*, our Supreme Court took great care in suggesting changes to CALJIC No. 2.90 that would shore up its constitutionality, and concluded that these changes, while not required, were "permissible." (*People* v. *Freeman, supra,* 8 Cal.4th at p. 504.) If there is to be any retreat from *Freeman*, it should come from the California Supreme Court, not us. We conclude, based on the "highly persuasive" pronouncements in *Freeman*, that the instruction given here satisfies constitutional concerns. (Accord, *People* v. *Light* (1996) 44 Cal.App.4th 879, 888-889.)

## IV.

### DISPOSITION

The judgments are affirmed.

First Appellate District, Division Two, No. A077240
S069474

IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE, Respondent

v.

JAMAINE VERNON PAIGE Et Al., Appellants

SUPREME COURT
FILED

JUN 1 0 1998

Robert Wangruff Clerk

DEPUTY

Appellants' petitions for review DENIED.



GEORGE

Chief Justice



# Supreme Court of California



JOHN C. ROSSI
ASSISTANT CLERK-ADMINISTRATOR

SAN FRANCISCO

——

ROBERT D. BARROW
CHIEF DEPUTY

LOS ANGELES

——

BRIAN CLEARWATER
CALENDAR COORDINATOR

SAN FRANCISCO

**ROBERT F. WANDRUFF**
COURT ADMINISTRATOR AND
CLERK OF THE SUPREME COURT

☐ SAN FRANCISCO  94107
SOUTH TOWER, EIGHTH FLOOR
303 SECOND STREET
(415) 396-9400

——

☐ LOS ANGELES  90013
RONALD REAGAN BUILDING
300 SOUTH SPRING STREET
(213) 897-5158

——

☐ SACRAMENTO  95814
100 LIBRARY AND COURTS BUILDING
(916) 322-5957

July 20, 1998


Jamaine Paige, K-39043
P. O. Box 290066
Represa, CA  95671


Re:    S069474 - People v. Paige, et al.


Dear Sir:

No action may be taken on your Petition for Reconsideration, received today.  The order of this Court filed June 10, 1998, denying the petitions for review in the above-referenced case, was final forthwith and may not be reconsidered.  Please rest assured, however, that the entire court considered the petitions and the contentions made therein and that the denial expresses the court's decision in this matter.

Very truly yours,

ROBERT F. WANDRUFF
Court Administrator and
Clerk of the Supreme Court

By:  John C. Rossi
Assistant Clerk-Administrator

(31)

FILED

2002 JAN 11  PM 4: 51

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JAMAINE PAIGE,

         Petitioner,

    v.

CAL TERHUNE,

         Respondent.

No. C 99-2870 MJJ (pr)

**ORDER AMENDING JANUARY 3, 2002, ORDER**

    The name of the January 3, 2002, Order in this matter, is hereby AMENDED, nunc pro tunc, to read: "Order Denying Petition for a Writ of Habeas Corpus."

    IT IS SO ORDERED.

DATED: 1/10/2002

MARTIN J. JENKINS
United States District Judge

(32)

**FILED**

UNITED STATES COURT OF APPEALS

JUN 1 3 2002

FOR THE NINTH CIRCUIT

CATHY A. CATTERSON
CLERK, U.S. COURT OF APPEALS

| | |
|---|---|
| JAMAINE PAIGE, | No. 02-15616 |
| Petitioner - Appellant, | D.C. No. CV-99-02870-MJJ Northern District of California, San Francisco |
| v. | |
| CAL TERHUNE, Director, | ORDER |
| Respondent - Appellee. | |

Before: RYMER and T.G. NELSON, Circuit Judges

The request for a certificate of appealability is denied because petitioner

failed to file a timely notice of appeal. *See* 28 U.S.C. § 2253(c)(2); Fed. R. Civ. P.

4(a).

No motions for reconsideration, modification, or clarification of this order

shall be filed or entertained.

S:\RESEARCH\COA's\Orders\GJ\0215616.wpd

(33)

FILED

JAN 1 8 2000

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JAMAINE PAIGE,

        Petitioner,

    v.

CAL TERHUNE,

        Respondent.

No. C 99-2870 MJJ (pr)

ORDER

In an order filed December 20, 1999, the court granted respondent's motion to dismiss the habeas petition on the ground that state judicial remedies had not been exhausted as to two of the claims in the petition. The court permitted petitioner to choose whether to dismiss the unexhausted claims and proceed with the exhausted claims or return to state court to exhaust the unexhausted claims. Petitioner then filed a "Notice of Election," in which he informed the court that he chose to dismiss the two unexhausted claims. Accordingly, Claim #3 and Claim #4 are dismissed from this action.

With the dismissal of Claim #3 and Claim #4, the only claims remaining for consideration on the merits are petitioner's claims that his due process and fair trial rights were violated because the testimony of an accomplice was not adequately corroborated and the evidence (excluding that uncorroborated testimony) was insufficient to support the verdict (Claim #1), and his due process and fair trial rights were violated by the jury instructions given at his trial in that the court failed to instruct the jury on assault with a deadly weapon as a lesser offense to attempted murder (Claim #2). In order to move this case toward resolution, the court sets the following new briefing schedule on petitioner's

(34)

remaining claims:

1.     Respondent shall file and serve upon petitioner, on or before **February 25, 2000**, an answer conforming in all respects to Rule 5 of the Rules Governing Section 2254 Cases, showing cause why a writ of habeas corpus should not be issued. Respondent shall file with the answer a copy of all portions of the state trial record that have been previously transcribed and that are relevant to a determination of the issues presented by the petition.

2.     If petitioner wishes to respond to the answer, he shall do so by filing a traverse with the Court and serving it on respondent on or before **March 24, 2000**.

IT IS SO ORDERED.

DATED: January _18_, 2000

Martin J. Jenkins
United States District Judge

2   (35)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FILED

OCT 6  1999

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JAMAINE PAIGE,

            Petitioner,

    v.

CAL TERHUNE,

            Respondent.

No. C 99-2870 MJJ (pr)

**ORDER TO SHOW CAUSE**

### INTRODUCTION

    Jamaine Paige, a California prisoner incarcerated at the California State Prison in Represa, California, has filed a pro se petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. His petition is now before the court for review pursuant to 28 U.S.C. § 2243 and Rule 4 of the Rules Governing Section 2254 Cases.

### BACKGROUND

    Paige alleges that he was convicted in Alameda County Superior Court in 1996 of second degree murder and two counts of attempted murder. He was sentenced to a term of 15 years to life in prison. His conviction was affirmed and his petition for review was denied. Paige apparently did not file any state habeas petition. Instead, he filed a petition for writ of habeas corpus in this court.

United States District Court
For the Northern District of California

# DISCUSSION

A.    Standard of Review

    This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A district court shall "award the writ or issue an order directing the respondent to show cause why the writ should not be granted, unless it appears from the application that the applicant or person detained is not entitled thereto." 28 U.S.C. § 2243. Summary dismissal is appropriate only where the allegations in the petition are vague or conclusory, palpably incredible, or patently frivolous or false. See Hendricks v. Vasquez, 908 F.2d 490, 491 (9th Cir. 1990).

B.    Legal Claims

    1.    Insufficiency Of The Evidence Without Accomplice Testimony

    Paige claims that his due process and fair trial rights were violated because the testimony of an accomplice was not adequately corroborated and the evidence (excluding that uncorroborated testimony) was insufficient to support the verdict. See In re Winship, 397 U.S. 358, 365 (1970) (Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged"). This claim faces a problem in that under federal law, the "uncorroborated testimony of an accomplice is sufficient to sustain a conviction unless it is incredible or insubstantial on its face." United States v. Necoechea, 986 F.2d 1273, 1282 (9th Cir. 1993); see United States v. Lai, 944 F.2d 1434, 1440 (9th Cir. 1991); Castellon v. Whitley, 739 F. Supp. 526, 531 (D. Nev. 1990) ("federal constitutional law does not require the testimony of an accomplice be corroborated"), aff'd 976 F.2d 736 (9th Cir. 1992). Dismissal is not appropriate at this stage because there is not enough in the record today for the court to determine that the accomplice's testimony was incredible or insubstantial. The claim warrants a response from respondent.

2. Jury Instruction Errors (Claims 2, 3 and 4)

In Paige's second, third and fourth claims, he contends that his due process and fair trial rights were violated by the jury instructions given at his trial. He contends the court failed to instruct the jury on assault with a deadly weapon as a lesser offense to attempted murder (Claim #2), the court gave faulty aiding and abetting instructions (Claim #3), and the court gave instructions that permitted the jury to convict him of second degree murder without proof of malice aforethought (Claim #4). Liberally construed, Paige's claims of jury instruction errors are cognizable in a federal habeas action and warrant a response. See Estelle v. McGuire, 502 U.S. 62, 72 (1991) (habeas relief available if petitioner shows that the ailing instruction by itself so infects the entire trial that the resulting conviction violates due process); Dunckhurst v. Deeds, 859 F.2d 110, 114 (9th Cir. 1988) (habeas relief available if refusal to give instruction so infects the trial that the defendant is deprived of the fair trial guaranteed by the Due Process Clause of the Fourteenth Amendment).

3. Jury Instruction Error - Reasonable Doubt Instruction

Paige's fifth claim is that his right to due process was violated by the reasonable doubt instruction given at his trial (i.e, CALJIC 2.90, as modified in 1994).

Due process requires that the trial court instruct the jury on the necessity that the defendant's guilty be proven beyond a reasonable doubt. See Victor v. Nebraska, 511 U.S. 1, 5 (1994). The Constitution does not, however, prohibit trial courts from defining reasonable doubt or require them to do so as a matter of course. See id. Taken as a whole, the instructions must correctly convey the concept of reasonable doubt to the jury. See id. The proper inquiry is "whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the Winship standard." See id. at 6 (citing In re Winship, 397 U.S. 358 (1970) (Due Process Clause of the Fourteenth Amendment requires that the government must prove beyond a reasonable doubt every element of a charged offense)).

Prior to 1994, CALJIC 2.90 mirrored the language of California Penal Code 1096 in describing the state of mind the jurors should be in when deciding to acquit, specifically, "in

3

United States District Court
For the Northern District of California

1  the condition that they cannot say they feel an abiding conviction, to a moral certainty, of the

2  truth of the charge." The 1994 modification eliminated the phrase, "to a moral certainty".

3  See CALJIC 2.90. This modification, Paige claims, left the instruction without any reference

4  to the degree of certainty which the evidence must establish. The purpose of the 1994

5  modification to CALJIC 2.90, however, was to clarify the instruction to the jury. Cf. People

6  v. Freeman, 8 Cal. 4th 450, 504 (Cal. 1994); CALJIC 2.90 use note. Not only has the U.S.

7  Supreme Court criticized the use of 'moral certainty' when instructing on reasonable doubt,

8  it also has approved the use of 'abiding conviction' (which remains in the instructions),

9  without any qualifying term. See Victor, 511 U.S. at 7-17. "An instruction cast in terms of

10  an abiding conviction as to guilt, without reference to moral certainty, correctly states the

11  government's burden of proof." Id. at 14-15 (citing Hopt v. Utah, 120 U.S. 430, 439) ("The

12  word 'abiding' here has the signification of settled and fixed, a conviction which may follow

13  a careful examination and comparison of the whole evidence"). Furthermore, the

14  constitutionality of a jury instruction on reasonable doubt is measured by looking at the

15  instruction in its entirety. There is no specific language that must be used to make the

16  instruction valid. The revised language of CALJIC 2.90 is not so vague as to create a

17  constitutional violation. The post-Victor version of CALJIC 2.90 -- the version given at

18  Paige's trial -- was upheld in Lisenbee v. Henry, 166 F.3d 997, 999-1000 (9th Cir. 1999) (use

19  of term "abiding conviction" in defining reasonable doubt is constitutionally sound). The

20  Lisenbee decision dictates the result here: the claim must be dismissed because the

21  reasonable doubt instruction given at Paige's trial did not violate due process.

## CONCLUSION

23    For the foregoing reasons,

24    1.    The claim concerning the reasonable doubt instruction is dismissed without

25  leave to amend. All the other claims in the petition warrant a response from respondent.

26    2.    The clerk shall serve by certified mail a copy of this Order, the petition and all

27  attachments thereto upon respondent and respondent's attorney, the Attorney General of the

28  State of California. The clerk also shall serve a copy of this Order on petitioner.

3.      Respondent shall file and serve upon petitioner, on or before

December 14, 1999, an answer conforming in all respects to Rule 5 of the Rules Governing

Section 2254 Cases, showing cause why a writ of habeas corpus should not be issued.

Respondent shall file with the answer a copy of all portions of the state trial record that have

been previously transcribed and that are relevant to a determination of the issues presented

by the petition.

4.      If petitioner wishes to respond to the answer, he shall do so by filing a traverse

with the Court and serving it on respondent on or before **January 14, 2000**.

IT IS SO ORDERED.

DATED:  October 6, 1999

Martin J. Jenkins
United States District Judge

United States District Court
For the Northern District of California

5      (40)

FILED

NOV 18 1999

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

No. C 99-2870 MJJ (pr)

JAMAINE PAIGE,

           Petitioner,

**ORDER**

      v.

CAL TERHUNE,

           Respondent.

      Respondent has filed a motion for extension of time, requesting that his deadline to file an answer to the order to show cause be extended until thirty days after the court rules on respondent's recently filed motion to dismiss the petition for writ of habeas corpus. Upon due consideration of the motion and accompanying declaration of counsel, the court GRANTS the request for an extension of time. The court now sets the following briefing schedule on respondent's motion to dismiss:

      Petitioner shall file and serve his opposition to the motion to dismiss no later than **December 30, 1999.** Respondent shall file and serve his reply, if any, no later than **January 20, 2000.** The motion will be submitted on the papers and no oral argument will be held. If the court grants the motion to dismiss, it will then set the briefing schedule for the filing of the answer to the order to show cause and the traverse.

      IT IS SO ORDERED.

DATED: November 18, 1999

                                   Martin J. Jenkins
                                   United States District Judge

(41)

United States District Court
For the Northern District of California

FILED

DEC 2 0 1999

MICHAEL W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JAMAINE PAIGE,

        Petitioner,

    v.

CAL TERHUNE,

        Respondent.

No. C 99-2870 MJJ (pr)

**ORDER GRANTING MOTION TO
DISMISS AND REQUIRING
ELECTION BY PETITIONER**

## INTRODUCTION

    Jamaine Paige, a California prisoner now incarcerated at High Desert State Prison, filed a pro se petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Respondent moved to dismiss on the ground that state judicial remedies had not been exhausted as to several of the claims in the petition. For the reasons discussed below, the court will grant the motion to dismiss, but will permit Paige to choose whether to drop the unexhausted claims or to return to state court to exhaust those claims.

## BACKGROUND

    Paige states in his petition that he was convicted in Alameda County Superior Court in 1996 of second degree murder and two counts of attempted murder. He was sentenced to a term of 15 years to life in prison. His conviction was affirmed and his petition for review was denied. Paige apparently did not file a habeas petition in state court.

    Paige filed a petition for writ of habeas corpus in this court. The court reviewed the petition and found that four of Paige's claims were cognizable: Paige's rights to due process and fair trial rights were violated because the testimony of an accomplice was not adequately

(42)

United States District Court
For the Northern District of California

1   corroborated and the evidence (excluding that uncorroborated testimony) was insufficient to

2   support the verdict (Claim 1); Paige's due process and fair trial rights were violated by the

3   jury instructions given at his trial in that the court failed to instruct the jury on assault with a

4   deadly weapon as a lesser offense to attempted murder (Claim #2), the court gave faulty

5   aiding and abetting instructions (Claim #3), and the court gave instructions that permitted the

6   jury to convict him of second degree murder without proof of malice aforethought (Claim

7   #4). (See October 6, 1999 Order To Show Cause, pp. 2-3.) Paige's fifth claim -- that his

8   right to due process was violated by the reasonable doubt instruction given at his trial -- was

9   dismissed.

10      Defendant then filed a motion to dismiss in which he contended that Claim 3 and

11  Claim 4 had not been exhausted in state court. Paige filed an opposition to the motion to

12  dismiss.

## DISCUSSION

13

14      Prisoners in state custody who wish to challenge collaterally in federal habeas

15  proceedings either the fact or length of their confinement are first required to exhaust state

16  judicial remedies, either on direct appeal or through collateral proceedings, by presenting the

17  highest state court available with a fair opportunity to rule on the merits of each and every

18  claim they seek to raise in federal court. See 28 U.S.C. § 2254(b),(c); Rose v. Lundy, 455

19  U.S. 509, 515-16 (1982); Duckworth v. Serrano, 454 U.S. 1, 3 (1981). The exhaustion-of-

20  state-remedies doctrine reflects a policy of federal-state comity to give the state "the initial

21  'opportunity to pass upon and correct alleged violations of its prisoners' federal rights.'"

22  Picard v. Connor, 404 U.S. 270, 275 (1971) (citations omitted). A federal district court must

23  dismiss a habeas petition containing any claim as to which state remedies have not been

24  exhausted. See Rose v. Lundy, 455 U.S. at 522.

25      Respondent contends that state judicial remedies have not been exhausted as to

26  Claims 3 and 4 in Paige's petition. After careful comparison of Paige's federal petition with

27

28

2   (43)

1  his petition for review to determine whether these claims are exhausted, the court concludes

2  that Claims 3 and 4 are not exhausted. Paige's petition contains both exhausted claims and

3  unexhausted claims. It is a mixed petition. Paige cannot go forward in federal court with a

4  mixed petition.

5       Due to a critical one-year statute of limitations on the filing of federal habeas

6  petitions, see 28 U.S.C. § 2244(d), the court is reluctant to dismiss the mixed petition (and

7  possibly cause a later-filed petition to be time-barred) without giving Paige the opportunity to

8  elect whether to proceed with exhausted claims or attempt to go back to state court to exhaust

9  the unexhausted claims. Accordingly, before this action will be dismissed, Paige will be

10  given an opportunity to choose whether he wants to (1) dismiss the unexhausted claims and

11  go forward in this action with only the exhausted claims, or (2) terminate this action and

12  return to state court to exhaust all claims before filing a new federal petition presenting all of

13  his claims. Paige is cautioned that if he proceeds only with his exhausted claims, he may

14  face dismissal of any subsequent petition. See 28 U.S.C. § 2244(b).

## CONCLUSION

16       For the foregoing reasons, respondent's motion to dismiss is GRANTED. Paige must

17  serve and file no later than **January 28, 2000** a notice in which he states whether he elects to

18  (1) dismiss the unexhausted claims and go forward in this action with only the remaining

19  claims, or (2) terminate this action and return to state court to exhaust all of his claims before

20  returning to federal court to present all of his claims in a new petition. If Paige fails to timely

21  make an election, this action will be dismissed without prejudice to his filing a new habeas

22  action containing only exhausted claims.

23       Paige's in forma pauperis application is GRANTED.

24       IT IS SO ORDERED.

25  DATED: 12/10/99

26                                Martin J. Jenkins
                                 United States District Judge

27

28                                3      (44)

United States District Court
For the Northern District of California

S151137

# IN THE SUPREME COURT OF CALIFORNIA

### En Banc

---

In re JAMAINE PAIGE on Habeas Corpus

---

The petition for writ of habeas corpus is denied. (See *In re Robbins* (1998) 18 Cal.4th 770, 780; *In re Swain* (1949) 34 Cal.2d 300, 304; *People v. Duvall* (1995) 9 Cal.4th 464, 474.)

SUPREME COURT
FILED

AUG 1 5 2007

Frederick K. Ohlrich Clerk

_____
Deputy

GEORGE
_____
Chief Justice

3    3 ע

EXHIBIT COVER PAGE

EXHIBITS A

DESCRIPTION OF THIS EXHIBIT: _____
Supporting Documents To State Habeas Corpus

JURISDICTION: STATE SUPREME COURT

NUMER OF PAGES TO THIS EXHIBIT:    Pages ___

_____ °

IN Re: Jamaine Paige, On Habeas Corpus

(46)

# EXHIBIT
# 3 - B

1        And could anyone fail to notice, isn't it odd that

2   not a single one of them, not a single one of them wanted to

3   come into this court and tell you what happened?

4        None of them wanted to come and testify.  Isn't that

5   odd?

6        The defense lawyers have no problem standing up with

7   straight faces and tone of great moral indignation, claiming

8   Kevin was untrustworthy, but what about a girl, 16-year-old

9   pregnant kid who walks into court and refuses even to take

10  the oath and be seated in the witness stand?  What about

11  that?

12       Remember when Miesha Singleton did that?

13       Now, that inspires real trust and confidence, doesn't

14  it?

15       What was Miesha Singleton so afraid of?

16       Why did she have to be forced and dragged kicking and

17  screaming on to the stand?

18       And Shavon, who was shot nine times, do you remember

19  what happened to her right after the murder?

20       Her mother moved her out of town and refused to give

21  the homicide investigator her name and address.  She was

22  hidden away from the homicide investigator because her mother

23  didn't want her to talk to them because her mother didn't

24  want her involved in the investigation because her mother

25  didn't want Shavon to help find the guys who had done this

26  because she didn't want her daughter to identify anybody.

27       And Shavon's mother only brought her in months later

28  so that they could apply for state victim of crime funds and

1  only at a time when mama could be sure that Shavon absolutely

2  would not identify anybody.

3      Now, after hearing Shavon's testimony, one would

4  conclude -- it's possible one might conclude that after

5  having been hurt so very badly and after having gone through

6  the hell that she went through, that not being able to even

7  say how many times you were shot until you woke up the next

8  day in the hospital, much less ID anybody, maybe she just

9  couldn't ID anybody.  One could conclude that if one wanted

10  to, or you could conclude a bit more realistically based on

11  all the circumstances, based of Shavon Pannell-Andrews'

12  behavior that she is scared, that she's scared out of her

13  wits, and she doesn't want to testify against these

14  defendants.

15      So no, there was absolutely no way.  This is no way

16  that you can conclude after hearing everything about Shavon

17  Pannell-Andrews and her history with the case and her

18  experiences.

19      Shavon testified -- Shavon testified here in court

20  that when she was brought in back in April or May of '96 to

21  testify at the preliminary hearing that she tried to refuse

22  to testify at the preliminary hearing, that she demanded a

23  lawyer.  She didn't want to be involved.  She testified that

24  she told the district attorney in municipal court that she

25  saw the faces of the men who shot her but then said when she

26  looked at the pictures she was just picking out people to get

27  everybody off her back.  And she came into court, and she

28  recanted her identification and said she was just picking

1   people to get people off her case, so people would stop

2   pestering her.

3           But, again, isn't it interesting that when Shavon was

4   shown those photos, she picked out three guys.  She didn't

5   pick out one guy.  She didn't pick out two guys, not four

6   guys.  It was three.

7           Maybe she was just picking blindly to get the DA and

8   the inspector off her case, but it was very, very, very

9   interesting that she picked out Kevin Banks and then picked

10  out two of the duds in the lineup, the fillers, the guys

11  whose pictures are just in there to round out the lineup.

12          At the time she was shown the lineups, she was under

13  sentence, had been removed from juvenile hall in Sacramento

14  to come testify in Oakland, and she knew she was here to

15  testify at the case of Paige and Nelson.

16          MR. MINTZ:  Objection.  There's no evidence to that

17  effect.  I ask the comment be stricken, Your Honor.

18          MR. COLE:  I join the objection.

19          THE COURT:  Again, Ladies and Gentlemen, you will

20  decide what the facts are from what you heard.  The

21  statements of the attorneys is not evidence.  And if that

22  statement is inconsistent with the evidence, you're to

23  disregard it.

24          Go ahead.

25          MS. DANZIG:  She knew why she was in Oakland, so who

26  doesn't she pick?  Who doesn't she pick?

27          It's safe to pick out Kevin Banks.  She never has to

28  face off with him in court.  She can't hurt him, and she

(254)

1  doesn't care if she picks him or not.

2      MR. COLE:  Objection.  No evidence in the record of

3  that.

4      THE COURT:  No.

5      Proceed.

6      MS. DANZIG:  Of course, she's not going to pick out

7  their photos, no way.  After all that she has been through,

8  there is absolutely no question she's not going to come into

9  this court and face off with those defendants and identify

10  them.  That isn't going to happen here because, remember,

11  Shavon, after her miraculous recovery, after all that she

12  went through, all the hell that she survived, what is she

13  going to do?

14      She is going to go right back out to the streets to

15  lead the same kind of life she was living before.  That's

16  perfectly obvious.

17      She was arrested in Sacramento passing bad checks,

18  and that's how she was obtained and sent back to Oakland to

19  testify here.

20      And she can't go back out to the streets, she can't

21  afford to go back out to the streets with a reputation as a

22  snitch, branded as a snitch, as bizarre as that may seem to

23  us, as bizarre and nonsensical.  If Shavon tells on the guys

24  who did this, she'd be viewed as a snitch.

25      She has the biggest motive to lie of anybody who's

26  testified in this courtroom, of all the witnesses in the

27  case, because she's been on the receiving end of this, and

28  she knows what it's all about.

(255)

# EXHIBIT 3 - C

1       Why on earth, why on earth would one of these

2  defendants --

3       Do you remember what she testified to, that one of

4  these defendants when she got up at 4:00 in the morning to

5  give the baby a bottle, that one of the defendants was in the

6  bathroom cutting his hair with clippers, that somebody was in

7  the bathroom cutting his hair with a pair a clippers?

8       Do you remember when she testified to that?

9       Who cuts their hair in the middle of the night at

10  4:00 o'clock in the morning?

11       Why?

12       Who was so highly motivated to alter his appearance

13  that he couldn't wait until daylight hours to give himself a

14  haircut?

15       By the way, did you notice -- did you notice that

16  when Miesha Singleton was done testifying, did you notice

17  that she stayed in the courtroom right in front of us?

18       Where did she go?

19       Did she walk out of the courtroom because she's a

20  disinterested witness in the course of the case, because she

21  was just a witness coming in to take an oath?

22       Where did she go?

23       She went down, and she sat right with the defendants'

24  mothers.

25       MR. MINTZ:  Objection.

26       May we approach at sidebar?

27       THE COURT:  Yes.

28       (Off-the-record discussion in chambers between Court

(287)

JAMES LEE, CSR NO. 4820



EXHIBIT

3 - D

1   it up any more than he did, and I'm not going to bother to

2   address all the misstatements of facts here because I have

3   absolutely no doubt that the 12 of you together, working

4   together, have a far better memory of what happened in this

5   courtroom of the testimony that we've heard than any one of

6   the lawyers has all by himself.  I have no doubt about it

7   whatsoever.

8        In fact, Kevin Banks has a better memory of what

9   happened a year and a half ago than Mr. Cole has of what the

10  testimony was in this courtroom last week.

11       By the way, Ladies and Gentlemen, if these defendants

12  were not out killing Sean Landry and attempting to kill

13  Shavon and Cedric and they weren't involved, where were they?

14       Where is the evidence that these defendants were

15  anywhere else on that night?

16       There isn't a shred of evidence which even suggests

17  that anyone other than these defendants killed Sean Landry

18  and tried to kill Shavon and Cedric.  And there isn't a shred

19  of evidence that they were anywhere else that night except

20  out killing Sean Landry and trying to kill Cedric and Shavon.

21       Put yourself in the position of being a defendant,

22  and you can bet that if you had anything to offer by way of

23  evidence that you would offer it.  But you don't have it

24  here.

25       So instead, the defense lawyers ask you to do the

26  next best thing, and that's just simply disregard the

27  evidence that you do have.  Just throw it away.  The defense

28  would very dearly love you to do this.

(289)



EXHIBIT

3 — E

(1) "<u>Coercion</u>" – The Prosecutions material witness, also defined as an Immunity granted accomplice Kevin Banks, testified that prior to his giving statements to Sgt. Madarang, inlight of offenses charged, that Sgt. Madarang, told him that he wanted and/or, needed Banks to tell him the truth, However he furtherly told Banks, that he already knew the truth, being; that Banks was present at the time of the murder, and that Banks witnessed both Petitioner and co-defendant Andre, open fire and shot the victims alleged in the indictment. And moreoverly that if Banks cooperated with Sgt. Madarang, by telling him the truth, like he said he already knew the truth, then Banks would not be charged in so many words.   <u>See in reference</u>; Clerk Transcripts at pp., 101 - 102 - 103 - 104 - 105 - 106 - 107 - 108 - 109 - 110.) enclosed here in as (Exhibit A)

2) "<u>Intimidation</u>" – Banks also testified that Sgt. Madarang, told him that if he failed to cooperate, that Banks <u>would</u> go to jail for 25 to ____ 30 years or whatever, that Banks would never see his baby, that ____ would be an old man, and his baby would be grown.   <u>See in reference</u> ____ Transcripts at pp. ( 101 - 102 - 103.)  Included here in as (Exhibit - A)

3) "<u>Intimidation</u>" – and "<u>Perjury</u>" – Banks testified that Sgt. Madarang, told him that both Petitioner and Andre Nelson had given statements which pointed fingers at Banks, and that since it wasn't looking to good for Banks that he'd advise Banks to tell his side of the story, by defending himself on tape.   <u>See in reference</u>; Clerk Transcripts at pp. ( 120 - 121 - 122 - 123 - 124.)

(261)

4) "Promise Making, and/or, Made a Deal Prior to Trial" — Kevin Banks testified that SGT. Madarang, told him that he would not charge him, and that he would allow Banks to go home, if Banks told him the truth, like he, being SGT. Madarang, said he already knew the truth. See in Reference; Clerks Transcripts at pp; (106-109.) Included here in as Exhibit - A)

─────────────────────────────────

(5) "Knowingly allowed tainted statements and/or, Perjury as Evidence" —
During the 4-24-1996. interview of Kevin Banks, conducted by both SGT. Madarang, and SGT. Clark, SGT. Madarang, inquired whether or not there exsisted a robbery and/or, an intended robbery included in the commission of of offenses charged,. And upon that inquiry, Kevin Banks informed SGT. Madarang, that he had no knowledge of a robbery and/or, an intended robbery, as alleged on the first Taped statement. See in reference; April-24-1996. Taped statement Transcript at pp; ( 16 - 17.    )

─────────────────────────────────

See Contridiction and/or, perjury on second taped statement dated; 4-26-1996. Conducted by SGT. Madarang, and SGT. Clark, when asked a second time about robbery, Kevin Banks, responded by recanting his first sworn taped statement, now alleging that there was infact a lengthy discussion of an intended robbery which was to take place in the commission of offenses charged. See in reference; April-26-1996. Taped statement Transcript at pp; ( 2-3-4-5.)    See also SGT. Madarang's testimony in light of the following; Included here in as Exhibit ( B ) ( RT at pp; 1050-1054-1055, 1058-1059-1060.)

(6)        However, of Course SGT. Madarang, gave testimony at Trial which denied the allegations, alleged against him by the testimony of State's witness Kevin Banks. (see in reference; (Reporter Transcripts at pp. (1031-1032-044, 1050-1051-1052-1053-1054-1055-1056-1057-1058-1059-1060-1061-1062-063-1064.)

7)"Threat and Intimidation" — On or about March 21-1996. I Petitioner, Jama-e Paige, was interrogated by two Oakland Homicide Detectives, inlight of crim-s involving murder, and this interview was conducted by the following Oakland-lice-Officer's — SGT. Jon Madarang, and SGT. Mike Clark, during this interview nong other things I was informed by SGT. Madarang, that if I continuely failed to operate with him inlight of his investigation, due to my respectfully requesting to consult th an Attorney, and thereby exercising my 5TH Amendment Right to remain silent, that would charge me with a (211 at a Bank) and inconjunction to this threat he placed before a photograph revealing the suspect in the commission of this crime, and upon my reviewing is photo I informed SGT. Madarang, that (1) I'm not a Bank robber, and (2) that this was t a photo of myself. SGT. Madarang, then informed me that he also knew, this was not a photo me, but that he would charge me with this (211) inorder to violate my Probation, which uld then permit him enough time to build a solid case on me inlight of his murder inves-gation. (Although to my recollection, the Entire this interview was not also audio recorded respectfully submit as Circumstantial Evidence insupport of my allegation (Exhibits C - D - nd E.     Also included here in is a copy of the Indictment of Offenses Charged nd tried against me listed as (Exhibit - F).

8)        Finally, State's witness, Ms. Shavon Andrews, testified in her encounter's and perception of SGT. Madarang's, rude Conduct regarding the investigation inlight of Offenses Charged.  See in reference; ( Clerk Transcr-ipts at pp. 125-126-127) and (Reporter Transcripts at pp. 321-322.)



STATEMENT
Oakland Police Department    536-200-1 (6/93)    Page 1 of 1    2. Report No.  95-70851
Offense/Crime   187 PC

1. Complainant
Landry, Sean    Sex/Race/DOB    ☒ Complainant  ☐ Suspect  ☐ Driver

3. Name of Person Giving Statement    ☐ Reporting Person  ☒ Witness
Nelson, Cedric    M B 13 Nov 73    City/Zip    Phone

4. Residence Address

5. Employment (Name, Address, Phone, Occupation, Work Hours, Days Off) or Supplemental Information if Unemployed or Transient

6. Statement Taken By    Serial No.    Date    Time Started - Completed
J. Sranchowski    7609P    29 Ju/95    0210-0250

7. Location Where Statement Taken    Names, Addresses of Persons Present During Statement
ACH
AWG 824

FOR VEHICLE COLLISIONS ONLY
8. License No.    State  Veh. Yr.  Make  Model  Type  Color(s)    Driver License No.    State

9. Registered Owner    Address    City/Zip    Residence/Business Phone
( )

ADMONITION: You have the right to remain silent. Anything you say can be used against you in a court of law. You have the right to talk to a lawyer and have him present with you while you are being questioned. If you cannot afford a lawyer, one will be appointed to represent you before any questioning if you wish one.    Subject's Initials

WAIVER:  Do you understand each of these rights I have explained to you? _____
Having these rights in mind, do you wish to talk to us now? _____

Statement:

My name is Cedric Nelson. Friday Night (29 Ju/95) I was driving to the store at 60th and MacArthur with my friends girlfriend Shavon and my friend Shawn. As I got out of the car and two male blacks came running north from the south side of the street. One A M B 21 (short 5', skinny with a light comp, gold tooth mustash and a 1" box cut haircut he wore a blk visor, blk T-Shirt and blk Jeans). (The second was a M B 20's short 5' heavy set wearing dark clothes. The first guy had a large pistol and as they ran at us yelled "break yourself", then started shooting. I think I can identify them, the ones that shot. The light skin guy goes by the name of Andre. I din't see where they went. This is a true statement.
          - Unable to sign due to injury -

(274)

| | RACE B | D.O.B. UNK | 21 | 5'-5" | THIN | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |

CITY [ ] OAKLAND    ZIP    APT. NO.    HOME MSG. PHONE

DDRESS    ( )

DDRESS (Name of Business) (School)    CITY [ ] OAKLAND    ZIP    OCCUPATION    WORK PHONE ( )

NISHMENT: ADMONISHED [ ] YES [ ] NO    REFUSED [ ] YES [ ] NO    STATEMENT [ ] YES [ ] NO    [ ] PROBATION COUNTY _____ Officer _____

[ ] PAROLE    AGENT _____ [ ] PAL

CER/DATE/TIME):

TION PROVIDE BY    CLOTHING, SCARS, MARKS, TATOOS, WORDS USED    All BLK CLOTHING, 1" BOX HAIR CUT

| LENGTH | HAIR STYLE | FACIAL HAIR | COMPLEXION | APPEARANCE | SPEECH | DEMEANOR |
| --- | --- | --- | --- | --- | --- | --- |
| HORT | [✗] NATURAL / AFRO | [ ] NONE | [✗] LIGHT | [ ] CASUAL | [ ] LOW PITCH | [ ] CALM |
| NG (HALF EAR) | [ ] BRAIDED | [ ] BEARD | [ ] MEDIUM | [ ] WELL GROOMED | [ ] HIGH PITCH | [ ] POLITE |
| NG (COVER EAR) | [ ] CREWCUT | [✗] MUSTACHE | [ ] DARK | [ ] UNKEMPT | [ ] SLURRED | [ ] APOLOGETIC |
| LAR | [ ] CURLY | [ ] BEARD & MUSTACHE | [ ] FRECKLED | [ ] RIGHT HANDED | [ ] STUTTER | [ ] NERVOUS |
| OULDER | [ ] PONYTAIL | [ ] GOATEE | [ ] ACNE | [ ] LEFT HANDED | [ ] ACCENT | [ ] PROFESSIONAL |
| NSHAVED | [ ] PUNK | [ ] SIDEBURNS | [ ] POCKMARK | [ ] BIRTHMARK | TYPE ___ | [ ] OFFENSIVE |
| EDING | [ ] CONSERVATIVE | | [ ] BUDDY | [ ] MOLE | [ ] OTHER | [ ] HOSTILE |
| | | | | | | [ ] VIOLENT |

WEAPON USED    [ ] REVOLVER    [✗] SEMI-AUTO PISTOL    [ ] SHOTGUN    [ ] RIFLE

R DISTINCTIVE FEATURES    [ ] BODY ODOR    TYPE ___    CAL. ___ BARREL ___    [ ] SAWED OFF    [ ] NICKEL    [ ] BLUED

LD TOOTH    [ ] MISSING TEETH    [ ] LARGE EYES    [ ] BLUDGEON / CLUB    [ ] HANDS / FEET    [ ] ROCK / BRICK    [ ] CUT / STAB    [ ] VEHICLE

VER TOOTH    [ ] GLASSES    [ ] MISSING LIMBS

RELATIONSHIP TO VICTIM    INCUSTODY THIS OFFENSE [ ] YES [ ] NO    CITE #

| SPECT | Number 2 | LAST, First, Mid. UNK | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |

| EX M | RACE B | D.O.B. | AGE 20's | HEIGHT 5'-5" | WEIGHT | HAIR HVY SET | EYES | DL. NUMBER | PFN |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |

CITY [ ] OAKLAND    ZIP    APT. NO.    HOME MSG. PHONE

ADDRESS    ( )

ADDRESS (Name of Business) (School)    CITY [ ] OAKLAND    ZIP    OCCUPATION    WORK PHONE ( )

ONISHMENT: ADMONISHED [ ] YES [ ] NO    REFUSED [ ] YES [ ] NO    STATEMENT [ ] YES [ ] NO    [ ] PROBATION COUNTY _____ Officer _____

[ ] PAROLE    AGENT _____ [ ] PAL

FFICER/DATE/TIME):

RIPTION PROVIDE BY    CLOTHING, SCARS, MARKS, TATOOS, WORDS USED    All BLK CLOTHING

| R LENGTH | HAIR STYLE | FACIAL HAIR | COMPLEXION | APPEARANCE | SPEECH | DEMEANOR |
| --- | --- | --- | --- | --- | --- | --- |
| HORT | [ ] NATURAL / AFRO | [ ] NONE | [ ] LIGHT | [ ] CASUAL | [ ] LOW PITCH | [ ] CALM |
| ED. (HALF EAR) | [ ] BRAIDED | [ ] BEARD | [ ] MEDIUM | [ ] WELL GROOMED | [ ] HIGH PITCH | [ ] POLITE |
| NG (COVER EAR) | [ ] CREWCUT | [ ] MUSTACHE | [✗] DARK | [ ] UNKEMPT | [ ] SLURRED | [ ] APOLOGETIC |
| OLLAR | [ ] CURLY | [ ] BEARD & MUSTACHE | [ ] FRECKLED | [ ] RIGHT HANDED | [ ] STUTTER | [ ] NERVOUS |
| HOULDER | [ ] PONYTAIL | [ ] GOATEE | [ ] ACNE | [ ] LEFT HANDED | [ ] ACCENT | [ ] PROFESSIONAL |
| ALD/SHAVED | [ ] PUNK | [ ] SIDEBURNS | [ ] POCKMARK | [ ] BIRTHMARK | TYPE ___ | [ ] OFFENSIVE |
| ECEDING | [ ] CONSERVATIVE | | [ ] BUDDY | [ ] MOLE | | [ ] HOSTILE |

WEAPON USED    [ ] REVOLVER    [ ] SEMI-AUTO PISTOL    [ ] SHOTGUN    [ ] RIFLE

HER DISTINCTIVE FEATURES    [ ] BODY ODOR    TYPE ___    CAL. ___ BARREL ___    [ ] SAWED OFF    [ ] NICKEL    [ ] BLUED

OLD TOOTH    [ ] MISSING TEETH    [ ] LARGE EYES    [ ] BLUDGEON / CLUB    [ ] HANDS / FEET    [ ] ROCK / BRICK    [ ] CUT / STAB    [ ] VEHICLE

SILVER TOOTH    [ ] GLASSES    [ ] MISSING LIMBS

| SUSPECT VEHICLE | VEHICLE WAS | | DAMAGE DETAILS, UNIQUE FEATURES | | OTHER DESCRIPTION | |
| --- | --- | --- | --- | --- | --- | --- |
| | [ ] SECURED AT SCENE | [ ] TOW (#) ___ [ ] FINGERPRINTED | | | | |
| | [ ] RELEASED TO OWNER | [ ] HOLD(UNIT) ___ | | | | |

NER    ADDRESS    CITY [ ] OAKLAND    ZIP    PHONE

| ATE/OR PLATE COLORS | YEAR | MAKE | MODEL | STYLE | EXTERIOR COLOR | CONDITION | INTERIOR COLOR | INTERIOR |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | [ ] CLEAN [ ] NEW | | [ ] CLEAN [ ] ODOR |
| | | | | | | [ ] DIRTY [ ] POOR | | [ ] DIRTY [ ] |

| ES | RIMS | LEVEL | ROOF | WINDOWS | SEATS | TRANSMISSION |
| --- | --- | --- | --- | --- | --- | --- |
| STOCK [ ] WIDE | [ ] STOCK [ ] CHROME | [ ] STOCK [ ] LOWERED | [ ] VINYL [ ] LANDAU | [ ] TINTED | [ ] VINYL [ ] BENCH | [ ] AUTOMATIC |
| SMALL [ ] | [ ] MAGS [ ] SPOKE | [ ] RAISED | [ ] CONV | [ ] BROKEN | [ ] CLOTH [ ] BUCKET | [ ] MANUAL |

| | SERIAL # | WATCH | DISTRICT | SUPERVISOR | SERIAL # | |
| --- | --- | --- | --- | --- | --- | --- |
| EPORTED BY | | | 4 | SGT. T HAYTER 7/04P | PAGE 3 OF 9 |

On March 19, 1996 I was advised by Sgt. V. Chan that Paige was identified as a suspect in a 211PC of a bank through bank photos taken at the time of the robbery.

March 21, 1996 I was advised by patrol units that Paige had been arrested on probable cause for murder and robbery. He was taken to Homicide Section for the purposes of interview. After Sgt. Clark and I admonished him he requested a lawyer and the interview was terminated.

March 22, 1996 I located Cedric Nelson (surviving comp) ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Sgt. Clark and I interviewed Nelson at ▮▮▮▮▮▮▮▮▮▮▮▮▮ and we showed him a photo line-up of eight persons which contained photos of both Paige and Banks. C. Nelson positively identified both Paige and Banks as being present at the time of the 187PC and he further identified Paige as one of the actual shooters (he was unsure if Banks had a gun.)



EXHIBIT

3 — F

CAOO109 Oakland Police Department

**CONSOLIDATED ARREST REPORT**

536-252 (7/90)

| | 2. ARREST NO. 7242 | 3. REPORT NO. | 4. BOOKING AGENCY |
|---|---|---|---|
| NT'S TRUE NAME (Leave Blank) | | | |

| | | 17. INCIDENT NO. | CRIME REPT. DETAILED TO: |
|---|---|---|---|
| NTS NAME | 6. PFN | | |

NICKNAME: A'IGE JAMAINO    PFN: AWJ285

| POB | HEIGHT | WEIGHT | HAIR | EYES | RACE | SEX | AGE | 10. JAIL USE |
|---|---|---|---|---|---|---|---|---|
| CA | 5'10 | 210 | BLK | BRO | B | M | 21 | A-3 910 386 |

9. OCCUPATION

RIGHT-INDEX FINGER

13. CHARACTERISTICS

NT'S RESIDENCE ADDRESS: 571 POPLAR Ave    CITY: Oakland    TELEPHONE

NT'S BUSINESS ADDRESS    SCHOOL    TELEPHONE

| 16. LICENSE NO. | 17. SOCIAL SECURITY NO. | 18. DATE ARRESTED 21 MAR 96 | 19. TIME ARRESTED 1510 |
|---|---|---|---|

| SEC. DIV | M/F | COURT | CC | WARRANT NO. | BAIL | CEN | PIN NO. | GII NO. |
|---|---|---|---|---|---|---|---|---|
| PC | F | | 7 | | 0 | | | FBI NO. |
| PC | F | | | | | | | CASH AT BOOKING |

ID CONFIRMED BY

CHECK ☐ PIN ☐ NCIC

CITATION NO.

COURT

| ION OF ARREST: 1535 8th Ave | TOTAL | 22. SUPERVISOR Sgt Neely | SERIAL NO. | COURT |
|---|---|---|---|---|
| STING OFFICER PARKINSON 7753P | SERIAL NO. | ARRESTING OFFICER D. Dornan 7604P | SERIAL NO. | COURT DATE/TIME |
| SPORTING OFFICER | SERIAL NO. | TRANSPORTING OFFICER | SERIAL NO. | HOLD FOR    TOW TAG |

SIGNATURE OF PERSON PRINTED    X    SIGNATURE OF PERSON TAKING PRINTS

| E LICENSE NO. | STATE | YEAR | 26. YEAR | MAKE | MODEL | COLOR | 27. TOWED TO |
|---|---|---|---|---|---|---|---|

HEREBY ARREST THE ABOVE DEFENDANT ON THE CHARGE INDICATED AND REQUEST A PEACE OFFICER TAKE HIM INTO CUSTODY. I WILL APPPEAR
SIGN A COMPLAINT AGAINST THE PERSON I HAVE ARRESTED (SEE REVERSE SIDE FOR INSTRUCTIONS.)

| ATURE OF ARRESTING CITIZEN | 29. ARRESTING CITIZEN'S RES. ADDRESS | 30. RES. PHONE ( ) |
|---|---|---|
| STING CITIZEN'S NAME    SEX—RACE—AGE | 32. ARRESTING CITIZEN'S BUS. ADDRESS | 33. BUS. PHONE ( ) |
| PLAINANT'S NAME    SEX—RACE—AGE | 35. COMPLAINANT'S ADDRESS    CITY | 36. ABC PREMISE INVOLVED |
| EFENDANT    SEX—RACE—AGE | CO-DEFENDANT    SEX—RACE—AGE | CO-DEFENDANT    SEX—RACE—AGE |

| SED A FIREARM OR DEADLY WEAPON | ☒ ARMED WITH A FIREARM | 39. BURGLARY CLASSIFICATION |
|---|---|---|
| USED GREAT BODILY HARM | ☐ ACTED IN CONCERT (261, 286, 288a PC) | |

STRUCTIONS: List charges by name and code section. Document your admonishment of the arrested person. Enter the names and charges of
er arrested persons who are not co-defendants. Enter "En Route (agency)" if appropriate. Indicate if suspect is on parole or probation. Describe
own medical problems. If you are completing an offense or continuation report, DO NOT start the narrative on this sheet. If the suspect is
ested WITHOUT A WARRANT for an offense which occurred in another jurisdiction, identify the agency, the investigator's name, and the report
mber. Enter the reason for physical arrest (misdemeanor only).

urder (187 PC)    Robbery (211 PC) (simulated)

usp ID by wit # other susps as being one of the shooters
t the 187 PC scene at 60 Ave + MacArthur
usp's picture was taken by yous camera as he fled
ank of America after at 211 PC (simulated) camera
as activated by bank clerk that susp tried to
rob

279

OAKLAND-PIEDMONT-EMERYVILLE MUNICIPAL COURT
PROBABLE CAUSE DETERMINATION

408621

| Reference No. 95- 70851 FILED | Complainant LANDAY, SEAN |
| Detainee PAIGE, JAMAINE 96 MAR 22 PH... | BFN AW J 285 CEN |
| Arrest Date/Time 21 MAR 96 1510 | 48-Hr. Expiration Date/Time |

## DECLARATION IN SUPPORT OF ARREST

The undersigned hereby declares:

That I am a Peace Officer for _OAKLAND POLICE DEPT, OAKLAND CA._

That the detainee referenced above was arrested for the crime(s) of

_MURDER 187PC & ROBBERY 211PC_

That the detainee committed said offenses in the manner and by the means set forth and described in
Consolidated Arrest Report No. _1040_ and any attachments thereto, a copy of which
is attached hereto and incorporated by reference herein.

That said document was prepared in the ordinary course of business and pursuant to the sworn duty of the
officer subscribing same, and that I believe the contents thereof to be true.

That this declaration and its attachment(s) provide probable cause to believe that the detainee committed said
offense(s) and therefore support the arrest and detention of said detainee.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed

on _21 MAR 96_ at _OAKLAND_ , Alameda County, California.

Name _SGT M CLARK 72682_ Signature _SGT M CLARK 72682_

## The Following To be Completed at Probable Cause Hearing

### TELEPHONIC DETERMINATION ONLY

On _____,
I was placed under oath by the Honorable

_____
a judicial officer of the County of Alameda. After I
read verbatim the contents of the foregoing, including
the contents of any attached reports or declarations,
the judicial officer advised me that there
___ IS ___ IS NOT
probable cause to detain the above-named individual.

Executed in Alameda County, California on
_____ at _____ hours.

Name _____

Signature _____

Badge No. _____

### PROBABLE CAUSE DETERMINATION

The undersigned judicial officer, based on the
review of this declaration and any attachments hereto,
hereby determines that there

_X_ IS probable cause to detain the
above-named individual.

___ IS NOT probable cause to detain the
above-named individual.

Signed _____

Date _3/22/96_

Time _1535_

(280)

# EXHIBIT

# 3 - 6

12

225

1    Q.   Did he refer to anyone else out of those eight

2  pictures?

3    A.   No.

4    Q.   How long did he look at the line up?

5    A.   Few seconds.

6    Q.   Did he sign the back of Andre Nelson's picture?

7    A.   No.

8    Q.   Did you ask him to?

9    A.   Yes, I did.

10    Q.   What did he say when you asked him to do that?

11    A.   He basically was afraid to sign the photo in fear

12  of any --

13         MR. CIRAOLO:  Objection, nonresponsive.

14         MR. MINTZ:  May the answer go out as being the

15  opinion and conclusion of the witness?

16         THE COURT:  Sustained.  May be.

17         MS. MCINTOSH:

18    Q.   What did he say to you?

19    A.   He said he was afraid to sign the photo.

20    Q.   Did he tell you why he was afraid to sign the

21  photo?

22    A.   Yes.

23    Q.   What did he say?

24    A.   He said that he was afraid of Andre or any of his

25  people hurting him, coming back to hurt him.

26    Q.   Did you have a final meeting with Cedric Nelson?

27    A.   Yes, I did.

28    Q.   When did that take place?

(282)

CECELIA R. PIERCE, CSR 7447

13

226

1    A.    That was March 22 of 1996.

2    Q.    Where did that take place?

3    A.    And that occurred at Santa Rita jail.

4    Q.    Again Sergeant Madarang was with you?

5    A.    Yes.

6    Q.    And during that meeting, did you have occasion to

7    show Cedric Nelson a second photo line up?

8    A.    Yes.

9    Q.    Showing you what has been marked as Defense

10   Exhibit A, do you recognize this photo line up?

11   A.    Yes, I do.

12   Q.    Is this the photo line up that you and Sergeant

13   Madarang showed Cedric Nelson on March 22?

14   A.    Yes, it is.

15   Q.    And in fact is it in the same order as it was on

16   March 22?

17   A.    Yes, it is.

18   Q.    Is it in the same folder?

19   A.    I believe so.  We make up these folders as we go.

20   Q.    Had Cedric Nelson's appearance changed in anyway

21   when you talked to him on March 22?

22   A.    Yes, it had.

23   Q.    Describe that to me?

24   A.    Um, he was wearing a white substance on and about

25   his face.

26   Q.    He was in custody at the time; is that right?

27   A.    Yes, he was.

28   Q.    Did you ask him about this white substance on his

14

227

1   face?

2       A.   Yes, I did.

3       Q.   What did he say?

4       A.   He said that he put this white substance on his

5   face because he was basically afraid of the people that

6   were involved in the shooting.  And also their associates

7   learning who he was and harming him in some way.

8       Q.   When you showed him what has been marked as I

9   believe Defense Exhibit A, did he pick out any photographs?

10      A.   Yes, he did.

11      Q.   How many photographs did he pick out?

12      A.   Two.

13      Q.   Which photographs did he pick out?

14      A.   Number 2 and number 3.

15           THE COURT:  2 and 3?

16           MS. MCINTOSH:  Yes.

17      Q.   And number 2 is a picture of who?

18      A.   Jamaine Paige.

19      Q.   Do you see Mr. Paige here in court today?

20      A.   Yes, I do.

21      Q.   Please identify him by describing what he is

22  wearing, where he is seated, please?

23      A.   Subject at the defendant's table wearing the

24  grayish looking sweater type shirt.

25      Q.   And he also pointed out number 3; is that right?

26      A.   Yes.

27      Q.   Do you know the identity of the person depicted in

28  number 3?

(284)

15
228

1      A.   Yes, um Kevin Banks.

2      Q.   Now after he picked out these two individuals, did

3 he tell you anything about the defendant Jamaine Paige

4 depicted in picture 2?

5      A.   Yes, he did.

6      Q.   What did he say?

7      A.   He had said that Mr. Paige was one of the

8 shooters.

9           THE COURT:  Said what, I didn't hear you?

10          THE WITNESS:  Mr. Paige was one of the shooters.

11          MS. MCINTOSH:

12     Q.   So Mr. Paige was one of the people who shot that

13 night?

14     A.   Yes.

15     Q.   Did he indicate who the Defendant Paige shot that

16 night?

17     A.   No, he did not.

18     Q.   Did he say anything about Mr. Banks depicted in

19 number 3?

20     A.   Yes, he did.

21     Q.   What did he say?

22     A.   He said that Mr. Banks was also present but he did

23 not believe he had a gun.

24          MS. MCINTOSH:  I have no further questions.

25          THE COURT:  All right.  Mr. Mintz.

26               CROSS-EXAMINATION

27     BY MR. MINTZ:

28     Q.   Sergeant Clark, you were the back up on this case;

CECELIA R. PIERCE, CSR 7447

247

1            THE COURT:  Any redirect?

2            REDIRECT EXAMINATION

3        BY MS. MCINTOSH:  Just briefly.

4      Q.   Did you ever specifically ask Cedric Nelson

5  whether he had been in Hayward earlier that evening with

6  Andre?

7      A.   I don't believe so, no.

8      Q.   Did you ever discuss with Cedric Nelson going to

9  Hayward or ever seeing this guy Andre in Hayward at all,

10  did that discussion --

11     A.   No.  Hayward had never come up.

12     Q.   How long did you talk with Cedric Nelson at the

13  hospital?

14     A.   Probably about three, four minutes.

15     Q.   Was it essentially Franckowski's job to get the

16  detailed description of these suspects and what happened?

17     A.   Yes.  I was just trying to get him basically to

18  cooperate.

19     Q.   Now, on March 22 when you showed Cedric Nelson

20  Defense Exhibit A, you were actually present when he

21  identified Jamaine Paige as the shooter and Kevin Banks as

22  being present; is that correct?

23     A.   That's correct.

24     Q.   You testified on direct examination that Cedric

25  Nelson told you he was with Sean and Shavon that night; is

26  that right?

27     A.   That's correct.

28     Q.   And he told you that Shavon was in the right front

237

1   MacArthur was to engage in or be present at a dope

2   transaction?

3       A.   He may have indicated that on the 22 of September

4   that the incident was all over the dope that was being

5   purchased slash sold.   But before then, no.

6       Q.   Okay.   Did Cedric Nelson ever tell you anything or

7   tell anyone in your presence about him seeing Dre or Andre

8   in Hayward at any time?

9       A.   No, he did not mention that.

10      Q.   Did Cedric Nelson ever tell you or anyone in your

11  presence that he had seen or saw Andre or Dre earlier the

12  very same day that the shooting took place?

13      A.   No.

14      Q.   Did Cedric Nelson ever describe to you or describe

15  to anyone in your presence, Dre or Andre, by physical

16  characteristics?

17      A.   He on the 29th he gave me a, I'd say a general

18  description of Andre.

19      Q.   And tell me what that general description was that

20  Cedric Nelson gave you on the 29th?

21      A.   Again he had indicated -- let me refer to my

22  notes.

23      Q.   Sure.

24      A.   He indicated that he was a male black in his late

25  teens early 20's.   5'5", skinny, medium complexion,

26  mustache.   And he indicated that the hairstyle was a flat

27  top fade and he was wearing black clothing.

28      Q.   Did Cedric Nelson ever tell you or tell anyone in

25

238

1    your presence that this person Dre or Andre was wearing a

2    black visor?

3        A.    No.

4        Q.    Did Cedric Nelson ever tell you or tell anyone in

5    your presence that this Dre or Andre had a gold tooth?

6        A.    Other then what was on Franckowski's statement

7    form, no.

8        Q.    Okay.  Well that was on Franckowski's statement

9    form that wasn't stated in your presence?

10       A.    Right.

11       Q.    Okay.  So you read what was on Franckowski's

12   statement form but you never discussed that with Cedric

13   Nelson?

14       A.    No.

15       Q.    All right.  So if it was on Franckowski's

16   statement form you can't personally attest to the fact that

17   indeed Cedric Nelson told Franckowski that; right?

18       A.    That's correct.

19       Q.    Did Cedric Nelson on the 29th of July tell you

20   that there were apparently three people involved and

21   present at the scene?

22       A.    No.

23       Q.    He did tell you that there were apparently two

24   people involved and present at the scene?

25       A.    That's correct.

26       Q.    When was the first time he mentioned any third

27   person?

28       A.    Um I believe that was with my partner Sergeant

(288)

CECELIA R. PIERCE, CSR 7447



CT                                              FILA

JAMAINE  PAIGE                    }    Case No: S 151137
              Petitioner,          }
                                   }
         v.                        }    PROOF OF SERVICE
Scott M. Kernan                    }
                                   }
              Respondent           }

    I the undersigned, here by certify that I am over the age
of eighteen years, and I (am) (am not)    a party to the above
entitled action.

    on  8-8-        , 2008    , I served a copy of:

~~A PETITION FOR WRIT OF HABEAS CORPUS AND THE~~
~~~~ . EXHIBITS & COURT OPINIONS IN SUPPORT OF PETITION

By placing said copy in a postage paid envelope addressed to the
person hereinafter listed, by depositing said envelope in the
United States mail:



1. ~~SUPREME COURT OF CALIFORNIA~~
   ~~~~
   ~~~~

2. OFFICE OF THE CLERK:
   NORTHERN DISTRICT COURT OF CALIFORNIA
   U.S. COURTHOUSE
   450 GOLDEN GATE AVE,
   SanFrancisco, CA 94102-3483

    I declare under the penalty of perjury that the foregoing
is true and correct.

(Signature)_____
                          Declarant

4 ૫

MR. Jamaine Paige, K-39043

H-D-S-P / B-3-145↙

P.O. Box 3030

Susanville, CA 96127

B3

STATE PRISON

OFFICE OF THE CLERK;

U.S. DISTRICT COURT FOR THE

OF CALIFORNIA

U.S. Courthouse 450 Gold

San Francisco, CA 94102-

PRIORITY MAIL
UNITED STATES POSTAL SERVICE®
www.usps.com

Label 107R, February 2006

RECEIVED

AUG 1 8 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALI

RISON

